UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| NELSON J. OBUS, PETER F. BLACK, THOMAS BRADLEY STRICKLAND, | ) ) ) ) |
| Defendants, and | ) ) |
| WYNNEFIELD PARTNERS SMALL CAP VALUE L.P., WYNNEFIELD PARTNERS SMALL CAP VALUE L.P., I WYNNEFIELD PARTNERS SMALL CAP VALUE OFFSHORE FUND, LTD., | ) ) ) ) ) ) ) |
| Relief Defendants. | ) ) |

JUDGE DANIELS

06 CV 3150

Civil No.

RECEIVED
APR 2 5 2006
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff the United States Securities and Exchange Commission ("Commission")

alleges as follows:

### SUMMARY

1.      This is an insider trading case.  Prior to the June 19, 2001, announcement

of a merger agreement between SunSource, Inc. ("SunSource") and Allied Capital

Corporation ("Allied"), defendant Nelson J. Obus ("Obus") directed the purchase of

287,200 shares of SunSource common stock based on a tip that he had received from

defendant Peter F. Black ("Black").  Black, an employee in one of Obus's investment

management firms, tipped Obus after receiving a tip from his close friend defendant

Thomas Bradley Strickland ("Strickland").  At the time, Strickand was working on the transaction between SunSource and Allied and tipped Black in breach of a duty that Strickland owed the shareholders of SunSource.

2.       Obus allocated the 287,200 shares SunSource stock among three hedge funds that his firms managed - relief defendants Wynnefield Partners Small Cap Value L.P. ("Wynn"), Wynnefield Partners Small Cap Value L.P. I ("Wynn I"), and Wynnefield Partners Small Cap Value Offshore Fund, Ltd. ("Wynn II") (collectively, the "Wynnefield Funds").  Obus and Black were limited partners in both Wynn and Wynn I. Following the announcement of the merger agreement between SunSource and Allied, the price of SunSource stock increased by 91.5% over the prior day's closing price.  As a result of the tipping and trading by Obus, Black, and Strickland, the relief defendants had illicit gains of $1,335,700.

3.       As a result of their conduct, defendants Obus, Black, and Strickland each knowingly or recklessly engaged in acts that violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5].  Accordingly, the Commission seeks a final judgment permanently enjoining each of the defendants from violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5; requiring the defendants and the relief defendants, jointly and severally, to disgorge the amount of the illicit gains, plus prejudgment interest; imposing a civil penalty on each defendant; and barring Obus and Black each from acting as an officer or director of a public company.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  In connection with certain of the transactions, acts, practices, and courses of business described in this Complaint, defendants Obus, Black, and Strickland, directly or indirectly, made use of the means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange.

5.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, and course of business described in this Complaint occurred within this District, including the trading described in the Complaint.

## DEFENDANTS AND RELIEF DEFENDANTS

6.      **Nelson J. Obus**, age 59, lives in Princeton, New Jersey.  Obus was a founder and, at all relevant times, a principal of two affiliated investment managers: Wynnefield Capital, Inc. ("Wynnefield") and Wynnefield Capital Management, LLC ("WCM").  Obus currently is, and has been at relevant times, a director of one or more public companies.

7.      **Peter F. Black**, age 34, lives in New York, New York.  At all relevant times, Black was an analyst for Wynnefield.  Black is a close friend of defendant Strickland.  Black currently is a director of one or more public companies.

8.      **Thomas Bradley Strickland**, age 33, lives in Mount Pleasant, South Carolina.  At all relevant times, Strickland lived in New York, New York, and was an

employee of General Electric Capital Corporation ("GE Capital"), which ultimately served as a lender in connection with the merger of SunSource and Allied. Strickland is a close friend of defendant Black.

9.      **Wynnefield Partners Small Cap Value L.P.,** formed in 1992 under the laws of Delaware, at all relevant times, was a private investment limited partnership. Wynn was not registered as an investment company under the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-1 through 80a-65]. WCM managed Wynn, was the general partner of Wynn, and received a performance share and management fee from Wynn. Obus and Black were limited partners of Wynn.

