## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND<br>EXCHANGE COMMISSION,<br><br><br><br>Plaintiff,<br><br>v.<br><br>NELSON J. OBUS,<br>PETER F. BLACK,<br>THOMAS BRADLEY STRICKLAND,<br><br>Defendants, and<br><br>WYNNEFIELD PARTNERS SMALL<br>    CAP VALUE L.P.,<br>WYNNEFIELD PARTNERS SMALL<br>    CAP VALUE L.P., I<br>WYNNEFIELD PARTNERS SMALL<br>    CAP VALUE OFFSHORE FUND, LTD.,<br><br>Relief Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil No.  06-cv-3150 (GBD)

ECF Case

### AMENDED COMPLAINT

Plaintiff the United States Securities and Exchange Commission ("Commission")

alleges as follows:

### SUMMARY

1.     This is an insider trading case.  Prior to the June 19, 2001, announcement of a

merger agreement between SunSource, Inc. ("SunSource") and Allied Capital Corporation

("Allied"), defendant Nelson J. Obus ("Obus") directed the purchase of 287,200 shares of

SunSource common stock based on a tip that he had received from defendant Peter F. Black

("Black").  Black, an employee in one of Obus's investment management firms, tipped Obus

after receiving a tip from his close friend, defendant Thomas Bradley Strickland

("Strickland). At the time, Strickand, through his employer, GE Capital, was performing

lending underwriting services for SunSource on two related transactions -- a "going private"

merger transaction between SunSource and Allied, and a management leveraged buyout of a

SunSource subsidiary, SunSource Technologies Services, Inc. Strickland tipped Black about

the forthcoming, but still non-public Allied acquisition of SunSource, in knowing or reckless

breach of the duties of trust and confidentiality that Strickland owed to his employer, GE

Capital, to SunSource, and to the shareholders of SunSource.

    2.    Obus allocated the 287,200 shares SunSource stock among three hedge

funds that his firms managed - relief defendants Wynnefield Partners Small Cap Value L.P.

("Wynn"), Wynnefield Partners Small Cap Value L.P. I ("Wynn I"), and Wynnefield

Partners Small Cap Value Offshore Fund, Ltd. ("Wynn II") (collectively, the "Wynnefield

Funds"). Obus and Black were limited partners in both Wynn and Wynn I. Following the

announcement of the merger agreement between SunSource and Allied, the price of

SunSource stock increased by 91.5% over the prior day's closing price. As a result of the

tipping and trading by Obus, Black, and Strickland, the relief defendants had illicit gains of

$1,335,700.

    3.    As a result of their conduct, defendants Obus, Black, and Strickland each

knowingly or recklessly engaged in acts that violated Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-

5 [17 C.F.R. § 240.10b-5]. Accordingly, the Commission seeks a final judgment

permanently enjoining each of the defendants from violating Section 10(b) of the Exchange

Act and Exchange Act Rule 10b-5; requiring the defendants and the relief defendants, jointly and severally, to disgorge the amount of the illicit gains, plus prejudgment interest; imposing a civil penalty on each defendant; and barring Obus and Black each from acting as an officer or director of a public company.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  In connection with certain of the transactions, acts, practices, and courses of business described in this Complaint, defendants Obus, Black, and Strickland, directly or indirectly, made use of the means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange.

5.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, and course of business described in this Complaint occurred within this District, including the trading described in the Complaint.

**DEFENDANTS AND RELIEF DEFENDANTS**

6.      **Nelson J. Obus**, age 60, lives in Princeton, New Jersey.  Obus was a founder and, at all relevant times, a principal of two affiliated investment managers: Wynnefield Capital, Inc. ("Wynnefield") and Wynnefield Capital Management, LLC ("WCM").  Obus currently is, and has been at relevant times, a director of one or more public companies.

7.      **Peter F. Black**, age 35, lives in New York, New York.  At all relevant

3

times, Black was an analyst for Wynnefield.  Black is a close friend of defendant

Strickland.  Black currently is a director of one or more public companies.

8.     **Thomas Bradley Strickland**, age 34, lives in Mount Pleasant, South

Carolina.  His current employment is not known.  At relevant times, Strickland lived in

New York City, or the New York metropolitan area, and was an employee of General

Electric Capital Corporation ("GE Capital"), which ultimately provided financing in

connection with the merger of SunSource and Allied.  Strickland is a close friend of

defendant Black.

9.     **Wynnefield Partners Small Cap Value L.P.**, formed in 1992 under the

laws of Delaware, at all relevant times, was a private investment limited partnership.

