UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,     :
                                        :
                    Plaintiff,          :
                                        :
        - against -                     :     ECF case
                                        :     (electronically filed)
NELSON J. OBUS,                         :
PETER F. BLACK,                         :
THOMAS BRADLEY STRICKLAND,              :     06 Civ. 3150 (GBD)
                                        :
                    Defendants, and     :
                                        :
WYNNEFIELD PARTNERS SMALL               :
    CAP VALUE L.P.,                     :
WYNNEFIELD PARTNERS SMALL               :
    CAP VALUE L.P. I,                   :
WYNNEFIELD PARTNERS SMALL               :
    CAP VALUE OFFSHORE FUND, LTD.,      :
                                        :
                    Relief Defendants.  :
-----------------------------------------------------------------x

## DEFENDANT PETER F. BLACK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Mark S. Cohen (MC 9055)
Sandra C. McCallion (SM 0833)
Oliver S. Haker (OH 6343)
COHEN & GRESSER LLP
100 Park Avenue, 23rd Floor
New York, New York 10017
(212) 957-7600

*Attorneys for Defendant Peter F. Black*

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTS AS TO DEFENDANT PETER BLACK........................................3

ARGUMENT ..........................................................................................................8

I. BLACK IS ENTITLED TO SUMMARY JUDGMENT UNDER THE SEC'S
CLASSICAL THEORY OF LIABILITY...........................................................9

    A. There Is No Evidence That Black Was Or Should Have Been Aware Of
Strickland's Alleged Duties To SunSource. .........................................11

        1. The SEC Has No Direct Evidence Of Black's Scienter. ...........................11

        2. The SEC Has No Indirect Evidence Of Black's Scienter. .........................12

    B. The SEC's Theory Of Tippee Liability Is Untenable On This Record And Under
Controlling Precedent. ..........................................................................13

II. BLACK IS ENTITLED TO SUMMARY JUDGMENT UNDER THE SEC'S
MISAPPROPRIATION THEORY OF LIABILITY..........................................15

    A. The SEC Has Failed To Identify Any Direct Evidence That Black Was
Or Should Have Been Aware Of Strickland's Alleged Duties To GE Capital......16

    B. The SEC Has Failed To Identify Any Indirect Evidence That Black Was Or
Should Have Been Aware Of Strickland's Alleged Duties To GE Capital...........16

III. SUMMARY JUDGMENT IS WARRANTED BECAUSE NO DECEPTIVE OR
IMPROPER TRADE OCCURRED. ................................................................19

    A. Obus' Voluntary Disclosure Of The "Tip" To The Source Of The Information
Necessarily Precludes Any Finding Of "Deception.".........................................19

CONCLUSION.......................................................................................................24

# TABLE OF AUTHORITIES

**Federal Cases**

*Batemen Eichler v. Berner*, 472 U.S. 299 (1985) ........................................................ 13

*Benjamin v. Kim*, 95 Civ. 9597 (LMM), 1999 WL 249706 (S.D.N.Y. Apr. 28, 1999)............... 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 8

*Chiarella v. U.S.*, 445 U.S. 222 (1980).......................................................... 13, 15, 21

*Dirks v. SEC*, 463 U.S. 646 (1983) ................................................ 8, 9, 10, 13, 15, 18

*In re Doral Financial Corp. Securities Litig.*, 563 F. Supp. 2d 461 (S.D.N.Y. 2008) ................. 13

*In re Investors Management Co.,* 44 S.E.C. 633 (1971)................................................... 10

*Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100 (2d Cir. 1994)..................................... 8

*Pro-Met Trading Co. v. Curtiss Wright Corp.*, No. 80 Civ. 5292, 1982 WL 1330
(S.D.N.Y. Sept. 7, 1982)...................................................... 11, 13, 15, 17, 18

*Radiation Dynamics v. Goldmuntz,* 464 F.2d 876 (2d Cir. 1972) ................................ 17

*SEC v. Cuban*, No. 3:08-CV-2050-D, 2009 WL 2096166
(N.D. Tex. July 17, 2009) ........................................................ 10, 15, 19, 20, 21

*SEC v. Drucker*, 06 Civ. 1644 (CM), 2007 WL 2042493 (S.D.N.Y. July 13, 2007) ..................... 8

*SEC v. Falbo*, 14 F. Supp. 2d 508 (S.D.N.Y. 1998) ........................................................ 9

*SEC v. Goldinger*, 106 F.3d 409, 1997 WL 21221 (9th Cir. 1997)................................... 12

*SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365 (S.D.N.Y. 2002) ........................................ 13

*SEC v. Gonzalez-Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001)................................... 15

*SEC v. Materia*, No. 82 Civ. 6225, 1983 WL 1396 (S.D.N.Y. Dec. 5, 1983)................................ 9

*SEC v. Monarch*, 608 F.2d 938 (2d Cir. 1979).......................................................... 18

*SEC v. Musella*, 748 F. Supp. 1028 (S.D.N.Y. 1984), *aff'd*, 898 F.2d 138 (2d Cir. 1990) .......... 15

*SEC v. Platt,* 565 F. Supp. 1244 (W.D. Okla. 1983) ................................................... 14

*SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001)............................................ 12

*SEC v. Truong,* 98 F. Supp. 2d 1086 (N.D. Cal. 2000) ................................................. 12

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) ................................................................. 8

*State Teachers Retirement Bd. v. Fluor Corp.*, 592 F. Supp. 592 (S.D.N.Y. 1984)........................ 9

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) ........................................................ 9

*United States v. O'Hagan*, 521 U.S. 642  (1997) ........................................... 14, 15, 19, 20, 21, 22

*United States v. Reed*, 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds*,
    773 F.2d 477 (2d Cir. 1985)............................................................................................. 21

**Rules**

Fed. R. Civ. P. 56...................................................................................................................... 1, 8

Defendant Peter F. Black ("Black") respectfully submits this memorandum of law in support of his motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

The Securities Exchange Commission ("SEC") has alternatively advanced both classical and misappropriation theories of insider trading in a futile attempt to impose liability on Black. The SEC has alleged that Black is derivatively liable as a tippee because Thomas Bradley Strickland ("Strickland") breached duties he owed to the shareholders of SunSource and/or his employer, GE Capital, by allegedly revealing to Black information about a potential sale of SunSource. Amended Verified Complaint ("Compl." or "Complaint") ¶¶ 45, 46.[1]  The SEC alleges that by virtue of receiving this alleged "tip" from his friend, and then relaying it to Nelson Obus, the that Black violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. ¶¶ 78j(b), and Rule 10b-5 promulgated thereunder.  17 C.F.R. ¶ 240.10b-5.

