UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,      :
                                                              :
                              Plaintiff,                      :     06 Civ. 3150 (GBD)
              - against -                                     :
                                                              :     **ECF Case**
NELSON J. OBUS,                                              :
PETER F. BLACK,                                             :
THOMAS BRADLEY STRICKLAND,                                  :
                                                              :
                              Defendants, and                :
                                                              :
WYNNEFIELD PARTNERS SMALL                                   :
        CAP VALUE L.P.,                                     :
WYNNEFIELD PARTNERS SMALL                                   :
        CAP VALUE L.P. I,                                  :
WYNNEFIELD PARTNERS SMALL                                   :
        CAP VALUE OFFSHORE FUND, LTD.,                      :
                                                              :
                              Relief Defendants.             :
                                                              :
-------------------------------------------------------------- x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT NELSON OBUS'S
MOTION FOR SUMMARY JUDGMENT**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4305

*Attorneys for Defendant Nelson Obus*

**ATTORNEY-CLIENT PRIVILEGE**
**ATTORNEY WORK PRODUCT**
**DRAFT – 9/12/2009 12:03 AM**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

    I.     GE Capital's Involvement with SunSource ................................................ 3

    II.    Strickland and Black's Conversation about SunSource ............................ 6

    III.   The Wynnefield Funds' Purchases of SunSource Stock in June 2001 ............... 10

ARGUMENT ........................................................................................................................ 11

    I.     The SEC Has Failed to Establish that Defendants Obus and Black Are
        Liable Under the Classical Theory of Insider Trading ........................................ 12

        A.    GE Capital and Strickland Were Not Temporary Insiders of
             SunSource. .................................................................................. 12

        B.    Even if Strickland Owed a Fiduciary Duty to SunSource as a
             Temporary Insider, Neither Obus Nor Black Knew or Were
             Reckless in Not Knowing of Any Alleged Breach of that Duty .............. 16

    II.    The SEC Has Failed to Establish that Black and Obus Are Liable Under
        the Misappropriation Theory of Insider Trading. ................................................ 19

        A.    Strickland Did Not Misappropriate Confidential Information from
             GE Capital in Breach of a Fiduciary Duty Owed to GE Capital. ............ 19

        B.    Even if Strickland Breached His Fiduciary Duty to GE Capital in
             Allegedly Tipping Black, Neither Black nor Obus had the
             Requisite Knowledge of Strickland's Alleged Breach. .......................... 23

CONCLUSION ..................................................................................................................... 25

**ATTORNEY-CLIENT PRIVILEGE**
**ATTORNEY WORK PRODUCT**
**DRAFT – 9/12/2009 12:03 AM**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................. 11

*Azurite Corp. Ltd. v. Amster & Co.*,
844 F. Supp. 929 (S.D.N.Y. 1994) ....................................................... 17, 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................. 3, 11

*D'Amico v. City of New York*,
132 F.3d 145 (2d Cir. 1998) ............................................................... 11, 12

*Design Strategies, Inc. v. Davis*,
367 F. Supp. 2d 630 (S.D.N.Y. 2005) ...................................................... 23

*Dirks v. SEC*,
463 U.S. 646 (1983) ............................................................ 12, 13, 21, 22

*Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*,
524 F.2d 275 (2d Cir. 1975) .................................................................... 13

*Greenberg v. Chrust*,
198 F. Supp. 2d 578 (S.D.N.Y. 2002) ...................................................... 13

*Mfrs. Hanover Trust Co. v. Yanakas*,
7 F.3d 310 (2d Cir. 1993) ........................................................................ 13

*Moss v. Morgan Stanley Inc.*,
719 F.2d 5 (2d Cir. 1983) .................................................................. 14, 15

*Pennsylvania Ave. Funds v. Dorey*,
No. C06-1737RAJ, 2008 WL 426509 (W.D. Wash. Feb. 13, 2008) ........... 15

*Radiation Dynamics, Inc. v. Goldmuntz*,
464 F.2d 876 (2d Cir. 1972) .................................................................... 24

*Roswell Capital Partners LLC v. Alternative ConsDep. Tech.*,
No. 08 Civ. 10647, 2009 WL 2163605 (S.D.N.Y. Jul. 20, 2009) ................. 13

*SEC v. Cherif*,
933 F.2d 403 (7th Cir. 1991) ................................................................... 22

*SEC v. Cuban*,
No. 3:08-CV-2050-D, 2009 WL 2096166 (N.D. Tex. July 17, 2009) ........... 16

*SEC v. Goldinger*,
No. CV-91-3445, 1995 U.S. Dist. Lexis 22168 (C.D. Cal. May 12, 1995),
*aff'd*, 106 F.3d 409, 1997 WL 21221 (9th Cir. 1997) ................................. 20

**ATTORNEY-CLIENT PRIVILEGE**
**ATTORNEY WORK PRODUCT**
DRAFT – 9/12/2009 12:03 AM

**TABLE OF AUTHORITIES**   *(continued)*

<u>**Page(s)**</u>

*SEC v. Gonzalez de Castilla,*
    184 F. Supp. 2d 365 (S.D.N.Y. 2002) ........................................................ 1, 16

*SEC v. Lyon,*
    605 F. Supp. 2d 531 (S.D.N.Y. 2009) ........................................................ 11

*SEC v. Materia,*
    1983 WL 1396 (S.D.N.Y. 1983), *aff'd,* 745 F.2d 197 (2d Cir. 1984) ............ 23

*SEC v. Mayhew,*
    916 F. Supp. 123 (D. Conn. 1995) ........................................................ 15, 16

*SEC v. Monarch Fund,*
    608 F.2d 938 (2d Cir. 1979) ........................................................ 17, 18, 20, 21

*SEC v. Platt,*
    565 F. Supp. 1244 (W.D. Okla. 1983) ........................................................ 24, 25

*SEC v. Seibald,*
    No. 95 CIV.2081, 1997 WL 605114 (S.D.N.Y. Sept. 30, 1997) ................. 20

*SEC v. Switzer,*
    590 F. Supp. 756 (W.D. Okla. 1984) ........................................................ 19, 22, 23

*SEC v. Truong,*
    98 F. Supp. 2d 1086 (N.D. Cal. 2000) ........................................................ 2, 18

*United States  v. Carpenter,*
    791 F.2d 1024 (2d Cir. 1986) ........................................................ 21, 22

*United States v. Cassese,*
    273 F. Supp. 2d 481, *aff'd,* 428 F.3d 92 (2d Cir. 2005) ........................ 14, 15

*United States v. Chestman,*
    947 F.2d 551 (2d Cir. 1991) ........................................................ 13, 15, 19

*United States v. Chiarella,*
    445 U.S. 222 (1989) ........................................................ 12, 22

*United States v. Libera,*
    989 F.2d 596 (2d Cir. 1993) ........................................................ 21, 22

*United States v. Mylett,*
    97 F.3d 663 (2d Cir. 1996) ........................................................ 23

*United States v. O'Hagan,*
    521 U.S. 642 (1997) ........................................................ 19, 22

*Walton v. Morgan Stanley & Co. Inc.,*
    623 F.2d 796 (2d Cir. 1980) ........................................................ 16

