## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,          No. 06 Civ. 3150 (GBD)

v.                                                ECF

NELSON J. OBUS, et al.,

                              Defendants.

### SECURITIES AND EXCHANGE COMMISSION'S
### RESPONSE TO DEFENDANTS' JOINT
### STATEMENT OF MATERIAL FACTS (L.R. 56.1)

Plaintiff U.S. Securities and Exchange Commission hereby submits its responses to

Defendants' joint Rule 56.1 statement.

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 1.      Defendant Nelson Obus is the founder and, at all relevant times, was a principal of two affiliated investment managers:  Wynnefield Capital, Inc. ("Wynnefield") and Wynnefield Capital Management, LLC.  Answer of Defendant Nelson Obus to the Complaint ¶ 6, dated March 6, 2007 ("Obus Answer") (Dunning Decl. Ex. B); *see also* Plaintiff's Amended Complaint, filed June 15, 2007 ("Am. Compl.") ¶ 6 (Dunning Decl. Ex. C). | Admitted. |
| 2.      Defendant Peter F. Black was an analyst for Wynnefield at all relevant times.  Obus Answer ¶ 7 (Dunning Decl. Ex. B); *see also* Am. Compl. ¶ 7 (Dunning Decl. Ex. C). | Admitted. |
| 3.      Defendant Thomas Bradley Strickland was an employee of General Electric Capital Corporation ("GE Capital") at all relevant times.  Obus Answer ¶ 8 (Dunning Decl. Ex. B); *see also* Am. Compl. ¶ 8 (Dunning Decl. Ex. C). | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
|  |  |
| 4.      Plaintiff Securities and Exchange Commission ("SEC") alleges that on May 24, 2001, Strickland "tipped" Black about a pending acquisition of SunSource, Inc. ("SunSource") by Allied Capital Corporation ("Allied").  Am. Compl. ¶ 31 (Dunning Decl. Ex. C). | Admitted. |
| 5.      The SEC alleges further that after receiving the tip from Strickland, Black told Obus what he had learned from Strickland. Am. Compl. ¶ 32 (Dunning Decl. Ex. C). | Admitted. |
| 6.      On June 8, 2001, Obus, through Wynnefield's trader, purchased a block of 287,200 shares of SunSource stock, which were deposited into the accounts of Wynnefield Partners Small Cap Value L.P. ("Wynn"), Wynnefield Partners Small Cap. Value L.P. I ("Wynn I"), and Wynnefield Partners Small Cap Value Offshore Fund, Ltd. ("Wynn II"). Obus Answer ¶ 27 (Dunning Decl. Ex. B); *see also* Am. Compl. ¶ 35 (Dunning Decl. Ex. C). | Admitted. |
| 7.      The SEC alleges that when Obus directed the purchase of SunSource stock on June 8, 2001, he knew material nonpublic information about Allied's pending acquisition of SunSource that had allegedly been communicated from Strickland to Black to Obus, and that Obus allegedly based his purchase on that information.  Am. Compl. ¶ 36 (Dunning Decl. Ex. C). | Admitted. |
| 8.      Strickland and Black were close friends. Deposition of Peter Black, dated June 10, 2008 ("Black Dep.") at 94:11 (Dunning Decl. Ex. D). | Admitted. |
| 9.      Black and Strickland met at Boston College in the early 1990s.  SEC Interview of Peter Black, dated September 10, 2002 ("Black Interview") at 115:14-25 (Dunning Decl. Ex. E). | Admitted (although Black's and other witnesses's sworn testimony before the SEC is not an "interview.") |
| 10.      Between their junior and senior years, Strickland had a summer internship in New York City and stayed with Black's parents. Black Interview at 115:15-116:2 (Dunning Decl. Ex. E). | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 11.    Following graduation from college, Black and Strickland moved to New York City. Black Interview at 116:7-25 (Dunning Decl. Ex. E). | Admitted. |
| 12.    At all times relevant to this action, Black was an analyst for Wynnefield and reported directly to Obus.  Black Dep. at 24:5-16 (Dunning Decl. Ex. D). | Admitted. |
| 13.    Black's duties included conducting research on companies in which Wynnefield considered investing.  Black Dep. at 25:4-26:4 (Dunning Decl. Ex. D). | Admitted. |
| 14.    Obus learned that Strickland was Black's friend after Obus was allegedly tipped by Black.  Deposition of Nelson Obus, dated June 17, 2008 ("Obus Dep.") at 173:13-19 (Dunning Decl. Ex. F). | Neither admitted nor denied -- evidence is inconclusive.  Black testified that he first mentioned Strickland in the "summer of 2001." Black Dep. at 106:6-1.  Black does not know if Obus knew who Strickland was on the day of the May 24 discussion.  Black Dep. at 119:9-18. Nevertheless, even if true, it is not a material fact. |
| 15.    Allied is a Maryland business development company headquartered in Washington, D.C.  Am. Compl. ¶ 13 (Dunning Decl. Ex. C). | Admitted. |
| 16.    Allied provides long-term investment capital to support the expansion of growing middle-market companies.  Am. Compl. ¶ 13 (Dunning Decl. Ex. C). | Admitted. |
| 17.    At all relevant times, SunSource was a Delaware corporation headquartered in Philadelphia, Pennsylvania.  Am. Compl. ¶ 12 (Dunning Decl. Ex. C). | Admitted. |
| 18.    SunSource distributed and provided industrial services.  Am. Compl. ¶ 12 (Dunning Decl. Ex. C). | Admitted. |
| 19.    SunSource Technology Services, Inc. ("STS") was a wholly-owned subsidiary of SunSource.  Am. Compl. ¶ 12 (Dunning Decl. Ex. C). | Admitted. |
| 20.    On December 28, 2000, Allied provided SunSource with $30 million in subordinated debt financing.  Deposition of Joseph Corvino, dated February 26-27, 2008 ("Corvino Dep.") at | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 177:19-178:7 (Dunning Decl. Ex. G). | |
| 21.     The $30 million facility was an interest-only facility and included warrants for Allied to acquire 285,000 shares of SunSource stock at a nominal value.  Corvino Dep. at 186:13-187:14 (Dunning Decl. Ex. G). | Admitted. |
| 22.     On March 9, 2001, G. Cabell Williams, III, a managing director of Allied, wrote to Maurice Andrien, the Chief Executive Officer ("CEO") of SunSource, proposing to "proceed with management in pursuing an acquisition of 100% of the outstanding shares of SunSource, Inc." H01569 (Dunning Decl. Ex. H). | Admitted. |
| 23.     GE Capital is the financial services arm of General Electric ("GE").  Deposition of William J. Brasser, dated April 23, 2008 ("Brasser Dep.") at 12:19-13:8 (Dunning Decl. Ex. I). | Admitted. |
| 24.     GE Capital provides loans to business ventures.  Deposition of Thomas Bradley Strickland, dated June 3, 2008 ("Strickland Dep.") at 20:3-10 (Dunning Decl. Ex. J).  At all times relevant to this action, GE Capital had seven different businesses, one of which was the Commercial Finance Group.  Strickland Dep. at 21:22-22:2 (Dunning Decl. Ex. J). | Admitted. |
| 25.     The Commercial Finance Group was involved with a wide variety of engagements. Strickland Dep. at 22:5-23:7 (Dunning Decl. Ex. J).  It "provided senior secured asset-based loans and cash flow loans," for "various purposes," including "straight refinances . . . recapitalizations of the balance sheet . . . management buyouts . . . restructuring situations where we were trying to help keep the companies out of bankruptcy.  Bankruptcy situations where [GE Capital] refinanced them into bankruptcy.  Plans of reorganization where [GE Capital] took them out of bankruptcy. Private equity transactions.  Acquisitions and mergers …"  Strickland Dep. at 22:5–23:7 (Dunning Decl. Ex. J). | Admitted. |
| 26.     In 2001, GE Capital participated in a large spectrum of deals, including credit card financing, equipment leases, aircraft leases, | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| senior loans, and equity investments in companies.  Deposition of Joseph Wiles, dated February 5, 2008 ("Wiles Dep.") at 141:9-21 (Dunning Decl. Ex. K). | |
| 27.     On or about April 23, 2001, Karl Slosberg joined GE Capital as a vice president in business development originations. Deposition of Karl Slosberg, dated January 30, 2008 ("Slosberg Dep.") at 17:4-18:3 (Dunning Decl. Ex. L). | Admitted. |
| 28.     Slosberg's job responsibilities included calling companies to tell them about GE Capital's services and capabilities and to develop relationships with companies that could ultimately lead to financing opportunities. Slosberg Dep. at 20:2-21:17 (Dunning Decl. Ex. L). | Admitted. |
| 29.     On or about April 27, 2001, Slosberg telephoned Andrien to reestablish contacts and solicit business.  Slosberg Dep. at 31:24-33:21, 113:9-114:6 (Dunning Decl. Ex. L). | Admitted. |
| 30.     Slosberg had met Andrien in the mid-1990s when Andrien was the CEO of Curtis Industries.  Slosberg Dep. at 27:7-13 (Dunning Decl. Ex. L). | Admitted. |
