UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,

**MEMORANDUM DECISION**
**AND ORDER**

                              Plaintiff,                           06 Civ. 3150 (GBD)

        - against -

NELSON J. OBUS,
PETER F. BLACK,
THOMAS BRADLEY STRICKLAND,

                        Defendants, and

WYNNEFIELD PARTNERS SMALL
      CAP VALUE L.P.,
WYNNEFIELD PARTNERS SMALL
      CAP VALUE L.P. I,
WYNNEFIELD PARTNERS SMALL
      CAP VALUE OFFSHORE FUND, LTD.,

                        Relief Defendants.
------------------------------------------------------------------ x
GEORGE B. DANIELS, District Judge:

*Introduction*

        This case involves allegations of insider trading in violation of Section

10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),

and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The Securities and

Exchange Commission ("SEC") alleges that, on May 24, 2001, Thomas Bradley

Strickland, an employee of GE Capital Corp., "tipped" his friend, Peter Black, an analyst

at Wynnefield Capital, Inc., about the potential acquisition of SunSource, Inc., by a

"financial buyer."  Black in turn passed the information to his superior, Nelson Obus,

who allegedly directed the purchase of SunSource stock.

1

The SEC asserts claims under both the "classical" and "misappropriation" theories of insider trading.[1]  Pending before the Court are Defendants Obus' and Black's (the "Moving Defendants") motions for summary judgment.  Defendant Strickland joins in the motion.  (See Docket Entry No. 73.)  The Moving Defendants argue that the record does not support any reasonable inference that the SEC has established the required elements of duty and breach.  More specifically, the Moving Defendants assert that, in regards to the classical theory, Strickland did not owe a duty to SunSource, and that, in regards to the misappropriation theory, Strickland did not breach the duty he owed to GE Capital.  The Moving Defendants further assert that that they were not aware, and could not have been aware, of any such duty or a corresponding breach.  Lastly, Moving Defendants assert that the SEC has not established the required element of scienter.[2]  For the reasons set forth below, summary judgment is granted in favor of the Moving Defendants, as well as defendant Strickland.

---

[1] The classical theory targets corporate insiders who trade based upon non-public, material information regarding their own company in violation of their duty to the shareholders. Chiarella v. United States, 445 U.S. 222, 228 (1980).  The misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information. United States v. O'Hagan, 521 U.S. 642, 652-53 (U.S. 1997).

[2] Counsel for Defendant Obus (joined by Defendant Black) submitted a letter to the Court on July 12, 2010 to apprise the Court of the decision in SEC v. Rorech, No. 09 Civ. 4329, 2010 U.S. Dist. LEXIS 63804 (S.D.N.Y. June 25, 2010) ("Deception is also an essential element of all claims brought pursuant to the misappropriation theory").  On July 14, 2010, the SEC responded to the letter and argued that Defendants; understanding of Rorech was incorrect, while simultaneously stating that they would prove deceptive conduct at trial.  On July 19, 2010, counsel for Obus submitted a response.  The Court has carefully considered Rorech, and other cited decisions, in reaching its conclusion.

2

*Procedural & Factual History*[3]

The crux of the SEC's allegations are that, on May 24, 2001, Strickland, an employee of GE Capital, "tipped" Black, an employee of Wynnefield Capital, about a pending acquisition of SunSource, Inc. ("SunSource") by Allied Capital Corporation ("Allied"). (Def. 56.1 Stmt. ¶ 4, Pl. 56.1 Stmt.¶ 4.) The SEC further alleges that Black passed information relating to the potential acquisition to his direct superior, Obus, who on June 8, 2001, directed the purchase of SunSource stock while in possession of material, nonpublic information. (Def. 56.1 Stmt. ¶ 7, Pl. 56.1 Stmt.¶ 7.) The SunSource-Allied merger was not publicly announced until June 19, 2001, and was not completed until September 26, 2001. (Def. 56.1 Stmt. ¶¶ 69, 80, Pl. 56.1 Stmt. ¶¶ 69, 80.)

Procedural Background

The SEC commenced an investigation surrounding the acquisition of SunSource in the summer of 2002 by serving subpoenas on Defendants Obus, Black and Strickland. (Dunning Dec. Exs. DD-FF.) In August and September of 2002, Obus, Black and Strickland provided testimony before the SEC. (Id. Exs. GG, E, HH.)

On April 21, 2006, the SEC initiated the instant action by filing a complaint against Obus, Black and Strickland as well as Wynnefield Partners Small Cap Value L.P. ("Wynn"), Wynnefield Partners Small Cap Value L.P. I ("Wynn I") and Wynnefield Partners Small Cap Value Offshore fund, Ltd. ("Wynn II") as Relief Defendants. (Docket Entry No. 1.) On June 28, 2006, Defendants Obus, Black and Strickland moved to dismiss the complaint for failure to state a cause of action. (Docket

---

[3] The procedural and factual history sections are derived from the Defendants' Joint Local Rule 56.1 Statement , the SEC's Response thereto and associated documents.

Entry Nos. 10, 12, 13.)  In its opposition to the motions to dismiss, the SEC reserved the right to proceed under the misappropriation theory.  (Docket Entry No. 19.)  On February 15, 2007, the Court denied the motions.  (Docket Entry No. 26.)  On June 13, 2007, the SEC filed an amended complaint including its claim made under the misappropriation theory.  (Docket Entry No. 42.)

<u>The Defendants</u>

Defendant Nelson Obus ("Obus") is the founder and, at all relevant times, was a principal of two affiliated investment managers: Wynnefield Capital, Inc. ("Wynnefield") and Wynnefield Capital Management, LLC.  (Def. 56.1 Stmt. ¶ 1, Pl. 56.1 Stmt.¶ 1.)  Defendant Peter F. Black ("Black") was an analyst for Wynnefield, and reported directly to Obus.  (Def. 56.1 Stmt. ¶¶ 2 & 12, Pl. 56.1 Stmt. ¶¶ 2 & 12.)  Defendant Thomas Bradley Strickland ("Strickland") was an employee of General Electric Capital Corporation ("GE Capital").  (Def. 56.1 Stmt. ¶ 3, Pl. 56.1 Stmt.¶ 3.)  Strickland and Black were classmates at Boston College, and remained close friends during the relevant period.  (Def. 56.1 Stmt. ¶¶ 8-9, Pl. 56.1 Stmt. ¶¶ 8-9.)

<u>The Relevant Entities and the Pre-Tip Negotiations</u>

GE Capital is the financial services arm of General Electric Corporation ("GE").  (Def. 56.1 Stmt. ¶ 23, Pl. 56.1 Stmt.¶ 23.)  In 2001, GE Capital, through its Commercial Finance Group, provided a wide variety of loans and other financial services to business ventures. (Def. 56.1 Stmt. ¶¶ 24-26, Pl. 56.1 Stmt. ¶¶ 24-26.)  SunSource was a Delaware corporation headquartered in Philadelphia, Pennsylvania, that distributed and provided industrial services.  (Def. 56.1 Stmt. ¶¶ 17-18, Pl. 56.1 Stmt. ¶¶ 17-18.)  SunSource Technology Services, Inc. ("STS") was a wholly-owned subsidiary of

4

SunSource.  (Def. 56.1 Stmt. ¶ 19, Pl. 56.1 Stmt.¶ 19.) Allied Capital Corporation

("Allied") is a business development company that provides long-term investment capital

to support expansion of growing middle-market companies (Def. 56.1 Stmt. ¶¶ 15-16, Pl.

