10-4749-cv
SEC v. Obus

N.Y.S.D. Case #
06-cv-3150(GBD)

1              UNITED STATES COURT OF APPEALS

2                FOR THE SECOND CIRCUIT

3                   August Term 2011

4    (Argued: November 18, 2011    Decided: September 6, 2012)

5               Docket No. 10-4749-cv

6 ----------------------------------------------------x

7 SECURITIES AND EXCHANGE COMMISSION,

8      Plaintiff-Appellant,

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** September 06, 2012

9              -- v. --

10 NELSON J. OBUS, PETER F. BLACK, THOMAS BRADLEY
11 STRICKLAND,

12      Defendants-Appellees,

13 WYNNEFIELD PARTNERS SMALL CAP VALUE L.P., WYNNEFIELD
14 PARTNERS SMALL CAP VALUE L.P. I, WYNNEFIELD PARTNERS
15 SMALL CAP VALUE OFFSHORE FUND, LTD.,

16      Relief Defendants.

17 ----------------------------------------------------x

18 B e f o r e :   WALKER, RAGGI and CARNEY, Circuit Judges.

19     The Securities and Exchange Commission ("SEC") appeals from an

20 order of the District Court for the Southern District of New York

21 (George B. Daniels, Judge) granting summary judgment to defendants

22 Nelson J. Obus, Peter F. Black, and Thomas Bradley Strickland on

23 the SEC's claims of insider trading in violation of section 10(b)

24 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and

25 Rule 10b-5, 17 C.F.R. § 240.10b-5. We hold that the SEC

26 established genuine issues of material fact with respect to its

27 claims of insider trading under the misappropriation theory.

28 VACATED and REMANDED.

CERTIFIED COPY ISSUED ON 09/06/2012

1                       DAVID LISITZA (Mark D. Cahn, Michael

2                       A. Conley, Mark Pennington, _on the_

3                       _brief_), Securities and Exchange

4                       Commission, Washington, DC, _for_

5                       _Plaintiff-Appellant_.

6

7                       JOEL M. COHEN, Gibson Dunn &

8                       Crutcher LLP, New York, NY (Mary Kay

9                       Dunning, Christopher Muller, Gibson,

10                      Dunn & Crutcher LLP, New York, NY,

11                      David Debold, Gibson, Dunn &

12                      Crutcher LLP, Washington, DC, _on the_

13                      _brief_), _for Defendant-Appellee_

14                      _Nelson Obus_.

15

16                      Mark S. Cohen, Sandra C. McCallion,

17                      Jonathan S. Abernethy, Cohen &

18                      Gresser LLP, New York, NY, _for_

19                      _Defendant-Appellee Peter F. Black_.

20

21                      Roland G. Riopelle, Sercarz &

22                      Riopelle, LLP, New York, NY, _for_

23                      _Defendant-Appellee Thomas Bradley_

24                      _Strickland_.

25

26  JOHN M. WALKER, JR., _Circuit Judge_:

27     The Securities and Exchange Commission ("SEC") filed this

28  civil enforcement action against defendants Nelson J. Obus, Peter

29  F. Black, and Thomas Bradley Strickland alleging insider trading in

30  violation of section 10(b) of the Securities Exchange Act of 1934,

31  15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  The SEC

32  alleges that Strickland learned material non-public information in

33  the course of his employment and revealed it to Black, his friend

34  and a hedge fund employee, and that Black in turn relayed the

35  information to his boss, Obus, who traded on the information.  The

36  District Court for the Southern District of New York (George B.

37  Daniels, _Judge_) granted summary judgment in favor of the defendants

1  on both the classical and misappropriation theories of insider

2  trading.  We hold that the SEC's evidence created genuine issues of

3  material fact as to each defendant's liability under the

4  misappropriation theory, and therefore that summary judgment for

5  the defendants was erroneous.  VACATED and REMANDED.

6                              **BACKGROUND**

7  **I.    Facts**

8      We recite only those facts pertinent to this appeal.  As the

9  non-moving party, the SEC is entitled to have all factual

10 inferences drawn in its favor.  See Eastman Kodak Co. v. Image

11 Tech. Servs., Inc., 504 U.S. 451, 456 (1992).  The facts are

12 undisputed unless noted otherwise.

13     **A.    The Planned Acquisition of SunSource and GE Capital's**
14             **Financing Bid**

15     In May 2001, Strickland worked as an assistant vice president

16 and underwriter at General Electric Capital Corporation ("GE

17 Capital"), a Connecticut-based company that provides corporate

18 financing.  Defendants' Statement of Undisputed Facts ("Def. 56.1

19 Stmt.") ¶¶ 3, 23-26, 82; Joint Appendix ("JA") 351 27:13-17.  That

20 spring, Allied Capital Corporation ("Allied") had approached GE

21 Capital about financing Allied's planned acquisition of SunSource,

22 Inc. ("SunSource"), a publicly traded company that distributed

23 industrial products.  JA 373 70:18-71:4; 301 93:14-94:23; 2301.

24 Strickland was assigned to perform due diligence on SunSource as

25 part of the GE Capital team working on the SunSource/Allied

1  financing proposal.  JA 299-300 88:2-89:5; 373 70:5-9; 454-55

2  59:24-60:12; 646 113:6-8.  His tasks included analyzing SunSource's

3  financial performance, but the parties dispute whether Strickland

4  was authorized to gather information about SunSource's management.

5  Def. 56.1 Stmt. ¶¶ 65-66; SEC's Response to Defendants' Joint

6  Statement of Material Facts ("Pl. 56.1 Resp.") ¶¶ 65-66; 353-54

7  31:4-32:5.

8      In the course of his work, Strickland learned non-public

9  information about SunSource, including the basic fact that

10  SunSource was about to be acquired by Allied.  Strickland testified

11  that he understood that Allied's acquisition of SunSource was

12  confidential.  JA 314 146:8-10; 379-80 83:6-85:14; 383 90:4-91:2;

13  384 92:6-13.  Each page of the transaction's deal book, which

14  Strickland received, was marked "Extremely Confidential."  JA 2308-

15  24.  In addition, Strickland had reviewed and annually signed GE

16  Capital's employee code of conduct, which required employees to

17  "safeguard company property [including] confidential information

18  about an upcoming deal."  JA 2270; see JA 314 148:10-22; 436 23:5-

19  22.  GE Capital also maintained a transaction-restricted list,

20  containing the companies about which GE Capital and its employees

21  possessed material non-public information, and which were therefore

22  off-limits for securities trading.  Def. 56.1 Stmt. ¶ 72; JA 554-55

23  123:11-124:3; 730 122:6-123:4; 2342-43.  SunSource and Allied were

24  not placed on the Transaction Restricted List until June 19, 2001,

25  after Strickland and the GE Capital team had completed their due

4

1    diligence work and submitted a financing proposal to Allied.  Def.