10.     **Wynnefield Partners Small Cap Value L.P., I,** formed in 1997 under the laws of Delaware, at all relevant times, was a private investment limited partnership. Wynn I was not registered as an investment company under the Investment Company Act. WCM managed Wynn I's investments, was the general partner of Wynn I, and received a performance share and management fee from Wynn I. Obus, Black, and Black's parents were limited partners of Wynn I.

11.     **Wynnefield Small Cap Value Offshore Fund, Ltd.,** formed in 1997 in the Cayman Islands, at all relevant times, was a private offshore fund. Wynn II was not registered as an investment company under the Investment Company Act. Wynnefield was the investment manager for Wynn II and received a management fee and an incentive fee from Wynn II.

## RELEVANT ENTITIES

4

12.     **SunSource, Inc.,** at all relevant times, was a Delaware corporation headquartered in Philadelphia, Pennsylvania.  SunSource was a distributor and provider of industrial services.  From 1997 through June 19, 2001, shares of SunSource common stock were traded on the New York Stock Exchange.  From June 20, 2001, through September 25, 2001, SunSource stock was traded on the American Stock Exchange.  SunSource's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78*l*].  On September 26, 2001, Allied completed the acquisition of SunSource shares in the transaction that was publicly announced on June 19, 2001.  On March 18, 2002, the SunSource name was changed to the Hillman Companies, Inc.  SunSource's Philadelphia offices were closed at the end of May 2002.

13.     **Allied Capital Corporation** is a Maryland business development company headquartered in Washington, D.C.  Allied provides long-term investment capital to support the expansion of growing middle-market companies.  Allied's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78*l*] and is traded on the New York Stock Exchange.

### FACTS

### Background of the Transaction Between SunSource and Allied

14.     On February 1, 2001, Allied contacted SunSource about a possible acquisition of SunSource.  On March 28, 2001, SunSource's board of directors agreed to proceed with discussions of a merger.  On April 4, 2001, SunSource and Allied executed a mutual nondisclosure agreement, and Allied began to conduct due diligence for the

transaction.  On April 6, 2001, Allied presented preliminary terms for the proposed transaction to SunSource.

15.    On April 30, 2001, a vice president at GE Capital responsible for business development met with SunSource's chief executive officer ("CEO") and chief financial officer ("CFO") to discuss Allied's proposed acquisition of SunSource and the possible sale of one of SunSource's subsidiaries.  Following that meeting, SunSource sent the GE Capital vice president a memorandum summarizing the proposed transaction.

**Strickland Learns of Allied's Plan to Acquire SunSource**

16.    On or before May 14, 2001, Strickland was assigned to work on the proposed acquisition of SunSource.  On May 14, 2001, the memorandum summarizing the transaction that had been sent to the GE Capital vice president was sent by e-mail to Strickland.  From the memorandum and otherwise, Strickland learned that information concerning the proposed transaction was confidential.  For example, the first page of memorandum describing the transaction included the following legend:  "THIS MEMORANDUM IS COVERED BY A CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT BETWEEN YOUR INSTITUTION AND ALLIED CAPITAL CORPORATION."

17.    On May 14 or 15, 2001, Strickland read the memorandum describing the transaction between SunSource and Allied and informing him that information about the transaction was confidential.  On May 15, 2001, Strickland attended a meeting regarding the transaction with Sunsource's CEO and CFO in SunSource's offices in Philadelphia, Pennsylvania.

6

18.     Following the May 15, 2001, meeting, Strickland continued to work on the proposed acquisition of SunSource and the sale of the SunSource subsidiary.

19.     On May 21, 2001, GE Capital submitted a proposal to SunSource for GE Capital to provide financing for the acquisition by acting as agent for a syndicate of lenders.  GE Capital was not chosen to act as agent but did participate in the financing as a lender.