Wynn was not registered as an investment company under the Investment Company Act of

1940 ("Investment Company Act") [15 U.S.C. §§ 80a-1 through 80a-65].  WCM managed

Wynn, was the general partner of Wynn, and received a performance share and

management fee from Wynn.  Obus and Black were limited partners of Wynn.

10.     **Wynnefield Partners Small Cap Value L.P., I**, formed in 1997 under the

laws of Delaware, at all relevant times, was a private investment limited partnership.

Wynn I was not registered as an investment company under the Investment Company Act.

WCM managed Wynn I's investments, was the general partner of Wynn I, and received a

performance share and management fee from Wynn I.  Obus, Black, and Black's parents

were limited partners of Wynn I.

11.     **Wynnefield Small Cap Value Offshore Fund, Ltd.**, formed in 1997 in the

Cayman Islands, at all relevant times, was a private offshore fund.  Wynn II was not

4

registered as an investment company under the Investment Company Act. Wynnefield was the investment manager for Wynn II and received a management fee and an incentive fee from Wynn II.

### RELEVANT ENTITIES

12.     **SunSource, Inc.**, at all relevant times, was a Delaware corporation headquartered in Philadelphia, Pennsylvania. SunSource was a distributor and provider of industrial services. From 1997 through June 19, 2001, shares of SunSource common stock were traded on the New York Stock Exchange. From June 20, 2001, through September 25, 2001, SunSource stock was traded on the American Stock Exchange. SunSource's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l]. On September 26, 2001, Allied completed the acquisition of SunSource shares in the transaction that was publicly announced on June 19, 2001. Following the merger, Allied owned 94 percent of SunSource, and former SunSource offices, directors, and shareholders owned 6 percent. On March 18, 2002, the SunSource name was changed to the Hillman Companies, Inc. SunSource's Philadelphia offices were closed at the end of May 2002. **SunSource Technology Services, Inc.** ("STS"), at all relevant times, was a wholly-owned subsidiary of SunSource, Inc. On or about September 28, 2001, SunSource sold STS to its officers and directors, and other buyers, in a management leveraged buyout. GE Capital submitted a confidential proposal to SunSource management to provide financing on the STS transaction, which SunSource management executed.

13.     **Allied Capital Corporation** is a Maryland business development company

headquartered in Washington, D.C. Allied provides long-term investment capital to
support the expansion of growing middle-market companies. Allied's common stock is
registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C.
§ 78l] and is traded on the New York Stock Exchange.

<b>FACTS</b>

<b><u>Background of the SunSource Transactions</u></b>

14.     On February 1, 2001, Allied contacted SunSource about a possible
acquisition of SunSource. On March 28, 2001, SunSource's board of directors agreed to
proceed with discussions of a merger. On April 4, 2001, SunSource and Allied executed a
mutual nondisclosure agreement, and Allied began to conduct due diligence for the
transaction. On April 6, 2001, Allied presented preliminary terms for the proposed
transaction to SunSource.

15.     On or about April 27, 2001, a new vice president at GE Capital responsible
for business development (the "GE Capital V.P.") called SunSource's chief executive
officer ("CEO") to reestablish contacts and to solicit business. During that phone call, or
soon thereafter, the SunSource CEO told the GE Capital V.P. that SunSource was seeking
financing on a sale of its subsidiary, STS, and that the sale of STS was a necessary part of a
proposed going-private transaction of the parent company, SunSource.

16.     On April 30, 2001, the GE Capital V.P. met with the SunSource CEO and
SunSource's chief financial officer ("CFO") to discuss both of the SunSource corporate
transactions -- the Allied acquisition of SunSource and the sale of STS (the "SunSource
Transactions"). The purpose of the meeting between GE Capital and SunSource was to

6

discuss the possibility of GE Capital providing financing, and financial services, on either or both of the SunSource Transactions.

17.     It was at that meeting that the GE Capital V.P. learned that Allied had submitted a confidential proposal to acquire SunSource; and that as a related and necessary part of that transaction, SunSource was to sell STS to SunSource management and others in a leveraged buyout.

18.     The GE Capital V.P. knew that the information that SunSource provided to him at and before the April 30, 2001 meeting about the SunSource Transactions was material, nonpublic, and confidential information at the time.

19.     At all relevant times, GE Capital had strict rules and policies in place mandating, among other things, that its employees keep material, nonpublic information learned in the course of employment confidential, and not trade on such information, or tip others about such information. GE Capital's rules and policies also required that its employees maintain confidentiality during public company deals. Strickland was aware of these rules and policies, received copies of them, took training courses regarding them, and agreed and committed to comply with them. For example, in an April 27, 2001 acknowledgement form that Strickland signed, it stated "I acknowledge that I have received the guide to GE Policies, *Integrity: The Spirit & the Letter of Our Commitment.* I understand that every employee is required to comply with the policies described in the guide."