One of the key elements the SEC must prove is that Black knew or should have known that Strickland provided the alleged tip in violation of a duty owed to SunSource and GE Capital. The Complaint alleges that Black had the requisite state of mind with only three conclusory paragraphs.  The record that the SEC developed during discovery did nothing to move the SEC's allegations beyond speculation and into fact.

Indeed, the SEC's claims fail as a matter of law as the undisputed evidentiary record conclusively establishes that Black did not know, and could not have known, that Strickland had any duties either to GE Capital or to SunSource, or that Strickland violated any such duties by relaying any information to Black.  Moreover, imposing liability upon Black – where the record

---

[1]  Black joins the Motion for Summary Judgment submitted by Defendant Nelson Obus, dated September 11, 2009 ("Obus Mem."), which demonstrates conclusively that (i) Strickland owed no duties to GE Capital, and (ii) Strickland owed no duties to SunSource sufficient to impose liability under Section 10(b) and Rule 10b-5.

1

is barren of any evidence that Black engaged in the requisite "deception" – would be an absurd application of the securities laws and a misuse of the SEC's enforcement powers.

Twenty-one fact witnesses have been deposed in connection with this matter, generating thousands of pages of deposition testimony. Not a single statement in any of this testimony contradicts the undisputed fact that Black was unaware that any information Strickland conveyed to him during the May 24, 2001 conversation in which the SEC claims Strickland tipped Black was obtained in breach of any duty Strickland owed to GE Capital or SunSource. Rather, the record indisputably establishes that Black *did not know* – and did not have any reason to know – that any information he received from Strickland was conveyed in breach of either: (i) any duties Strickland may have owed SunSource; or (ii) any duties Strickland owed to his employer, GE Capital. As such, no reasonable juror could conclude that Black knowingly or recklessly assumed any duties Strickland may have had to SunSource and/or GE Capital. Absent the requisite scienter and assumption of Strickland's duties, Black simply cannot be liable under § 10(b) or Rule 10b-5 as a matter of law.

In addition, the SEC's claims fail as a matter of law because Wynnefield's purchase of SunSource shares simply cannot be characterized as either deceptive or manipulative. Even if the Court credits the SEC's allegations that Obus disclosed the alleged "tip" to SunSource (despite testimony contradicting this assertion), such disclosure necessarily precludes any finding that Obus acted with the requisite deception. Because no genuine issues of material facts remain concerning Black's derivative liability, the Court should grant Black's motion for summary judgment. In addition, Black joins in the motion made by Defendant Nelson Obus.

## RELEVANT FACTS AS TO DEFENDANT PETER BLACK[2]

### Peter Black and Brad Strickland.

Black and Strickland were close friends who met at Boston College in the early 1990s.

Compl. ¶¶ 8, 30; Deposition of Peter Black dated June 10, 2008 ("Black Dep.") at 94:7-11; SEC

Interview of Peter Black dated September 10, 2002 ("Black Interview") at 115:14-24; Joint Stmt.

¶¶ 8, 9.  Following graduation, they both moved to New York City and maintained a purely

social relationship.  Black Interview at 116:7-25; Joint Stmt. ¶ 11.

In 2001, when the events at issue took place, Black worked as an analyst at Wynnefield

Capital Inc. (together with its affiliated entities, "Wynnefield").  Compl. ¶ 7; Joint Stmt. ¶ 2.  As

an analyst, Black reported directly to Nelson Obus, a principal of Wynnefield.  Black Dep. at

24:5-15; Joint Stmt. ¶ 12.  Black's duties included conducting research on companies in which

Wynnefield considered investing.  Black Dep. at 24:5-15; Joint Stmt. ¶ 13.

In 2001, Strickland worked in Connecticut in the Middle Market Lending Group within

the Commercial Finance Group of GE Capital.  Deposition of Thomas Bradley Strickland dated

June 3, 2008 ("Strickland Dep.") at 22:5-23:7; Joint Stmt. ¶ 81.  The Commercial Finance Group

was involved with a wide variety of engagements.  Strickland Dep. at 22:5-23:7; Joint Stmt.

¶ 25.  As Strickland explained during his deposition, his group

> provided senior secured asset-based loans and cash flow loans," for
> "various purposes," including "straight refinances …
> recapitalization[s] of the balance sheet … management buyouts …
> restructuring situations where we were trying to help keep the
> companies out of bankruptcy.  Bankruptcy situations where we
> refinanced them into bankruptcy.  Plans of reorganization where

---

[2] The facts set forth herein are relevant only to this motion on behalf of Defendant Black.  A full statement of facts
setting forth the background of the events at issue can be found in the accompanying Joint Rule 56.1 Statement of
Undisputed Material Facts as to Which There is No Genuine of Issue to be Tried submitted by Defendants Nelson
Obus, Thomas Bradley Strickland, and Peter F. Black ("Joint 56.1 Statement" or "Joint Stmt.") and the
Memorandum of Law in Support of Nelson Obus' Motion for Summary Judgment, dated September 11, 2009
("Obus Memorandum" or "Obus Mem.") at 3-11.

> we took them out of bankruptcy.  Private equity transactions.
> Acquisitions and mergers. . .