**ATTORNEY-CLIENT PRIVILEGE**
**ATTORNEY WORK PRODUCT**
DRAFT – 9/12/2009 12:03 AM

**TABLE OF AUTHORITIES**   *(continued)*

<u>**Page(s)**</u>

**RULES**

Fed. R. Civ. P. 56(c) ................................................................................................ 11

Defendant Nelson Obus submits this Memorandum of Law in Support of His Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

During the more than eight years since the alleged tip in this case, and the seven years since the SEC began investigating Defendants' actions, the SEC has failed to adduce sufficient direct or circumstantial evidence to permit a reasonable jury to infer that Defendants engaged in insider trading under either of its two theories of liability. Although the SEC was afforded and took what most plaintiffs cannot obtain – one-sided, pre-pleading discovery within a year of the alleged events, including documents and sworn, on-the-record testimony from all Defendants and many other important witnesses – the SEC's complaint notably lacked substance and consisted of conclusory allegations. Indeed, at the motion to dismiss stage, the Court observed about the SEC's complaint that "the facts are sparse," and it made clear that its denial of Defendants' motions to dismiss "did not mean obviously at some stage in this proceeding that it would not be ripe for a consideration of summary judgment." [Tr. of Oral Argument, Feb. 15, 2007, at 59:23-60:1, 64:9-13 (Dunning Decl. Ex. JJ)].

Now, at the summary judgment stage, after filing an amended complaint and taking an additional year's worth of discovery, the SEC still rests its case on the same unsupported allegations that barely withstood dismissal, namely that Strickland owed and breached a duty to SunSource and/or GE Capital when he communicated with Black about SunSource, and that Black and Obus knew or were reckless in not knowing of Strickland's duty and breach. The SEC's burden, however, is now much higher than it was before, and its speculation, without more, cannot withstand the more demanding standard of summary judgment, for it is well-established that allegations rooted in "conjecture or surmise" are simply "unsupported allegations [that] do not create a material issue of fact." *SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365, 375 (S.D.N.Y. 2002).

1

Instead of allegations, the SEC must now offer evidence that establishes or allows a reasonable inference for the factual and legal predicates of duty, breach, and knowledge under each of its two theories, not just allegations of those elements.  This it cannot do.  The record does not support any reasonable inference that Strickland and GE Capital were temporary insiders of SunSource under the classical theory.  Rather, they were potential lenders engaged in arms-length negotiations with SunSource, they never entered into any special relationship with SunSource, and they therefore owed it no fiduciary duty.  Nor is it reasonable to infer from the facts that Strickland breached a duty to his employer, GE Capital, under the misappropriation theory, because discovery revealed that his employer determined after a thorough investigation that when he spoke with Black about SunSource, Strickland acted with no malice or intent and was actually engaged in underwriting per his job responsibilities.

Moreover, even if Strickland had breached a duty owed to either SunSource or GE Capital, the record confirms that Black and Obus did not know, and could not have known, that Strickland breached any duty to either entity.  The factual record shows that Strickland's communication with Black was so lacking in detail and substance about SunSource that Black and Obus did not know – and could not have known – what the source of the alleged tip was, that the information communicated to Black was confidential, and that Strickland was acting inappropriately with respect to either SunSource or GE Capital.  To the contrary, the reasonable inference from the facts is that Black and Obus logically assumed that Strickland was doing his job by making a due diligence inquiry of Black, as Strickland's employer concluded.

Although mere allegations of liability can withstand challenges to a motion to dismiss, "[a]fter a respectable period of time for discovery through interrogatories, requests for admissions, requests for the production of documents, and depositions, reliance upon pure speculation is unacceptable." *SEC v. Truong*, 98 F. Supp. 2d 1086, 1098 (N.D. Cal. 2000) (quotations and citations omitted).  Accordingly, Defendants are now entitled to prevail simply by establishing the absence of evidence of any essential element of the SEC's case, because "a complete failure of

proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The SEC's wholesale failure of proof on essential elements of its classical and misappropriation claims is undeniable from this record. Therefore, this Court should grant summary judgment in Defendants' favor.

## STATEMENT OF FACTS[1]

### I.   GE Capital's Involvement with SunSource

On March 9, 2001, G. Cabell Williams III, of Allied Capital ("Allied"), wrote to Maurice Andrien, the Chief Executive Officer ("CEO") of SunSource, Inc. ("SunSource"), proposing to "proceed with management in pursuing an acquisition of 100% of the outstanding shares of SunSource, Inc." H01569 (Dunning Decl. Ex H). On April 23, 2001, Karl Slosberg joined GE Capital in Business Development Originations, where his job responsibilities included prospecting for financing opportunities for GE Capital. Slosberg Dep. (Dunning Decl Ex. L) at 15:8-10, 17:4-17, 17:25-18:3, 20:5-21:17, Jan. 30, 2008. Slosberg had known Andrien since the mid-1990s when Andrien was the CEO of Curtis Industries and Slosberg was working at Fleet Financial Services. *Id.* at 27:7-16. Soon after Slosberg began working at GE Capital, Slosberg called Andrien, who told him that SunSource was seeking financing to divest one of its subsidiaries, STS Technologies, and asked him whether he would be interested in looking at the financing. *Id.* at 31:24-32:7, 33:22-34:7. Andrien also told Slosberg that the divestiture of STS (the "STS Sale") was part of a larger going-private transaction. *Id.* at 34:5-7.

Slosberg then contacted his boss, Joseph Wiles, a team leader in business origination at GE Capital. Wiles Dep. (Dunning Decl. Ex. K) 33:4-20, 36:4-6, 66:14-17, Feb. 5, 2009. On April 30, 2001, Slosberg and Wiles met with Andrien and Joseph Corvino, SunSource's Chief Financial Officer ("CFO"), to discuss whether GE Capital might be able to finance the potential SunSource

---

[1]   A full statement of the relevant facts is set forth in the accompanying Defendants' Joint Local Rule 56.1 Statement of Undisputed Material Facts as to Which There is No Genuine Issue to Be Tried in Support of Their Motions for Summary Judgment.

transactions.  Slosberg Dep. at 34:11-36:16; Wiles Dep. at 70:24-71:6.  Wiles and Slosberg, along with Michael Lustbader, a lead underwriter at GE Capital, met a second time with Andrien and Corvino in early May to further discuss the potential financings.  Wiles Dep. at 71:20-72:11.

On May 11, 2001, GE Capital sent Allied a proposal letter, expressing "its interest in providing up to $40 million of financing…in support of the management buyout of SunSource Technology Services, Inc."  GE5712 (Dunning Decl. Ex. O).  On May 21, GE Capital also sent Corvino a letter in which it proposed $95 million worth of financing in support of Allied's buy-out of "SunSource and all operating subsidiaries."  GE0007497-7502 (Dunning Decl. Ex. P).