| 31.     During that telephone call, or soon thereafter, Andrien told Slosberg that SunSource was seeking financing of a sale of STS, and that the sale of STS was a necessary part of a proposed going-private transaction of SunSource.  Slosberg Dep. at 33:22-34:7, 61:20-62:20, 114:3-9 (Dunning Decl. Ex. L). | Admitted. |
| 32.     After his telephone call with Andrien, Slosberg mentioned the opportunity to potentially pursue the SunSource financing to his boss, Joseph Wiles, a team leader in business origination at GE Capital.  Wiles Dep. at 66:14-67:3 (Dunning Decl. Ex. K). | Admitted. |
| 33.     On April 30, 2001, Slosberg and Wiles met with Andrien and SunSource's Chief Financial Officer ("CFO"), Joseph Corvino, to discuss how GE Capital might be able to finance Allied's potential acquisition of SunSource (the "Allied Acquisition") and the potential sale of STS (the "STS Sale"). | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| Slosberg Dep. at 34:13-21, 114:17-115:17 (Dunning Decl. Ex. L); Wiles Dep. at 70:24-71:6 (Dunning Decl. Ex. K); Corvino Dep. at 259:4-260:19, 261:21-24 (Dunning Decl. Ex. G). | |
| 34.     Specifically, SunSource was "trying to determine if GE Capital would provide financing without an appraisal of the inventory." Slosberg Dep. at 35:13-36:16 (Dunning Decl. Ex. L); *see also* GE2002155-2002158 (Dunning Decl. Ex. M). | Admitted in part. *See* Andrien Dep. at 805 ("SunSource wanted GE to provide financing for the spinoff.") |
| 35.     At no time, either before, during, or after this meeting, did SunSource ask GE Capital to enter into a non-disclosure or confidentiality agreement. Slosberg Dep. at 50:20-52:12, 98:10-23 (Dunning Decl. Ex. L). | It is admitted that SunSource did not ask GE to execute a separate written confidentiality agreement, per se, and that GE did not execute a separate written confidentiality agreement, per se. These are immaterial facts for several reasons: |
| | There was no need for a separate written confidentiality agreement. GE was bound by a duty of confidentially to SunSource and Allied, arising under the mutual understanding of the parties, the confidential discussions of the parties, the confidential nature of the transactions, and GE's own policies. See the SEC's Brief In Opposition to Defendants' Motion For Summary Judgment ("SEC Br.") at Counter Statement Of Facts ("Facts") §§ A-D; Argument §§ III-IV. *See also,* Strickland Test. at 146:8-10 ("Q At that time, did you believe that the work you were doing was confidential? A Yes, I did."); Strickland Dep. at 90-91 (understood he had an obligation to keep information about Allied Acquisition confidential); Slosberg Dep. at 109-110, 132-33 (owed duty of confidentiality to SunSource and Allied); Lustbader Dep. at 167-69; Wiles Dep. at 165-66; Brasser Dep. at 61-62; Corvino Dep. at 572-73, 599-600; Andrien Dep. at 782-83; Russell Dep. at 308-09. |
| | GE's (and Strickland's) duty of confidentiality began immediately, as soon as its employees received confidential information in the course of their employment. The duty existed independently of a formal written |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| | confidentiality agreement.  Strickland Dep. at 85:11-14 ("I don't think it would change how I handled … the information, I mean everything was to be held confidential"); Slosberg Dep. at 111:3-11 ("It really shouldn't matter … materials should have been and was, from my standpoint, treated the same."); Lustbader Dep. at 145-46 (absence of a written confidentiality agreement does not affect the duty of confidentiality); Wiles Dep. at 155-56 ("if you have confidential information it is illegal to disclose it.")  In fact, in 2001, confidentiality agreements were more of an exception than the norm.  Slosberg Dep. at 111. *See also,* Corvino Dep. at 572-73, 599-600; Andrien Dep. at 782-83.<br><br>GE's duty of confidentiality also arose under the terms of the Deal Book prepared by Allied, accepted and reviewed by GE, that contained explicit terms of confidentiality applicable to all lenders and potential lenders that received the Deal Book, including GE.  *See* Corvino Dep. at 273, 575-76, 579-80, 599-600; Russell Dep. at 307-09.  The Deal Book contained the words *"extremely confidential"* on every page, and stated, *"[t]his memorandum is covered by a confidentiality agreement between your institution and Allied Capital Corporation." "Your institution"* meant every lender or potential lender that received and accepted the Deal Book.  Corvino Dep. at 273, 575-76.  *See* Russell Dep. at 307-08 (recipients of deal books are often lenders, and Allied expected all lenders, including GE, to keep information in Deal Book confidential). |
| 36.     In early May 2001, Wiles and Slosberg, along with Michael Lustbader, a lead underwriter at GE Capital, met a second time with Andrien and Corvino to further discuss the potential financings of the Allied Acquisition and the STS Sale.  Wiles Dep. at 71:20-72:11 (Dunning Decl. Ex. K). | Admitted. |
| 37.     On May 9, 2001, Jim Powell of Allied sent Corvino via e-mail a memorandum summarizing the Allied Acquisition and the | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| STS Sale.  GE2002405-2002423 (Dunning Decl. Ex. N). | |
| 38.     This "deal summary" was put together by Allied and provided to SunSource.  Corvino Dep. at 578:11-16 (Dunning Decl. Ex. G). | Admitted. |
| 39.     The deal summary was also sent to potential lenders.  Corvino Dep. at 578:11-16 (Dunning Decl. Ex. G) | Admitted. |
| 40.     The deal summary contained information about a transaction in which "Allied Capital was contemplating, in cooperation with SunSource's management, a buy-out of SunSource in which SunSource would be taken private."  Strickland Dep. at 79:22-81:7; 83:15-84:2 (Dunning Decl. Ex. J); GE2002407-2002423 (Dunning Decl. Ex. N). | Admitted. |
| 41.     The first page of the deal summary stated:  "This memorandum is covered by a confidentiality and non-disclosure agreement between Your Institution and Allied Capital Corporation."  Strickland Dep. at 83:6-10 (Dunning Decl. Ex. J); GE2002407 (Dunning Decl. Ex. N). | Admitted.  "Your institution" meant all lenders or potential lenders who received the Deal Book.  *See* Corvino Dep. at 273, 575-76; Russell Dep. at 307-08. |
| 42.     On May 11, 2001, Corvino forwarded to Slosberg and Wiles the e-mail and attached memorandum summarizing the Allied Acquisition and the STS Sale (the deal summary).  GE2002405 (Dunning Decl. Ex. N). | Admitted. |
| 43.     As of May 11, 2001, when Corvino sent Slosberg and Wiles this e-mail, there was no written confidentiality agreement in place between SunSource and GE Capital.  Corvino Dep. at 267:3-14 (Dunning Decl. Ex. G). | Denied.  *See* response to pars. 35. |
| 44.     On May 11, 2001, GE Capital sent a proposal letter to Frank Izzo, Vice President of Allied, expressing "its interest in providing up to $40 million of financing . . . in support of the management buyout of SunSource Technology Services, Inc." (the STS Sale).  GE0005711-0005717 (Dunning Decl. Ex. O). | Admitted. |
| 45.     GE Capital's proposal letter contained a list of 21 proposed terms, "all to be acceptable to GE Capital."  GE0005712 (Dunning Decl. Ex. O). | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 46.      On May 15, 2001, Strickland and Slosberg attended a meeting with Corvino at SunSource's headquarters in Philadelphia. Strickland Dep. at 85:21-86:11 (Dunning Decl. Ex. J).  During the meeting, Corvino was focused on GE Capital's potential financing of the STS sale.  Strickland Dep. at 86:19-21 (Dunning Decl. Ex. J). | Admitted. |
| 47.      Corvino asked Slosberg numerous questions about what GE Capital could advance on STS's assets as part of a potential financing of the STS Sale and how quickly GE Capital could arrange for that financing.  Strickland Dep. at 86:19. | Admitted. |
| 48.      SunSource's management would have been the borrower in GE Capital's potential financing of the STS Sale.  Strickland Dep. at 76:8. | Admitted in part.  GE listed the borrower on the STS transaction as "SunSource Technology Services, Inc., in care of Mr. Frank Izzo, Vice President, Allied Capital."  (Slosberg Ex. 5 at GE 005713).  GE's client for STS "would have been the ultimate buyer of STS, the equity group, and management if they were still involved with the company."  Slosbeg Dep. at 131:15-18.  GE's clients on both deals were SunSource, SunSource management, and Allied.  *See* Corvino Dep. at 583-84; Lustbader Dep. at 64-65, 161-62; Wiles Dep. at 171-72; Strickland Dep. at 85; Slosberg Dep. at 131:4-18. |