56.1 Stmt.¶¶ 15-16.)  )

On December 28, 2000, Allied provided SunSource with $30 million in

subordinated debt financing.  (Def. 56.1 Stmt. ¶ 20, Pl. 56.1 Stmt.¶ 20.)  The $30 million

facility was an interest-only facility that included warrants for Allied to acquire 285,000

shares of SunSource stock at a nominal value.  (Def. 56.1 Stmt. ¶ 21, Pl. 56.1 Stmt.¶ 21.)

On March 9, 2001, G. Cabell Williams, III, a managing director of Allied, wrote to

Maurice Andrien ("Andrien"), the Chief Executive Officer ("CEO") of SunSource,

proposing to "proceed with management in pursuing an acquisition of 100% of the

outstanding shares of SunSource, Inc.."  (Dunning Dec. Ex. H..)

On April 23, 2001, Karl Slosberg joined GE Capital as a vice president in

business development originations.  (Def. 56.1 Stmt. ¶ 27, Pl. 56.1 Stmt.¶ 27.)  Slosberg's

job responsibilities included informing companies about GE Capital's services and

capabilities, and developing relationships with companies that could ultimately lead to

financing opportunities.  (Def. 56.1 Stmt. ¶ 28, Pl. 56.1 Stmt.¶ 28.)

On April 27, 2001, Slosberg telephoned SunSource's CEO, Mark Andrien,

to reestablish contact and solicit business. (Def. 56.1 Stmt. ¶ 29, Pl. 56.1 Stmt.¶ 29.)

Slosberg had met Andrien in the mid-1990's.  (Def. 56.1 Stmt. ¶ 30, Pl. 56.1 Stmt.¶ 30.)

During the April 27, 2001,  telephone call, or soon thereafter, Andrien told Slosberg that

SunSource was seeking financing of a sale of STS, and that the sale of STS was a

necessary part of a proposed going-private transaction of SunSource.  (Def. 56.1 Stmt. ¶

31, Pl. 56.1 Stmt.¶ 31.)  After his telephone call with Andrien, Slosberg mentioned to his

boss, Joseph Wiles, a team leader in business origination at GE Capital, the possibility of

potentially pursuing the SunSource opportunity.  (Def. 56.1 Stmt. ¶ 32, Pl. 56.1 Stmt.¶

32.)

On April 30, 2001, Slosberg and Wiles met with Andrien and SunSource's

Chief Financial Officer ("CFO"), Joseph Corvino, to discuss how GE Capital might be

able to finance Allied's potential acquisition of SunSource (the "Allied Acquisition") and

the potential sale of STS. (Def. 56.1 Stmt. ¶ 33, Pl. 56.1 Stmt.¶ 33.)

Specifically, SunSource was "trying to determine if GE Capital would provide financing

without an appraisal of the inventory."  (Slosberg Dep. at 35:13-36:16.)   At this meeting,

SunSource did not ask GE to execute a separate written confidentiality agreement, and

none was ever executed.  (Id. at 50:20-52:12, 98:10-23.)

In early May of 2001, Wiles and Slosberg, along with Michael Lustbader, a

lead underwriter at GE Capital, met a second time with Andrien and Corvino to further

discuss the potential financings of the Allied Acquisition and the STS Sale.  (Def. 56.1

Stmt. ¶ 36, Pl. 56.1 Stmt.¶ 36.)  On May 9, 2001, Jim Powell of Allied sent Corvino, via

e-mail attachment, a memorandum summarizing the Allied Acquisition and the STS Sale

(the "Deal Summary") (Dunning Dec. Ex. N.)   The Deal Summary was also sent to

several potential lenders.  (Def. 56.1 Stmt. ¶ 39, Pl. 56.1 Stmt.¶ 39.)  The Deal Summary

contained information about a transaction in which "Allied Capital was contemplating, in

cooperation with SunSource's management, a buy-out of SunSource in which SunSource

would be taken private." (Dunning Dec. Ex. N. P. 2.)  The first page of the Deal

6

Summary stated: "This memorandum is covered by a confidentiality and non-disclosure agreement between Your Institution and Allied Capital Corporation." (Id. P. 1.) On May 11, 2001, Corvino forwarded to Slosberg and Wiles the e-mail and attached memorandum summarizing the Allied Acquisition and the STS Sale (the Deal Summary). (Def. 56.1 Stmt. ¶ 42, Pl. 56.1 Stmt.¶ 42.)  As of May 11, 2001, when Corvino sent Slosberg and Wiles this e-mail, there was no separate and distinct (from the "engagement letter") written confidentiality agreement in place between SunSource and GE Capital. (Corvino Dep. at 267:3-14).  Also, on May 11, 2001, GE Capital sent a proposal letter to Frank Izzo, Vice President of Allied, expressing "its interest in providing up to $40 million of financing. . . in support of the management buyout of SunSource Technology Services, Inc." (the "STS Sale"). (Dunning Dec. Ex. O.)

On May 15, 2001, Strickland and Slosberg attended a meeting with Corvino at SunSource's headquarters in Philadelphia.  During the meeting, Corvino focused on GE Capital's potential financing of the STS Sale. (Def. 56.1 Stmt. ¶ 46, Pl. 56.1 Stmt.¶ 46.)  Corvino asked Slosberg numerous questions about what GE Capital could advance on STS's assets as part of a potential financing of the STS Sale and how quickly GE Capital could arrange for that financing.  (Def. 56.1 Stmt. ¶ 47, Pl. 56.1 Stmt.¶ 47.)  The borrower in GE Capital's potential financing of the STS Sale "would have been the ultimate buyer of STS, the equity group, and management if they were still involved with the company." (Slosberg Dep. at 131:7-18.)

On May 21, 2001, GE Capital submitted to Corvino a "best efforts" proposal to provide $95 millions worth of financing in support of Allied's buy-out of "SunSource and all operating subsidiaries" (the Allied acquisition).  (Dunning Dec. Ex.

7

P.)  GE Capital's May 21, 2001, proposal was "simply an indication of interest and did not constitute a commitment or undertaking to provide financing."  (Corvino Dep. at 269:13-25.)  GE Capital's May 21, 2001 proposal prohibited SunSource from disseminating the information contained in the GE Proposal to third parties.  (Dunning Dec. Ex. P.)

Meanwhile, in May 2001, SunSource was speaking to several other financing institutions – not just GE Capital - regarding the STS sale, including Congress and Foothill, which is the institution that ultimately financed the STS sale.  (Slosberg Dep. at 58:3-10, Corvino Dep. at 262:10-20.)  At this time, SunSource was not exclusively negotiating with GE Capital regarding its financing needs. (Corvino Dep. at 262:5-9.)  SunSource considered GE Capital "a bidder, if you will, or a contender for the STS separate financing."  (Andrien Dep. at 359:21-23.)