2    56.1 Stmt. ¶ 71.  The parties dispute whether, under GE Capital

3    policies, SunSource should have appeared on the Transaction

4    Restricted List at an earlier date, and whether it was among

5    Strickland's responsibilities to add SunSource to the list.  Pl.

6    56.1 Resp. ¶ 73; JA 371-72 67:14-68:7; 646 113:2-8; 730 123:1-9.

7        **B.   The Alleged Tip from Strickland to Black**

8        In the spring of 2001, Black, a friend of Strickland's from

9    college, worked as an analyst at Wynnefield Capital, Inc.

10   ("Wynnefield"), which managed a group of hedge funds.  Def. 56.1

11   Stmt. ¶¶ 8-10, 12; JA 313 141:5-6; 933 23:10-19.  In the course of

12   his due diligence research, Strickland learned from publicly

13   available sources that Wynnefield was a large holder of SunSource

14   stock.  JA 312 138:9-140:19; 399-400 123:19-124:16.

15       On May 24, 2001, Strickland and Black had a conversation about

16   SunSource.  We note that Strickland remembered the conversation

17   taking place face-to-face; Black recalled a telephone conversation.

18   Def. 56.1 Stmt. ¶ 98; Pl. 56.1 Resp. ¶ 98.  The SEC and the

19   defendants dispute what was said during this conversation.  Def.

20   Br. at 44 n.5.  The defendants maintain that Strickland asked Black

21   his opinion of SunSource's management as part of Strickland's due

22   diligence work.  Strickland testified that it was common to contact

23   third parties while performing due diligence, and that his practice

24   during such inquiries was to avoid revealing details by stating

25   only that GE Capital was potentially doing business with the

1  relevant company.  Def. 56.1 Stmt. ¶¶ 100-102, 104-106; JA 313

2  142:4-24; 315 149:19-150:1; 336 233:13-234:16; 851-52 148:2-149:4.

3  The SEC maintains that Strickland revealed material non-public

4  information by telling Black that Allied was about to acquire

5  SunSource.  Pl. 56.1 Resp. ¶¶ 100-102, 104-106.  The SEC relies on

6  testimony that contacting large shareholders was not standard due

7  diligence practice at GE Capital and that Strickland and Black

8  discussed SunSource after GE Capital had completed its financing

9  proposal.  JA 301 93:12-16; 463 77:2-6, 574 162:21-163:12; 745-46

10  153:23-154:19; 2325-30.  The SEC further argues that events

11  following Strickland and Black's May 24 conversation, described

12  below, raise a strong inference that Strickland told Black about

13  the SunSource/Allied acquisition.

14      **C.  The Alleged Tip from Black to Obus**

15      Obus was Wynnefield's principal and Black's boss.  Def. 56.1

16  Stmt. ¶ 1; 934 24:2-16.  Immediately after Black's conversation

17  with Strickland, Black relayed the information he had learned to

18  Obus.  JA 852 149:21-150:2; 861-62 163:22-165:11; 981 118:15-25;

19  1030 42:19-43:19.  Black maintains that Strickland's general

20  questions about SunSource's management led Black to suspect (based

21  on SunSource's prior public actions) that SunSource was considering

22  a transaction that would dilute existing shareholders.  JA 852-53

23  148:25-150:3.  Black testified that he conveyed this suspicion to

24  Obus.  JA 852 149:21-150:3.  The SEC contends that Black told Obus

1   that SunSource was about to be acquired by Allied.  Pl. 56.1 Resp.

2   ¶¶ 111-112.

3       **D.   Obus's Call to Andrien**

4       Later that same day, Obus called Maurice Andrien, SunSource's

5   CEO.  Def. 56.1 Stmt. ¶ 122; JA 850 146:12-147:23; 853 150:4-12;

6   854 152:8-18; 1360 169:7-10.  As a large SunSource shareholder,

7   Obus regularly spoke to Andrien about the company.  Def. 56.1 Stmt.

8   ¶ 121.  Obus and Andrien gave different accounts of this phone

9   call.  Obus testified that the information from Black led him to

10  believe that SunSource was considering a transaction that would

11  dilute the value of its public shares, and he called Andrien to

12  voice his concerns.  JA 853 150:4-23; 1030-31 43:20-23; 1032 45:20-

13  46:10; 1088 139:3-13; 1360-61 169:11-171:3.  Andrien testified that

14  Obus informed him that Wynnefield had been tipped about SunSource's

15  imminent acquisition:

16              [I]t was a very funny conversation. And he [Obus]
17              said that he never had a conversation like this
18              before, and didn't know whether he should be having
19              it.

20              He said[,] I always knew you guys would sell
21              SunSource Technology Services [a subsidiary of
22              SunSource] if you could, but I never figured you'd
23              sell the whole company.

24              And I said, Nelson, that's just not the kind of
25              thing that I could ever discuss under any
26              circumstances with you.  Whether we did, or we
27              didn't, I just refuse to comment about that.

28              He said, well, a little birdie told me that you guys
29              are planning to sell the company to a financial
30              buyer.  I said, a little birdie; he said, a little
31              birdie in Connecticut.

7

```
1              I said, a little birdie in Connecticut, and he said
2              --I might have even said[,] who would tell you
3              something like that.  And he said GE.

4
5  JA 1449 134:11-135:2; 1721-22 542:14-544:17.  The term "financial
```

buyer" referred to a buyer planning to add SunSource to an

investment portfolio, as opposed to a "strategic buyer" looking to

acquire SunSource for its assets and business capabilities.  JA

1355 159:2-19.  Black overheard what Obus said on the phone to

Andrien.  Consistent with Obus's testimony, Black testified that

Obus said that a "guy" from "a big conglomerate in Fairfield" might

be working with SunSource and that Obus hoped SunSource would not

dilute shareholders.  JA 853 150:4-12; 863 168:2-8; 983-84 123:19-

124:8.

         In any event, whether the Obus call to Andrien was as

described by Black and Obus or as described by Andrien, Black was

"shocked" to hear Obus make the call, and tried to signal Obus to

stop talking.  JA 853 150:13-151:10; 862-63 165:25-167:7.  After

Obus hung up, Black said, "what are you doing? . . . You realize,

you know, my friend is going to be fired."  JA 853 150:13-151:3.

Obus then became "ashen" and "very upset" because he realized "it

was a kind of call that could be traced back to" Strickland.  JA

853 151:1-5; 1365-66 179:21-180:2.  Obus said if Strickland were

fired, Obus would offer Strickland a job at Wynnefield or would

help Strickland find another job on Wall Street.  JA 853 151:6-10;

987 130:4-10.

1       **E.   Weber's Call to Andrien**

2       On the same day that Obus spoke with Andrien, Andrien also

3  took a call from Alan Weber, a business acquaintance of Obus's and

4  another large investor in SunSource.  JA 1140-43 226:7-229:15; 1709

5  518:20-519:10; 1710 521:8-522:7.  On the call, Weber told Andrien

6  he hoped that SunSource would not be sold to a financial buyer--the

7  same term Andrien recalled Obus using in his phone call.  JA 1448

8  125:16-23; JA 1716-17 533:5-535:2.  The two calls from Weber and

9  Obus led Andrien to be "fairly certain" that news of the planned

10  SunSource/Allied acquisition had been leaked.  JA 1724-26 549:21-

11  552:7.