**Strickland Tips Obus Through Black, and Obus Acknowledges the Tip**

20.     On the morning of May 24, 2001, Strickland called and spoke with Black. At that time, and at all relevant times, Black and Strickland were close friends.  They spoke frequently and socialized with one another.  Strickland once had lived with Black and Black's parents while Strickland interned in New York City.  In the summer of 2002, Strickland stayed in a vacation home at the Hamptons that Black and others had rented, and later stayed in Black's hotel room while both were traveling in France.

21.     When Strickland and Black spoke on the morning of May 24, 2001, Strickland told Black about Allied's planned acquisition of SunSource.  That information was nonpublic at the time.  Immediately after receiving the tip, Black told Obus what he had learned from Strickland.  Minutes thereafter, Obus called SunSource's offices and left a message for SunSource's CEO to call him.  When SunSource's CEO returned Obus's call shortly thereafter, Obus acknowledged that he had been tipped.  Obus told the CEO that a "little birdie" at GE Capital had told him that SunSource management was planning to sell the company to a financial buyer.

22.     Black was present when Obus spoke with SunSource's CEO.  When Black heard what Obus told the CEO, he jumped out of his chair and began waving his arms because he was concerned that his friend Strickland would get into trouble.  When Obus finished his conversation with Sunsource's CEO, Black told Obus of his concern, and Obus responded that, if GE Capital fired Strickland, Obus would offer Strickland a job or find him a job elsewhere on Wall Street.

23.     Following Strickland's May 24, 2001, conversation with Black, Strickland continued to work on, and thus receive nonpublic information about, the progress of the proposed transaction between SunSource and Allied.  On June 4, 2001, Black called Strickland, and they had a four-minute conversation.  That conversation provided Black with the opportunity to receive an update on the progress of the transaction and to update Obus.

**Obus Directs the Purchase of SunSource Stock Based on Inside Information**

24.     On June 8, 2001, Obus directed Wynnefield's trader to purchase a block of 287,200 shares of SunSource stock at $4.75 per share, which the trader then did.  The 287,200 shares of SunSource stock were deposited into accounts of Wynn, Wynn I, and Wynn II.

25.     At the time when Obus directed the purchase, he knew the material, nonpublic information about the transaction between SunSource and Allied that Strickland had communicated through Black and based his purchase decision on that material, nonpublic information.

26.     The 287,200 shares of SunSource stock that Obus ordered to be purchased comprised 99% of the 289,400 shares of SunSource stock that were traded on June 8, 2001, and was approximately seventeen times the average volume of approximately 16,785 SunSource stock traded in the month prior to purchase that Obus directed.

27.     The June 8, 2001, stock purchase also represented the largest purchase of SunSource stock that Obus had ever directed, and increased the Wynnefield Funds' holdings in SunSource stock from 5.8% to more than 10%.

28.     On June 19, 2001, SunSource and Allied jointly announced that they had signed a definitive merger agreement under which Allied would pay approximately $72 million, or approximately $10.38 per share, for each outstanding share of SunSource common stock.  Following that announcement, SunSource's stock price closed that day at $9.50 per share, an increase of $4.54 per share, or 91.5%, from the prior day's closing stock price.

29.     Based on the closing price of SunSource's stock on June 19, 2001, Wynn, Wynn I, and Wynn II had profits of $1,335,700 as a result of the tipping by Strickland and Black and the trading directed by Obus.

**Obus Again Acknowledges that He Was Tipped, and Strickland and Black Meet to Plan Responses to Inquiries**

30.     In July 2001, after the announcement of the merger agreement between SunSource and Allied, Obus called a senior vice president of Allied.  Obus asked the Allied senior vice president whether Allied would be willing to postpone the closing date for the merger so that one or more of the funds could avoid paying short term capital gains taxes on SunSource stock that had been purchased in late 2000.  The Allied senior

vice president did not agree to the request. During the conversation, Obus told the Allied senior vice president that he (Obus) had been tipped about the transaction between SunSource and Allied.