20.     Following the April 30, 2001 meeting, SunSource sent the GE Capital V.P. a confidential memorandum, prepared by Allied, summarizing and discussing the

7

SunSource Transactions (the "SunSource Memorandum").

**Strickland Learns of Allied's Plan to Acquire SunSource**

21.    On or before May 14, 2001, GE Capital assigned Strickland to the deal team to work on the SunSource Transactions. Strickland's responsibilities were to work as an underwriter for the financing of the SunSource Transactions. Part of his responsibilities entailed researching SunSource, speaking with SunSource employees, and receiving confidential information from SunSource regarding its operations and financial condition.

22.    On May 14, 2001, a GE Capital representative e-mailed the SunSource Memorandum to Strickland. From the SunSource Memorandum and otherwise, Strickland learned that information concerning the SunSource Transactions was material and confidential. For example, the first page of the SunSource Memorandum included the following legend: "THIS MEMORANDUM IS COVERED BY A CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT BETWEEN YOUR INSTITUTION AND ALLIED CAPITAL CORPORATION." The memorandum also stated on the top right corner of every page, except the first page, that it was *"Extremely Confidential"* (underlined and italicized in original).

23.    On May 14 or 15, 2001, Strickland read the SunSource Memorandum describing the SunSource Transactions and informing him that information about the transactions was confidential. On May 15, 2001, Strickland attended a confidential meeting regarding the SunSource Transactions with Sunsource's CEO and CFO in SunSource's offices in Philadelphia, Pennsylvania.

24.    Following the May 15, 2001, meeting, Strickland continued to work on the

8

underwriting of the SunSource Transactions, and continued to receive confidential information from SunSource about, *inter alia,* its operations and financial condition.

25.    On May 11, 2001, GE Capital submitted a confidential proposal to SunSource to provide financing on the STS management buyout. The borrower listed on the proposal was SunSource Technology Services, Inc.

26.    On May 21, 2001, GE Capital submitted a confidential proposal to SunSource for GE Capital to provide financing on the Allied-SunSource merger by acting as agent, putting together a syndicate of lenders. The borrower listed on the proposal was "The Hillman Group, formally [sic.] known as SunSource and all operating subsidiaries." GE Capital noted in the proposal that following the merger, Hillman Group would be owned by Allied and former SunSource management. The borrower ultimately did not select GE Capital as agent on the Allied-SunSource transaction, but GE Capital did participate in the financing of the transaction.

27.    On May 25, 2001, SunSource's CFO sent back initialed edits of GE Capital's proposal concerning the STS transaction to GE Capital by facsimile, and signed the amended proposal. On May 31, 2001, GE Capital sent a signed revised version of the confidential STS transaction proposal to SunSource reflecting the edits made by SunSource's CFO. SunSource's CFO signed the revised proposal on May 31, 2001, and returned the executed proposal by facsimile to GE Capital on June 1, 2001. The borrower on the STS transaction ultimately did not select GE Capital to provide financing on the transaction.

28.    By way of the context and nature of the confidential relationship between

9

SunSource and GE Capital, the confidential discussions between SunSource and GE
Capital, and the confidential information exchanged between SunSource and GE Capital,
solely for business purposes, GE Capital, and Strickland, assumed a duty of confidentiality
and trust to SunSource and its shareholders.

**Strickland Tips Obus Through Black, and Obus Acknowledges the Tip**

29.    Strickland knew from the nature of the SunSource Transactions, and the
context and nature of the discussions and information exchanged between GE Capital and
SunSource, that the information that he learned from GE Capital, and from SunSource,
about the Allied-SunSource transaction during the course of his employment was material
and non-public. Strickland knew that disclosing such material, non-public information to
outsiders would violate GE Capital rules, policies, and procedures, and the duties of trust
and confidence he owed to his employer and to SunSource and its shareholders.

30.    On the morning of May 24, 2001, Strickland called and spoke with Black,
an outsider of SunSource and GE Capital. At that time, and at all relevant times, Black and
Strickland were close friends. They spoke frequently and socialized with one another.
Strickland once had lived with Black and Black's parents while Strickland interned in New
York City. In the summer of 2002, Strickland stayed in a vacation home in the Hamptons
that Black and others had rented, and later stayed in Black's hotel room while both were
traveling in France.

31.    When Strickland and Black spoke on the morning of May 24, 2001,
Strickland told Black about Allied's planned acquisition of SunSource. As Strickland and
Black both knew, that information was material, nonpublic information at the time.