*Id.*

In his job as an underwriter, Strickland evaluated the riskiness and viability of potential transactions.  Strickland Dep. at 31:4-32:6; *see also* Deposition of William Brasser dated April 23, 2008 ("Brasser Dep.") at 60:4-12; Joint Stmt. ¶¶ 83, 84.  This required an analysis of a prospective borrower, commonly referred to as "due diligence."  Strickland Dep. at 34:15-19; *see also* Brasser Dep. at 60:4-12; Joint Stmt. ¶ 84.

### *Black's Limited Knowledge of Strickland's Position at GE.*

Although Strickland and Black were friends, Strickland never discussed the specifics about his position at GE Capital with Black, including the fact that he was an underwriter.  Black Interview at 136:24-137:7; Joint Stmt. ¶ 86.  Thus, Black did not know whether Strickland's responsibilities at GE Capital included underwriting.  *Id.*  Black was not even certain what title Strickland held at GE Capital or in which group Strickland worked.  Black Dep. at 96:19-23; Joint Stmt. ¶ 87.  He did not know that Strickland worked on "any merger and acquisition financing."  Black Dep. at 97:5-16; Joint Stmt. ¶ 88.  Rather, Black generally understood that Strickland was a "junior person" at GE Capital in 2000-2001, who was "researching new potential clients, performing due diligence."  Black Dep. at 96:11-18; Joint Stmt. ¶ 89.  If Strickland discussed GE Capital's business issues with Black, he spoke "in generalities," at a "high level."  Strickland Dep. at 116:25-117:12; Joint Stmt. ¶ 90.  Similarly, it was not Black's general practice to discuss Black's own duties and/or Wynnefield's business issues with Strickland.  Black Dep. at 99:14-100:11; Joint Stmt. ¶ 91.

4

### *Strickland's Involvement with SunSource, Inc.*

In or about May 2001, GE was introduced to the executives at SunSource, Inc.

("SunSource") and learned that SunSource needed financing for two different transactions:  the

spin-off of SunSource Technology Services ("STS"), and the leveraged buyout that SunSource

was negotiating with Allied Capital Corporation (the "SunSource Transactions").[3]  Deposition of

Karl Slosberg, dated January 30, 2008 ("Slosberg Dep.") at 31:24-34:7, 61:20-62:20, 113:9-

114:9; Joint Stmt. ¶¶ 29, 31.  On or about May 14, 2001, GE Capital assigned Strickland to the

deal team to work on the SunSource Transactions.  Strickland Dep. at 78:21-79:8; Wiles Dep.

73:2-10; Joint Stmt. ¶ 92.  This was the first time Strickland had heard of the SunSource

Transactions.  Strickland Dep. at 79:5-8; Joint Stmt. ¶ 94.

Strickland worked on the team that was responsible for putting together a pre-investment

committee memo for the potential transaction.  Strickland Dep. at 88:3-16; Joint Stmt. ¶ 95.

Strickland was responsible for, among other things, performing the necessary due diligence to

help GE Capital's investment committee evaluate the riskiness and viability of the SunSource

Transactions.  Strickland Dep. at 34:9-19; Joint Stmt. ¶ 96.  One of Strickland's tasks was to

perform due diligence as to whether SunSource management was risk-worthy.  Strickland Dep.

at 31:4-32:6; Joint Stmt. ¶ 96.

During his due diligence investigation, Strickland learned that Wynnefield owned

SunSource shares.[4]  Strickland Dep. at 123:19-124:16; Joint Stmt. ¶ 97.  Strickland knew that his

friend, Peter Black, worked at Wynnefield.  Strickland Dep. at 115:8-22; Joint Stmt. ¶ 97.  Thus,

---

[3]  The details of the SunSource Transactions and GE Capital's involvement are set forth in the Obus Memorandum at 3-6 and the Joint 56.1 Statement ¶¶ 15-80.

[4]  For greater detail of Strickland's role in the SunSource Transactions, *see* Obus Mem. at 4-6.

as part of his due diligence, he called Black to learn about SunSource's management.[5]  Black

Dep. at 106:21-24, 111:5-9; Compl. ¶ 30; Joint Stmt. ¶ 98.

***Black and Strickland's Conversation Regarding SunSource.***

During the conversation on or about May 24, 2001, Strickland asked Black questions

concerning SunSource that were "general in nature."  Black Dep. at 114:19-115:7; Black

Interview at 153:1-6; Strickland Dep. at 121:3-21; Joint Stmt. ¶ 100.  Strickland's questions

related to the following topics:  Black's impression of SunSource's management; the position of

SunSource in the industry; how SunSource's divisions were doing; and whether SunSource had

good prospects.  Strickland Dep. at 121:9-21; Black Dep. at 115:17-20; Joint Stmt. ¶¶ 101, 104.

During the conversation, Strickland also mentioned to Black that GE Capital was looking

at "doing some potential business with SunSource," "possibly working with SunSource,"

"thinking of working together [with SunSource] or something," and/or "going to have an

opportunity to work on a financing of putting money to work."  Strickland Dep. at 121:11-15;

Black Dep. at 107:3-19, 111:15-25, 112:15-113:19; Joint Stmt. ¶ 105.

Strickland never told Black that he had received any information pursuant to a

confidentiality agreement with SunSource.  Black Interview at 162:10-163:2; Joint Stmt. ¶ 108.

Black was entirely unaware at the time whether Strickland and/or GE Capital were working on a

confidential matter relating to SunSource, Black Interview at 162:10-16; Joint Stmt. ¶ 109, and

Strickland did not tell Black that the information Strickland shared should be kept in confidence

or not disseminated to any third party.  Strickland Dep. at 133:10-23; Joint Stmt. ¶ 110.

---

[5] Black recalls that the conversation was by telephone. Black Dep. at 111:5-14; Joint Stmt. ¶ 98. Strickland, however, believes that he spoke with Black about SunSource management while they were waiting to be seated at a restaurant. Strickland Dep. at 121:3-21; Joint Stmt. ¶ 98.