Defendant Bradley Strickland, an associate at GE Capital, was assigned to work on the potential SunSource matters.  Wiles Dep. 73:2-10; Strickland Dep. (Dunning Decl. Ex. J) 20:13-15, 70:5-9, June 3, 2008.  On May 14, Strickland received an e-mail and attachment, which had originally been sent by Jim Powell of Allied Capital to Corvino, who then forwarded the e-mail and attachment to Slosberg and Wiles; Wiles in turn sent them to Lustbader, who sent them to Strickland and one of his colleagues.  GE2002405-2423 (Dunning Decl. Ex. N).  The attachment was a "deal book" prepared by Allied for potential lenders containing information about a transaction in which "Allied Capital was contemplating, in cooperation with SunSource's management, a buy-out of SunSource in which SunSource would be taken private."  *Id.* at GE2002408.  The first page of the deal book stated:  "This memorandum is covered by a confidentiality and non-disclosure agreement between Your Institution and Allied Capital Corporation."  *Id.* at GE2002407.  The next day, Strickland and Slosberg attended a meeting with Corvino at SunSource's office in Philadelphia during which Corvino asked Slosberg numerous questions about what GE Capital could advance on STS's assets as part of a potential financing of the STS divestiture and how quickly GE Capital could arrange for that financing, in which SunSource's management would have been the borrower.  Strickland Dep. 86:5-25, 76:8-12; Slosberg Dep. 131:14-18.

Meanwhile, SunSource was also talking with several other banks about potentially

4

financing the STS divestiture, and was actively engaged in negotiations with two banks --
Congress and Foothill, the bank that ultimately financed the STS divestiture.   Slosberg Dep. 58:8-
59:2; Corvino Dep. 262:10-20 (Dunning Decl. Ex. G), Feb. 26-27, 2008.  As Corvino testified,
SunSource was "not giving GE Capital an exclusivity regarding that financing we had talked
about with lenders."  *Id.* at 262:5-9.  Rather, according to Andrien, GE Capital was "a bidder, if
you will, or a contender for the STS separate financing."  Andrien Dep. 359:21-23 (Dunning Decl.
Ex. Q), March 4-5, 2008.

On May 25, 2001, the day after the alleged tip at issue in this case, Corvino faxed to Wiles
and Slosberg a revised version of the May 11 GE Capital proposal letter for the potential financing
of the STS divestiture, which had been originally addressed to Izzo but which Corvino had
executed in his name instead.  GE0005711-17 (Dunning Decl. Ex. _).  By its terms, the "letter was
simply an indication of interest and did not constitute a commitment or undertaking to provide
financing."  *Id.* at GE0005712.  The letter contained a list of 21 proposed terms, "all to be
acceptable to GE Capital," and some of which Corvino had altered before signing.  *Id.* at
GE0005715.  It also contained a paragraph forbidding SunSource from disclosing the contents of
the letter other than to officers, employees, or advisors of SunSource involved in the transaction.
*Id.* at GE0005716.  This paragraph, which used language standard in most GE Capital proposal
letters, imposed no corresponding duty of confidentiality on GE Capital for the STS transaction.
Wiles Dep. 130:14-131:4, 96:2-19.  Consistent with its plain language, Corvino understood this
paragraph to impose an obligation of confidentiality not on GE Capital but on SunSource only.
Corvino Dep. 607:24-609:6.  In connection with the proposal letter, Corvino also forwarded GE
Capital an underwriting deposit of $50,000.00 so that it would begin its due diligence and field
audit.  Slosberg Dep. 56:16-19; GE1005327 (Dunning Decl. Ex. R); GE0005717.

During this period of discussions about possible financings, SunSource never asked GE
Capital for a confidentiality agreement for the proposed financing of the STS Sale, even though it
was GE Capital's standard practice for the potential customer to request the confidentiality

agreement if there was to be one.  Wiles Dep. 124:8-12; 43:5-11.  Nor was there a confidentiality agreement put in place during this time concerning GE Capital's proposed participation in the financing of the going-private transaction.  Slosberg Dep. 52:3-12.

Ultimately, SunSource refused GE Capital's proposal on the financing of the STS divestiture.  Corvino Dep. 344:16-18.  However, GE Capital continued to try to participate in the financing of Allied's buyout of SunSource, which Allied was contemplating in concert with SunSource's management.  Wiles Dep. 107:23-10.  GE Capital's proposed role in the buyout was that of a senior lender.  *Id.* at 108:11-16.  Because SunSource's management would be involved in the buyout, GE Capital was concerned about SunSource management's capabilities and background.  *Id.* at 108:6-109:19.

## II.    Strickland and Black's Conversation about SunSource

Strickland, Black, and Obus all recall the events of Strickland and Black's conversation about SunSource on or about May 24, 2001 – which the SEC alleges somehow constituted the "tip" in this case, *see* Am. Compl. (Dunning Decl. Ex. C) ¶ 31-- in the same general way.  While Strickland was performing due diligence in connection with the STS and buyout transactions, he noticed that Wynnefield Capital, Inc. (hereinafter, "Wynnefield") was an owner of SunSource. Strickland Dep. 123:19-124:16.  Strickland knew that his friend, Defendant Peter Black, worked at Wynnefield.  *Id.* at 115:2-22.  As part of his due diligence efforts, Strickland asked Black, on or about May 24, 2001, what he thought about SunSource management.  *Id.* at 121:19-21, 122:7-17. He had a "high-level" conversation with Black in which he mentioned that "we were looking at doing some potential business with SunSource," *id.* at 121:11-15, and asked Black for his "impression of management and the position of the company in the industry." *Id.* at 121:19-21.

Black testified that he had a conversation with Strickland in which Strickland told Black that he had noticed that Wynnefield was a large shareholder of SunSource and then asked Black questions about the quality of the SunSource management team.  Black Dep. (Dunning Decl. Ex. D) 107:7-10, June 10, 2008.  Strickland also asked Black his general opinions of SunSource's

6

performance and about SunSource's various divisions.  *Id.* at 107:13-15.  Strickland said to Black that GE Capital possibly was going to work with SunSource, which Black assumed meant that GE Capital might have an opportunity to work on a financing of SunSource.  *Id.* at 111:15-113:12.

Black considered Strickland's questions to be a due diligence inquiry: "Strickland mentioned that as part of researching potential candidates he asked about the quality of management, he would do background checks, his questions were general in nature about whether these were good guys and whether the company SunSource had good prospects, which,…to me is due diligence."  *Id.* at 114:22-115:6.  Black testified that Strickland did not ask him any specific questions about the performance of the business; "it was general high-level stuff, what are they like, how are the divisions doing, have you met them before."  *Id.* at 115:17-20.  At the time of this conversation, Black knew that Strickland worked at GE Capital and that he was a junior person who researched potential new clients and performed due diligence.  *Id.* at 95:16-96:18.  Black did not know that Strickland's job included working on potential financing of mergers and acquisitions.  *Id.* at 97:11-98:25.

Shortly after Black's conversation with Strickland, Black mentioned to his boss, Defendant Nelson Obus, that a friend of his at GE Capital had asked him a few questions about SunSource and had said "that they were thinking of working with SunSource."  *Id.* at 118:11-25.  Obus testified that he remembered Black saying that he had received "a call from someone at GE Capital asking why we owned the stock SunSource, asking a lot of questions about why we owned the stock."  Obus Dep. (Dunning Decl. Ex. F) 161:17-22, June 17, 2008).  Obus "couldn't imagine why someone from GE Capital would be calling unless there was some kind of financing out there."  *Id.* at 173:5-12.  Obus's impression of Black's conversation with Strickland was that GE Capital might have been considering a PIPE ("private investment in public equity") financing of SunSource similar to the PIPE investment that Allied Capital had previously made in SunSource in December 2000.  *Id.* at 109:20-110:22, 164:11-23.  Obus had disliked the earlier PIPE because SunSource had turned to Allied for its financing needs instead of to its current shareholders, one of

which was Wynnefield.  *Id.* at 164:5-10; 112:15-22.