| 49.      On May 21, 2001, GE Capital submitted to Corvino a "best efforts" proposal to provide $95 million worth of financing in support of Allied's buy-out of "SunSource and all operating subsidiaries" (the Allied Acquisition). GE0007497-0007502 (Dunning Decl. Ex. P); Corvino Dep. at 269:13-25 (Dunning Decl. Ex. G); Slosberg Dep. at 76:11-14 (Dunning Decl. Ex. L). | Admitted. |
| 50.      This proposal was for GE to be the agent bank, or the "lead lender," for the Allied Acquisition.  Strickland Dep. at 71:13-19 (Dunning Decl. Ex. J). | Admitted. |
| 51.      GE Capital's May 21, 2001 proposal was "simply an indication of interest and did not constitute a commitment or undertaking to provide financing."  GE0007497 (Dunning | Admitted that the provision is correctly quoted. Denied that this provision represents a material fact, or that it lessened GE's duties to SunSource or Allied.  *See* response to par. 35. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| Decl. Ex. P); Corvino Dep. at 269:13-25 (Dunning Decl. Ex. G). | |
| 52.      GE Capital's May 21, 2001 proposal prohibited SunSource from disseminating the information contained in the GE Proposal to third parties.  Corvino Dep. at 270:6-19 (Dunning Decl. Ex. G); GE0007501 (Dunning Decl. Ex. P). | Admitted in part.  The proposal had other provisions as well. |
| 53.      Meanwhile, in May 2001, SunSource was speaking to several other financial institutions – not just GE Capital – regarding the STS sale, including Congress and Foothill, which is the institution that ultimately financed the STS sale.  Slosberg Dep. at 58:3-10 (Dunning Decl. Ex. L); Corvino Dep. at 262:10-20 (Dunning Decl. Ex. G). | Admitted.  Denied it represents a material fact. GE's duties of confidentiality to SunSource existed no matter how many other lenders reviewed confidential information from Allied/SunSource.  *See* response to par. 35.<br><br>Note:  there is no evidence that any other lender or potential lender misused confidential information obtained from Allied/SunSource. |
| 54.      At this time, SunSource was "not giving GE Capital an exclusivity regarding the financing it had talked about with lenders." Corvino Dep. at 262:5-9 (Dunning Decl. Ex. G). | Admitted.  Denied it represents a material fact. *See* response to pars. 35, 53. |
| 55.      SunSource considered GE Capital "a bidder, if you will, or a contender for the STS separate financing."  Deposition of Maurice P. Andrien, dated March 4-5, 2008 ("Andrien Dep.") at 359:21-23 (Dunning Decl. Ex. Q). | Admitted. |
| 56.      On May 25, 2001, the day after the alleged tip in this case, Corvino faxed to Wiles and Slosberg a revised version of GE Capital's May 11, 2001 proposal letter on the STS Sale, which had originally been sent to Izzo at Allied. GE0005711-0005717 (Dunning Decl. Ex. O). | Admitted. |
| 57.      Corvino altered some of the proposed terms of the GE Capital proposal letter. GE0005711-0005717  (Dunning Decl. Ex. O). Corvino executed GE Capital's proposal letter on May 25, 2001 in his name.  GE0005717 (Dunning Decl. Ex. O). | Admitted. |
| 58.      The letter contained a paragraph that forbade "neither the letter nor its contents to be disclosed publicly or privately except as to those individuals who are your officers, employees or advisors who have a need to know as a result of being involved in" the | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| potential transaction concerning the STS sale. GE0005716 (Dunning Decl. Ex. O). | |
| 59.      This language was standard language included in most GE Capital proposal letters issued at all relevant times.  Wiles Dep. at 130:14-131:4, 96:2-11 (Dunning Decl. Ex. K). | Admitted. |
| 60.      Corvino understood the language to impose an obligation of confidentiality not on GE Capital but on SunSource only.  Corvino Dep. at 607:24-609:6 (Dunning Decl. Ex. G). | Admitted in part, denied in part.  Admitted that the particular provision quoted by defendants in par. 58 applied to SunSource.  Indeed, defense counsel limited his question to Corvino, and Corvino's answer, to that specific provision of the proposal, and not a "general discussion" about GE's duty of confidentiality to SunSource/Allied.<br><br>On the other hand, GE, Allied, and SunSource witnesses testified that GE and its employees, including Strickland, were expected and obligated to keep the information about the SunSource acquisition confidential, even in the absence of a written confidentiality agreement. *See* response to par. 35, and Facts § C. |
| 61.      On May 25, 2001, without a signed confidentiality in place, SunSource wired GE Capital an Underwriting Deposit of $50,000 for GE Capital to "begin [its] due diligence and field audit" for its proposed financing of the STS Sale.  GE1005327-1005328 (Dunning Decl. Ex. R); GE0005711 (Dunning Decl. Ex. O);  Slosberg Dep. at 56:7-22 (Dunning Decl. Ex. L). | Admitted in part, denied in part.  Admitted that SunSource wired GE money.  Admitted that GE and SunSource did not execute a separate confidentiality agreement.  Denied this is a material fact.  Denied that there was no confidentiality agreement in place.  *See* response to par. 35. |
| 62.      SunSource ultimately refused GE Capital's proposal on the financing of the STS Sale.  Corvino Dep. at 344:16-18 (Dunning Decl. Ex. G). | Admitted. |
| 63.      GE Capital continued to try to participate as a senior lender in the proposed financing of the Allied Acquisition.  Wiles Tr. 108:11-16 (Dunning Decl. Ex. K). | Admitted. |
| 64.      In the Allied Acquisition, Allied was contemplating with SunSource's management a buyout of SunSource in which SunSource would be taken private.  Wiles Dep. at 107:23-108:5 (Dunning Decl. Ex. K). | Admitted. |
| 65.      Given the structure of the proposed | Admitted in part.  It is admitted that GE may |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| Allied Acquisition, GE Capital was concerned about or interested in SunSource management's capabilities.  Wiles Dep. at 109:6-12 (Dunning Decl. Ex. K). | have been interested in the capabilities of SunSource management.  Denied this is a material fact.  There is no evidence that GE was authorized, or performed any investigation of SunSource management.<br><br>*See* Lustbader Dep. at 153-54; Corvino Dep. at 602-04; Strickland Dep. at 106, 142:12-15, 147:7-9; Brasser Dep. at 75-77.   *See* Facts § I. |
| 66.      GE Capital expected that it would find out about management's capabilities during "due diligence," which included asking about the performance of the company, management, and background.  Wiles Dep. at 109:13-29 (Dunning Decl. Ex. K). | It is denied that GE or Strickland were authorized to perform any due diligence on SunSource management, or did such due diligence.  *See* Lustbader Dep. at 153-54; Corvino Dep. at 602-04; Strickland Dep. at 106, 142:12-15, 147:7-9; Brasser Dep. at 75-77. Facts § I.<br><br>If GE expected it would find out about management, they did not expect Strickland to do the asking, especially without taking any precautions.  *Id.*  Generally, if GE performed background checks on management, they hired a third party who would be subject to a confidentiality agreement, and took other precautions.  *See* Brasser Dep. at 63:6-16, 120-21. |
| 67.      Subsequent to May 25, 2001, SunSource did not contact GE Capital regarding the Allied Acquisition and the STS Sale for approximately one or two months.  Strickland Dep. at 111:6-112:9 (Dunning Decl. Ex. J). | Admitted, but not a material fact. |
| 68.      In either July or August of 2001, GE Capital received a request to participate in the syndication, and put together another pitch.  Strickland Dep. at 112:2-9 (Dunning Decl. Ex. J). | Admitted. |
| 69.      On or about June 19, 2001, Allied issued a press release announcing the Allied-SunSource merger.  WYN 003682-003684 (Dunning Decl. Ex. S). | Admitted. |
| 70.      As of June 19, 2001, GE Capital and SunSource had not entered into a confidentiality agreement.  GE0020410-0020411 (Dunning Decl. Ex. T). | Denied.  *See* response to par. 35. |