Strickland's Role

From 1999-2005, Strickland worked in the Middle Market Lending Group within the Commercial Finance Group at GE Capital.  (Def. 56.1 Stmt. ¶ 81, Pl. 56.1 Stmt.¶ 81.)   His responsibilities included certain underwriting work, including conducting "due diligence" to help GE Capital's investment committee evaluate the riskiness and viability of prospective deals. (Strickland Dep. at 34:15-17, Brasser Dep. 60:4-12.)

On May 14, 2001, GE Capital assigned Strickland to a deal team to work on the potential financing of the Allied Acquisition and the STS Sale.  (Def. 56.1 Stmt. ¶ 92, Pl. 56.1 Stmt.¶ 92.)  Strickland was a "front person" or "point person" for the underwriting team.  (Slosberg Dep. 129:5-14.)  Also on May 14, 2001, Lustbader

forwarded to Strickland the "Deal Summary" that Allied had prepared and originally sent to SunSource, and which was sent to other potential lenders. (Def. 56.1 Stmt. ¶ 93, Pl. 56.1 Stmt.¶ 93.)  May 14, 2001 was the first day that Strickland had heard of the proposed Allied Acquisition and the STS Sale.  (Def. 56.1 Stmt. ¶ 94, Pl. 56.1 Stmt.¶ 94.)

The Alleged Tip

While performing underwriting duties relating to GE Capital's potential financings of the Allied Acquisition and the STS Sale, Strickland noticed that Wynnefield was an owner of SunSource stock.  (See Wynnefield Funds' Transactions in SunSource Common Stock, Kisslinger Decl., Ex. 4.)  Strickland was aware that his college classmate Black worked at Wynnefield.  (Strickland Dep. at 115.)

On or about May 24, 2001, Black and Strickland had at least one conversation concerning SunSource.[4] (Def. 56.1 Stmt. ¶ 98, Pl. 56.1 Stmt.¶ 98.) Strickland states that he does not remember the conversation or conversations. (Strickland Dep. at 119:7-11.)   Black testified that he thought that Strickland's questions concerning SunSource related to his performance of due diligence on the company.  (Def. 56.1 Stmt. ¶ 103, Pl. 56.1 Stmt.¶ 103.)  Strickland did not inform Black that the information conveyed to Black during their conversation should be kept in confidence or not disseminated to any third party.  (Def. 56.1 Stmt. ¶ 107, Pl. 56.1 Stmt.¶ 107.)

Soon after Black's conversation with Strickland about SunSource, Black spoke with his boss, Obus. (Black Dep. at 118:20-25.)  Obus recalled that Black told him

---

[4] The SEC and the Moving Defendants disagree about precisely what was said during the conversation or conversations, and what inferences can properly be drawn from the fact that a conversation regarding SunSource took place.  (See e.g. Pl. 56.1 Stmt. ¶ 100.) Based upon the grounds upon which the Moving Defendants rely in their summary judgment motions, the lack of duty and breach, the Court has determined that the parties contrasting versions do not raise a genuine issue of material fact, and accepts the facts as alleged in the SEC's opposition papers.  (See e.g. SEC Opp. Docket Entry No. 70, PP. 3, 10-11.)

that he had a conversation with someone from GE Capital who asked a lot of questions about why Wynnefield owned SunSource stock.  (Def. 56.1 Stmt. ¶ 112.)

<u>Obus' Post-Tip Admission</u>

Shortly after Black told Obus about his conversation with Strickland, Obus telephoned Andrien at SunSource.  (Obus Test. 51:10.)  Notably, Obus told Andrien that he was informed by "a little birdie in Connecticut" that SunSource was going to be sold to a "financial buyer."  (Andrien Test. 134-135, Andrien Dep. 542-543, 835-37.)  Obus and Andrien had a pre-existing relationship, as Wynnefield held 5.9% of SunSource's common stock at the time of the alleged tip. (Wynnefield Funds' Transactions in SunSource Common Stock , Kisslinger Decl., Ex. 4, Def. 56.1 Stmt. ¶ 121, Pl. 56.1 Stmt.¶ 121).  Obus claims that he feared that SunSource was considering another PIPE (private investment in public equity) transaction rather than seeking funding from existing shareholders.  (Def. 56.1 Stmt. ¶ 123, Pl. 56.1 Stmt.¶ 123.)

Black overheard the Obus-Andrien conversation and "jumped out of (his) seat" when he realized what was transpiring, as he feared for his friend, Strickland. (Black Test. 147, 149:15-19.)  Also on May 24, 2001, Andrien received a call from Alan Weber, another large investor and an acquaintance of Obus, who stated that he knew a "financial buyer" for SunSource was being considered.  (Obus Test. 229, Andrien Test. 125-127, Weber Dep. 194-195).

In response to Obus' disclosure of the alleged "tip," Andrien did not ask Obus to keep the alleged "tip" confidential or to refrain from trading in SunSource stock. (Andrien Dep. at 543:16-544:10.)   Andrien did not disclose the alleged "tip" conveyed

10

by Obus to the public, to the market, or to GE Capital, nor did SunSource make any public disclosure about the pending transaction. (Id. 576:19-579:15.)

### The Post-Tip Events Between GE Capital, SunSource and Allied

On May 25, 2001, the day after the alleged tip, Corvino faxed to Wiles and Slosberg a revised version of GE Capital's May 11, 2001, proposal letter on the STS Sale, which had originally been sent to Izzo at Allied. (Dunning Dec. Ex. O.) Corvino altered some of the proposed terms of the GE Capital proposal letter on May 25, 2001. (Id.) The letter contained a paragraph that stated "neither the letter nor its contents to be disclosed publicly or privately except as to those individuals who are your officers, employees or advisors who have a need to know as a result of being involved in" the potential transaction concerning the STS sale. (Id.) This language was standard language included in most GE Capital proposal letters issued at all relevant times. (Wiles Dep. at 130:14-131:4, 96:2-11.) Corvino considered the language to impose an obligation of confidentiality on SunSource, and not GE Capital. (Corvino Dep. at 607:24-609:6.)

Also on May 25, 2001, without a separate written confidentiality agreement in place, SunSource wired GE Capital an underwriting deposit of $50,000 for GE Capital to "begin [its] due diligence and field audit" for its proposed financing of the STS Sale. (Dunning Dec. Exs. R, O.) SunSource ultimately refused GE Capital's proposal on the financing of the STS Sale. (Def. 56.1 Stmt. ¶ 62, Pl. 56.1 Stmt.¶ 62.) GE Capital continued to try to participate as a senior lender in the proposed financing of the Allied Acquisition. (Wiles Tr. 108:11-16.)