12      **F.   The June 8, 2001 Trade**

13      On June 8, 2001, two weeks after the conversation between

14  Strickland and Black, a trader at Cantor Fitzgerald contacted

15  Wynnefield offering 50,000 shares of SunSource at $5.00 per share.

16  JA 2231 70:5-71:8; 2249-50 107:5-108:23.  Wynnefield counteroffered

17  $4.75 per share, and ultimately purchased at that price a total

18  block of 287,200 shares, about five percent of SunSource's

19  outstanding common stock.  JA 1126 201:11-16; 1130 208:2-6; 1134

20  216:1-7; 2231 70:5-71:8; 2249 106:4-107:23; 2407.  Obus testified

21  that he was unaware of the pending acquisition when he made the

22  trade and that his decision to buy had nothing to do with

23  Strickland's conversation with Black.  JA 1132 211:9-17; 1133-34

24  214:18-215:7; 1138 222:12-15.  The June 8, 2001 purchase

25  represented about the same number of shares as Wynnefield had

9

1    bought in October 2000, the last time Obus believed he had seen

2    such a large block of shares available for purchase.  JA 1126

3    201:7-16; 1127-28 204:15-205:5; 1137 221:5-7; 2407.  On June 11,

4    2001, Wynnefield sold 6,000 shares of SunSource.  JA 2407.

5         **G.   Allied's Acquisition of SunSource**

6         On June 19, 2001, Allied publicly announced that it was

7    acquiring SunSource for $10.38 per share in cash or stock.  JA

8    2344.  SunSource's stock closed that day at $9.50 per share, an

9    increase of $4.54 (or 91.5 percent) over the prior day's closing

10   price.  JA 1856-57 812:15-814:21.  Wynnefield's June 8, 2001

11   purchase of SunSource stock nearly doubled in value (from the $4.75

12   purchase price to $9.50), producing a paper profit to Wynnefield of

13   over $1.3 million.  JA 2407.  On June 19 and June 20, Wynnefield

14   purchased another 150,000 shares of SunSource at prices over $9.40

15   per share.  JA 2407.

16        **H.   Obus's Call to Russell**

17        In June or July 2001, Obus contacted Andrien to ask when the

18   merger with Allied would close; Andrien referred Obus to Daniel

19   Russell, Allied's CFO.  JA 1232 378:11-379:14; 1804 709:4-24.  Obus

20   and  Russell's recollections of their phone call differ.  Obus

21   testified that he called to express his preference to be paid in

22   Allied stock, rather than in cash, and to ask that Allied extend

23   the closing date of the merger to lower Wynnefield's tax

24   liabilities.  JA 1232 379:11-18; 1373-74 195:14-196:16.  Russell

25   testified that Obus told him that Obus "was tipped off to the deal"

1  between Allied and SunSource, and when Russell asked what that

2  meant, Obus changed the subject.  JA 2190 202:6-204:1.

3  **I.   The 2002 SEC Subpoenas**

4      In July and August 2002, the SEC subpoenaed Obus and Black

5  about the SunSource trades.  JA 2410-19; 2429-34.  On August 8,

6  2002, Strickland also received an SEC subpoena and contacted Black

7  to arrange a meeting.  JA 2420-28; 837-38 123:14-125:15.  Black

8  told Obus about Strickland's request to meet, realizing that

9  Strickland might want to discuss the subpoenas.  JA 849-50 144:22-

10  145:22; 998-99 153:10-154:10; 1093 147:6-19; 838 125:16-24.  Obus

11  and Black agreed that Black should try to avoid discussing

12  SunSource or the subpoenas and encourage Strickland to be truthful.

13  JA 1095 150:5-18; 1100 158:4-21; 1102 161:1-9; 1369 187:4-14; 1370

14  188:14-25.

15      At their meeting, Strickland told Black that he had informed

16  GE Capital's counsel that he did not recall any conversation about

17  SunSource.  JA 315-16 152:25-153:19; 317 157:25-158:10; 401 126:3-

18  127:18.  Black reminded Strickland that they had discussed

19  SunSource in May 2001, before the acquisition was announced.  JA

20  317 159:18-23; 401 127:3-18; 867 174:11-17; 871 180:3-181:1.  When

21  Black told Obus about the meeting, Obus told Black to tell

22  Strickland about Obus's conversation with Andrien, and to encourage

23  Strickland to tell GE Capital's counsel about the May conversation

24  between Black and Strickland.  JA 999 154:25-155:9; 877-78 190:17-

25  191:11; 1099-1100 157:16-21.

1    **J.   GE Capital's Internal Investigation**

2         After receiving the SEC's subpoena related to SunSource, GE

3    Capital conducted an internal investigation into Strickland's

4    conduct.  JA 2408-09.  The internal investigation did not go beyond

5    interviewing Strickland and other GE Capital employees and thus did

6    not include statements from Andrien or Russell.  JA 459 68:20-69:7;

7    460 70:15-71:12; 487-88 125:22-126:9.  The investigation concluded

8    that while Strickland had "disclosed information outside of [GE

9    Capital] pertaining to" SunSource, JA 463 76:2-12, he "did not

10   discuss the nature of the specific transaction being contemplated,"

11   JA 2408.  Nevertheless, his conduct demonstrated a "disregard" of

12   GE Capital's "confidentiality restrictions."  JA 2408.  Following

13   the investigation, Strickland was denied a bonus and salary

14   increase, but was not terminated.  A letter of reprimand was placed

15   in his file stating that he should have consulted a manager or

16   counsel before discussing SunSource with a third party.  JA 2408-

17   09; 459 69:9-24; 469 89:5-18.  Testifying later, a representative

18   of GE Capital said that the investigation concluded that Strickland

19   "made a mistake" but was "trying to do some underwriting" when he

20   called Black.  JA 490 131:8-14; 468-69 87:25-88:8; 487 125:7-9.

21   **II.  Prior Proceedings**

22        The SEC filed a civil complaint against Strickland, Black and

23   Obus on April 25, 2006, that (as later amended on June 15, 2007)

24   alleged that the defendants were liable for insider trading in

25   violation of section 10(b) and Rule 10b-5 under both the classical

12

1 and the misappropriation theories of insider trading.  Under the

2 classical theory, the SEC alleged that Strickland, through his work

3 for GE Capital, became a temporary insider of SunSource and owed a

4 duty to SunSource's shareholders not to share material non-public

5 information about the company's acquisition.  Under the

6 misappropriation theory, the SEC claimed that Strickland had a duty

7 to GE Capital, his employer, to keep information about SunSource's

8 acquisition confidential, and that he breached that duty by tipping

9 Black.

10      The district court granted the defendants' summary judgment

11 motion on both theories, SEC v. Obus, No. 06-civ-3150(GBD), 2010 WL

12 3703846, 2010 U.S. Dist. LEXIS 98895 (S.D.N.Y. Sept. 20, 2010), but

13 the SEC appeals only with respect to the misappropriation theory.