31.     By August 6, 2002, GE Capital had learned that the Commission was conducting an investigation of trading in SunSource stock, and counsel for GE Capital began to arrange interviews of Strickland and other GE Capital employees. After Strickland learned that he was to be interviewed, he tried unsuccessfully to contact Black. On August 7, 2002, counsel for GE Capital interviewed Strickland and asked whether Strickland had discussed SunSource with Black. Strickland denied that he and Black had discussed SunSource.

32.     Following his interview with counsel for GE Capital, Strickland contacted and arranged to meet with Black. Black then told Obus that he was going to meet with Strickland. On August 9, 2002, Black and Strickland met at a restaurant in New York, New York. Strickland told Black that he (Strickland) had been subpoenaed, that he had been interviewed by counsel for GE Capital, and that he had told counsel that he had not discussed SunSource with Black. Black was aware not only that he and Strickland had discussed SunSource, but that Obus had acknowledged to SunSource's CEO that someone at GE Capital had tipped Obus. Black then "reminded" Strickland that the two of them previously had had a conversation in which Strickland had mentioned SunSource. Strickland thereafter "remembered" that conversation and told counsel for GE Capital of the conversation. Strickland, however, did not inform counsel for GE Capital that he had told Black of the transaction between SunSource and Allied.

## CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5]

33.     Paragraphs 1 through 32 are re-alleged and incorporated herein by reference.

34.     Defendant Strickland owed a fiduciary or similar duty of trust and confidence to the shareholders of SunSource as a result of his status as an employee of GE Capital and GE Capital's relationship with SunSource, which relationship afforded GE Capital with access to confidential information about the transaction with Allied.

35.     Defendant Strickland knew or was reckless in not knowing that the information concerning the transaction between SunSource and Allied that he learned was nonpublic and material.

36.     By communicating the material, nonpublic information concerning the transaction between SunSource and Allied, defendant Strickland made a gift of that information to his close friend defendant Black and thereby received a personal benefit. In communicating that information under these circumstances, Strickland knowingly or reckless breached his duty to the shareholders of SunSource.

37.     Defendant Black knew or should have known that defendant Strickland breached his fiduciary or similar duty of trust and confidence that he owed to the shareholders of SunSource by giving Black the information about the transaction between SunSource and Allied.  Black thus assumed Strickland's duty to the shareholders of SunSource and breached that duty by communicating the information that he had learned to Obus.

11

38.     Defendant Obus knew or should have known that that the information about the SunSource - Allied transaction that he received from defendant Black had been communicated in breach of a fiduciary or similar duty of trust and confidence owed to the shareholders of SunSource.  Obus thus assumed the duty to the shareholders of SunSource that defendant Strickland owed and Black assumed.  By directing the purchase of the 287,200 shares of SunSource stock, Obus then breached that duty.

39.     Defendants Obus, Black, and Strickland each, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices or courses of business that have operated or would operate as a fraud and deceit upon other persons.

## RELIEF REQUESTED

Wherefore, the Commission respectfully requests that this Court enter a final judgment

(A)     permanently restraining and enjoining each of defendants Obus, Black, and Strickland and each defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Court's final judgment from violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5;

(B)     ordering defendants Obus, Black, and Strickland and relief defendants Wynn, Wynn I, and Wynn II, jointly and severally, to disgorge the $1,335,700 in the ill-gotten gains resulting from the conduct described above, plus pre-judgment interest thereon;

(C)     ordering defendants Obus, Black, and Strickland each to pay a civil money penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

(D)     prohibiting Obus and Black each, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

13

(E)     granting such other and further relief as the Court deems just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Dated:  April 21, 2006

Respectfully submitted,

Paul W. Kisslinger (PK0764)
U.S. SECURITIES AND EXCHANGE
        COMMISSION
100 F Street, NW
Washington, D.C. 20549-4010A
(202) 551-4427 (Kisslinger)
(202) 772-9246 (Fax)
<u>kisslingerp@sec.gov</u> (e-mail)

Counsel for Plaintiff

<u>Of Counsel</u>:
Scott W. Friestad
Laura B. Josephs
Thomas D. Silverstein
Adrienne V. Hyat