10

32.     Immediately after receiving the tip, Black told Obus what he had learned from Strickland. Minutes thereafter, Obus called SunSource's offices and left a message for SunSource's CEO to call him. When SunSource's CEO returned Obus's call shortly thereafter, Obus acknowledged that he had been tipped. Obus told the CEO that a "little birdie in Connecticut" at GE Capital had told him that SunSource management was planning to sell the company to a financial buyer.

33.     Black was present when Obus spoke with SunSource's CEO. When Black heard what Obus told the CEO, he jumped out of his chair and began waving his arms because he was concerned that his friend Strickland would get into trouble. When Obus finished his conversation with Sunsource's CEO, Black told Obus of his concern, and Obus responded that if GE Capital fired Strickland, Obus would offer Strickland a job or find him a job elsewhere on Wall Street.

34.     Following Strickland's May 24, 2001, conversation with Black, Strickland continued to work on, and thus receive nonpublic information about, the progress of the proposed transaction between SunSource and Allied. On June 4, 2001, Black called Strickland, and they had a four-minute conversation. That conversation provided Black with the opportunity to receive an update on the progress of the transaction and to update Obus.

**Obus Directs the Purchase of SunSource Stock Based on Inside Information**

35.     On June 8, 2001, Obus directed Wynnefield's trader to purchase a block of 287,200 shares of SunSource stock at $4.75 per share, which the trader then did. The 287,200 shares of SunSource stock were deposited into accounts of Wynn, Wynn I, and

Wynn II.

36.     At the time when Obus directed the purchase, he knew the material,
nonpublic information about the transaction between SunSource and Allied that Strickland
had communicated through Black and based his purchase decision on that material,
nonpublic information.

37.     The 287,200 shares of SunSource stock that Obus ordered to be purchased
comprised 99% of the 289,400 shares of SunSource stock that were traded on June 8, 2001,
and was approximately seventeen times the average volume of approximately 16,785
SunSource stock traded in the month prior to purchase that Obus directed.

38.     The June 8, 2001, stock purchase also represented the largest purchase of
SunSource stock that Obus had ever directed, and increased the Wynnefield Funds'
holdings in SunSource stock from 5.8% to more than 10%.

39.     On June 19, 2001, SunSource and Allied jointly announced that they had
signed a definitive merger agreement under which Allied would pay approximately $72
million, or approximately $10.38 per share, for each outstanding share of SunSource
common stock.  Following that announcement, SunSource's stock price closed that day at
$9.50 per share, an increase of $4.54 per share, or 91.5%, from the prior day's closing
stock price.

40.     Based on the closing price of SunSource's stock on June 19, 2001, Wynn,
Wynn I, and Wynn II had profits of $1,335,700 as a result of the tipping by Strickland and
Black and the trading directed by Obus.

12

**Obus Again Acknowledges that He Was Tipped, and Strickland
and Black Meet to Plan Responses to Inquiries**

41.     In July 2001, after the announcement of the merger agreement between

SunSource and Allied, Obus called a senior vice president of Allied. Obus asked the

Allied senior vice president whether Allied would be willing to postpone the closing date

for the merger so that one or more of the funds could avoid paying short term capital gains

taxes on SunSource stock that had been purchased in late 2000. The Allied senior vice

president did not agree to the request. During the conversation, Obus told the Allied senior

vice president that he (Obus) had been tipped about the transaction between SunSource and

Allied.

42.     By August 6, 2002, GE Capital had learned that the Commission was

conducting an investigation of trading in SunSource stock, and counsel for GE Capital

began to arrange interviews of Strickland and other GE Capital employees. After

Strickland learned that he was to be interviewed, he tried unsuccessfully to contact Black.

On August 7, 2002, counsel for GE Capital interviewed Strickland and asked whether

Strickland had discussed SunSource with Black. Strickland denied that he and Black had

discussed SunSource.

43.     Following his interview with counsel for GE Capital, Strickland contacted

and arranged to meet with Black. Black then told Obus that he (Black) was going to meet

with Strickland. On August 9, 2002, Black and Strickland met at a restaurant in New York

City. Strickland told Black that he (Strickland) had been subpoenaed, that he had been

interviewed by counsel for GE Capital, and that he had told counsel that he had not

discussed SunSource with Black. Black was aware not only that he and Strickland had

13

discussed SunSource, but that Obus had acknowledged to SunSource's CEO that someone

at GE Capital had tipped Obus.  Black then "reminded" Strickland that the two of them

previously had had a conversation in which Strickland had mentioned SunSource.