*The Alleged Improper Trade*

At all times relevant to this action, Black did not personally trade SunSource stock and did not direct Wynnefield to trade any SunSource stock. Black Dep. at 78:2-5; Joint Stmt. ¶ 110. On June 8, 2001, in response to an unsolicited offer, Obus directed that Wynnefield purchase 287,200 shares of SunSource. Compl. ¶ 35; Deposition of Nelson Obus dated June 17, 2008 ("Obus Dep.") at 131:8-132:21; Joint Stmt. ¶¶ 145-150. Black was not aware that Wynnefield had purchased SunSource stock on June 8, 2001; he learned of the purchase more than one year later, in July of 2002. Black Dep. at 87:17-23; Joint Stmt. ¶ 153.

As a shareholder in SunSource, Obus frequently spoke to Maurice Andrien, SunSource's CEO, about the company. Deposition of Maurice Andrien dated March 5, 2008 ("Andrien Dep.") at 454:2-20, 540:2-10; Joint Stmt. ¶ 121. According to Andrien, Obus and Andrien had one such conversation during the week of May 21, 2001, during which Obus disclosed that he had received a "tip" from GE Capital to the effect that SunSource was planning to sell the company. Andrien Dep. at 543:13-544:5; Joint Stmt. ¶ 126.

In response to Obus' disclosure of the alleged "tip," Andrien did not ask Obus to keep the alleged "tip" confidential or to refrain from trading in SunSource stock. Andrien Dep. at 543:16-544:10; Obus Dep. at 170:25-171:3 (testifying that Andrien did not say anything "substantive" in response); Joint Stmt. ¶ 127. Andrien also did not disclose the alleged "tip" conveyed by Obus to the public, to the market, or to GE Capital, nor did Andrien make any public disclosure about the pending transaction. Andrien Dep. at 576:19-579:15; Joint Stmt. ¶ 128. According to Andrien, Obus subsequently called him to disclose Wynnefield's purchase of 287,200 shares of SunSource stock on June 8, 2001. Andrien Dep. at 595:9-17; Joint Stmt. ¶ 152. On June 19, 2001, the transaction was publicly announced.

## ARGUMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party "need not prove a negative when it moves for summary judgment on an issue that a plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, the plaintiff must designate *specific facts* showing there is a genuine issue for trial." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 1994) (emphasis added) (internal quotations marks omitted).

"[W]here the nonmoving party bears the burden of proof at trial," as the SEC does in asserting its claim that Black is liable as a "tippee," "it is the SEC's burden to demonstrate that there are disputed issues that must be decided by a factfinder." *SEC v. Drucker*, 06 Civ. 1644 (CM), 2007 WL 2042493 at *3 (S.D.N.Y. July 13, 2007). A hypothetical factual dispute offered by the SEC, based upon "merely colorable, conclusory, speculative or not significantly probative evidence, will not defeat the motion." *Id.*

Insider trading in violation of section 10(b) and Rule 10b-5 requires proof of the following five elements: (i) that the tipper possessed material, nonpublic information regarding a security's issuer; (ii) the tipper disclosed this information to the tippee; (iii) the tippee traded in the issuer's securities while in possession of the information; (iv) the tippee knew or should have known that the information was disclosed in violation of a relationship of trust; and (v) the tipper benefited by the disclosure to the tippee. *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (citing *Dirks v. SEC*, 463 U.S. 646, 654-64 (1983)). "The scienter requirement is an independent

element of a Rule 10b-5 violation," *Dirks*, 463 U.S. at 664, n.23, requiring that the tippee have a "mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Falbo*, 14 F. Supp. 2d 508, 524 (S.D.N.Y. 1998).

As set forth below, the SEC has adduced absolutely no probative evidence – either direct or indirect – that could reasonably support a finding that Black knew or should have known that any information disclosed by Strickland to him was in violation of a relationship of trust between Strickland and any other party.  Without this knowledge, Black could not have acted with the requisite scienter and could not have "participated" in the deception.  Therefore, Black cannot be liable as a matter of law under either the classical, *see* Part I, or misappropriation, *see* Part II, theories of insider trading.

In addition, the Court should grant summary judgment to Black because the SEC cannot show at trial that any trade occurred in violation of the securities laws.  *See* Part III.

## I.   BLACK IS ENTITLED TO SUMMARY JUDGMENT UNDER THE SEC'S CLASSICAL THEORY OF LIABILITY.

Under the classical theory of insider trading, a "tippee's duty to disclose or abstain is derivative from that of the insider's duty." *Dirks*, 463 U.S. at 659.  Derivative liability can attach to a tippee only if he effectively becomes a *knowing* participant after the fact in the insider's breach. *State Teachers Retirement Bd. v. Fluor Corp.*, 592 F. Supp. 592, 594-95 (S.D.N.Y. 1984).  To establish tippee liability, the SEC "must establish that the recipient [tippee] knew or by reason of recklessness failed to use its reason to know that the information was nonpublic and had been obtained improperly." *SEC v. Materia*, No. 82 Civ. 6225, 1983 WL 1396, *15 (S.D.N.Y. Dec 5, 1983); *see also United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) ("Rule 10b-5 requires that the defendant subjectively believe that the information received was obtained in breach of a fiduciary duty.").

9

Under this standard, the only way the SEC can establish that Black assumed Strickland's alleged duties to SunSource is by showing that he knew or should have known that Strickland owed a duty to SunSource and GE Capital, and that Strickland breached those duties by providing him with material, non-public information concerning SunSource. As the *Dirks* court stated, "tippee responsibility must be related back to insider responsibility by a necessary finding that the tippee knew the information was given to him in breach of a duty by a person having a special relationship to the issuer not to disclose the information." *Dirks*, 463 U.S. at 661, *quoting In re Investors Management Co.,* 44 S.E.C. 633, 651 (1971).