Concerned that GE was exploring a possible PIPE investment that would have excluded shareholders like Wynnefield, Obus telephoned Andrien, with whom he had a good relationship, to express his concern that SunSource was not turning to its shareholders to satisfy its short-term capital needs.  *Id.* at 164:18-24; 168:15-16.  Obus told Andrien that he hoped SunSource was not "doing another PIPE, and if they were, he hoped Andrien would reconsider if they needed more capital to move along the lines of involving current shareholders, which is common practice."  *Id.* at 170:3-8.  Andrien's recollection of this telephone call is that Obus told him that Obus heard from "a little birdie" at GE Capital that SunSource was going to be sold.  Andrien Dep. 542:19-544:13.  Obus testified that during this call with Andrien, Obus "did a little bit of what's called puffing,…where you kind of act a little more sure than you might be in order to…convince the person on the other side that if indeed,…he is up to this, that he ought to alter his ways before anything gets cast in concrete."  Obus Dep. 174:19-175:2.

At the time of Strickland's conversation with Black, GE Capital had not placed SunSource on its "transaction restricted list," GE20410-GE411 (Dunning Decl. Ex. T), which was a list of all companies about which GE Capital employees possessed nonpublic information as a result of their participation in a particular transaction.  Wiles Dep. 123:11-21.  GE Capital deal teams placed companies on the transaction restricted list as soon as anyone became aware of confidential nonpublic information about the company.  *Id.* at 123:22-124:12; Lustbader Dep. (Dunning Decl. Ex. U) 122:23-123:4, Feb. 6, 2008.  SunSource was not added to the transaction restricted list until June 19, 2001, the day the Allied-SunSource merger was announced, when, according to the supporting documentation for the list, GE Capital had "Access to Material Inside Information" about SunSource.  GE0020410.  This was twenty-six days after the SEC alleges that Black and Obus were tipped and eleven days after Wynnefield purchased the block of SunSource at issue in this litigation.  Am. Compl. ¶¶ 31, 35.

Likewise, in May 2001, when Strickland asked Black about SunSource management, there

was no policy at GE Capital that specifically prohibited divulging the name of a potential

borrower.  Slosberg Dep. 98:10-23.  Wiles testified that in 2001, GE Capital participated in a large

spectrum of financial deals, including credit card financing, equipment leases, aircraft leases,

senior loans, and equity investments in companies.  Wiles Dep. 143:4-14.  If a GE Capital

employee revealed to a third party that GE Capital was "looking at a transaction or considering a

transaction," that transaction could refer to any number of transactions, "everything from

financing xerox machines to a going private transaction."  *Id.* at 143:4-14.

In its subsequent internal investigation of Strickland's conversation with Black, GE Capital

concluded that, far from engaging in any sort of illegal "tip" of confidential and nonpublic

information, Strickland was "actually trying to do some underwriting" when he asked Black about

his impressions of SunSource management.  Brasser Dep. (Dunning Decl. Ex. I 125:8-9, April 23,

2008.  During its investigation, GE and its counsel interviewed Strickland and noted that

Strickland had testified before the SEC staff concerning his involvement in the proposed

financings of SunSource.  GECC0000100-01 (Dunning Decl. Ex. W).  It was GE Capital's

"understanding that Strickland was personally acquainted with an employee of Wynnefield Capital

Management LLC," and that "at the time Strickland was working on the SunSource matter, he

became aware that Wynnefield was a significant shareholder of SunSource, Inc. and that

Strickland asked this individual his views concerning SunSource, Inc. and its management."  *Id.*  It

was GE Capital's further "understanding that Strickland did not discuss the nature of the specific

transaction being contemplated, but told his individual that GE was considering potential business

with SunSource."  *Id.*  GE Capital noted that Strickland indicated that his "inquiry was part of a

due diligence effort to obtain insight on the Company SunSource."  *Id.*

GE Capital placed a letter of reprimand in Strickland's file because it determined that

Strickland should have consulted with his manager or legal counsel before contacting a third party,

but GE Capital did not terminate Strickland's employment or otherwise punish Strickland.  *See id.*

While the letter indicated that Strickland "showed a lack of judgment and a disregard of GE

policies," it nowhere concluded that Strickland violated any duties to GE Capital or its potential

clients—GE Capital merely "called Strickland's attention to" a policy that employees are "'urged

to consult with Company legal counsel'" to determine whether certain communications are needed

and 'being undertaken in an appropriate manner.'" *Id.* GE Capital's view, in short, "was that

Strickland made a mistake." Brasser Dep. 124:22-24. More specifically, the company's ultimate

"finding was that Brad Strickland made a mistake by…inquiring about the borrower that we were

looking to provide the financing for, and that he did not do it with any sort of malice or intent."

*Id.* at 131:10-14.

### III.    The Wynnefield Funds' Purchases of SunSource Stock in June 2001

On June 8, 2001, more than two weeks after Strickland and Black's conversation about

SunSource, Baron Bruno, a trader at Cantor Fitzgerald's Los Angeles office, received an order to

sell SunSource stock at 9:37 a.m. EST. Bruno Dep. 66:19-67:17 (Dunning Decl. Ex. X), Dec. 14,

2007; C00015 (Dunning Decl. Ex. Z). He contacted SunSource's Corvino and left him a

voicemail message to determine whether he or someone else at SunSource had an interest in

buying the stock. Bruno Dep. 33:7-25, 36:25-37:3, 67:2-9. Bruno then contacted Wynnefield's

trader, Stephen Zelkowicz, and asked him whether Wynnefield had an interest in buying the block

of SunSource stock. *Id.* at 68:3-17; C00015. Zelkowicz responded to Cantor's unsolicited offer

by indicating at 12:07 p.m. EST that Wynnefield would purchase the stock. Bruno Dep. 68:3-17;

C00015. At that point, Bruno, on Wynnefield's behalf, worked with Cantor's salesperson

representing the seller of the shares to negotiate the terms of the trade (number of shares and price

per share), which were finalized by 12:37 p.m. EST, the time when the trade actually commenced.

Bruno Dep. 68:21-70:4. As a result of Bruno's offer to sell it SunSource shares, Wynnefield

purchased a total of 287,200 shares of SunSource stock at $4.80 per share on June 8, 2001 through

Cantor Fitzgerald. Zelkowicz Dep. (Dunning Decl. Ex. AA) 93:12-19, June 4, 2008.

On June 11, 2001, the first business day following June 8, Wynnefield sold 6,000 shares of

SunSource stock. WYNN-CC 02152 (Dunning Decl. Ex. BB). On June 19, 2001, after the public

announcement of Allied's buyout of SunSource, Wynnefield purchased 38,400 more shares of SunSource at $9.5290 per share, and the next day, it purchased another 111,600 SunSource shares at $9.4828 per share.  WYNN-CC 03037 (Dunning Decl. Ex. CC).