| 71.      On June 19, 2001, the day that the | Admitted, but not a material fact.  GE and |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| Allied-SunSource merger was announced, GE Capital placed SunSource on its "Transaction Global Authority: Restricted List" (transaction restricted list") noting that on that date, GE Capital had "access to material inside information" about SunSource, but the box for "confidentiality agreement" was not checked on the transaction restricted list form. GE0020410-00204411 (Dunning Decl. Ex. T). | Strickland's duties of confidentiality were not lessened by the underwriting team's (probably Strickland's) failure to place SunSource on the TRE list at an earlier date.  *See* Facts § B; Wiles Dep. at 157 ("it doesn't matter one way or the other."); Strickland Dep. at 91-92. |
| 72.     The transaction restricted list was a list of all companies at GE Capital about which employees possessed nonpublic information as a result of their participation in transactions involving those companies.  Wiles Dep. at 123:11-21 (Dunning Decl. Ex. K). | Admitted. |
| 73.     As soon as someone at GE Capital became aware of confidential nonpublic information about a particular company, a member of a deal team would place the company on the transaction restricted list.  Wiles Dep. at 123:18-124:3 (Dunning Decl. Ex. K); Deposition of Michael Lustbader ("Lustbader Dep."), dated February 6, 2008 at 122:23-123:9 (Dunning Decl. Ex. U). | Admitted in part, denied in part.  A member of the underwriting team (probably Strickland) was supposed to put the company on the TRE restricted list when they became aware of material inside information.  Strickland Dep. at 67-68; Slosberg Dep. at 113:2-8.<br><br>Denied this is a material fact.  *See* response to pars. 35, 71. |
| 74.     At all relevant times, there was no confidentiality agreement between GE Capital and any other entity with regard to the proposed financings for the Allied Acquisition or the STS Sale.  Slosberg Dep. at 52:3-12 (Dunning Decl. Ex. L). | Denied.  *See* response to par. 35. |
| 75.     At all relevant times, it was standard practice at GE Capital for the potential customer to request the confidentiality agreement if there was to be one.  Wiles Dep. at 43:5-11 (Dunning Decl. Ex. K). | Denied.  In 2001, confidentiality agreements were more of an exception than the norm.  Slosberg Dep. at 111.  *See also,* Corvino Dep. at 572-73, 599-600; Andrien Dep. at 782-83 (though written confidentiality agreements not always executed, expectation of confidentiality remained). Even if true, not a material fact.  *See* response to par. 35. |
| 76.     At all relevant times, SunSource had never asked GE Capital to enter into a confidentiality agreement.  Wiles Dep. at 124:8-12 (Dunning Decl. Ex. K). | Admitted in part, denied in part.  *See* response to par. 35. |
| 77.     At all relevant times, there was no agreement between GE Capital and any other entity preventing GE Capital from disclosing | Admitted in part, but denied as a material fact. *See* response to par. 35.  Strickland disclosed more than just the name, "SunSource" to Black. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| the name of its potential client (SunSource) to third parties. Corvino Dep. at 608:3-609:6 (Dunning Decl. Ex. G). | *See* response to pars. 35, 100. |
| 78.    At all relevant times, there was no policy at GE Capital that specifically prohibited divulging the name of a potential borrower to third parties. Slosberg Dep. at 98:10-23 (Dunning Decl. Ex. L). | Denied as overbroad  -- GE's policy prohibited divulging confidential information to third parties. *See* Facts § B.  In some cases, the name of a borrower could be confidential information, depending on the borrower and type of transaction at issue. |
| 79.    At all relevant times, there was no confidentiality agreement between GE Capital and Allied. Wiles Dep. at 96:20-97:2 (Dunning Decl. Ex. K). | Denied.  *See* response to par. 35. |
| 80.    The merger between Allied and SunSource closed on September 26, 2001. Corvino Dep. at 353:2-5 (Dunning Decl. Ex. G). | Admitted. |
| 81.    From 1999 through 2005, Strickland worked in the Middle Market Lending Group within the Commercial Finance Group at GE Capital. Strickland Dep. at 20:11-22:2 (Dunning Decl. Ex. J). | Admitted. |
| 82.    Strickland was an associate at GE Capital from 1999 until May of 2001, and was an Assistant Vice President until 2005. Strickland Dep. at 21:7-18 (Dunning Decl. Ex. J). | Admitted. |
| 83.    Strickland's responsibilities included working as an underwriter for GE Capital's potential financings of the Allied Acquisition and the STS Sale. Strickland Dep. at 70:5-9 (Dunning Decl. Ex. J). | Admitted. |
| 84.    As an underwriter, Strickland was responsible for evaluating the riskiness or viability of a potential transaction. Strickland Dep. at 31:4-32:6 (Dunning Decl. Ex. J); *see also* Brasser Dep. at 60:4-12 (Dunning Decl. Ex. I).  This required an analysis of a prospective borrower, commonly referred to as "due diligence." Strickland Dep. at 34:15-17 (Dunning Decl. Ex. J); *see also* Brasser Dep. at 60:4-12 (Dunning Decl. Ex. I). | Admitted. |
| 85.    At all relevant times, Black knew that Strickland worked at GE Capital. Black Dep. at 95:16-18.  (Dunning Decl. Ex. D). | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 86.    At all relevant times, Strickland never informed Black that he was an underwriter at GE Capital, and Black did not have any understanding as to whether Strickland's responsibilities at GE Capital included underwriting.  Black Interview at 136:24-137:7 (Dunning Decl. Ex. E). | Denied.  Black Dep. at 96-97 (Black knew Strickland was "on the team researching new potential clients, performing due diligence"; knew he worked on financing transactions).<br><br>Even if true, this is not a material fact.  Whether Black knew exactly what Strickland did at GE, or for whom, does not mean he or Obus did not know or should have known that Strickland was betraying the confidence of GE and SunSource. *See* SEC Br. at Argument § IV. |
| 87.    At all times relevant to this action, Black did not know what group Strickland worked in while employed at GE Capital.  Black Dep. at 96:22-24 (Dunning Decl. Ex. D). | Denied in part (to the extent knowing what "team" Strickland worked on included knowing what "group" he worked on).<br><br>Even if true, this is not a material fact.  *See* response to par. 86. |
| 88.    At all times relevant to this action, Black did not know that Strickland worked on "any merger and acquisition financing."  Black Dep. at 97:5-16 (Dunning Decl. Ex. D). | Admitted that Black claimed as such.  It defies belief and common sense that Strickland would not have disclosed this basic fact in their social discourse.  Nevertheless, even if true, this is not a material fact.  *See* response to par. 86. |
| 89.    Black generally understood that Strickland was a "junior person" at GE Capital in 2000-2001, who was "researching new potential clients, performing due diligence." Black Dep. at 96:11-18 (Dunning Decl. Ex. D). | Admitted that Black claimed as much. |
| 90.    If Strickland discussed GE Capital's business issues with Black, he spoke "in generalities," at a "high level."  Strickland Dep. at 116:25-117:12 (Dunning Decl. Ex. J). | Denied.<br>Even if generally true, denied as a material fact.<br><br>At least on one occasion, a telephone call occurring on May 24, 2001, Strickland told Black that GE's client SunSource was going to be purchased by a financial buyer.  *See* response to par. 100. |
| 91.    It was not Black's general practice to discuss Black's own duties and/or Wynnefield's business issues with Strickland.  Black Dep. at 99:14-100:11 (Dunning Decl. Ex. D). | Denied.  On at least one occasion, Black told Strickland details of one of his trades.  *See* Black Dep. at 101-102 (discussing January 16, 2002 email from Black to Strickland:  "I shorted 2 million worth of TYC right before you called this morning… yeah baby, yeah.")  Even if true, not a material fact.<br><br>Even if true, this is not a material fact. |
| 92.    On or about May 14, 2001, GE Capital | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| assigned Strickland to the deal team to work on the potential financings of the Allied Acquisition and the STS Sale.  Strickland Dep. at 20:13-15, 70:5-9, 78:21-79:8 (Dunning Decl. Ex. J); Wiles Dep. at 73:2-10 (Dunning Decl. Ex. K). | |