### The Trade

11

On June 8, 2001, Baron Bruno, a trader at Cantor Fitzgerald's Los Angeles office, received an order to sell SunSource stock at 9:37 a.m. EST. (Bruno Dep. at 66:19-67-17.) After receiving this order, Bruno contacted SunSource's Corvino and left him a voicemail message to determine whether he or someone else at SunSource was interested in buying the stock. (Id. at 33:7-25, 36:35-37:3, 67:2-9.) Bruno then contacted Wynnefield's trader, Stephen Zelkowicz, and asked him whether Wynnefield had interest in buying SunSource stock. (Id. at 68:3-17.) Zelkowicz responded to Cantor's unsolicited offer by indicating that Wynnefield was interested in purchasing the stock. (Bruno Dep. at 68:3-17.) Zelkowicz attempted to reach Obus, who was attending a board meeting, and left him a voicemail regarding the unsolicited offer from Cantor Fitzgerald. (Obus Dep. at 132:9-21.) Obus returned Zelkowicz's call and instructed him to bid five percent lower than the approximately $5 asking price ($4.75). (Id.) For the next 30 minutes, Bruno negotiated the terms of the trade (number of shares and price per share) with Zelkowicz, which were finalized by 12:37 p.m. EST, the time when the trade was consummated. (Bruno Dep. at 68:21-70:4.) When asked if he provided "Mr. Zelkowicz a directive to be on the lookout for SunSource stock" during June of 2001," Obus responded that "[a]t no point did I tell him during that period to initiate anything." (Obus Dep. at 135:2-25.)

Ultimately, on June 8, 2001, Wynnefield's trader (Zelkowicz) purchased a block of 287,200 shares of SunSource stock at $4.80 per share, which were deposited into the accounts of Wynnefield Partners Small Cap Value L.P. ("Wynn"), Wynnefield Partners Small Cap Value L.P. I ("Wynn I") and Wynnefield Partners Small Cap Value Offshore fund, Ltd. ("Wynn II"). (Def. 56.1 Stmt. ¶¶ 6 & 150, Pl. 56.1 Stmt.¶¶ 6 & 150.)

12

The SEC alleges that on June 8, 2001, Obus directed Wynnefield's purchase of SunSource stock based upon material, nonpublic information regarding Allied's pending acquisition of SunSource. (Def. 56.1 Stmt. ¶ 7, Pl. 56.1 Stmt.¶ 7.)

### SunSource's June 19, 2001 Press Release

On June 19, 2001, Allied issued a press release announcing the Allied - SunSource merger. (Def. 56.1 Stmt. ¶ 69, Pl. 56.1 Stmt.¶ 69.) Also on June 19, 2001, after the public announcement of the Allied-SunSource merger, Wynnefield purchased 38,400 more shares of SunSource at $9.5290 per share. On June 20, 2001, it purchased an additional 111,600 SunSource shares at $9.4828 per share. (Def. 56.1 Stmt. ¶ 154, Pl. 56.1 Stmt.¶ 154.) The merger between Allied and SunSource closed on September 26, 2001. (Def. 56.1 Stmt. ¶ 80, Pl. 56.1 Stmt.¶ 80.)

### Obus' Post-Announcement Admission

In June or July of 2001, after the merger had been announced, Obus called Dan Russell, Allied Capital's CFO. (Russell Dep. at 202:10-203:17.) During their conversation, Obus claimed that he was "tipped off to the deal." (Id.)

### GE Capital's Internal Controls

GE Capital's employees owed it a duty of trust and loyalty as set forth in the company's code of conduct, entitled *The Spirit & Letter.* (Kisslinger Decl., Ex. 1.) GE employees are not to share inside information learned on the job with third parties unless (a) there is an actual business need; and (b) appropriate safeguards are taken. (Id., Brasser Dep. at 37, 39, 48:5-13, 62-63.) Furthermore, certain employees, including Strickland, were designated Transaction Restriction Employees ("TRE"), who were not permitted to buy or sell certain securities about which GE Capital possessed material

13

non-public information. (Id.) TRE employees also received specialized training

regarding how to handle such non-public information. (Brasser Dep. at 44-45, 62:6-19;

Wiles Dep. at 154-155; Lustbader Dep. at 142-143.) The TRE list is not the sole

determinant as to whether information should remain confidential; it is not the "line in the

sand." (Strickland Dep. at 91-92.) Lustbader testified that a confidentiality agreement

can exist without being reduced to writing. (Lustbader Dep. at 145-146.)

On June 19, 2001, the day that the Allied-SunSource merger was

announced, GE Capital placed SunSource in its "Transaction Global Authority:

Restricted List" noting that on that date, GE Capital had "access to material inside

information" about SunSource, but the box for "confidentiality agreement" was not

checked on the transaction restricted list form. (Def. 56.1 Stmt. ¶ 71, Pl. 56.1 Stmt.¶ 71.)

The SEC's Investigation

GE Capital was subpoenaed by the SEC to testify, pursuant to Federal

Rule of Civil Procedure 30(b)(6), about "T. Bradley Strickland's employment history,

including disciplinary action taken against him, and the reasons therefore." (Dunning

Dec. Ex. V.) William Brasser, who was the CEO of the Corporate Lending Group of GE

Capital from the spring of 2000 through 2005, testified on behalf of GE Capital. (Id, Ex.

I.) Brasser testified that when Strickland asked Black about his impressions of

SunSource management, Strickland was "actually trying to do some underwriting." (Id. at

125:8-9.) GE Capital's conclusion "was that Strickland made a mistake." Specifically,

GE Capital's "finding was that Brad Strickland made a mistake by. . . inquiring about the

borrower that GE Capital was looking to provide the financing for, and that he did not do

it with any sort of malice or intent." (Id. at 131:10-14.) Wiles further testified that if a

14

GE Capital employee revealed to a third party that GE Capital was "looking at a transaction or considering a transaction," the word transaction could refer to any number of transactions, "everything from financing Xerox machines to a going private transaction." (Wiles Dep. at 143:4-14.) There is no evidence that Strickland passed on confidential material to Black with the intention that Black or any of his associates would trade on inside information.

### GE Capital's Internal Investigation

Also in the summer of 2002, GE Capital, including its legal counsel, conducted an internal investigation concerning Strickland's interactions with Black regarding SunSource. (Def. 56.1 Stmt. ¶ 132, Pl. 56.1 Stmt.¶ 132.) After completing its internal investigation of Strickland for stock tipping, GE Capital did not terminate Strickland's employment. (Dunning Dec. Ex. W) GE Capital did, however, place a letter of reprimand, signed by Brasser, in Strickland's file. (Id.) In its letter of reprimand, GE Capital called Strickland's attention to Policy 20.13 of its internal policy, *The Spirit & Letter*, which provides that employees are "urged to consult with Company legal counsel" to determine whether communications are needed and "being undertaken in an appropriate manner." (Id. quoting Kisslinger Decl., Ex. 1. at 20.13)

The letter of reprimand went on to state that it was GE Capital's "understanding that Strickland was personally acquainted with an employee of Wynnefield Capital Management LLC," and that "at the time Strickland was working on the SunSource matter, he became aware that Wynnefield was a significant shareholder of SunSource, Inc. and that Strickland asked this individual his views concerning SunSource, Inc. and its management. (Id.) It was GE Capital's further "understanding

15

that Strickland did not discuss the nature of the specific transaction being contemplated, but told this individual that GE was considering potential business with SunSource." (Id.) GE Capital noted that Strickland indicated that this "inquiry was part of a due diligence effort to obtain insight on the Company [SunSource]." (Id.)