14 In the portion of its decision addressing that theory, the district

15 court held that, even assuming Strickland told Black material non-

16 public information about the SunSource/Allied deal, the SEC had

17 failed to establish a genuine issue of fact as to whether

18 Strickland breached a fiduciary duty to his employer, GE Capital.

19 2010 WL 3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *48.  The

20 district court based this finding on GE Capital's internal

21 investigation, which concluded that Strickland had not breached a

22 duty to his employer, and on the fact that SunSource was not placed

23 on GE Capital's Transaction Restricted List until after the

24 SunSource acquisition was publicly announced.  Id.  The district

25 court further held that the SEC failed to establish facts

1    sufficient for a jury to find that Strickland's conduct was

2    deceptive.  2010 WL 3703846, at *14-15, 2010 U.S. Dist. LEXIS

3    98895, at *47.  Because the district court found that Strickland

4    had not breached a duty, neither Black nor Obus could have

5    inherited that duty, and thus they also could not be held liable

6    under the misappropriation theory.  Finally, the district court

7    held that the SEC failed to present sufficient evidence that Obus

8    "subjectively believed that the information he received was

9    obtained in breach of a fiduciary duty."  2010 WL 3703846, at *16,

10   2010 U.S. Dist. LEXIS 98895, at *50-51.

11                              **DISCUSSION**

12   **I.   Standard of Review**

13       We review de <u>novo</u> the district court's grant of summary

14   judgment.  <u>Huppe v. WPCS Int'l Inc.</u>, 670 F.3d 214, 217 (2d Cir.

15   2012).  Summary judgment is appropriate where "the movant shows

16   that there is no genuine dispute as to any material fact and the

17   movant is entitled to judgment as a matter of law."  Fed. R. Civ.

18   P. 56(a).[1]  A factual dispute is genuine "if the evidence is such

19   that a reasonable jury could return a verdict for the nonmoving

20   party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

21   In reviewing a motion for summary judgment, "[t]he evidence of the

22   non-movant is to be believed, and all justifiable inferences are to

---

[1] Rule 56 was amended in a non-substantive manner after the district
court granted summary judgment.  We cite the current version of the
Rule.

14

1    be drawn in [its] favor." _Id._ at 255.

2    **II.   Legal Background**

3         **A.    The Misappropriation Theory of Insider Trading**

4         Insider trading--unlawful trading in securities based on

5    material non-public information--is well established as a violation

6    of section 10(b) of the Securities Exchange Act of 1934 and Rule

7    10b-5.  <u>See</u> <u>Dirks v. SEC</u>, 463 U.S. 646, 653-54 (1983); <u>Chiarella v.</u>

8    <u>United States</u>, 445 U.S. 222, 226-30 (1980); <u>SEC v. Texas Gulf</u>

9    <u>Sulphur Co.</u>, 401 F.2d 833, 847-48 (2d Cir. 1968) (en banc); <u>In re</u>

10   <u>Cady, Roberts & Co.</u>, 40 S.E.C. 907 (1961).  Under the classical

11   theory of insider trading, a corporate insider is prohibited from

12   trading shares of that corporation based on material non-public

13   information in violation of the duty of trust and confidence

14   insiders owe to shareholders.  <u>Chiarella</u>, 445 U.S. at 228.  A

15   second theory, grounded in misappropriation, targets persons who

16   are not corporate insiders but to whom material non-public

17   information has been entrusted in confidence and who breach a

18   fiduciary duty to the source of the information to gain personal

19   profit in the securities market.  <u>United States v. O'Hagan</u>, 521

20   U.S. 642, 652 (1997); <u>United States v. Chestman</u>, 947 F.2d 551, 566

21   (2d Cir. 1991) (en banc).  Such conduct violates section 10(b)

22   because the misappropriator engages in deception (as required for

23   liability under that section and Rule 10b-5) by pretending "loyalty

24   to the principal while secretly converting the principal's

25   information for personal gain."  <u>O'Hagan</u>, 521 U.S. at 653 (internal

1    quotation marks omitted).  The requirement under section 10(b) that

2    the deception be "in connection with the purchase and sale of any

3    security" is met because the information is "of a sort that [can]

4    ordinarily [be] capitalize[d] upon to gain no-risk profits through

5    the purchase or sale of securities."  Id. at 656; United State v.

6    Falcone, 257 F.3d 226, 233-34 (2d Cir. 2001).  This appeal is

7    concerned only with liability under the misappropriation theory.

8        One who has a fiduciary duty of trust and confidence to

9    shareholders (classical theory) or to a source of confidential

10   information (misappropriation theory) and is in receipt of material

11   non-public information has a duty to abstain from trading or to

12   disclose the information publicly.  The "abstain or disclose" rule

13   was developed under the classical theory to prevent insiders from

14   using their position of trust and confidence to gain a trading

15   advantage over shareholders.  See Chiarella, 445 U.S. at 227-30;

16   Dirks, 463 U.S. at 660.  "Abstain or disclose" has equal force in

17   the misappropriation context, but the disclosure component operates

18   somewhat differently.  Because the misappropriation theory is based

19   on a fiduciary duty to the source of the information, only

20   disclosure to the source prevents deception; disclosure to other

21   traders in the securities market cannot cure the fiduciary's breach

22   of loyalty to his principal.  O'Hagan, 521 U.S. at 655; see Moss v.

23   Morgan Stanley Inc., 719 F.2d 5, 13 (2d Cir. 1983) (fiduciary duty

24   of disclosure to employer does not imply duty to disclose to the

25   public).  Under either theory, if disclosure is impracticable or

16

1    prohibited by business considerations or by law, the duty is to

2    abstain from trading.  See United States v. Teicher, 987 F.2d 112,

3    120 (2d Cir. 1993).

4         **B.   Tipping Violations of Insider Trading Laws**

5         The insider trading case law is not confined to insiders or

6    misappropriators who trade for their own account.  Section 10(b)

7    and Rule 10b-5 also reach situations where the insider or

8    misappropriator tips another who trades on the information.  In

9    Dirks, 463 U.S. 646, the Court addressed the liability of an

10   analyst who received confidential information about possible fraud

11   at an insurance company from one of the insurance company's former

12   officers.  Id. at 648-49.  The analyst relayed the information to

13   some of his clients, and some of them, in turn, sold their shares

14   in the insurance company based on the analyst's tip.  Id.  The

15   Court held that a tipper like the analyst in Dirks is liable if the

16   tipper breached a fiduciary duty by tipping material non-public

17   information, had the requisite scienter (to be discussed

18   momentarily) when he gave the tip, and personally benefited from

19   the tip.  Id. at 660-62.  Personal benefit to the tipper is broadly

20   defined:  it includes not only "pecuniary gain," such as a cut of

21   the take or a gratuity from the tippee, but also a "reputational

22   benefit" or the benefit one would obtain from simply "mak[ing] a

23   gift of confidential information to a trading relative or friend."