Strickland thereafter "remembered" that conversation and told counsel for GE Capital of

the conversation.  Strickland, however, did not inform counsel for GE Capital that he had

told Black of the transaction between SunSource and Allied.

## CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5]

44.     Paragraphs 1 through 43 are re-alleged and incorporated herein by
reference.

45.     Defendant Strickland owed a fiduciary duty of trust and confidence to his

employer, GE Capital, pursuant to which, *inter alia,* was the duty to not disclose material,

nonpublic information learned during the scope of his employment to outsiders.

46.     Defendant Strickland owed a fiduciary or similar duty of trust and

confidence to the shareholders of SunSource as a result of his and GE Capital's

relationship with SunSource and SunSource management, which relationship afforded him

and GE Capital access to material, confidential information about the SunSource

Transactions.

47.     Defendant Strickland knew or was reckless in not knowing that the

information concerning the transaction between SunSource and Allied that he learned

during the scope of his employment was nonpublic and material at the time that he tipped

his friend, Peter Black.

14

48.     By communicating the material, nonpublic information concerning the transaction between SunSource and Allied, defendant Strickland made a gift of that information to his close friend, defendant Black and thereby received a personal benefit.

49.     In communicating that material, nonpublic information under these circumstances, Strickland knowingly or recklessly breached the fiduciary duty of trust and confidence that he owed to his employer, GE Capital.

50.     In communicating that material nonpublic information under these circumstances, Strickland knowingly or recklessly breached the fiduciary or similar duty of trust and confidentiality that he owed to the shareholders of SunSource.

51.     Defendant Black knew or should have known that defendant Strickland breached his fiduciary or similar duties of trust and confidence that he owed to his employer, and/or to the shareholders of SunSource, by giving Black the information about the transaction between SunSource and Allied.  Black thus assumed Strickland's duties to his employer, and/or to the shareholders of SunSource, and breached those duties by communicating the information that he had learned to Obus.

52.     Defendant Obus knew or should have known that that the information about the SunSource - Allied transaction that he received from defendant Black had been communicated in breach of fiduciary or similar duties of trust and confidence owed to GE Capital, and/or the shareholders of SunSource.  Obus thus assumed the duties to GE Capital, and/or the shareholders of SunSource, that Strickland owed and Black assumed. By directing the purchase of the 287,200 shares of SunSource stock, Obus then breached those duties.

53.     Defendants Obus, Black, and Strickland each, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange

      (a)     employed devices, schemes or artifices to defraud;

      (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices or courses of business that have operated or would operate as a fraud and deceit upon other persons.

## RELIEF REQUESTED

Wherefore, the Commission respectfully requests that this Court enter a final judgment,

(A)     permanently restraining and enjoining each of defendants Obus, Black, and Strickland and each defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Court's final judgment from violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5;

(B)     ordering defendants Obus, Black, and Strickland and relief defendants Wynn, Wynn I, and Wynn II, jointly and severally, to disgorge the $1,335,700 in the ill-gotten gains resulting from the conduct described above, plus pre-judgment interest thereon;

(C)     ordering defendants Obus, Black, and Strickland each to pay a civil money

penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

(D)     prohibiting Obus and Black each, pursuant to Section 21(d)(2) of the

Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer

that has a class of securities registered pursuant to Section 12 of the Exchange Act [15

U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange

Act [15 U.S.C. § 78o(d)]; and

(E)     granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Dated:  June 13, 2007                          Respectfully submitted,

Of Counsel:                                    Paul W. Kisslinger (PK0764)
Scott W. Friestad                              U.S. SECURITIES AND EXCHANGE
Laura B. Josephs                                    COMMISSION
Thomas D. Silverstein                          100 F Street, NE
Adrienne V. Hyat                               Washington, D.C. 20549-4030
                                               (202) 551-4427 (Kisslinger)
                                               (202) 772-9246 (Fax)

                                               Counsel for Plaintiff

17

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

NELSON OBUS, et. al,

Defendants.

Civil Action No. 06-CV-3150
(GBD)

## DECLARATION OF SERVICE

I, IBRAHIM SAJALIEU BAH, pursuant to 28 U.S.C. § 1746, declare as follows:

I am at least 21 years old and am employed as a paralegal specialist at the

Securities & Exchange Commission's New York Regional Office.

On this 15th day of June, 2007, I caused to be served a copy of plaintiff's

Amended Complaint on all counsels of record by electronic mail, per the Scheduling

Order of the Court.

Upon information and belief, I declare under penalty of perjury that the foregoing

is true and correct.

Executed:     June 15, 2007
              New York, New York

By: _Ibrahim Sajalieu Bah_
              Ibrahim Sajalieu Bah