In the first instance, the SEC must establish that Strickland was a temporary insider of SunSource. Temporary insider status may arise by virtue of a fiduciary or fiduciary-like relationship with the source, *see SEC v. Cuban*, No. 3:08-CV-2050-D, 2009 WL 2096166, *6 (N.D. Tex. July 17, 2009), or out of an explicit agreement with the source to take on *both* a duty of confidentiality *and* a duty of non-use. *See id.* at *8 ("Where [insider trading] liability is predicated on an agreement . . . a person must undertake, either expressly or implicitly, both obligations" not to disclose the information and not to use it for personal gain). As set forth more fully in the Obus Memorandum, there is no evidence at all in this record that the SEC can use to establish that GE Capital – and therefore Strickland – owed any duty to SunSource. *See* Obus Mem. at 12-16. Absent a duty binding Strickland, the SEC can never show either that Black (i) knew or could have known of any duty Strickland may have owed to SunSource; or that he (ii) knew or could have known that the information relayed to him concerning SunSource was provided in breach of any such duty.

Even assuming, *arguendo*, that the SEC can overcome the fatal lack of evidence that its alleged tipper (Strickland) owed any duty – summary judgment is still appropriately granted

10

because, as discussed below, the SEC has elicited no evidence whatsoever that Black was aware of any alleged duty owed by Strickland.

### A.   There Is No Evidence That Black Was Or Should Have Been Aware Of Strickland's Alleged Duties To SunSource.

#### 1.   The SEC Has No Direct Evidence Of Black's Scienter.

As the Court noted in the hearing on Defendants' motion to dismiss, the facts as alleged supporting the Complaint are "sparse." Transcript of Oral Argument on Motion to Dismiss, dated Feb. 15, 2007 at 59:24-60:2. Now that discovery is closed, the SEC "may not rely on the allegations or denials in its *pleadings*, but must set forth *specific facts* showing that there is a genuine issue for trial" to defeat this motion for summary judgment. *Pro-Met Trading Co. v. Curtiss Wright Corp.*, No. 80 Civ. 5292, 1982 WL 1330, *2 (S.D.N.Y. Sept. 7, 1982) (emphasis added).

The SEC has not elicited a single fact to support the allegation that Black was aware of Strickland's alleged temporary insider status and thereby "assumed Strickland's duties ... to the shareholders of SunSource, and breached those duties by communicating the information that he learned to Obus." Compl. ¶ 51. Because the SEC bears the "ultimate burden of proof at trial" of showing whether Black knew or should have known of Strickland's alleged duties to SunSource, the "absence of evidence to support" this claim entitles Black to summary judgment. *Falbo*, 14 F. Supp. 2d at 518.

The SEC has no direct evidence to support its allegations that Black knew or should have known that GE Capital purportedly owed a duty to SunSource. There is no tape of the alleged telephone conversation – or indeed *any* telephone conversation – in which Strickland allegedly reveals the contours of GE Capital's relationship with SunSource. *Compare Benjamin v. Kim*, 95 Civ. 9597 (LMM), 1999 WL 249706, *8 (S.D.N.Y. Apr. 28, 1999) (relying in part on

11

memoranda).  There is no email or other documentation of the conversation.  No witness will testify as to the content of the conversation.  *Compare SEC v. Thrasher*, 152 F. Supp. 2d 291, 304-05 (S.D.N.Y. 2001) (relying in part on witness testimony).  Indeed, the only direct evidence contradicts the SEC's allegation.  Black denies that Strickland said anything more to him than words to the effect that GE Capital was "possibly working with SunSource."  Black Dep. at 111:15-25; Joint Stmt. ¶ 105.  Strickland confirms this.  Black Dep. at 119:23-120:4; Strickland Dep. at 121:5-21; Joint Stmt. ¶ 105.  The *only* reasonable inference Black could have drawn from this exchange is that GE Capital and SunSource had no relationship at the time of the conversation.

## 2.    The SEC Has No Indirect Evidence Of Black's Scienter.

The SEC has similarly failed to elicit any credible indirect evidence that Black knew of GE Capital's alleged duties to SunSource.  The SEC may nonetheless ask the Court to let the case proceed because it should be permitted to argue to the jury that the fact that Obus traded two weeks after the May 24, 2001 conversation shows that Strickland told Black SunSource was being acquired.  Compl. ¶¶ 35, 36.  As discussed in detail in the Obus Memorandum at 17-20, the inferences required to premise liability on such reasoning are insufficient to permit this case to go forward.  On summary judgment, "[a]lthough reasonable inferences must be drawn in the SEC's favor, the SEC cannot merely provide circumstantial evidence to show the *possibility* of illegal trading.  The SEC's evidence must be sufficient to allow a reasonable jury [to] find it met its burden of persuasion at trial."  *SEC v. Goldinger*, 106 F.3d 409, 1997 WL 21221, at *3 (9th Cir. 1997) (emphasis in original) (affirming district court's grant of summary judgment for broker-tipper and tippees).  Further, any inference proposed by the SEC at this stage must be supported by "direct or circumstantial evidence to back u[p] [its] legal claims."  *SEC v. Truong*, 98 F. Supp. 2d 1086, 1098 (N.D. Cal. 2000) (granting summary judgment for tipper and tippee

defendants and stating that that the SEC could not defeat summary judgment merely by identifying a defendant's suspicious trading and alleging he had access to material nonpublic information).  The inference must also be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Doral Financial Corp. Securities Litig.*, 563 F. Supp. 2d 461, 464 (S.D.N.Y. 2008).  In the face of unequivocal denials of Black (and Strickland) and the total lack of tape recordings or written corroborating evidence, any jury finding that Black knew or should have known that Strickland breached a duty to SunSource during the course of the conversation would necessarily be based on conjecture and speculation, working backward from the fact of Wynnefield's trade two week's later, or alternatively from the bare allegations in the SEC's Complaint.  Neither is sufficient to withstand a motion for summary judgment.  *SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365, 375 (S.D.N.Y. 2002) (summary judgment cannot be "defeated merely … on the basis of conjecture or surmise") (internal citations omitted); *Pro-Met Trading*, 1982 WL 1330 at *2 (the SEC "may not rely on the allegations or denials in its pleadings" to defeat a motion for summary judgment).