## ARGUMENT

With fact discovery now complete, the facts that the SEC has put forth remain too sparse to support its attenuated theories of liability.  This Court should accordingly grant summary judgment for Defendants.  As this Court well knows, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law" on any essential element of the nonmoving party's case.  Fed. R. Civ. P. 56(c); *see also* Celotex, 477 U.S. at 323.  While the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in that party's favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment, *id*.  Rather, to defeat summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* "Mere conclusory allegations [or] speculation," unaccompanied by "'some hard evidence' in support of [the nonmoving party's] factual assertions,'" are insufficient.  *SEC v. Lyon*, 605 F. Supp. 2d 531, 540 (S.D.N.Y. 2009) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

The SEC cannot survive this standard here.  With respect to the SEC's "classical" theory of this case, there is simply no evidence in the record to support a finding that Strickland or his employer, GE Capital, owed a fiduciary duty of loyalty to SunSource such that they were "temporary insiders" of that company at the time of Strickland's alleged tip to Black, a necessary predicate for liability under the classical theory.  As such, no reasonable jury could find either that Strickland breached any such duty in his conversation with Black, or that Obus or Black could or should have been aware of any such breach.  Likewise, with respect to the SEC's

"misappropriation" theory, the record is virtually devoid of any concrete evidence that, in speaking with Black about SunSource, Strickland was in effect stealing and misusing confidential information from his employer in breach of a duty to GE Capital, or that either Obus or Black knew or had any reasons to suspect that he was allegedly doing so.  To the contrary, Strickland's own employer—Strickland's specific duties to which define the scope of his fiduciary duties under the misappropriation theory—concluded after investigation that he was guilty of no serious wrongdoing.  Like the SEC's allegations with respect to its classical theory, its allegations with respect to its misappropriation theory rest entirely on "conclusory allegations [and] speculation," thus mandating a grant of summary judgment in Defendants' favor on that theory as well.  *See D'Amico*, 132 F.3d at 149.

I.    **The SEC Has Failed to Establish that Defendants Obus and Black Are Liable Under the Classical Theory of Insider Trading.**

The classical theory of insider trading predicates liability on a corporate insider's breach of a fiduciary duty owed to the shareholders of his or her company through trading in the shares of the company on the basis of material nonpublic information.  *United States v. Chiarella*, 445 U.S. 222, 227-28 (1989).  Neither Strickland nor GE Capital were corporate insiders of SunSource. Hence, the only way that Obus or Black could be liable as tippees under the classical theory is if Strickland and GE Capital somehow assumed the position of "temporary insiders" who, by virtue of some special relationship with SunSource, actually owed the same duty to SunSource shareholders as did corporate insiders of SunSource itself.  *See Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983) (citations omitted).  Even then, to prove liability, the SEC would still also have to show, among other things, that Obus and Black knew or had reason to know that Strickland breached a duty that he owed to SunSource shareholders as a temporary insider of the company when he communicated with Black on May 24, 2001.  *Id.*  at 661.  On the undisputed record before this Court, the SEC cannot establish either point.

A.    **GE Capital and Strickland Were Not Temporary Insiders of SunSource.**

Mere possession of nonpublic information by itself is insufficient to turn a corporate

outsider into a temporary insider under the law of insider trading.  *See id.* at 655 n.14 (citations

omitted).  Rather, an outsider becomes a temporary insider only by "hav[ing] entered into a special

confidential relationship in the conduct of the business of the enterprise," *id.* (citations omitted),

such as the relationship between principal and agent, lawyer and client, or another similar

arrangement evincing some traditional indicia of trust and confidence that lie at the heart of the

fiduciary relationship.  *Id.*; *see also United States v. Chestman*, 947 F.2d 551, 565 (2d Cir. 1991).

No such relationship existed in this case between GE Capital and SunSource.[2]

At the time of the alleged tip in this case the evidence shows *only* that GE Capital and

SunSource were engaged in arms-length potential lending discussions.  The law presumes that the

arms-length relationship between a borrower and a lender is not a fiduciary relationship.  *Roswell*

*Capital Partners LLC v. Alternative ConsDep. Tech.*, No. 08 Civ. 10647, 2009 WL 2163605, at *6

(S.D.N.Y. Jul. 20, 2009) (citation omitted).  A lender thus owes no fiduciary duty to a borrower

unless there is "'a confidence reposed which invests the person trusted with an advantage in

treating with the person so confiding, or an assumption of control and responsibility.'"  *Id.* at *6

(quoting *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993)); *see also Greenberg*

*v. Chrust*, 198 F. Supp. 2d 578, 585 (S.D.N.Y. 2002) ("Where parties deal at arms length in a

commercial transaction, no relation of confidence or trust sufficient to find the existence of a

fiduciary relationship will arise absent extraordinary circumstances.") (citation omitted); *see*

*generally Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*, 524 F.2d 275, 278-79 (2d Cir. 1975)

(investment companies that traded on confidential information during arms-length negotiations for

private placement of debentures owed no fiduciary duty to selling corporation).  To establish a

fiduciary duty in the context of arms-length negotiations, the "plaintiff must "set forth facts that

turn the negotiations from arm's length bargaining into a fiduciary relationship."  *Moss v. Morgan*

---

[2]  Because Strickland's alleged status as a "temporary insider" of SunSource could only have
    been derivative of his employer's (GE Capital) temporary insider status, the temporary insider
    discussion in this section refers only to the GE Capital's relationship with SunSource.

*Stanley Inc.*, 719 F.2d 5, 14 (2d Cir. 1983) (internal quotations omitted).

The SEC is unable to do so here, for it has established no facts whatsoever to show that GE Capital and SunSource had progressed beyond the point of arms-length commercial negotiations and had entered into a special fiduciary relationship at the time of Strickland's conversation with Black.  At the time, SunSource was actively negotiating potential financing packages with several banks; as Corvino pointed out, SunSource did "not give GE Capital an exclusivity regarding the financing it had talked about with lenders" and did not consider GE Capital to be its agent; SunSource and GE Capital never executed a confidentiality agreement regarding the potential loans under consideration; indeed, SunSource never even asked GE Capital to sign a confidentiality agreement, even though it was standard practice among GE Capital's potential customers to insist upon such an agreement; SunSource itself likewise had not signed any confidentiality agreement by May 24; nor had SunSource paid any retainer to GE Capital or signed or returned GE Capital's proposal letter by that date, which letter, in any event, was "simply an indication of interest and did not constitute a commitment or undertaking to provide financing;" and even the SunSource official who later executed that letter understood it to impose some duty of confidentiality only on SunSource and not on GE Capital.

That understanding, and the lack of any confidentiality agreement between GE Capital and SunSource, is powerful evidence of the absence of any fiduciary relationship of the sort that the SEC conclusorily asserts.  Courts examining insider trading claims where the alleged insider received confidential information during an arms-length negotiation  have considered the lack of an explicit confidentiality agreement as persuasive evidence that the insider owed no fiduciary duty to the source of the information.  *See, e.g., United States v. Cassese*, 273 F. Supp. 2d 481, 487 (noting that neither defendant nor anyone else from his company executed a confidentiality agreement with insider company); *Pennsylvania Ave. Funds v. Dorey*, No. C06-1737RAJ, 2008 WL 426509, at *3-4 (W.D. Wash. Feb. 13, 2008) (rejecting claims under both classical and misappropriation theories because defendant who obtained confidential information about

company during bid process did not sign nondisclosure agreement until after it bought company's stock, even though defendant ultimately funded acquisition in exchange for fifty-percent stake in company); *SEC v. Mayhew*, 916 F. Supp. 123, 130 (D. Conn. 1995) (despite information source's expectation that tippee keep information confidential, evidence did not establish fiduciary relationship in part because of lack of confidentiality agreement between source and tippee, or between their companies).