| 93.     On May 14, 2001, Lustbader forwarded Strickland via e-mail the deal summary that Allied had prepared and originally sent to SunSource, and which was sent to other potential lenders.  GE2002405-2002423 (Dunning Decl. Ex. N). | Admitted. |
| 94.     May 14, 2001 was the first day that Strickland had heard of the proposed Allied Acquisition and the STS Sale.  Strickland Dep. at 79:5-8 (Dunning Decl. Ex. J). | Admitted. |
| 95.     Strickland worked on the team at GE Capital that was responsible for putting together a pre-investment committee memo for the Allied Acquisition.  Strickland Dep. at 88:3-16 (Dunning Decl. Ex. J). | Admitted. |
| 96.     Strickland was responsible for, among other things, performing the necessary due diligence to help GE Capital's investment committee evaluate the riskiness and viability of the prospective financings involving SunSource.  Strickland Dep. at 34:9-19 (Dunning Decl. Ex. J).  One of Strickland's tasks was to perform due diligence as to whether SunSource management was risk-worthy.  Strickland Dep. at 31:4-32:6 (Dunning Decl. Ex. J). | Admitted. |
| 97.     While performing due diligence on GE Capital's potential financings of the Allied Acquisition and the STS Sale, Strickland noticed that Wynnefield was an owner or had been an owner of SunSource.  Strickland Dep. at 123:19-124:16 (Dunning Decl. Ex. J).  Strickland knew that Black worked at Wynnefield.  Strickland Dep. at 115:2-3 (Dunning Decl. Ex. J). | Admitted. |
| 98.     On or about May 24, 2001, Black and Strickland had a conversation concerning SunSource.  Black Dep. at 106:21-24, 111:5-9 | Admitted in part.  Phone records and witness testimony place the call on the morning of May 24, 2001, at approximately 9:52 a.m.  *See* Black |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| (Dunning Decl. Ex. D). | Dep. at 133. |
| 99.     During the conversation, Strickland told Black that he had noticed that Wynnefield was a large shareholder of SunSource.  Black Dep. at 107:7-10 (Dunning Decl. Ex. D). | Admitted. |
| 100.     Strickland asked Black questions concerning SunSource that were "general in nature."  Black Dep. at 115:3-6, 115:17-20 (Dunning Decl. Ex. D); Black Interview at 153:1-7 (Dunning Decl. Ex. E); Strickland Dep. at 121:3-21 (Dunning Decl. Ex. J). | Hearsay objection. Denied.  The direct and indirect evidence in the record, and all reasonable inferences taken in the SEC's favor, establish that Strickland's call to Black was not part of a legitimate due diligence exercise, did not just consist of Strickland asking general questions to Black, and did not consist of Strickland disclosing only vague, "high-level stuff" to Strickland.  The evidence establishes that Strickland disclosed material nonpublic information to Black about the Allied Acquisition.  *See* Facts §§ E, F, H; K, Argument § IV.<br><br>To summarize: Obus admitted on two separate occasions that he was tipped off about the Allied Acquisition: once to Maurice Andrien, CEO of SunSource; once to Dan Russell, CFO of Allied Capital.  Facts §§ F, H.  Obus disclosed the <u>source</u> of his information to Andrien (*"GE"*), as well as a <u>detail</u> that he only could have learned from an insider -- that the buyer was a *"financial buyer."*  Andrien Test. at 134-35.  The "financial buyer" detail was reiterated in a call from fellow investor and Obus acquaintance, Alan Weber, that same day, corroborating the detailed nature of the tip.  Andrien Test. at 125-27.<br><br>The circumstantial evidence independently establishes Strickland's improper tip of material inside information to Black, and Black's tip to Obus.  The evidence includes:  (a) the close friendship between Black and Obus; (b) Strickland's May 24 call to Black in which he admittedly discussed "working on a financing" for SunSource (Defendants' Rule 56.1 statement, ¶ 105); (c) the immediacy of Black's conversation with Obus about the Strickland call; (d) the immediacy of Obus's call to |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| | Andrien about the Strickland call; (e) Alan Weber's strikingly similar call to Andrien the same day; (f) Black's outraged reaction to Obus's call to Andrien ("you're going to get my friend fired"); (g) Obus's "ashen and upset" discussion with Black afterwards, in which Obus said he would find a job for Strickland if he was fired; (h) the proximity between the May 24 conversations and Obus's June 8 trade; (i) the uncharacteristic nature of the June 8 trade, which turned a quick $1.3 million profit; and (j) the unusual meetings between the defendants in 2002 ("like out of the movie Wall Street").  *See* Facts §§ E-H, K.<br><br>The only reasonable inference from this evidence is that Strickland knowingly tipped Black who knowingly tipped Obus who knowingly traded while in possession of material inside information.<br><br>The evidence also establishes that Strickland's call was not part of legitimate or actual due diligence exercise.  His call was not authorized by SunSource or GE, not needed for business purposes, and he took no precautions to insure the information was not misused.  Facts § I. |
| 101.    Strickland's questions concerning SunSource related to the following topics: SunSource's management; the position of SunSource in the industry; how SunSource's divisions were doing; and whether SunSource had good prospects.  Strickland Dep. at 121:9-11 (Dunning Decl. Ex. J); Black Dep. at 114:23-115:6, 115:17-20 (Dunning Decl. Ex. D). | Hearsay objection.<br>Denied.  *See* response to par. 100. |
| 102.    Strickland "mentioned to Black that as part of researching potential candidates he [Strickland] asked about the quality of management, he would do background checks, his questions were general in nature about whether these were good guys and whether the company [SunSource] had good prospects." Black Dep. at 114:23-115:6 (Dunning Decl. Ex. D). | Hearsay objection.<br>Denied.  *See* response to par. 100.<br>*See also,* Black Test. at 148 (describing Strickland's call with no mention of Strickland saying anything about "background checks"). |
| 103.    Black thought that Strickland's | Admitted that Black claimed as much.  Denied |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| questions concerning SunSource related to his performance of due diligence on the company. Black Dep. at 114:19-115:6 (Dunning Decl. Ex. D); Black Interview at 153:1-6 (Dunning Decl. Ex. E). | this was the truth.  *See* response to par. 100. |
| 104.    Strickland's questions were "general high-level stuff, such as what are they [SunSource management] like, how are the divisions doing, have you [Black] met them before."  Black Dep. at 115:17-20 (Dunning Decl. Ex. D). | Hearsay objection.<br>Denied.  *See* response to par. 100. |
| 105.    Strickland mentioned to Black that GE Capital was looking at "doing some potential business with SunSource," "possibly working with SunSource," "thinking of working together [with SunSource] on something;" and/or "going to have an opportunity to work on a financing of putting money to work."  Strickland Dep. at 121:11-15 (Dunning Decl. Ex. J); Black Dep. at 107:15-19, 111:15-25, 112:15-112:19 (Dunning Decl. Ex. D). | Hearsay objection.<br>Denied.  Strickland gave details about the Allied Acquisition to Black.  *See* response to par. 100. |
| 106.    Black assumed that Strickland meant that GE Capital might have an opportunity to work on a financing of SunSource.  Black Dep. at 111:15-113:12 (Dunning Decl. Ex. D). | Denied.  *See* response to par. 100. |
| 107.    At no point relevant to this action did Strickland inform Black that the information conveyed to Black during their conversation should be kept in confidence or not disseminated to any third party.  Black Interview at 155:1-4 (Dunning Decl. Ex. E); *see also* Strickland Dep. at 133:14-23 (Dunning Decl. Ex. J). | Hearsay objection.<br>Admitted.  Strickland did not take any precautions before disclosing material inside information to Black, in breach of his fiduciary duties.  Facts § B, I.<br><br>Nevertheless, Black (and Obus) knew or should have known that Strickland was violating duties of trust and confidence by way of his tip.  Black admitted that Strickland's call, if it got back to GE, could get Strickland fired.  Black Test. at 151.  Black knew that SunSource trusted GE like a "financial advisor."  Black Test. at 149:15-19.  *See* Argument §§ IV, V. |