GE Capital went on to state that "it should have been clear to Strickland that before contacting or talking with a third party not involved in a transaction and indicating that GE had an interest in a company, its management or otherwise, Strickland should have consulted with his manager or legal counsel. Failing to do so was inappropriate, showed a lack of judgment and a disregard of GE policies." (Slosberg Dep. P. 105, Def. 56.1 Stmt. ¶ 141, Pl. 56.1 Stmt.¶ 141.)

### Black, Obus and Strickland Met in 2002

In the summer of 2002, with both the SEC and GE Capital having commenced investigations, Strickland arranged to meet with Black in New York City. (Black Test. 126:13.) Prior to meeting with Strickland, Black met with Obus, and they devised a strategy to "not say anything" about SunSource. (Id. 179-180, Obus Test. 161:19-20.) At the meeting between Strickland and Black, Strickland claimed not to remember a discussion about SunSource. (Black Test. 179-80). Black later met Obus to discuss his meeting with Strickland. (Id.)

### *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A "genuine" issue exists if the "evidence is such that a reasonable jury

16

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "Material" facts are only those

"that might affect the outcome of the suit under the governing law." Id.  See also

Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009) (quoting Guilbert v.

Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  When considering a summary judgment

motion, the Court must "construe the facts in the light most favorable to the non-moving

party and must resolve all ambiguities and draw all reasonable inferences against the

movant." Id. (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir.

2003)).  "The plain language of Rule 56(c) mandates the entry of summary judgment . . .

against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of

proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 321 (U.S.1986).

      The SEC alleges that the aforementioned facts constitute insider trading in

violation on Section 10(b) and Rule 10b-5.[5]  To establish a violation of Section 10(b) and

Rule 10b-5, the SEC is required to prove that a defendant "(1) made a material

---

[5]   Section 10(b) provides, in relevant part, that it is unlawful:

"[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b-5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

      (a) To employ any device, scheme, or artifice to defraud,
      (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
      (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

securities." <u>SEC v. Gottlieb</u>, 88 Fed. Appx. 476, 477 (2d Cir. 2004) (<u>citing</u> <u>SEC v.</u>

<u>Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999)).[6] Acts of insider trading

constitute a manipulative or deceptive device under Section 10(b) of the Exchange Act.

<u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 665 n. 46 (S.D.N.Y. 2007).

   The term "scienter" refers to a mental state embracing intent to deceive,

manipulate, or defraud. <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 (U.S. 1976).

Scienter is a necessary element of Section 10b and Rule 10b-5 cases, whether they are

brought by a private plaintiff or the SEC. <u>Aaron v. SEC</u>, 446 U.S. 680, 691 (U.S. 1980).

With regards to insider trading cases "[w]hether the defendant is a tipper or a tippee, the

plaintiff must demonstrate that the defendant acted with scienter. . ." <u>United States SEC</u>

<u>v. Svoboda</u>, 409 F. Supp. 2d 331, 340 (S.D.N.Y. 2006). Furthermore, Rule 10b-5

requires that a tippee defendant subjectively believe that the information received was

obtained in breach of a fiduciary duty. <u>See</u> <u>United States v. Chestman</u>, 947 F.2d 551, 570

(2d Cir. 1991)

   Rule 9(b) requires that "in alleging fraud or mistake, a party must state

with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Securities complaints brought by the SEC are "subject to the heightened pleading

standards imposed by Rule 9(b) to the extent that they make allegations sounding in

fraud." <u>SEC v. Kelly</u>, 663 F. Supp. 2d 276, 283 (S.D.N.Y. 2009). Although intent may

be alleged generally, a plaintiff must still "allege facts that give rise to a strong inference

---

[6] The SEC need not prove reliance, economic loss or loss causation. <u>See</u> <u>i.e.</u> <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 341 (U.S. 2005).

of fraudulent intent." <u>Acito v. IMCERA Group</u>, 47 F.3d 47, 52 (2d Cir. 1995).  The

requisite "strong inference" of fraudulent intent (scienter) may be established by alleging

either (a) facts to show that defendants had both motive and opportunity to commit fraud,

or (b) facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.  <u>See</u> <u>In re Time Warner Inc. Securities Litigation</u>, 9 F.3d 259, 268-69 (2d

Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 1397 (1994).  Lastly, the Court notes that "Rule 9(b)

extends to all averments of fraud or mistake, whatever may be the theory of legal duty --

statutory, common law, tort, contractual, or *fiduciary*." <u>Abercrombie v. Andrew Coll.</u>,

438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (emphasis added).

   The SEC has asserted its claims under both the "classical" and

"misappropriation" theories of insider trading.  The parties agree that, under either

theory, the SEC must prove the following five elements: (l) the tipper possessed material

non-public information concerning a publicly traded company; (2) the tipper disclosed

this information to the tippee; (3) the tippee traded in the company's securities while in

possession of the inside information; (4) the tippee knew or should have known that the

tipper had violated a relationship of trust by providing the non-public material

information and (5) the tippee benefited from the disclosure of the information. <u>S.E.C. v.</u>

<u>Warde</u>, 151 F.3d 42, 47 (2d Cir. 1998).  At issue in this case is whether the fourth

element has been satisfied, specifically whether, in regards to the classical theory, a duty

existed, and in regards to the misappropriation theory, a duty was breached.

   The SEC bases its insider trading allegations on the premise that, by

tipping Black about the impending SunSource merger: 1. Strickland breached the

fiduciary duty (or functional equivalent) he owed to SunSource as a "temporary insider"

under the "classical theory;" and 2. Strickland breached the fiduciary duty (or functional

equivalent) he owed to GE Capital under the "misappropriation theory." [7]

       The parties do not dispute that a duty and corresponding breach are

necessary elements under both the classical and misappropriation theories of insider

trading.  See Dirks v. SEC, 463 U.S. 646, 662, (U.S. 1983); United States v. O'Hagan,

521 U.S. 642, 652 (U.S. 1997).  It logically flows that any such duty must have existed

on May 24, 2001, the date of the alleged tip, in order for a violation of Section 10(b) and

Rule 10b-5 to have occurred. See SEC v. Lyon, 605 F.Supp.2d 532, 544 (S.D.N.Y.

2009).

       The SEC argues that under the law of the case doctrine, that this Court's

Order denying the motions to dismiss precludes consideration of whether Strickland or

GE Capital owed a fiduciary duty to SunSource and Allied Capital.  (See Docket Entry

No. 26.)  The SEC asserts that during oral arguments on February 15, 2007, that the

Court ruled that the lender-borrower relationship between GE Capital and SunSource

represented an enforceable duty of trust and confidentiality.  (Oral Arg. Tr. at 60-65.)

The Court notes that it expressly stated that the issue could be revisited on a motion for

summary judgment.  (Id. at 64.)  Furthermore, the standard at the motion to dismiss stage

is far different than that at the summary judgment stage.  For instance, in SEC v. Lyon,

the court denied the defendants' motions to dismiss on the grounds that the SEC need not

establish the existence of such a duty at the motion to dismiss stage and stated that

---

[7] In its opposition papers, the SEC alleges that GE Capital also owed a fiduciary duty to Allied, in part
because they received the "Deal Summary."  Even if this assertion is accepted as true, it would be
insufficient for a finding that GE Capital owed the necessary duty to SunSource as of May 24, 2001.  The
Court further  notes that the SEC alleged, for the first time, in its opposition papers, that GE Capital owed a
duty to Allied, after failing to do so in its initial and amended complaints.  As such, the Court may properly
grant a motion for summary judgment on that ground as well.  See  SEC v. Lyon, 605 F.Supp 2d at 550;
Fed. R. Civ. P. 9(b).