24   Id. at 663-64.  When an unlawful tip occurs, the tippee is also

25   liable if he knows or should know that the information was received

17

1   from one who breached a fiduciary duty (such as an insider or a

2   misappropriator) and the tippee trades or tips for personal benefit

3   with the requisite scienter.  See id. at 660.  The Supreme Court's

4   tipping liability doctrine was developed in a classical case,

5   Dirks, but the same analysis governs in a misappropriation case.

6   See Falcone, 257 F.3d at 233.

7   **C.   Scienter**

8        Liability for securities fraud requires proof of scienter,

9   defined as "a mental state embracing intent to deceive, manipulate,

10  or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12

11  (1976).  Negligence is not a sufficiently culpable state of mind to

12  support a section 10(b) civil violation.  Id.  While the Supreme

13  Court has yet to decide whether recklessness satisfies section

14  10(b)'s scienter requirement, see Matrixx Initiatives, Inc. v.

15  Siracusano, 131 S. Ct. 1309, 1323 (2011), we have held that

16  scienter "may be established through a showing of reckless

17  disregard for the truth, that is, conduct which is highly

18  unreasonable and which represents an extreme departure from the

19  standards of ordinary care," SEC v. McNulty, 137 F.3d 732, 741 (2d

20  Cir. 1998) (internal citations and quotation marks omitted); see

21  SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998)

22  (recognizing that eleven circuits hold that recklessness satisfies

23  the scienter requirement of section 10(b)).  We read the scienter

24  requirement set forth in Hochfelder (and the recklessness variation

25  in McNulty) to apply broadly to civil securities fraud liability,

18

1   including insider trading (under either the classical or

2   misappropriation theory), and to tipper/tippee liability.  <u>See,</u>

3   <u>e.g.</u>, <u>Elkind v. Liggett & Myers, Inc.</u>, 635 F.2d 156, 167-68 (2d

4   Cir. 1980).  In every insider trading case, at the moment of

5   tipping or trading, just as in securities fraud cases across the

6   board, the unlawful actor must know or be reckless in not knowing

7   that the conduct was deceptive.

8       With this background, we turn specifically to the scienter

9   requirements for both tippers and tippees under the

10  misappropriation theory.

11  **1. Tipper Scienter**

12       To be held liable, a tipper must (1) tip (2) material non-

13  public information (3) in breach of a fiduciary duty of

14  confidentiality owed to shareholders (classical theory) or the

15  source of the information (misappropriation theory) (4) for

16  personal benefit to the tipper.  The requisite scienter corresponds

17  to the first three of these elements.  First, the tipper must tip

18  deliberately or recklessly, not through negligence.  Second, the

19  tipper must know that the information that is the subject of the

20  tip is non-public and is material for securities trading purposes,

21  or act with reckless disregard of the nature of the information.

22  Third, the tipper must know (or be reckless in not knowing) that to

23  disseminate the information would violate a fiduciary duty.  While

24  the tipper need not have specific knowledge of the legal nature of

1    a breach of fiduciary duty, he must understand that tipping the

2    information would be violating a confidence.

3         As the Supreme Court and commentators have recognized, the

4    first and second aspects of scienter—a deliberate tip with

5    knowledge that the information is material and non-public--can

6    often be deduced from the same facts that establish the tipper

7    acted for personal benefit.  See Dirks, 463 U.S. at 663-64 (holding

8    that the inquiry into the tipper's scienter "requires courts to

9    focus on objective criteria, i.e., whether the insider receives a

10   direct or indirect personal benefit from the disclosure"); Donald

11   C. Langevoort, Insider Trading: Regulation, Enforcement, and

12   Prevention § 4.04[1] (1992 ed.) ("The requirement that the tipper

13   act with scienter . . . is effectively subsumed in proof that the

14   insider's motive was personal benefit.").  The inference of

15   scienter is strong because the tipper could not reasonably expect

16   to benefit unless he deliberately tipped material non-public

17   information that the tippee could use to an advantage in trading.

18   The third aspect of scienter, that the tipper acted with knowledge

19   that he was violating a confidence, will often be established

20   through circumstantial evidence.  Because the act of

21   misappropriation itself is deceitful, O'Hagan, 521 U.S. at 653,

22   evidence that the tipper knowingly misappropriated confidential

23   information will support an inference that the misappropriator had

24   "a mental state embracing intent to deceive, manipulate, or

25   defraud," Hochfelder, 425 U.S. at 193 n.12.

20

1      Because a defendant cannot be held liable for negligently

2  tipping information, see Hochfelder, 425 U.S. at 193 & n.12,

3  difficult questions may arise when a tip is not apparently

4  deliberate or when the alleged tipper's knowledge is uncertain.

5  The line between unactionable negligence and actionable

6  recklessness is not a bright one.  But, we have held that a tipper

7  cannot avoid liability merely by demonstrating that he did not know

8  to a certainty that the person to whom he gave the information

9  would trade on it.  "One who deliberately tips information which he

10 knows to be material and non-public to an outsider who may

11 reasonably be expected to use it to his advantage has the requisite

12 scienter. . . . One who intentionally places such ammunition in the

13 hands of individuals able to use it to their advantage on the

14 market has the requisite state of mind . . . ."  Elkind, 635 F.2d

15 at 167.  Moreover, conscious avoidance can be sufficient to

16 establish tipper scienter.  United States v. Gansman, 657 F.3d 85,

17 94 (2d Cir. 2011) (approving jury instructions that allowed the

18 jury to consider "whether [the defendant tipper] deliberately

19 closed his eyes to what would otherwise have been obvious to him").

20 By the same token, there is a valid defense to scienter if the

21 tipper can show that he believed in good faith that the information

22 disclosed to the tippee would not be used for trading purposes.

23 See id.

24     Assume two scenarios with similar facts.  In the first, a

25 commuter on a train calls an associate on his cellphone, and,

21

1    speaking too loudly for the close quarters, discusses confidential

2    information and is overheard by an eavesdropping passenger who then

3    trades on the information.  In the second, the commuter's

4    conversation is conducted knowingly within earshot of a passenger

5    who is the commuter's friend and whom he also knows to be a day

6    trader, and the friend then trades on the information.  In the

7    first scenario, it is difficult to discern more than negligence and

8    even more difficult to ascertain that the tipper could expect a

9    personal benefit from the inadvertent disclosure.  In the second,

10   however, there would seem to be at least a factual question of

11   whether the tipper knew his friend could make use of material non-

12   public information and was reckless in discussing it in front of

13   him.  Similarly, there would be a question of whether the tipper

14   benefited by making a gift of the non-public information to his

15   friend, or received no benefit because the information was revealed

16   inadvertently through his poor cellphone manners.