**B.      The SEC's Theory Of Tippee Liability Is Untenable On This Record And Under Controlling Precedent.**

Just as the inferences the SEC is seeking to draw are untenable, its proposed theory of tippee liability with respect to Black is unsound and exceeds the permissible statutory scope of § 10(b) of the Securities Exchange Act.  Common sense – and Supreme Court precedent – dictate that the "tippee's obligation [be] viewed as arising from his *role as a participant* after the fact in the insider's breach of a fiduciary duty." *Dirks*, 463 U.S. at 659 (emphasis added); *see also Batemen Eichler v. Berner*, 472 U.S. 299, 313 (1985) (same).  Absent participation in the tipper's underlying deception, liability would attach to those simply in possession of inside information – a proposition that the Supreme Court has squarely and repeatedly rejected. *See*

13

*Chiarella v. U.S.*, 445 U.S. 222, 233 (1980) (the Court refused to "recognize[] a general duty between all participants in market transactions to forgo actions based on material, nonpublic information," noting that "[f]ormulation of such a broad duty [would] depart[] radically from the established doctrine that duty arises from a specific relationship between two parties."); *Dirks*, 463 U.S. at 657 n.16.

The statutory language of § 10(b) itself, "to use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," requires that the alleged tippee *actually* engage in manipulation or deception – because he has participated directly and knowingly in a co-venture with one who has a fiduciary duty and who has breached it. The Supreme Court has emphasized that the gravamen of Rule 10b-5 is not simply a breach of fiduciary duty to keep information confidential, it is the *deception* of the principal in the self-serving use of the information. *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). *O'Hagan* stressed that "the theory is limited to those who breach a recognized duty." *Id.* at 666. The only record evidence that the SEC had elicited shows that Black received general, unsubstantiated information from a friend about a "potential" project that "might" or might not happen – one that could relate to any of the myriad of transactions in which GE Capital engages. Strickland Dep. at 22:13-23:7. Black relayed this information to Obus. Black's behavior cannot reasonably be characterized as manipulative or deceptive. *See SEC v. Platt,* 565 F. Supp. 1244, 1258 (W.D. Okla. 1983) (granting summary judgment to defendants tippee where the alleged tip was "vague as to source, was not specific as to why Phoenix was a good buy, and contained nothing of substance which would put [the alleged tippee] on notice that he should know that the information was confidential or that it came from an inside source.").

14

To impose liability on Black without any evidence that he was an after-the-fact participant in the deception would be a gross misapplication of the securities laws and an impermissible exercise of the SEC's enforcement power. *See Chiarella*, at 234-35 ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud."). This Court must not permit the SEC to exceed the statutory mandate of § 10(b) in its attempt to craft a theory of liability for Black under the classical theory of insider trading.

## II.   BLACK IS ENTITLED TO SUMMARY JUDGMENT UNDER THE SEC'S MISAPPROPRIATION THEORY OF LIABILITY.

The SEC alternatively claims that Black is liable as a tippee under the misappropriation theory of insider trading, which applies to "outsiders to a corporation who have access to confidential information that will affect the corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Dirks*, 463 U.S. at 653. Under this theory, "the outsider-tipper's duty arises from his relationship to the source of the information rather than to the corporation's shareholders." *SEC v. Gonzalez-Castilla*, 145 F. Supp. 2d 402, 413 (S.D.N.Y. 2001) (citing *O'Hagan*, 521 U.S at 652-53); *see also Cuban*, 2009 WL 2096166 at *11 ("under the misappropriation theory of liability, it is the undisclosed use of confidential information for personal benefit, in breach of a duty not to do so, that constitutes the deception.").

To survive a motion for summary judgment under this formulation of tippee liability, the SEC must be able to identify "specific facts" that Strickland had been entrusted with confidential information by GE Capital, *Pro-Met Trading Co.*, 1982 WL 1330 at *2-3, and that Black knew or should have known that the information he received from Strickland was obtained improperly. *SEC v. Musella*, 748 F. Supp. 1028, 1038 (S.D.N.Y. 1984), *aff'd*, 898 F.2d 138 (2d Cir. 1990). Even if the SEC's allegations that Strickland improperly obtained information from his employer

15

are credited (they should not be at this stage of the proceedings), the evidentiary record precludes the possibility that Black knew or should have known of Strickland's duties to GE Capital or his alleged improper conduct.  The Court should therefore grant Black's motion dismissing the misappropriation claim.

### A. The SEC Has Failed To Identify Any Direct Evidence That Black Was Or Should Have Been Aware Of Strickland's Alleged Duties To GE Capital.

There is no direct evidence that Black was aware of any improper misappropriation of information on Strickland's part.  Nor is there any direct evidence that Black was aware of any duty that Strickland may have owed to GE Capital or had sufficient knowledge to determine if or when Strickland was acting in violation of those duties.  As noted, the only direct evidence consists of the denials by Black and Strickland.  Absent any direct evidence, the SEC will need to proffer indirect proof of Black's scienter.  As discussed in the next section, there is no such proof.

### B. The SEC Has Failed To Identify Any Indirect Evidence That Black Was Or Should Have Been Aware Of Strickland's Alleged Duties To GE Capital.

Lacking any direct evidence that Black knew that Strickland breached any duty to GE Capital, the SEC must anchor its entire case to the fact that the men had been friends since the early 1990's when they met at college to establish that Black knew or should have known that Strickland owed a duty to GE with regard to SunSource.  This relationship, however, does not give rise to a reasonable inference that Black knew either that Strickland (1) owed GE Capital a duty of confidentiality and a duty of non-use, or (2) breached either duty.  Indeed, to give rise to such an inference, the SEC asks this Court to believe that Peter Black is not simply an analyst, he is a telepathist.