That GE Capital and Strickland may have received confidential information in the course of GE Capital's discussions with SunSource does not alter this analysis.  As an initial matter, the fact that the e-mail attachment received by GE Capital and Strickland contained a copy of a confidentiality agreement between Allied and SunSource is irrelevant to whether GE Capital had entered into its own confidentiality agreement with SunSource by the time of the alleged tip, which, as explained *supra*, both SunSource and GE Capital understood not to have happened. Moreover, even if SunSource had provided GE Capital with confidential information by May 24, 2001, GE Capital would not thereby have become SunSource's fiduciary.  It is well-established that the mere receipt of confidential information, without more, does not give rise to a fiduciary duty.  *See, e.g., Chestman*, 947 F.2d at 568 ("Reposing confidential information in another… does not by itself create a fiduciary relationship."); *Moss*, 719 F.2d at 13-14 (bank and its tipping employee owed no fiduciary duty to target corporation in whose shares employee traded even though bank obtained confidential financial information about target during representation of target's potential acquiror); *Cassese*, 273 F. Supp. 2d at 485 (a fiduciary duty cannot be unilaterally forced upon party by entrusting it with confidential information).

That SunSource might have assumed that GE Capital would keep any information confidential—which, incidentally, is a point for which the SEC has adduced no evidence anywhere in the record—is likewise beside the point.  Because "courts will not construct a duty of confidentiality simply because confidential information was thrust on a recipient without obtaining an explicit confidentiality agreement," *Lyon*, 605 F. Supp. 2d at 544, an insider's subjective

15

expectation that the recipient of the information would preserve its confidentiality is insufficient to create a fiduciary relationship between the parties. *See Mayhew*, 916 F. Supp. at 130; *see also Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796, 799 (2d Cir. 1980) (holding that investment bank that traded in potential target's securities owed no fiduciary duty to target merely upon receipt of confidential information despite the fact that "target's management "placed its confidence in [the bank] not to disclose the information""); *SEC v. Cuban*, No. 3:08-CV-2050-D, 2009 WL 2096166, at *8 (N.D. Tex. July 17, 2009) ("The expectation [of confidentiality] is not unilateral, arising merely from the source's subjective belief that the recipient will not trade on the information. It rests on the recipient's undertaking of a duty to refrain from doing so as well.").

> **B.** **Even if Strickland Owed a Fiduciary Duty to SunSource as a Temporary Insider, Neither Obus Nor Black Knew or Were Reckless in Not Knowing of Any Alleged Breach of that Duty.**

Even if Strickland and GE Capital were temporary insiders of SunSource—which they clearly were not—the SEC still could not prove, as it must under *Dirks*, that Obus and Black knew or should have known of Strickland's alleged breach of a duty to SunSource when he discussed the company with Black. There is no direct evidence of anything that might have put Obus or Black on notice that Strickland had assumed some special temporary insider status at the time of his conversation in Black; likewise, the substance of Strickland's conversation with Black, including his comment that GE Capital was thinking of working with SunSource, was so devoid of details that it could not have signaled to Obus or Black that Strickland was violating some duty owed to SunSource in asking the questions that he did. While the SEC may certainly rely on circumstantial evidence to prove the requisite tippee state of mind under *Dirks*, it must come forward with more than a scintilla of evidence from which the jury could reasonably infer that Obus and Black knew or should have known of Strickland's alleged breach. *See Castilla*, 184 F. Supp. 2d at 376. Speculation is not proof, and this Court is not required, in drawing inferences in favor of the SEC, "to credit unsupported factual allegations and innuendoes." *See Azurite Corp. Ltd. v. Amster & Co.*, 844 F. Supp. 929, 936 (S.D.N.Y. 1994) (citations omitted).

Defendants' recollections of the substance of Strickland and Black's conversation about SunSource cohere to one another.  Strickland and Black both testified, in substance, that Strickland told Black he had noticed that Wynnefield Capital was a SunSource shareholder, asked Black about the quality of SunSource management, and told him that "we" (logically, GE Capital) are considering working with SunSource.  Obus testified that Black told him that someone at GE Capital asked him questions about why Wynnefield owned SunSource stock.  The vagueness of Strickland and Black's conversation about SunSource belies any inference that, based on the substance of the conversation, Black (and Obus derivatively) could have known that Strickland was breaching a duty to SunSource.  There is, moreover, no evidence that Strickland told Black that he was sharing confidential information about SunSource.

Courts have repeatedly rejected attempts at such strained proof by the SEC on the issue of tippees' knowledge of tippers' alleged breaches where, as here, the circumstances were insufficient to put the alleged tippee on notice of any impropriety on the part of the supposed tipper.  In *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979), for example, the Second Circuit overturned a finding of tippee liability because information allegedly disclosed to the tippee lacked basic elements of specificity and because those who disclosed the information did not reveal that the information was confidential.  The Court did so even though the defendant had discussed rumors of a financing in a company in which he had invested with: (1) an investment advisor who, in addition to telling him that the financing was imminent and that insurance companies would be involved, specifically named two banks and disclosed the planned price per share of the notes to be issued; (2) the vice-president of a company that had participated in an earlier financing for the company named a major institution supposedly involved with  $5 million worth of financing; and (3) a director of the company itself, who told the defendant "that the company [was] working on the financing and…expect[ed] it to be done shortly."  *Id.* at 940. Rejecting a finding of tippee liability as unsupported by the evidence, the Second Circuit noted that "the record is silent as to whether [the defendant] had reason to believe that either of his

17

contacts . . . had acted inappropriately.  Indeed, if any inference may be drawn, it is the contrary one since neither [of the defendants' contacts], when they discussed the possible financing with [the defendant], indicated that there was anything confidential about the information." *Id.* at 942.

Here, as in *Monarch Fund*, the only reasonable inference to be drawn from the evidence of Strickland's conversation with Black is that Black and Obus would have had no reason to know of any inappropriate actions on the part of Strickland vis-à-vis SunSource.  The generality of Strickland's questions to Black did nothing to signal anything to the contrary or otherwise to put Black on notice of some supposed temporary insider status.  *Id.* (possibility of violation of securities laws diminishes the more general the information disclosed).  Moreover, even assuming that Black knew generally that Strickland had access to confidential information at work, there are no facts to show that Black knew, nor should have known, that Strickland had access to confidential information about *SunSource*, and that what Strickland was telling him was confidential.  Nor are there facts to show that Black and Obus knew that Strickland had been assigned to work on two potential financings involving SunSource.  As Black did not even know at the time of the alleged tip that generally speaking, Strickland's job responsibilities at GE Capital included mergers and acquisition financing, there is no reasonable basis to conclude that Black knew whether Strickland was in possession of material nonpublic information about SunSource when he discussed the company with Black.