| 108.    Strickland never told Black that he had received any information pursuant to a confidentiality agreement with SunSource.  Black Interview at 162:10-20 (Dunning Decl. Ex. E). | Hearsay objection.<br>Admitted in part, but not a material fact.  *See* response to pars. 35, 100, 107. |
| 109.    Black was unaware at the time that | Objection that the statement, *"at the time,"* is |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| Strickland and/or GE Capital was working on a confidential matter relating to SunSource. Black Interview at 162:10-20 (Dunning Decl. Ex. E). | vague and ambiguous. Does *at the time* mean before or after the tip from Strickland? If the statement means before the tip, it is an immaterial fact. If it means after the tip, then the statement is denied. Strickland's tip let Black know that Strickland was working on a confidential matter relating to SunSource. *See* response to pars. 100, 107. |
| 110.    At all times relevant to this action, Black did not personally trade SunSource stock and did not direct Wynnefield to trade any SunSource stock. Black Dep. at 78:2-5 (Dunning Decl. Ex. D). | Admitted that Black claimed as much. Denied this is a material fact. Black tipped Obus who traded on behalf of Wynnefield. |
| 111.    After Black's conversation with Strickland about SunSource, Black mentioned to Obus that he had spoken to a friend of his at GE or GE Capital, and that the friend had "asked him a few questions about SunSource and said that they were thinking of working with SunSource." Black Dep. at 118:18-25 (Dunning Decl. Ex. D). | Hearsay objection. Denied. The only reasonable inference from the direct and indirect evidence in the record is that Strickland told Black about the nature of the Allied Acquisition, who then told Obus. *See* response to par. 100. |
| 112.    Obus recalled that Black told him that he had a conversation with someone from GE Capital who asked a lot of questions about why Wynnefield owned SunSource stock. Obus Dep. at 161:17-22 (Dunning Decl. Ex. F). | Hearsay objection. Denied. The only reasonable inference from the direct and indirect evidence in the record is that Strickland told Black about the nature of the Allied Acquisition, who then told Obus. *See* response to par. 100. |
| 113.    Obus assumed that "there was some kind of financing out there." Obus Dep. at 173:5-12 (Dunning Decl. Ex. F). | Admitted in part. After the tip, Obus knew that SunSource was going to be sold to a financial buyer. *See* response to par. 100. |
| 114.    At all relevant times, Obus knew that Allied had made a PIPE ("private investment in public equity") loan to SunSource in December 2000. Obus Dep. at 109:20-110:3 (Dunning Decl. Ex. F). | Admitted that Obus testified as such. Denied it is a material fact. Denied that Obus's call to Andrien had anything to do with a PIPE. *See* response to pars. 100, 116, 123. |
| 115.    At all relevant times, Obus had disliked SunSource's decision to do that PIPE transaction without involving the current shareholders (one of which was Wynnefield), because in the PIPE transaction, Allied, in addition to getting the principal on its loan back, also received 4% of SunSource for nothing. Obus Dep. at 112:1-7 (Dunning Decl. Ex. F). This PIPE transaction had a dilutive effect on SunSource's stock. Obus Dep. at | Admitted that Obus testified as such. Denied it is a material fact. *See* response to pars. 100, 116, 123. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 113:11-13 (Dunning Decl. Ex. F). | |
| 116.    Obus's impression of Black's conversation with Strickland about SunSource was that GE Capital might have been considering doing a PIPE or financing similar to the one that Allied had done in December 2000.  Obus Dep. at 163:13-164:8 (Dunning Decl. Ex. F). | Denied.  *See* response to par. 100, 123.<br><br>Strickland does not claim to have said anything about a PIPE in his discussion with Black. Strickland Test. at 142; Strickland Dep. at 121.<br><br>Obus did not mention anything about a PIPE to Andrien.  Andrien Dep. at 542:6-13, 844, 847-48.  Andrien did not even know what a PIPE was.  Andrien Dep. at 176:11-23 ("I don't know the term."), 540:11-17.<br><br>On the other hand, Obus knew from his discussion with Black that SunSource was going to be sold to a financial buyer. |
| 117.    Obus did not want to see SunSource doing another PIPE transaction without giving its shareholders a chance to invest in the company.  Obus Dep. at 164:8-10 (Dunning Decl. Ex. F). | Even if true, denied it as a material fact.  *See* response to par. 100, 116, 123. |
| 118.    Obus believed that SunSource had an ethical responsibility to involve its shareholders in any kind of refinancing that involved dilution of the stock value.  Obus Dep. at 172:7-12 (Dunning Decl. Ex. F). | Admitted that Obus testified as such.  Denied it is a material fact.  *See* response to par. 100, 116, 123. |
| 119.    Obus had an association of GE Capital as being the kind of company that would have done the same kind of transaction that Allied had done in December 2000.  Obus Dep. at 164:5-8 (Dunning Decl. Ex. F). | Admitted that Obus testified as such.  Denied it is a material fact.  *See* response to par. 100. |
| 120.    After Black told Obus about his conversation with Strickland about SunSource, Obus was not sure whether GE Capital was considering a PIPE transaction with SunSource, but he felt that he had to express his concerns to Andrien, as Obus thought that he and Andrien had an understanding that any additional need for short-term capital that SunSource would have been offered to its shareholders, not to third parties.  Obus Dep. at 164:18-23 (Dunning Decl. Ex. F). | Denied.  *See* response to par. 100, 123.  Obus did not mention anything about a PIPE to Andrien.  Andrien Dep. at 542:6-13, 844, 847-48.  Andrien did not even know what a PIPE was.  Andrien Dep. at 176:11-23 ("I don't know the term."), 540:11-17. |
| 121.    As a shareholder in SunSource, Obus frequently spoke to Andrien, SunSource's CEO, about SunSource.  Andrien Dep. at 454:2-20, | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 540:2-10 (Dunning Decl. Ex. Q). | |
| 122.    At some point shortly after Black told Obus about his conversation with Strickland, Obus telephoned Andrien.  Obus Dep. at 169:7-10 (Dunning Decl. Ex. F). | Admitted. |
| 123.    Obus said to Andrien that he "hoped that they [SunSource] weren't doing another PIPE, and if they were, [he] hoped [Andrien] would reconsider if they [SunSource] needed more capital to move along the lines of involving the current shareholders, which is a common practice."  Obus Dep. at 170:3-8 (Dunning Decl. Ex. F). | Hearsay objection.<br>Denied.  Obus did not mention anything about a PIPE to Andrien, or anything about giving shareholders an opportunity to participate in a financing or rights offering.  Andrien Dep. at 542:6-13, 844, 847-48.  Andrien did not even know what a PIPE was.  Andrien Dep. at 176:11-23 ("I don't know the term."), 540:11-17. |
| 124.    The point of this call was to ensure that Andrien was not reverting to a financing strategy that Obus thought he and Andrien had agreed was not appropriate.  Obus Dep. at 174:11-14 (Dunning Decl. Ex. F). | Denied.   The purpose of the call was to confirm the tip.  *See* response to par. 100. |
| 125.    During the call, Obus "did a little bit of what's called puffing…where you kind of act a little more sure than you might be in order to…convince the person on the other side that if indeed,…he is up to this, that he ought to alter his ways before anything gets cast in concrete."  Obus Dep. at 174:19-175:2 (Dunning Decl. Ex. F). | Denied.  Obus's 2002 SEC testimony does not mention anything about "puffing."  *See* Obus Test. at 43-45. |
| 126.    Andrien's recollection of this call was that Obus told him that "a little birdie" at GE Capital told him that SunSource was going to be sold.  Andrien Dep. at 543:13-544:5 (Dunning Decl. Ex. Q). | Admitted in part, but defendants' summary of Andrien's testimony leaves out important details.  Andrien's complete recollection of the call, given in 2002, is contained at Andrien Test. at 134-35, and was repeated in his deposition. |
| 127.    In response to Obus' disclosure of the alleged "tip," Andrien did not ask Obus to keep the alleged "tip" confidential or to refrain from trading in SunSource stock.  Andrien Dep. at 543:16-544:10 (Dunning Decl. Ex. Q); Obus Dep. at 170:25-171:3 (testifying that Andrien did not say anything "substantive" in response) (Dunning Decl. Ex. F). | Admitted in part.  Andrien told Obus, "I don't want to go here.  This is nothing I can comment about."   Andrien Test. at 135. |