> "[i]t may be, for example, that in discovery the SEC uncovers communications showing that defendants explicitly accepted the relevant confidentiality conditions or that the customary practice among participants in the private-placement market is to be bound and abide by the confidentiality provisions stated in the offering memoranda." 529 F. Supp. 2d 444, 451 (S.D.N.Y. 2008).

After that decision, cross-motions for summary judgment were filed, and the court found that, while the SEC's evidence was "strong," that it was insufficient to find that a duty existed as a matter of law.  SEC v. Lyon, 605 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) (the defendants' cross-motion was rejected on similar grounds). Therefore, it remains the SEC's burden to meet the evidentiary standard necessary to find that a fiduciary duty, or its functional equivalent, exists.  Now, with discovery completed, the evidence, when viewed in the light most favorable to the SEC must establish a plausible inference that such a duty existed.

**The Classical Theory**

Under the "classical theory" of insider trading, Section 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of their corporation on the basis of material, nonpublic information.  United States v. O'Hagan, 117 S. Ct. 2199, 2207 (U.S. 1997) (citations omitted).  The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation. Id. See also Dirks v. SEC, 463 U.S. 646, 655, n.14 (1983).  Neither Strickland nor his employer, GE Capital, was a corporate insider of SunSource as of May 24, 2001. Therefore, in order to find the Moving Defendants liable, the SEC must establish that Strickland became a temporary fiduciary of SunSource, as of May 24, 2001, the date of

21

the alleged tip, and thereafter committed a breach of the resulting duty.  See Dirks, 463

U.S. at 659 ("The tippee's duty to disclose or abstain is derivative from that of the

[tipper's] duty."); O'Hagan, 521 U.S. at 663 ("Absent any violation by the tippers, there

[can] be no derivative liability for the tippee.").  The Moving Defendants argue that the

SEC has failed to establish that the required fiduciary duty existed as of May 24, 2001,

and as such, that they are entitled to summary judgment on the SEC's "classical" theory

claim.

        The law of insider trading is not based on a federal statute expressly

prohibiting the practice; but has instead developed through SEC and judicial

interpretations of Section 10(b)'s prohibition of "deceptive" conduct and Rule 10b-5's

antifraud provisions.  See i.e. Ernst & Ernst v. Hochfelder, 425 U.S. at 199(holding that

the scope of Rule 10b-5 cannot exceed the power Congress granted to the SEC under

Section 10(b)).  The SEC, in In re Cady, Roberts & Co, 40 S.E.C. 907 (1961), and the

Supreme Court, in Chiarella v. United States, 445 U.S. 222, 227-30, 100 S. Ct. 1108, 63

L. Ed. 2d 348 (1980), first recognized the "classical" theory of insider trading.  The

required element of a "duty to disclose" was premised on the "relationship of trust and

confidence between the shareholders of a corporation and those insiders who have

obtained confidential information by reason of their position with that corporation."

Chiarella, 445 U.S. at 228.  It has been argued that there has been a "failure to

meaningfully define the scope and content of the fiduciary duty" required to establish

insider trading liability.[8]

---

[8] See Bainbridge, Stephen M. "Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition," 52 Wash & Lee L. Rev. 1189, 1198.  (Discussing how, in order to determine if a fiduciary duty exists, federal courts must look to state substantive law).  The Supreme Court has long grappled with

In the wake of <u>Chiarella</u> and its progeny, courts have consulted state law to identify a duty adequate to support insider trading liability.  <u>See i.e.</u> <u>O'Hagan</u>, 521 U.S. at 652-53 (relying on attorney's fiduciary duty to client); <u>Dirks v. SEC</u>, 463 U.S. at 653-55; <u>See</u> <u>also</u> FN 9.  This development is in accordance with the general rule against the creation of federal common law.  <u>See i.e.</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).  While the SEC may promulgate a rule that imposes such a duty, provided the rule conforms to the rulemaking powers conferred to it by Congress, the SEC, has not requested statutory clarification of the duty necessary to impose insider trading liability.[9]  The Second Circuit Court of Appeals has addressed how and when the required duty arises in insider trading cases.[10]

Financial consultants, including underwriters such as GE Capital, working for a corporation may become "temporary insiders" of a corporation.  <u>See i.e.</u> <u>SEC v. Downe</u>, 1993 U.S. Dist. LEXIS 753, 26-27 (S.D.N.Y. Jan. 26, 1993) <u>citing</u> <u>Dirks</u>, 463 U.S. at 655 n.14.  Temporary insider status is not established by merely alleging that a defendant "acquired nonpublic corporate information," but only upon a finding that said defendant entered into a "special relationship" <u>Id.</u>  Similarly, a fiduciary duty "cannot be imposed unilaterally by entrusting a person with confidential information." <u>United States</u>

---

how and when a fiduciary duty is established in securities cases.  As stated by Justice Frankfurter: "[b]ut to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty? <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 85-86 (U.S. 1943).

[9] Karmel, Roberta S. "Outsider Trading on Confidential Information – A Breach in Search of a Duty," 20 Cardozo L. Rev. 83, 108

[10] The Court of Appeals for the Second Circuit recently considered how a fiduciary duty may arise in an insider trading case.  <u>See</u> <u>SEC v. Dorozhko</u>, 574 F.3d 42, 46 (2d Cir. 2009) ("computer hacking" was a misstatement under Section 10(b) and Rule 10b-5 and a "hacker" was under no fiduciary duty whereas ". . . silence is fraudulent only where there is a duty to disclose.").  The Second Circuit had previously stated that "a fiduciary obligation is not to be lightly implied. . .To label someone a fiduciary is to impose on that person obligations additional, and often contrary, to the ordinary allocations of responsibility that govern commercial transactions.  <u>United States v. Skelly</u>, 442 F.3d 94, 98 (2d Cir. 2006).

23

v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001) citing United States v. Chestman, 947 F.2d
551, 567-568 (2d Cir. 1991) (stating that "[a]t the heart of the fiduciary relationship" lies
"reliance, and de facto control and dominance" in determining that no such duty existed
between a nephew-in-law and his uncle based solely upon a familial relationship.)
(Internal citations omitted).  Instead, "a fiduciary relationship, or its functional
equivalent, exists only where there is explicit acceptance of a duty of confidentiality or
where such acceptance may be implied from a similar relationship of trust and confidence
between the parties." Id.  To establish acceptance, the plaintiff must show defendant was
on notice of his duty not to use or disclose the material non-public information. See
Lyon, 605 F. Supp. 2d at 545; S.E.C. v. Musella, 748 F. Supp. 1028, 1037-38 (S.D.N.Y.
1989), aff'd, 898 F.2d 138 (2d Cir. 1990).