17        **2.   Tippee Scienter**

18        Like a tipper, a liable tippee must know that the tipped

19   information is material and non-public.  And a tippee must have

20   some level of knowledge that by trading on the information the

21   tippee is a participant in the tipper's breach of fiduciary duty.

22   This last element of tippee scienter was addressed in Dirks, which

23   held that a tippee has a duty to abstain or disclose "only when the

24   insider has breached his fiduciary duty . . . and the tippee knows

25   or should know that there has been a breach."  463 U.S. at 660

1    (emphasis added).  In such a case, the tippee is said to "inherit"

2    the tipper's duty to abstain or disclose.  The parties dispute

3    whether the Dirks rule is in conflict with Hochfelder's holding

4    that negligence does not satisfy section 10(b)'s scienter

5    requirement because the "knows or should know" rule, repeated in

6    numerous Second Circuit cases,[2] sounds somewhat similar to a

7    negligence standard.  See Restatement (Third) of Torts § 3, cmt. g

8    (2010) (negligence requires foreseeability, which "concerns what

9    the actor 'should have known'").  We think the best way to

10   reconcile Dirks and Hochfelder in a tipping situation is to

11   recognize that the two cases were not discussing the same knowledge

12   requirement when they announced apparently conflicting scienter

13   standards.  Dirks' knows or should know standard pertains to a

---

[2] See, for example, SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998)
(SEC must establish that tippee "knew or should have known that
[tipper] violated a relationship of trust by relaying [the]
information"); Falcone, 257 F.3d at 229 (tippee "assumes a
fiduciary duty" when "the tippee knows or should know that there
has been a breach" ( internal quotation marks omitted)); SEC v.
Monarch Fund, 608 F.2d 938, 942 (2d Cir. 1979) (distinguishing "the
tippee who knows or ought to know that he is trading on inside
information" from "the outsider who has no reason to know he is
trading on the basis of such knowledge").

Our only case to vary from this formulation is United States
v. Mylett, 97 F.3d 663 (2d Cir. 1996).  In Mylett we stated that a
tippee must "subjectively believe that the information received was
obtained in breach of a fiduciary duty."  Id. at 668.  For that
proposition Mylett cited a statement from Chestman, 947 F.2d at
570, that the defendant tippee "knew" that the tipper had breached
a duty.  An earlier discussion in Chestman, however, gives the
familiar Dirks "knows or should know" standard.  947 F.2d at 565.
In Mylett it was clear that the defendant "knew" that the tipper
"held a position of trust and confidence" at the company the tip
concerned, so there was no need for the court to examine the
"should know" standard from Dirks.  97 F.3d at 667-68.

1  tippee's knowledge that the tipper breached a duty, either to his

2  corporation's shareholders (under the classical theory) or to his

3  principal (under the misappropriation theory), by relaying

4  confidential information.  This is a fact-specific inquiry turning

5  on the tippee's own knowledge and sophistication, and on whether

6  the tipper's conduct raised red flags that confidential information

7  was being transmitted improperly.  Hochfelder's requirement of

8  intentional (or McNulty's requirement of reckless) conduct pertains

9  to the tippee's eventual use of the tip through trading or further

10 dissemination of the information.  Thus, tippee liability can be

11 established if a tippee knew or had reason to know that

12 confidential information was initially obtained and transmitted

13 improperly (and thus through deception), and if the tippee

14 intentionally or recklessly traded while in knowing possession of

15 that information.

16 **D. Tipping Chains**

17     One last question presented by this case is how a chain of

18 tippers affects liability.  Such chains of tipping are not

19 uncommon, see, e.g., Dirks, 463 U.S. at 649-50; Falcone, 257 F.3d

20 at 227; United States v. McDermott, 245 F.3d 133, 135-36 (2d Cir.

21 2001); and follow the same basic analysis outlined above.  A tipper

22 will be liable if he tips material non-public information, in

23 breach of a fiduciary duty, to someone he knows will likely

24 (1) trade on the information, or (2) disseminate the information

25 further for the first tippee's own benefit.  The first tippee must

1    both know or have reason to know that the information was obtained

2    and transmitted through a breach, and intentionally or recklessly

3    tip the information further for her own benefit.  The final tippee

4    must both know or have reason to know that the information was

5    obtained through a breach, and trade while in knowing possession of

6    the information.  Chain tippee liability may also result from

7    conscious avoidance.  See SEC v. Musella, 678 F. Supp. 1060, 1063

8    (S.D.N.Y. 1988) (finding scienter satisfied where the defendants,

9    tippees at the end of a chain, "did not ask [about the source of

10   information] because they did not want to know").

11              *                    *                    *

12        To summarize our discussion of tipping liability, we hold that

13   tipper liability requires that (1) the tipper had a duty to keep

14   material non-public information confidential; (2) the tipper

15   breached that duty by intentionally or recklessly relaying the

16   information to a tippee who could use the information in connection

17   with securities trading; and (3) the tipper received a personal

18   benefit from the tip.  Tippee liability requires that (1) the

19   tipper breached a duty by tipping confidential information; (2) the

20   tippee knew or had reason to know that the tippee improperly

21   obtained the information (i.e., that the information was obtained

22   through the tipper's breach); and (3) the tippee, while in knowing

23   possession of the material non-public information, used the

24   information by trading or by tipping for his own benefit.

1    **III. Application**

2    Applying these standards to the defendants in this case, we

3    conclude that the SEC presented sufficient evidence to create

4    genuine issues of material fact as to Strickland's, Black's, and

5    Obus's liability under the misappropriation theory.

6    **A.    Strickland**

7    Turning first to Strickland, the SEC presented sufficient

8    evidence to survive summary judgment.  First, it is undisputed that

9    Strickland, an employee of GE Capital, owed GE Capital a fiduciary

10   duty.  See O'Hagan, 521 U.S. at 654 (holding that a company's

11   confidential information "qualifies as property" and "undisclosed

12   misappropriation of such information . . . by an employee

13   violate[s] a fiduciary duty"); Restatement (Third) of Agency § 8.05

14   (2006) ("An agent has a duty . . . not to use or communicate

15   confidential information of the principal for the agent's own

16   purposes or those of a third party.").  Moreover, the SEC presented

17   sufficient evidence that Strickland knew he was under an obligation

18   to keep information about the SunSource/Allied deal confidential,

19   including Strickland's testimony that he knew it was confidential,

20   the deal book that had every page marked "Extremely Confidential,"

21   and Strickland's annual review of GE Capital's employee code of

22   conduct, which contained provisions on confidentiality.  While the

23   defendants make much of SunSource's absence from GE Capital's

24   Transaction Restricted List until after the deal was publicly

25   announced, this fact is not determinative to our analysis.

1    Moreover, there is a separate question of fact whether it was

2    Strickland himself who should have added SunSource to the list at

3    an earlier date.   Thus there is sufficient evidence that Strickland

4    knew he owed GE Capital a duty to keep information about the

5    SunSource/Allied acquisition confidential and not to convert it for

6    his own profit.