16

Because there is no record evidence, the only hint as to the SEC's intentions is found in its Complaint. The only indirect "evidence" that Black knew or should have known of Strickland's duties to GE Capital alleged there are the facts that "Strickland once had lived with Black and Black's parents while Strickland interned in New York City," and that "in the summer of 2002 (after the alleged tipping call on May 24, 2001), Strickland stayed in a vacation home in the Hamptons that Black and others had rented, and later stayed in Black's hotel room while both were traveling in France." Compl. ¶ 30. These allegations, however, serve only to illustrate that the relationship between Strickland was purely social, reinforcing Black's testimony (and Strickland's) that their relationship did not involve the sharing of detailed business activities. As such, they do not give rise to a reasonable inference that Black was aware of any specific duties owed by Strickland to GE Capital. *SEC v. Goldinger*, 1997 WL 21221 at *3 ("the SEC cannot merely provide circumstantial evidence to show the *possibility* of illegal trading") (emphasis in original).

The SEC's reliance on unsupported speculation and unreasonable inferences to impose liability on Black is not sufficient to defeat summary judgment concerning Black's awareness of Strickland's duties or Strickland's alleged breach of those duties, as they extend beyond the permissible "range of reasonable probability." *Radiation Dynamics v. Goldmuntz,* 464 F.2d 876, 887 (2d Cir. 1972). In such situations, the Second Circuit has held it is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests on mere speculation and conjecture." *Id.*; *see also Pro-Met Trading Co.*, 1982 WL 1330 at *2-3 (granting summary judgment for defendant where the evidence viewed most favorably for the plaintiff showed only that defendant's purchase of stock was coincidental with the publication of a

17

favorable article; jury could only speculate that defendant had been informed about the article before buying the stock).

In contrast to the SEC's speculation that Black might have known of Strickland's duties to GE Capital because the two friends travelled socially together, the evidentiary record (and the law of this Circuit) provide a rational explanation concerning what Black "should have" known and negates any attenuated inference the SEC seeks to draw any duties as Strickland owed to GE Capital. Given Black's experience as an analyst – during which Black conducted research, or due diligence, on companies in which Wynnefield was considering investing – and his limited understanding of Strickland's role conducting due diligence at GE Capital, Black reasonably assumed that Strickland was simply performing routine due diligence in the event that GE Capital *might* consider financing a transaction. Black Dep. at 114:19-21; Joint Stmt. ¶ 103. Black's assumption is not only logical under the circumstances, but also based upon explicitly recognized routine analyst activities in the Second Circuit. *See SEC v. Monarch*, 608 F.2d 938, 942 (2d Cir. 1979) (noting that "[a]ll reasonable investors seek to obtain as much information as they can before purchasing or selling a security."); *see also Dirks*, 463 U.S. at 648-49 (recognizing that "[i]t is commonplace for analysts to ferret out and analyze information . . . and information that analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities.") (internal quotations omitted).

Because a factfinder could not reasonably infer from the evidence that Black knew of Strickland's alleged duties to GE Capital and whether he had complied with them, the SEC is left only with its conclusory allegation in the Complaint asserting that "Black knew or should have known that defendant Strickland breached his fiduciary or similar duties of trust and confidence that he owed to his employer ... by giving Black the information about the transaction between

18

SunSource and Allied." Compl. ¶ 51. This allegation in a pleading is insufficient to defeat summary judgment in favor of Black. *See Pro-Met Trading Co.*, 1982 WL 1330 at *2.

**III.  SUMMARY JUDGMENT IS WARRANTED BECAUSE NO DECEPTIVE OR IMPROPER TRADE OCCURRED.**

To prove a violation of the securities laws, the SEC must establish that one or more of the defendants improperly traded on the alleged tip. *See O'Hagan,* 521 U.S. at 650 (a violation of 10b-5 is consummated when, without disclosure, material, non-public information is used to buy or sell securities). At the heart of a violation of § 10(b) and Rule 10b-5, however, is the requirement that the source of the information was deceived. *O'Hagan*, 521 U.S. at 654. That "deception . . . inheres in the *undisclosed* use of information, in breach of a duty not to do so." *Cuban*, 2009 WL 2096166 at *9 (emphasis added); *see also O'Hagan*, 521 U.S. at 643 ("A fiduciary who '[pretends] loyalty to the principal while secretly converting the principal's information for personal gain' 'dupes' or defrauds the principal.") (emphasis added). Despite this statutory requirement of deception, the SEC continues to pursue this case although, according to the SEC, Obus *voluntarily disclosed* the alleged "tip" to the ultimate source of the information *before* trading in SunSource stock. Compl. ¶ 32. This disclosure precludes any finding that Wynnefield's trade could possibly constitute deceptive or manipulative conduct. It further precludes any possibility that Black could be found liable for insider trading and warrants dismissal of the SEC's claims against him.

**A.      Obus' Voluntary Disclosure Of The "Tip" To The Source Of The Information Necessarily Precludes Any Finding Of "Deception."**

On or about May 24, 2001, following Black's conversation with Strickland, Obus called Andrien of SunSource and, according to Andrien's testimony, acknowledged that he had been

tipped by someone at GE Capital.[6]  Andrien Dep. at 543:1-544:5; Joint Stmt. ¶ 126.  While the

SEC attempts to distort this alleged conversation into an admission, *see* Compl. ¶ 32, even if

Andrien's testimony is credited, it was a voluntary disclosure to the ultimate source of the

information.  This disclosure precludes any possible deception as a matter of law and

demonstrates Obus's *fidelity* to SunSource and requires dismissal of these claims.

As discussed in Part IB, *supra,* the Supreme Court has emphasized that the gravamen of

Rule 10b-5 is not simply a breach of a duty to keep information confidential, but rather the

*deception* of the principal in the self-serving use of the information.  *O'Hagan*, 521 U.S. at 652.