The fact that Strickland's conversation with Black would have given Strickland some opportunity to communicate confidential information to Black is, of course, irrelevant without more.  *See, e.g., SEC v. Truong*, 98 F. Supp. 2d 1086, 1098-99 (N.D. Cal. 2000) (insufficient evidence for reasonable jury to infer insider trading liability where only evidence was that defendants had opportunity at work to read documents revealing confidential information about company and that they sold their stock weeks before company announced negative financial information, but offered no evidence that defendants actually read the documents).  Courts have rejected claims of alleged tippee's knowledge or recklessness of a tipper's supposed breach on

facts much more compelling than these.  *See, e.g.*, *SEC v. Switzer*, 590 F.Supp. 756, 761-63 (W.D. Okla. 1984) (rejecting tippee liability because defendant did not know that information he overheard was confidential, although he knew that information source was chairman of issuer's parent, that chairman was in a position to possess nonpublic information about parent, and that issuer was subsidiary of parent).  This Court should do the same here.

## II.   The SEC Has Failed to Establish that Black and Obus Are Liable Under the Misappropriation Theory of Insider Trading.

Under the misappropriation theory, a corporate outsider is liable for insider trading when he "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."  *United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *see also Chestman*, 947 F.2d at 566.  According to the SEC, the alleged misappropriation here occurred when Strickland communicated with Black in breach of a duty that he owed to GE Capital, his employer, as the source of the information.  As with the classical theory, the SEC has adduced no evidence sufficient to support a finding that Strickland actually misappropriated confidential information from his employer, GE Capital, in breach of a fiduciary duty owed to it.  Moreover, even if the SEC could prove such a breach, it has not adduced even a scintilla of evidence that Obus and Black, as supposed tippees, either knew or should have known of Strickland's breach, given the vagueness of Strickland's communication with Black.

### A.   Strickland Did Not Misappropriate Confidential Information from GE Capital in Breach of a Fiduciary Duty Owed to GE Capital.

Assuming *arguendo* that Strickland owed some duty of confidentiality to his employer, GE Capital, the SEC has failed to present any evidence that Strickland misused information about SunSource gained through his employment in clear breach of that duty, and, more specifically, that he misused the information in a way that could support a predicate for a violation of the federal securities laws.  Insofar as the actual substance of Strickland's conversation with Black is concerned, nothing in Defendants' testimony or anywhere else in the record indicates that Strickland and Black discussed the type of transaction that GE Capital was contemplating, the

identities of the potential merger partners, the timing of the merger, or other relevant details.

Defendants' testimony is undisputed that Strickland's conversation with Black consisted mostly of

Strickland asking *questions* about SunSource, not providing affirmative statements about the

company.  The conversation lacked the "basic elements of specificity" required for a finding of

tippee liability.  *See Monarch Fund*, 608 F.2d at 942.  This lack of detail in and of itself is fatal to

the SEC's claim that Strickland misappropriated from GE Capital.  *See, e.g., SEC v. Seibald*, No.

95 CIV.2081, 1997 WL 605114, at *3 (S.D.N.Y. Sept. 30, 1997) (granting defendant's summary

judgment motion because there was no justifiable basis for inference of violation where alleged

tipper merely stated his preference between two stocks in response to a question).

      The possibility that Strickland's general questions about SunSource could have piqued

Black's or Obus's interest in SunSource changes nothing.  Mere utterance of the SunSource name

by Strickland was neither a violation of GE Capital's policies nor an improper disclosure of

material non-public information, whether it piqued Defendants' interest or not.  *See SEC v.

Goldinger*, No. CV-91-3445, 1995 U.S. Dist. LEXIS 22168, at *8 (C.D. Cal. May 12, 1995), *aff'd*,

106 F.3d 409, 1997 WL 21221 (9th Cir. 1997) ("simply mentioning the name of a company in an

effort to elicit information needed to properly advise a client is not the same as disclosing

allegedly material, nonpublic information about a merger"); *Goldinger*, 1997 WL 21221, at *1-2

(merely piquing interest is an insufficient basis for finding a breach of fiduciary duty for insider

trading purposes).

      There is nothing odd or suspicious, moreover, about a due diligence inquiry piquing the

interest of those on its receiving end:  indeed, it would have been odd had either Obus or Black's

interest *not* been piqued by Strickland's general inquiry, for, as fund managers with a large

position in SunSource, they had an obligation to their shareholders to investigate new information

about Wynnefield's investment in SunSource on the shareholders' behalf.  *See Monarch Fund*,

608 F.2d at 942-43 (as an investment adviser, "it was [defendant's] duty to trade in securities that

he thought had attractive investment potential").  In this case, based on Obus's past experiences

with SunSource, Strickland's general questions spurred Obus's suspicions—suspicions that, it bears noting, ultimately turned out to be wrong—that SunSource was going to engage in another PIPE transaction that would not include Wynnefeld.  Obus's follow-up call to Andrien in which he attempted to protect Wynnefield's investment by securing an opportunity to participate in the PIPE, then, far from showing the existence of some elusive tip, shows only that Obus was doing his job.  *See id.* at 943 (finding it wholly legitimate, and an insufficient basis for inferring the receipt of some unlawful tip, for a defendant investment advisor to "ma[k]e inquiries in the investment community to get information that he thought would be helpful in determining the efficacy of investments to be made for the clients he represented").

Even if this Court were to accept the SEC's unsubstantiated allegations that Strickland let slip some material non-public information during his conversation with Black, the evidence overwhelmingly suggests that any such disclosure would have been wholly inadvertent and, hence, did not amount to any misappropriation-type breach of a duty that Strickland owed to GE Capital as his employer.  This, indeed, is what GE Capital itself concluded after thoroughly investigating the matter: Strickland did not intend to breach *and did not breach* any duty to GE Capital, nor did he act willfully or recklessly with respect to any information that he may have conveyed in his conversation with Black.  Insider trading liability, and liability for misappropriation in particular, is premised on deceptive or manipulative conduct:  "Not all breaches of fiduciary duty in connection with a securities transaction…come within the ambit of Rule 10b-5.  There must also be manipulation or deception."  *Dirks*, 463 U.S. at 654 (citations and internal quotations omitted).  The "garden variety" misappropriation case is one where the defendant "misappropriated – stole, to put it bluntly – valuable nonpublic information entrusted to him in the utmost confidence."  *See United States  v. Carpenter*, 791 F.2d 1024, 1031 (2d Cir. 1986).  *See also, e.g., United States v. Libera*, 989 F.2d 596, 600 (2d Cir. 1993) (analogizing misappropriation to embezzlement); *Dirks*, 463 U.S. at 663 n.23 ("a violation may be found only where there is 'intentional or willful conduct designed to deceive or defraud investors by

controlling or artificially affecting the price of securities'") (citation omitted).  In these typical
misappropriation cases, the defendants exhibited a degree of intent or willfulness that is noticeably
lacking in this case.  *See, e.g., Carpenter*, 791 F.2d 1024 (newspaper employees employed
scheme to provide stockbrokers with securities-related information prior to publication, and all
defendants traded on misappropriated information); *Libera*, 989 F.2d at 597-99 (similar facts);
*SEC v. Cherif*, 933 F.2d 403 (7th Cir. 1991) (former employee forged document to authorize
continued access to employer's building after his termination, misappropriated and traded on
confidential information regarding prospective transactions).