| 128.    Andrien did not disclose the alleged "tip" conveyed by Obus to the public, to the market, or to GE Capital, nor did Andrien make any public disclosure about the pending | It is admitted that the Allied Transaction was nonpublic before the June 19, 2001 public announcement.  Andrien did speak with his CFO and counsel after the calls from Obus and |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| transaction.  Andrien Dep. at 576:19-579:15 (Dunning Decl. Ex. Q). | Weber, however.  Andrien Dep. at 839-40. |
| 129.    GE Capital conducted an internal investigation through counsel to review whether Strickland's conversation with Black about SunSource was stock tipping.  Brasser Dep. at 67:12-15, 68:3-5 (Dunning Decl. Ex. I). | Admitted. |
| 130.    In the instant case, GE Capital was subpoenaed by the SEC in the instant case to testify, pursuant to Federal Rule of Civil Procedure 30(b)(6), about "T. Bradley Strickland's employment history, including disciplinary action taken against him, and the reasons therefore."  Subpoena of GE Capital Corporation Commercial Finance, dated February 15, 2008 (Dunning Decl. Ex. V). | Admitted. |
| 131.    GE Capital offered William Brasser, who was the CEO of the Corporate Lending Group of GE Capital from the spring of 2000 through the fall of 2005, to testify on behalf of GE Capital.  Brasser Dep. at 11:10-15 (Dunning Decl. Ex. I). | Admitted. |
| 132.    During its investigation of Strickland's conversation with Black about SunSource, GE Capital and its counsel interviewed Strickland about his conduct relating to GE Capital's proposed financing of an acquisition of shares involving SunSource during the period from April 2001 through June 2001 (the Allied Acquisition).  GECC0000100-0000101 (Dunning Decl. Ex. W). | Admitted. |
| 133.    GE Capital noted that the SEC had commenced an investigation concerning trading in SunSource and had issued subpoenas to Strickland and to GE Capital in August and September of 2002.  GECC0000100  (Dunning Decl. Ex. W). | Admitted. |
| 134.    GE Capital also noted that Strickland was interviewed by GE Capital and its counsel, and that Strickland subsequently testified before the SEC staff concerning his involvement in the proposed financing of the acquisition of SunSource (the Allied Acquisition).  GECC0000100  (Dunning Decl. Ex. W). | Admitted. |
|  |  |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| 135.    It was GE Capital's "understanding that Strickland was personally acquainted with an employee of Wynnefield Capital Management LLC," and that "at the time Strickland was working on the SunSource matter, he became aware that Wynnefield was a significant shareholder of SunSource, Inc. and that Strickland asked this individual his views concerning SunSource, Inc. and its management." GECC0000100-0000101 (Dunning Decl. Ex. W). | Global hearsay, relevancy, competency, speculation, and prejudice objection as to defendants' use of GE's letter of reprimand to Strickland to establish truth of matters asserted therein, namely the content of Strickland's discussion with Black, the purpose/reason for the discussion, and GE's findings. GE's findings not only contain multiple hearsay, but are based on an incomplete factual investigation (i.e., only Strickland's description of his call), and contain inadmissible speculation regarding Strickland's subjective intent -- matters to be determined by the jury.<br><br>Subject to this objection:<br>The statement is admitted to the extent defendants correctly characterized the GE letter of reprimand. It is denied that GE correctly determined, knew, and/or characterized the true nature, content, intent, and/or purpose of Strickland's conversation(s) with Black about SunSource. *See* response to par. 100. |
| 136.    It was GE Capital's further "understanding that Strickland did not discuss the nature of the specific transaction being contemplated, but told this individual that GE was considering potential business with SunSource." GECC0000100 (Dunning Decl. Ex. W). | Evidentiary objections, par. 135.<br><br>Admitted to the extent defendants correctly characterize the GE letter of reprimand. Denied that GE correctly determined, knew, and/or characterized the true nature, content, intent, and/or purpose of Strickland's conversation(s) with Black about SunSource. *See* response to par. 100. |
| 137.    GE Capital noted that Strickland indicated that this "inquiry was part of a due diligence effort to obtain insight on the Company [SunSource]." GECC0000100 (Dunning Decl. Ex. W). | Double hearsay objection.<br>Evidentiary objections, par. 135.<br>Admitted to the extent defendants correctly characterize the GE letter of reprimand. Denied that GE correctly determined, knew, and/or characterized the true nature, content, intent, and/or purpose of Strickland's conversation(s) with Black about SunSource. *See* response to par. 100. |
| 138.    After completing its internal investigation of Strickland for stock tipping, GE Capital did not terminate Strickland's employment. GECC0000101 (Dunning Decl. Ex. W). | Evidentiary objections, par. 135. Admitted, based on facts GE understood at the time, based on Strickland's own description of his discussion with Black.<br>Denied this is a material fact. A GE representative testified if GE learned that |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| | Strickland had given more details of the transaction to Black, or was not engaging in legitimate due diligence, sanctions would have been more severe. Brasser Dep. at 70 (Q "If the facts you learned were different from those as written here, was it possible he could have been subject to different sanctions?" A "Depending on the additional facts, certainly."), 73 ("it would have made the matter more severe."), 125 (Q "Would it have been a more serious violation of GE's policies if Mr. Strickland … did discuss the nature of the transaction being contemplated?" A I would have to say yes."). *See* response to par. 100. |
| 139.     GE Capital placed a letter of reprimand in Strickland's file because it concluded that Strickland "did not consult with counsel or receive the approval of his supervisor prior to having" his conversation with Black about SunSource.  GECC0000100 (Dunning Decl. Ex. W). | Evidentiary objections, par. 135.  Admitted in part, based on facts understood by GE at the time. *See* response to pars. 100, 138. |
| 140.     In its letter of reprimand addressed to Strickland, GE Capital "called Strickland's attention to Policy 20.13 of the Spirit & Letter, which provides that employees are 'urged to consult with Company legal counsel' to determine whether communications are needed and 'being undertaken in an appropriate manner.'"  GECC0000100 (Dunning Decl. Ex. W). | Admitted. |
| 141.     GE Capital stated that "it should have been clear to Strickland that before contacting or talking with a third party not involved in a transaction and indicating that GE had an interest in a company, its management or otherwise, Strickland should have consulted with his manager or legal counsel.  Failing to do so was inappropriate, showed a lack of judgment and a disregard of GE policies." GECC0000100 (Dunning Decl. Ex. W). | Evidentiary objections, par. 135.  Admitted in part, based on facts understood by GE at the time. *See* response to pars. 100, 138. |
| 142.     GE Capital concluded that when Strickland asked Black about his impressions of SunSource management, Strickland was "actually trying to do some underwriting." Brasser Dep. at 125:8-9 (Dunning Decl. Ex. I). | Evidentiary objections, par. 135. Admitted that Brasser testified as such, based on facts understood at the time.  Denied this is a material fact.  Brasser testified that if GE learned that Strickland had given more details of the transaction to Black, or was not |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| | doing underwriting, this would have suggested a more culpable intent, and sanctions would have been more severe.  Brasser Dep. at 70 (Q "If the facts you learned were different from those as written here, was it possible he could have been subject to different sanctions?"  A "Depending on the additional facts, certainly."), 73 ("it would have made the matter more severe…I think it is intent."), 125 (Q "Would it have been a more serious violation of GE's policies if Mr. Strickland … did discuss the nature of the transaction being contemplated?"  A I would have to say yes.").  Evidence demonstrates that Strickland was not performing legitimate due diligence, had no business need to make the call, and did not take any precautions to prevent misuse of the information.  *See* response to pars. 100, 135. |