        Under New York state law, a financial institution typically owes no
fiduciary duty to its borrowers. See i.e. Aaron Ferer & Sons Ltd. v. Chase Manhattan
Bank, 731 F.2d 112, 122 (2d Cir. 1984).  The arm's-length relationship of parties in a
business transaction is, if anything, antithetical to the notion that either would owe a
fiduciary relationship to the other.  Dopp v. Teachers Ins. & Annuity Ass'n, 1993 U.S.
Dist. LEXIS 13980 (S.D.N.Y. Sept. 27, 1993).  In "special circumstances …, a fiduciary
relationship will arise between a bank and a customer if there is a confidence placed in
the bank that gives it an advantage in dealing with the customer who is placing his trust
in the bank." Scott v. Dime Sav. Bank of New York, FSB, 886 F. Supp. 1073, 1078
(S.D.N.Y. 1995), aff'd., 101 F.3d 107 (2d Cir. 1996).  Absent these "special
circumstances," parties to arms length commercial contracts do not owe each other a
fiduciary obligation.  See Greenberg v. Chrust, 198 F. Supp. 2d 578, 585 (S.D.N.Y. 2002)

24

(internal citations omitted) (finding that no fiduciary relationship arose out of misrepresentations made during pre-merger negotiations by a defendant investor that lead to his appointment as a director.)

GE Capital has not admitted to having "explicitly accepted" a fiduciary duty. Therefore, the instant case poses the following question: does a prospective underwriter engaged in negotiations to finance a potential acquisition stand in a position of trust and confidence such that a duty can be implied, and acceptance inferred, from the parties' relationship absent a transaction-specific, written, confidentiality agreement?[11]

As of the date of the alleged tip, May 24, 2001, GE Capital was a potential lender engaged in arms-length negotiations to provide financing for the buy-out of SunSource.[12] The initial negotiations were born out of GE Capital's original cold-call inquiry about SunSource's financing needs. GE Capital's proposal letter to provide financing for the STS sale remained unexecuted as of May 24, 2001, and SunSource was in negotiation with, and ultimately selected, another underwriter. The SEC has admitted that SunSource did not ask for, and GE did not execute, a separate written confidentiality agreement. The SEC points to the "deal book" provided by Allied, which included a confidentiality and non-disclosure agreement. However, if any duty was created, it was in favor of Allied, not SunSource. Lastly, SunSource did not pay a professional retainer to GE in connection with the sale as of May 24, 2001.

---

[11] As a general proposition, "market professionals who enjoy time and place advantages with respect to market information do not owe a general duty to investors and therefore are not inhibited from profiting from market information to the fullest extent possible." 20 Cardozo L. Rev. 83, 85 (The author, Roberta Karmel, a former SEC Commissioner, discusses the problems associated with the fiduciary duty element as applied in insider trading cases, specifically that the SEC is guided by the oft-cited O'Hagan decision, which was itself born out of Chief Justice Berger's dissent in United States v. Chiarella, 445 U.S. 222, 240 (1980), rather than a Congressional directive.

[12] The SEC agrees that the relationship between GE Capital and SunSource was that of a lender and borrower. (SEC Opp. P. 20.)

The SEC acknowledges that its case is based, in large part, upon circumstantial evidence that a duty existed. (See i.e. SEC Opp. PP.19-20.) The Court agrees that "[i]n cases involving insider trading, however, where the specific facts are 'peculiarly within the knowledge of defendants,' the application of Rule 9(b) is 'relaxed' to allow circumstantial evidence to plead the specific content and circumstances of insider tips." SEC v. Alexander, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001) (quoting Energy Factors, Inc. v. Nuevo Energy Co., No. 91 Civ. 4273 (RLC), 1991 U.S. Dist. LEXIS 16983, 1991 WL 259425, at *4 (S.D.N.Y. Nov. 22, 1991)). The Court is also well aware that all ambiguities must be resolved and all inferences drawn in favor of the SEC. Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1222 (2d Cir, 1994). Nevertheless, the claims of the plaintiff in an insider trading case "must be accompanied by factual allegations that provide substantiation and make them plausible; mere 'boilerplate and conclusory allegations will not suffice.'" Id. (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)).

The SEC submits that the instant motion turns on the disputed factual question: what did Brad Strickland say to Peter Black in their telephone discussion on the morning of May 24, 2001? (Emphasis in original) (SEC Opp. P. 1.) On the contrary, the Moving Defendants' summary judgment motions are premised on a failure to prove the required elements of duty and breach. The SEC's primary counterargument is that the lender-borrower relationship represents an enforceable duty of trust and confidentiality as a matter of law, which is incorrect. Similarly, as noted above, the "Deal Summary," if anything, created a duty owed from GE Capital to Allied, not SunSource, as would be required to successfully allege a violation.

26

In its opposition brief, the SEC devotes a scant three-and-half pages to its legal argument that a duty existed between GE Capital and SunSource as of May 24, 2001.  It concludes that the "mutual expectations of confidentiality of the parties arose out of an obvious confidential relationship between GE and SunSource." (SEC Opp. P. 23.)  The SEC asserts that the testimony of witnesses' from GE Capital (i.e. Strickland, Brasser, Lustbader, Slosberg), if accepted as true, indicate a fiduciary duty existed. However the passages on which the SEC relies indicate that they believed they owed a duty to their employer, GE Capital, not SunSource.  (SEC Opp. Facts § B.)  With regards to any expectation, as required, on behalf of SunSource, the SEC's arguments simply cycle back to the Deal Summary.  (Id. §§ C, D.)  The SEC quotes SunSource's Corvino, who stated we "expect all conversations regarding the lending activities to be confidential.  We also marked various document to be confidential. . ."  However, one party's expectations, absent communication and agreement, are insufficient.  The SEC has offered no documents originating from SunSource that include any confidentiality agreement.  (Corvino Dep. at 572-573.)

The Court "is not required to credit mere legal conclusions that are dressed up as factual allegations that a defendant was in a fiduciary relationship with a plaintiff." World Wrestling Entm't, Inc. v. Jakks Pacific, Inc., 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007).  In the instant case, there is a lack of a specific confidentiality agreement or a retainer payment, and the dearth of facts sufficient to imply communication of an expectation by SunSource or acceptance of a fiduciary duty by GE Capital vis-à-vis the borrower/lender relationship.  Additionally, the fact that SunSource was negotiating with other lenders as of the May 24, 2001, date of the alleged tip, establish that no reasonable

fact-finder could find the existence of the required fiduciary relationship or its functional equivalent. Even if, as alleged, GE Capital received confidential information, and SunSource unilaterally expected it to remain as such, the absence of any ascension on the part of GE Capital to accept such a duty precludes a finding of liability under Section 10b and Rule 10b-5. The "absence of any expectation of confidentiality or breach of a duty of confidentiality is fatal to the SEC's claim." SEC v. Rorech, 2010 U.S. Dist. LEXIS 63804 (S.D.N.Y. June 24, 2010) citing Dirks, 463 U.S. at 665. Similarly, the Court of Appeals for the Second Circuit, in analyzing the duty requirement, has held that "we see no reason to complicate the enforcement of Section 10(b) by divining new requirements." SEC v. Dorozhko, 574 F.3d 42, 49 (2d Cir. 2009). Even after independently searching the record and resolving any and all inferences in favor of the SEC, the Court cannot identify the critical facts required to establish the existence of an enforceable duty. The SEC cannot prove from the facts on record that GE Capital or Strickland owed a duty of confidentiality to SunSource as of May 24, 2001. Accordingly, judgment must be entered in favor of the Moving Defendants and Strickland with regards to the SEC's claims under the "classical" theory of insider trading.