7         More hotly disputed is whether the SEC presented sufficient

8    evidence to allow a jury to conclude that Strickland told Black

9    that SunSource was about to be acquired--i.e., whether the alleged

10   tip actually occurred.[3]  As is often the case, there is no direct

11   evidence that Strickland tipped Black; both maintained in

12   depositions that Strickland asked Black general questions about

13   SunSource's management as part of his due diligence work, but

14   revealed nothing about a sale to Allied.   However, we have never

15   held that a tip needs to be established by direct evidence (indeed,

16   such a requirement would restrict successful tipping cases to those

17   in which at least one party cooperated with the government, or

18   where the government had a court-authorized surreptitious

19   recording).   See McDermott, 245 F.3d at 139.   In McDermott, we

20   found that the government had presented enough evidence to prove

21   the content of a tip beyond a reasonable doubt based only on

---

[3] There is no dispute that if Strickland passed along such
information, it would have qualified as material and non-public.
Unannounced acquisitions are a prototypical example of material
non-public information.  Basic Inc. v. Levinson, 485 U.S. 224, 238-
39 (1988); SEC v. Warde, 151 F.3d at 47 (the materiality of a
planned acquisition is "not open to doubt").

1   evidence that the tipper and tippee were having an affair and

2   frequently spoke to each other on the phone; the tippee greatly

3   increased her trading activities after the affair began; the tippee

4   frequently traded in stocks about which the tipper had confidential

5   information; the timing of the phone calls and trades was

6   consistent with tipping; and the tippee's trades were profitable.

7   Id. at 138-39; see also Warde, 151 F.3d at 47-48 (pattern of phone

8   calls and trades can support an inference of tipping).  Here, the

9   SEC presented the following evidence:

10      (1) Strickland and Black, who were college friends, had a

11          conversation about SunSource on May 24, 2001, three days

12          after GE Capital submitted its financing proposal to

13          SunSource.  Strickland's superiors stated that contacting

14          shareholders was not part of due diligence, and Strickland

15          himself had never done so in the past.

16      (2) Black immediately told his superior, Obus, about the

17          conversation, and Obus immediately called Andrien to tell

18          him, as Andrien testified, that he had heard from "a

19          little birdie in Connecticut" that SunSource was planning

20          to sell the company to a financial buyer.  When Andrien

21          asked who the little birdie was, Obus responded that it

22          was GE.

23      (3) Wynnefield purchased a large block of stock about two

24          weeks after the conversation by increasing a broker's

25          offer of 50,000 shares to an actual purchase of 287,200

28

1              shares.  After SunSource's acquisition was publicly

2              announced, this investment nearly doubled in value.

3         (4) In a later conversation between Obus and Russell, Obus

4              told Russell that he had been "tipped off about the

5              [SunSource] deal."

6         (5) Black and Strickland met to discuss the case immediately

7              after Strickland was subpoenaed by the SEC.  They

8              subsequently provided very similar accounts of the May 24

9              conversation (contradicted by the testimony of Andrien and

10             Russell).  Prior to the meeting with Black, Strickland had

11             told GE Capital's counsel that he did not remember having

12             any conversation with Black about SunSource.

13    To be sure, the defendants challenge the credibility of much of

14    this evidence and point to other facts that suggest a more innocent

15    explanation.  However, on summary judgment, the district court was

16    required to credit the testimony relied on by the SEC and to draw

17    all inferences in its favor.  A rational jury could reasonably

18    infer from the SEC's evidence that Strickland did tell Black that

19    SunSource was about to be acquired.

20         In addition, the SEC presented sufficient evidence for a jury

21    to find that Strickland knew the material non-public information

22    was "ammunition" that Black was in a position to use.  See Elkind,

23    635 F.2d at 167.  Strickland knew that Black worked for a hedge

24    fund that traded in stocks (sufficient knowledge in itself) and,

25    additionally, that Black's hedge fund traded in SunSource shares.

1   This evidence easily supports a finding of knowing or reckless

2   tipping to someone who likely would use the information to trade in

3   securities.

4        The district court relied on GE Capital's internal

5   investigation to determine that Strickland breached no duty by

6   tipping Black, reasoning that the alleged victim of the breach of

7   fiduciary duty did not consider itself a victim.  See Obus, 2010 WL

8   3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *48.  This was

9   error, however, because the internal investigation was not

10  indisputably reliable, and because its conclusions were

11  contradicted by other evidence.  GE Capital's investigation was

12  based only on interviews with Strickland and other GE Capital

13  employees; it did not have the benefit of evidence from outside

14  sources such as Andrien or Russell, the primary witnesses relied on

15  by the SEC.  More broadly, the GE investigation was motivated by

16  corporate interests that may or may not coincide with the public

17  interest in unearthing wrongdoing and affording a remedy.  And

18  finally, the conclusion of such an internal investigation cannot

19  bind a jury, which will make its own independent assessment of the

20  evidence.  The jury, after reviewing the evidence, might conclude

21  that Strickland simply "made a mistake" and did not breach his duty

22  of confidentiality to GE Capital, or, that Strickland breached his

23  duty by tipping.  That factual dispute cannot be resolved on

24  summary judgment.

1    Next, although the district court did not reach the issue, it
2    is readily apparent that the SEC presented sufficient evidence
3    that, if the tip occurred, Strickland made the tip intentionally
4    and received a personal benefit from it.  Dirks defined "personal
5    benefit" to include making a gift of information to a friend.  463
6    U.S. at 664; see Warde, 158 F.3d at 48-49 (the "close friendship"
7    between the alleged tipper and tippee was sufficient to allow the
8    jury to find that the tip benefitted the tipper).  Here, the
9    undisputed fact that Strickland and Black were friends from college
10   is sufficient to send to the jury the question of whether
11   Strickland received a benefit from tipping Black.  See Dirks, 463
12   U.S. at 664.  This same evidence creates a question of fact with
13   respect to whether Strickland intentionally tipped Black.  And it
14   is sufficient for a jury to conclude that Strickland intentionally
15   or recklessly revealed material non-public information to Black,
16   knowing that he was making a gift of information Black was likely
17   to use for securities trading purposes.  See Gansman, 657 F.3d at
18   94.

19   Finally, the district court erred by requiring the SEC to make
20   an additional showing of "deception" beyond the tip itself.  See
21   Obus, 2010 WL 3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *48-
22   50.  As explained in O'Hagan, employees who misappropriate
23   confidential information "deal in deception."  521 U.S. at 653.  If
24   the jury accepts that a tip of material non-public information
25   occurred and that Strickland acted intentionally or recklessly,

31

1  Strickland knowingly deceived and defrauded GE Capital.  That is

2  all the deception that section 10(b) requires.