In a recent case decided in the Northern District of Texas, *SEC v. Cuban*, the Chief Judge,

relying on Supreme Court and Second Circuit precedent, analyzed § 10(b)'s deception

requirement and concluded that, absent breaches of duties owed to the source of the information

to (i) keep the information confidential and (ii) not to use the information for personal benefit, no

violation could occur.  *Cuban*, 2009 WL 2096166 at *7 (citing *O'Hagan*, 521 U.S. at 652, 655-

56).  Applying these principles, the *Cuban* court refused to impose liability on a shareholder of a

company who received "inside" information from the company's CEO because there was no

deception, even where the recipient agreed to keep the information confidential and

acknowledged that he could not trade on the information.  *Id.* at *2.  In *Cuban*, The SEC alleged

that in June 2004, the CEO of Mamma.com Inc. called Cuban and invited him to participate in

the stock offering *after* Cuban had agreed to keep the information confidential.  *Id.* at *1.  Upon

learning about the stock offering, recognizing that the offering would be dilutive to existing

shareholder, Cuban said: "'Well, now I'm screwed. I can't sell." *Id.*  Within hours of receiving

---

[6] Both Obus and Black dispute Andrien's recollection of this conversation, but Black accepts that for purposes of summary judgment, the Court may consider Andrien's testimony regarding the conversation.

this information, Cuban called his broker and instructed him to sell Cuban's entire position in the Company. *Id.*

Applying the *Cuban* court's deception analysis – which is grounded primarily in Supreme Court and Second Circuit precedent – to the facts here, it is clear that even crediting Andrien's version of the call, Obus simply cannot be deemed to have feigned loyalty to SunSource in an effort to "dupe" Andrien, SunSource, or its shareholders. To the contrary, by calling Andrien, Obus ensured that Andrien and thus SunSource and its shareholders could not possibly have been deceived. In light of the SEC's own allegations, then, it cannot credibly assert that any "use of the information" was "undisclosed" to the source or to SunSource's shareholders subsequent to Obus's conversation with Andrien. As such, there can be no liability as a matter of law. *See O'Hagan*, 521 U.S. at 652 (the "undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information"); *Chiarella*, 445 U.S. at 227 ("[C]ourts have consistently held that insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment.") (internal quotations omitted).

The facts as alleged by the SEC, when viewed in light of the *Cuban* analysis and Supreme Court and Second Circuit precedent, illustrate the overreaching nature of the SEC's position. Once Obus disclosed the information to Andrien, it was incumbent on Andrien as SunSource's CEO to obtain from Obus an agreement (i) to keep the information confidential and (ii) refrain from trading on the information if Obus was to be barred from trading. *Cuban*, 2009 WL 2096166 at *8. Andrien failed, however, to ask Obus to assume either duty. Andrien Dep. at 543:16-544:10; Obus Dep. at 170:25-171:3 (testifying that Andrien did not say anything

21

"substantive" in response); Joint Stmt. ¶ 127. Obus therefore neither agreed to keep the information confidential nor to refrain from using it. It is well settled that such duties cannot be imposed unilaterally. *See United States v. Reed*, 601 F.Supp. 685, 715 (S.D.N.Y.) ("The mere unilateral investment of confidence by one party in the other will not suffice to saddle the parties with the obligations and duties of a confidential relationship") (*rev'd on other grounds*, 773 F.2d 477 (2d Cir. 1985)). Because Obus owed no duties to SunSource or its shareholders, Wynnefield's June 8, 2001 trade was entirely proper. As a result, there can be no liability under the classical theory of insider trading.

Nor is there any liability under misappropriation theory. Obus' complete disclosure[7] to the ultimate source of the "inside information" – SunSource – makes any argument that Obus had a duty to make similar disclosures to GE Capital absurd. The issue is not to whom the disclosure was made, but whether the tippee disclosed the alleged "tip" sufficiently to remove any deception or intent to defraud the source of the information. *O'Hagan*, 521 U.S. at 659 (citing 45 Fed.Reg. 60412 (1980) (trading on misappropriated information "undermines the integrity of, and investor confidence in, the securities markets")). Further, Obus' disclosure to Andrien was the functional equivalent of disclosure to GE Capital, because (according to the SEC) Obus informed SunSource that the alleged "tip" came from GE Capital, thereby conveying to SunSource all the information necessary to provide GE Capital with notice of the disclosure.[8]

Indeed, disclosure by Obus directly to GE Capital would arguably have been futile. In contrast to the typical fact pattern exemplified by *O'Hagan*, Obus was neither an agent nor employee of GE Capital and did not owe GE Capital any direct duties. *See O'Hagan,* 521 U.S.

---

[7] Obus denies that he made any such disclosure to Andrien. To the extent that Andrien's testimony, and/or the SEC's allegations, are credited, however, such disclosure eliminates insider trading liability under either theory.
[8] Neither Andrien nor anyone from SunSource informed GE Capital at the time that Obus allegedly had been "tipped" by someone at GE Capital. Andrien Dep. at 576:19-578:16; Joint Stmt. ¶ 128.

at 653 (individual charged with violations of Rule 10b-5 misappropriated information directly from his employer and its client, and subsequently traded on such information).  Upon the facts presently before the Court, the focus should be not to which source disclosure was made, but rather whether the disclosure was sufficient to remove any deception or intent to defraud the source of the information.

Absent the obligations of nondisclosure and nonuse, and in light of Obus' voluntary disclosure to the source of the information, Obus could not – and did not – deceive SunSource or GE Capital on June 8, 2001, when he caused Wynnefield to purchase a block of SunSource stock.  Viewed properly against the statutory mandate and binding precedent, liability simply cannot be imposed on Black or Obus on the basis of these facts.  Summary judgment should be granted on this ground alone.

## CONCLUSION

For the foregoing reasons, Defendant Peter F. Black respectfully requests the Court grant

his Motion for Summary Judgment.

Dated: September 11, 2009
       New York, New York

COHEN & GRESSER LLP

By:_____/s/_____
      Mark S. Cohen (MC 9055)
      Sandra C. McCallion (SM 0833)
      Oliver S. Haker (OH 6343)
      100 Park Avenue, 23rd Floor
      New York, New York 10017
      (212) 957-7600

      *Attorneys for Defendant Peter F. Black*

24