     Strickland's conduct stands in stark contrast with the conduct of the misappropriators in
*Carpenter*, *Libera* and *Cherif*.   According to GE Capital, Strickland did not act with intent, but
rather "made a mistake," "a genuine error," while "actually trying to do some underwriting."
Unlike the egregious conduct of the garden-variety misappropriators in *Carpenter*, *Libera* and
*Cherif*, Strickland did not make his due diligence inquiry "with any sort of malice or intent."   The
facts in this record support, at most, a finding that Strickland was negligent in making his due
diligence inquiry, and that he inadvertently or indirectly disclosed to Black that GE Capital was
thinking of working with SunSource.  Inadvertent or indirect disclosures are insufficient to give
rise to tipper liability under the misappropriation theory.  *See, e.g.*, *Switzer*, 590 F. Supp. at 766
(no liability where disclosure of material nonpublic information was inadvertent).

     GE Capital's own treatment of Strickland after concluding its investigation underscores
this fact.  Misappropriators typically face immediate dismissal and other severe consequences
from their employers as part and parcel of their having committed a breach.  *See, e.g., Chiarella*,
445 U.S. at 224 (defendant employee of printing company discharged); *O'Hagan*, 521 U.S. at 649
n.2  (defendant lawyer disbarred).  That GE Capital did not terminate Strickland after learning of
his alleged breach distinguishes his case from the archetypal misappropriator and provides
powerful evidence that GE Capital did not consider Strickland as having misappropriated
information from the company.  And while the company did place a letter of reprimand in

Strickland's file, that letter notably did not suggest that Strickland's conduct constituted a violation of his employment contract or a breach of any fiduciary duty owed to GE Capital. Instead, the letter stated that Strickland's failure to obtain approval from counsel or his supervisor before having the conversation was "inappropriate, showed a lack of judgment and a disregard of GE policies"; it did not state that the due diligence inquiry would have been forbidden if Strickland had received approval prior to making it.  Where, as here, the source of the alleged fiduciary duty is an employer-employee relationship, it would be nonsensical to find a breach of duty where the defendant's own employer concluded that there was no breach of the employment contract.  *See, e.g., Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 638-39 (S.D.N.Y. 2005) (defendant's fiduciary duties to his employer were derivative of his employment relationship, and alleged breach of fiduciary duty derived from alleged violations of obligations stemming from his employment relationship; "absent the employment relationship between the parties, there would be no duty to be breached, no wrong, and, thus, no cause of action") (citation omitted).

**B.    Even if Strickland Breached His Fiduciary Duty to GE Capital in Allegedly Tipping Black, Neither Black nor Obus had the Requisite Knowledge of Strickland's Alleged Breach.**

Even if Strickland had misappropriated information from GE Capital, this Court should grant summary judgment for Defendants because the SEC has proffered *no* evidence—direct or circumstantial—to convince a reasonable jury that Obus and Black knew, or should have known, of the misappropriation.  *See United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) ("Rule 10b-5 requires that the defendant subjectively believe that the information was obtained in breach of a fiduciary duty") (citation omitted); *SEC v. Materia*, 1983 WL 1396, at *15 (S.D.N.Y. 1983), *aff'd*, 745 F.2d 197 (2d Cir. 1984) ("plaintiff must establish that the recipient knew or by reason of recklessness failed to use its reason to know that the information was non-public and had been obtained improperly."); *Switzer*, 590 F. Supp. at 764 (remote tippees not liable because they did not "kn[o]w or ac[t] in reckless disregard of circumstances through which they could have had a reason to believe that the information they received was disclosed by an insider…for an improper

purpose" ).

As discussed *supra* in Part I.B, courts repeatedly have held that, even in the context of establishing a tippee's state of mind, a party opposing summary judgment may not merely rest on "conclusory allegations" in lieu of facts.   *See Azurite Corp.*, 844 F. Supp. at 934.  While direct or circumstantial evidence may be used to illuminate state of mind, "permissible inferences must still be within the range of reasonable probability… and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."  *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 887 (2d Cir. 1972) (citations and internal quotations omitted).

Applying this principle, courts have granted summary judgment for defendants where, as here, the alleged tip was so insufficiently substantive that it could not have signaled to the tippees that the communication of the information constituted a breach.  In *SEC v. Goldinger*, for example, a broker who had learned from an insider about a pending merger between Thrifty Corp. and another company asked his colleague during a brief hallway encounter whether he knew "anything about Thrifty" because he "had a client coming in."  1997 WL 21221, at *1.  The SEC alleged that Goldinger also told his colleague about the merger.  *Id.*  Affirming the summary judgment for defendants because the SEC had failed to offer sufficient evidence of an improper disclosure, the court stated that the inference of a direct tip was "unreasonable because it involve[d] too many inferred steps and amount[ed] to no more than conjecture."  *Id.*  at *3.

In  *SEC v. Platt,* 565 F. Supp. 1244, 1259 (W.D. Okla. 1983), the court granted summary judgment for the tippee because statements that "there's something going on at Phoenix," "I'm excited about Phoenix," or "I'm buying Phoenix" did "not raise the slightest inference that [the alleged tippee], by hearing the statement, knew that he was hearing inside information, knew that it was confidential, or knew or should have known that it came from a corporate insider."  The alleged tip in *Platt* was "vague as to source, was not specific as to why Phoenix was a good buy, and contained nothing of substance which would put [the alleged tippee] on notice that he should

24

know that the information was confidential or that it came from an inside source." *Id.* at 1258.

Here, as in *Goldinger* and *Platt*, what Strickland said to Black about GE Capital considering working with SunSource was so vague that it could not have put Black (and Obus, derivatively) on notice that Strickland had made an improper disclosure in violation of a duty to GE Capital.  Black knew that Strickland's job was to research potential clients and perform due diligence, so he considered Strickland's questions about SunSource to be the type of standard due diligence inquiry that Strickland did as part of his job.  Black thus would and could not have been put on notice that Strickland was allegedly misusing information gained by virtue of his employment at GE Capital, given that he assumed that Strickland was actually doing the job he was hired to do by performing due diligence on SunSource.  Obus, who only learned of Strickland's existence when Black told him about the conversation, certainly could not have known that Strickland was acting inappropriately vis-à-vis SunSource because he knew even less about Strickland's job responsibilities than Black did.  Moreover, it strains incredulity that either Black or Obus could have thought that Strickland acted inappropriately when GE Capital itself, after a thorough investigation, concluded that he had not.

## CONCLUSION

For all of the foregoing reasons, Defendant Nelson Obus respectfully requests that this Court grant his Motion for Summary Judgment.

Dated:  New York, New York
            September 11, 2009

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Joel M. Cohen_____

        Joel M. Cohen (JC 9162)
        Richard A. Bierschbach (RB 7861)
        Mary Kay Dunning (MD 9803)
        Siham Nurhussein (SN 9379)

200 Park Avenue
New York, New York 10166
(212) 351-4000
*Attorneys for Defendant Nelson Obus*