| 143.    GE Capital's conclusion "was that Strickland made a mistake."  Brasser Dep. at 124:22-24.  (Dunning Decl. Ex. I).  Specifically, GE Capital's "finding was that Brad Strickland made a mistake by…inquiring about the borrower that GE Capital was looking to provide the financing for, and that he did not do it with any sort of malice or intent."  Brasser Dep. at 131:10-14 (Dunning Decl. Ex. I). | Evidentiary objections, par. 135. Admitted that Brasser testified as such based on what GE knew at the time.  Denied this is a material fact.  *See* response to par. 142. |
| 144.    Wiles testified that if a GE Capital employee revealed to a third party that GE Capital was "looking at a transaction or considering a transaction," that transaction could refer to any number of transactions, "everything from financing xerox machines to a going private transaction."  Wiles Dep. at 143:4-14 (Dunning Decl. Ex. K). | Admitted Wiles testified to this effect.  Denied it as a material fact.  Strickland told Black more details about the Allied Acquisition than GE was "looking at a transaction."  *See* response to par. 100. |
| 145.    On June 8, 2001, Baron Bruno, a trader at Cantor Fitzgerald's Los Angeles office, received an order to sell SunSource stock at 9:37 a.m. EST.  Deposition of Baron Bruno, dated December 14, 2007 ("Bruno Dep.") (Dunning Decl. Ex. X) at 66:19-67:17; C00143 (Dunning Decl. Ex. Y). | Admitted. |
| 146.    After receiving this order, Bruno contacted SunSource's Corvino and left him a voicemail message to determine whether he or someone else at SunSource was interested in | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| buying the stock.  Bruno Dep. at 33:7-25, 36:25-37:3; 67:2-9 (Dunning Decl. Ex. X); C00143 (Dunning Decl. Ex. Y). | |
| 147.    Bruno then contacted Wynnefield's trader, Stephen Zelkowicz, and asked him whether Wynnefield had an interest in buying the block of SunSource stock.  Bruno Dep. at 68:3-17; C00015 (Dunning Decl. Ex. Z). | Admitted in part.  Bruno began with an offer of 50,000 shares that came over the "hoot," and ended up selling the whole block of 287,2000 shares to Wynnefield.  *See* Bruno Dep. at 70, 107-08. |
| 148.    At 12:07 p.m. EST on June 8, 2001, Zelkowicz responded to Cantor's unsolicited offer and indicated that Wynnefield would purchase the stock.  Bruno Dep. at 68:3-17 (Dunning Decl. Ex. X); C00015 (Dunning Decl. Ex. Z). | Admitted in part.  *See* response to par. 147. |
| 149.    For the next 30 minutes, Bruno negotiated the terms of the trade (number of shares and price per share), which were finalized by 12:37 p.m. EST, the time when the trade actually commenced.  Bruno Dep. at 68:21-70:4 (Dunning Decl. Ex. X). | Admitted. |
| 150.    As a result of Bruno's offer to sell Wynnefield shares of SunSource stock, Wynnefield purchased a total of 287,200 shares of SunSource stock at $4.80 per share on June 8, 2001 through Cantor Fitzgerald.  Deposition of Stephen J. Zelkowicz, dated June 4, 2008, at 93:12-19 (Dunning Decl. Ex. AA). | Admitted in part.  *See* response to par. 147. |
| 151.    Andrien testified that Obus called him to disclose Wynnefield's purchase of 287,200 shares of SunSource stock on June 8, 2001.  Andrien Dep. at 595:9-17 (Dunning Decl. Ex. Q). | Admitted. |
| 152.    Black was not aware that Wynnefield had purchased SunSource stock on June 8, 2001; he first learned of the purchase in July of 2002.  Black Dep. at 87:17-23 (Dunning Decl. Ex. D). | Admitted that Black testified as much.  This testimony seems incredible given the small size of the Wynnefield office and the unusual circumstances surrounding the tip and trade.  *See* response to par. 100. |
| 153.    On June 11, 2001, prior to the June 19, 2001 public announcement of the Allied-SunSource merger, Wynnefield sold 6,000 shares of SunSource stock.  WYNN-CC 02152 (Dunning Decl. Ex. BB). | Admitted. |
| 154.    On June 19, 2001, after the public announcement of the Allied-SunSource merger, Wynnefield purchased 38,400 more shares of | Admitted. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| SunSource at $9.5290 per share, and the next day, it purchased another 111,600 SunSource shares at $9.4828 per share.  WYNN-CC 03037 (Dunning Decl. Ex. CC). | |
| 155.     The SEC served subpoenas on Defendants Obus, Black, and Strickland in July and August of 2002.  Subpoena of Nelson Obus, dated July 21, 2002 (Dunning Decl. Ex. DD); Subpoena of Peter Black, dated August 23, 2002 (Dunning Decl. Ex. EE); Subpoena of Thomas Brad Strickland, dated August 8, 2002 (Dunning Decl. Ex. FF). | Admitted. |
| 156.     In August of 2002, Obus provided the SEC with two full days of sworn, on-the-record testimony.  SEC Interview of Nelson Obus, dated August 29 and 30, 2002 (Dunning Decl. Ex. GG). | Admitted in part (though 9:43 am to 4:25 pm, with a lunch break, is arguably not quite a "full" day.) |
| 157.     In September of 2002, Black and Strickland each provided one full day of sworn, on-the-record testimony before the SEC.  Black Interview (Dunning Decl. Ex. E); SEC Interview of Thomas Bradley Strickland, dated September 17, 2002 (Dunning Decl. Ex. HH). | Admitted. |
| 158.     On April 21, 2006, more than three-and-one-half years later, the SEC filed a complaint against Obus, Black, and Strickland, naming Wynn, Wynn I, and Wynn II as Relief Defendants.  Plaintiff's Complaint, filed April 25, 2006 (Dunning Decl. Ex. A). | Admitted.  Global evidentiary objection (relevance, prejudice) to all facts and arguments going to the length of time of the SEC's investigation. |
| 159.     On June 28, 2006, Defendants Obus, Black, and Strickland moved to dismiss the complaint.  Docket #13: Motion to Dismiss Complaint, filed by Nelson Obus, June 28, 2006 (Dunning Decl. Ex. II); Docket #12: Motion to Dismiss Complaint, filed by Peter F. Black, June 28, 2006 (Dunning Decl. Ex. II); Docket #10: Motion to Dismiss Complaint, filed by Thomas Bradley Strickland, June 28, 2006 (Dunning Decl. Ex. II). | Admitted. |
| 160.     On February 15, 2007, this Court denied Defendants' motions to dismiss the complaint, concluding that the complaint was minimally sufficient for pleading purposes.   Transcript of Oral Argument, Feb. 15, 2007, at 59:23-60:1 (Dunning Decl. Ex. JJ); Docket #26: Order | Denied.  The Court denied the motions to dismiss because the allegations -- now supported in the evidentiary record -- clearly outline illegal tipping and trading activity. |

| Defendants' Statement Of "Undisputed" Facts | The SEC's Response |
|---|---|
| Denying Motions to Dismiss, Feb. 15, 2007 (Dunning Decl. Ex. II). | |
| 161.    In denying Defendants' motions to dismiss the complaint, this Court "acknowledged that the facts are sparse," Tr. of Oral Argument Feb. 15, 2007, at 60:1-2 (Dunning Decl. Ex. JJ), and made clear that its denial of the motions to dismiss "did not mean obviously at some stage in this proceeding that it would not be ripe for a consideration of summary judgment if, in fact, the facts do not reasonably support what appears to be the reasonable inference from the facts alleged in this complaint." Tr. of Oral Argument Feb. 15, 2007,  at 64:9-13 (Dunning Decl. Ex. JJ). | Admitted in part.  Denied as incomplete.  The Court also found that the SEC had alleged a clear duty owed by GE and Strickland to SunSource, which, if supported by the evidence, is sufficient to state a prima face case for insider trading.  *See* Hearing Tr. at 60-65. |
| 162.    On June 13, 2007, more than six years after the events at issue in this case, the SEC filed an amended complaint against Defendants Obus, Black, and Strickland, and Wynn, Wynn I, and Wynn II as Relief Defendants.  Am. Compl. (Dunning Decl. Ex. C). | Admitted. |

Dated:  October 13, 2009

Respectfully submitted,


   __/s Paul W. Kisslinger_____
Terence M. Healy
Paul W. Kisslinger (PK0764)
U.S. SECURITIES AND EXCHANGE
        COMMISSION
100 F Street, NE
Washington, D.C. 20549-4030
(202) 551-4427 (Kisslinger)