### The Misappropriation Theory

The "misappropriation theory" applies when a person commits fraud "in connection with" a securities transaction. They thereby violate Section 10(b) and Rule 10b-5, when they misappropriate confidential information for securities trading purposes, in breach of a duty owed to the source of the information. United States v. O'Hagan, 521 U.S. at 653. Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and

28

confidentiality, defrauds the principal of the exclusive use of that information.  Id.  In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.  Id.  Misappropriation liability, therefore, requires a plaintiff to establish (1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question.  SEC v. Lyon, 605 F. Supp. 2d 531 at 541.  It is required that Strickland must have breached a duty owed to his employer, GE Capital, and that the Moving Defendants knew of such a breach, if derivative liability is to extend to the Moving Defendants.  See Dirks, 463 U.S. at 653-54.

The Moving Defendants argue that the record does not support any reasonable inference that Strickland breached a duty to GE Capital, because 1.) Strickland's conduct was not deceitful; and 2.) while GE Capital did in fact place a "letter of reprimand" in Strickland's file following its investigation, it did not conclude that Strickland violated any duty owed to GE Capital.

The SEC posits that GE had strict rules in place, summarized in *The Spirit & Letter*, that, *inter alia*, preclude an employee from engaging in any tipping or trading activities based on such information.  The SEC further argues that, by virtue of his possessing the "deal book" provided by Allied, Strickland breached his duty to GE Capital when he shared material, non-public, information with Black on May 24, 2001.

29

*Scienter*

In order to find that a violation of Rule 10b-5 has occurred, there must be "fraud". See i.e. Ernst & Ernst v. Hochfelder, 425 U.S. at 199 (statutory words "manipulative," "device," and "contrivance . . . [connote] intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"). Deception is an essential element of all fraud claims brought pursuant to the misappropriation theory of section 10(b) and Rule 10b-5 liability. See SEC v. Rorech, 2010 U.S. Dist. LEXIS 63804 (S.D.N.Y. June 24, 2010) citing O'Hagan, 521 U.S. at 654. "Theft not accomplished by deception (e.g., physically taking and carrying away another's property) is not fraud absent a fiduciary duty." United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008) citing In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig., 2007 U.S. Dist. LEXIS 68082, 2007 WL 2694469, at *8 (S.D.N.Y. Sept. 13, 2007). The very definition of "deceptive" calls for some showing of "what the investing public expected." United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008).

It is undisputed that Strickland owed a fiduciary duty to his employer, GE Capital. GE Capital, however, did not find that Strickland breached this duty, stating, following an investigation, "that Brad Strickland made a mistake by. . . inquiring about the borrower that GE Capital was looking to provide the financing for, and that he did not do it with any sort of malice or intent." (Def. 56.1 Stmt. ¶ 143, Pl. 56.1 Stmt.¶ 143.) Furthermore, SunSource was not placed on GE Capital's "Transaction Restricted List" until June 19, 2001. Critically, the SEC submits that "the 'deception' element is satisfied by the breach, tip, and trade" and that they "need not establish any additional deceit, malice or deceptive conduct by any party." (SEC Opp. P. 28) The SEC offers roughly

30

half-a-page in their opposition to counter the Moving Defendants primary argument against the misappropriation theory. (Id.)  In response to the Moving Defendants July 12, 2010, letter regarding the deception element required by Rorech[13], the SEC maintains its argument that there is no additional deception required beyond the trade itself, yet simultaneously states that it "will establish at trial. . .deceptive and secretive actions that evidences their scienter." (SEC July 14, 2010, Letter at FN 1.)

The SEC's conclusion that the initial communication or "tip" qualifies as a breach by its very nature would eliminate the deceptive conduct (i.e. scienter) requirement from this case.  The only defendant to authorize a trade, Obus, had a prior business relationship with SunSource CEO Andrien.  Wynnefield continuously held and purchased a substantial amount of SunSource stock prior and subsequent to the events that brought upon the instant case.  Obus openly telephoned Andrien both before and after Wynnefield traded SunSource stock in June of 2001.  (Def. 56.1 Stmt. ¶¶ 126, 151 Pl. 56.1 Stmt.¶¶ 126, 151.)  This is hardly evidence of deception or stealth by someone who is secretly in possession of confidential information on which he intends to trade. Andrien did not contact GE Capital or warn Obus that he should refrain from trading; despite his knowledge that Obus was in possession of information that SunSource was seeking financing.  (Def. 56.1 Stmt. ¶¶ 128, 151 Pl. 56.1 Stmt.¶¶ 128, 151.)  The SEC agrees with the Court that these conversations with the CEO of the company would have been "stupid" if Obus believed he was committing an act of insider trading.  (Transcript of Oral Argument November 18, 2009, 103:23-104:3.)  The SEC is required to prove that each defendant, both the tipper and tippee(s) acted with scienter.  See United States SEC v. Svoboda, 409 F. Supp. 2d at 340 ("Whether the defendant is a tipper or a tippee, the

---

[13] See FN 2.

plaintiff must demonstrate that the defendant acted with scienter -- i.e., an "intent to deceive, manipulate, or defraud . . . or at least knowing misconduct.") (internal citation omitted).

The SEC further argues that the Moving Defendants were "negligent" in not knowing of Strickland's alleged breach. (SEC Opp. P. 26.) In Ernst, the Supreme Court stated that "Section 10 (b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone." 425 U.S. at 201. Therefore, the negligence standard advocated by the SEC is insufficient to find the Moving Defendants liable for insider trading under the misappropriation theory.

Lastly, the Court notes that Rule 10b-5 requires that the defendant subjectively believe that the information received was obtained in breach of a fiduciary duty. See Chestman, 947 F.2d at 570. Given the chain of events that both preceded and followed Wynnefield's purchase, the evidence submitted by the SEC is insufficient to prove that Obus subjectively believed that the information he received was obtained in breach of a fiduciary duty.

The SEC has not produced facts sufficient to prove that Strickland breached a duty to his employer, nor has it demonstrated the requisite degree of deceptive conduct on the part of any defendant. While the Court has viewed each and every allegation and fact in a light most favorable to the SEC, its case is premised on an incorrect standard insufficient to withstand a summary judgment motion. See SEC v. Rorech, 2010 U.S. Dist. LEXIS 63804 (S.D.N.Y. June 24, 2010)( "The wholesale lack of any deceptive conduct in this case. . .underscores that the SEC has failed to establish the necessary elements of its section 10(b) and Rule 10b-5 claim. . ."); Celotex Corp. v.

32

<u>Catrett</u>, 477 U.S. at 321  (failure to establish a required material element mandates the

entry of summary judgment).

## CONCLUSION

Summary judgment is granted in favor of defendants Obus, Black and

Strickland.  The three claims alleged against each of these defendants are dismissed.

Dated: New York, New York
        September 20, 2010

GEORGE B. DANIELS
United States District Judge

33