3       The SEC thus presented sufficient evidence to establish a

4  genuine issue of material fact with respect to whether Strickland

5  tipped Black, whether Strickland knowingly or recklessly breached a

6  duty to his employer by doing so, whether Strickland knew there was

7  a high likelihood that the tip would result in the trading of

8  securities, and whether Strickland tipped for his own personal

9  benefit.  The district court therefore erred in granting summary

10 judgment to Strickland.

11      **B.   Black**

12      Assessing Black's tippee liability requires us to determine

13 whether Black inherited Strickland's duty of confidentiality.

14 Black's liability therefore depends first on whether Strickland

15 breached a duty to his employer in tipping Black.  See Dirks, 463

16 U.S. at 660.  For the reasons already stated, we hold that there is

17 sufficient evidence for a jury to so conclude.

18      Next, the SEC must establish that Black knew or should have

19 known that Strickland breached a fiduciary duty when he passed

20 along the tip, see id. at 660, and thus inherited Strickland's duty

21 to abstain or disclose.[4]  Black, a sophisticated financial analyst,

---

[4] Here the duty to "disclose," as applied to Black, would have
required Black to disclose his intention to trade to the source of
the information, GE Capital, because Black inherited Strickland's
duty, which was owed by Strickland to GE Capital.  As noted in our
previous discussion, if such disclosure was impracticable, Black's

1    testified that he knew Strickland worked at GE Capital, which

2    provided loans to businesses; that he knew Strickland was involved

3    in developing financing packages for other companies and performing

4    due diligence; and that information about a non-public acquisition

5    would be material inside information that would preclude someone

6    from buying stock.  This is sufficient for the jury to conclude

7    that Black knew or had reason to know that any tip from Strickland

8    on SunSource's acquisition would breach Strickland's fiduciary duty

9    to GE Capital.  See Warde, 151 F.3d at 48 (sufficient that tippee

10   knew that the tipper was a director of the company with which the

11   tip was concerned because a sophisticated party should know that

12   board members cannot convey material non-public information to

13   outsiders).  Such a conclusion of course would be reinforced should

14   the jury find that Black deliberately lied to the SEC about his

15   conversation with Strickland.

16        Because, according to the SEC, Black himself did not trade on

17   the SunSource information but instead tipped his boss, Obus, the

18   SEC must also present evidence that Black derived some personal

19   benefit from relaying the tip.  In light of the broad definition of

20   personal benefit set forth in Dirks, this bar is not a high one.

21   Based on the evidence that Black worked for Obus and that

22   Wynnefield traded in SunSource stock, a jury could find that by

23   passing along what he was told by Strickland, Black hoped to curry

---

duty was to abstain from trading or disseminating the information
further.

33

1  favor with his boss.  See Dirks, 463 U.S. at 663 (citing

2  reputational advantage as an example of a personal benefit).  If a

3  jury could find that Black conveyed Strickland's tip in order to

4  improve his standing with Obus, it could also find that Black acted

5  recklessly or intentionally in passing on the information.

6  Moreover, because Black was well aware that Wynnefield held

7  SunSource stock, the jury could find that he knew that there was a

8  reasonable expectation that Obus would trade in SunSource on

9  Wynnefield's behalf while in possession of the tip.  See Elkind,

10  635 F.2d at 167.  The SEC thus presented sufficient evidence to

11  send the question of Black's liability to a jury.

12      **C.   Obus**

13      As the final alleged tippee in the chain, Obus's duty to

14  abstain or disclose is derivative of Strickland's duty.  Therefore,

15  his liability depends first on Strickland having breached a duty to

16  GE Capital.  As explained above, the SEC has presented sufficient

17  evidence on this issue.  Next, the SEC must show that Obus knew or

18  had reason to know that the SunSource information was obtained

19  through a breach of fiduciary duty.  While there was evidence that

20  Black was aware of Strickland's precise position at GE Capital,

21  there was not evidence that Obus had the same level of knowledge.

22  We need not decide if Obus's bare knowledge that Strickland worked

23  for GE Capital (of which there was evidence), along with Obus's

24  status as a sophisticated financial player, was enough for Obus to

25  have had reason to know that Strickland breached a duty to GE

34

1  Capital by talking to Black.  Here, there is the additional

2  evidence of Obus's call to Andrien and his conversation with Black

3  about the call.  From this, a jury could infer (1) that Obus

4  believed Black's information was credible and thus knew that it

5  originated from someone entrusted with confidential information;

6  and (2) that Obus recognized that Strickland might lose his job as

7  a result of the information he had conveyed to Black, demonstrating

8  Obus's knowledge that Strickland had acted inappropriately.  Taken

9  together, this evidence is sufficient to allow a jury to infer that

10  Obus was aware that Strickland's position with GE Capital exposed

11  Strickland to information that Strickland should have kept

12  confidential.  The defendants counter by arguing that Obus's

13  recollections of the conversation with Black and the call with

14  Andrien would not permit the inference that Obus knew Strickland

15  had breached a duty.  But when the evidence is conflicting, it is

16  the jury's task to decide whose testimony to credit and what

17  conclusions to draw from that testimony.

18      Finally, the SEC must establish that Obus traded while in

19  knowing possession of material non-public information.  <u>United</u>

20  <u>States v. Royer</u>, 549 F.3d 886, 899 (2d Cir. 2008).  Obus argues

21  that the June 8, 2001 SunSource purchase was not unusual for

22  Wynnefield, that the trade was not initiated by Obus, and that Obus

23  sold back some of the SunSource shares before the Allied deal was

24  publicly announced.  None of these facts are relevant to whether

25  Obus was in knowing possession of material non-public information

1    when he traded on June 8.  See Teicher, 987 F.2d at 120-21.  The

2    SEC's evidence that Obus told Andrien and later Russell that he

3    bought the shares on a tip is sufficient for the jury to find that

4    Obus subjectively knew he possessed material non-public information

5    when he made the June 8 purchase, whether or not his purchase was

6    directly caused by his knowledge of the pending acquisition.[5]  See

7    id.  Accordingly, the SEC has established genuine questions of fact

8    about whether Obus knew that Strickland had breached a duty to GE

9    Capital and whether Obus traded in SunSource stock while in knowing

10   possession of the material non-public information that SunSource

11   was about to be acquired.

12                           **CONCLUSION**

13        For the foregoing reasons, the district court's order granting

14   summary judgment to the defendants is VACATED and the case is

15   REMANDED for further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

---

[5] The district court suggested that Obus's calls to Andrien might
insulate Obus from liability because the calls were "hardly
evidence of deception or stealth."  Obus, 2010 WL 3703846, at *15,
2010 U.S. Dist. LEXIS 98895, at *49.  This misapprehends the duty
Obus inherited.  If the SEC's evidence is believed, Strickland
(and, derivatively, Black and Obus) owed a duty to GE Capital not
to use information about SunSource for personal benefit.  See supra
n.4.  Even if Obus had told Andrien that he was trading based on a
tip, it would have done nothing to absolve Obus of his inherited
duty to GE Capital, the source of the information.  See O'Hagan,
521 U.S. at 654 n.6.