E588SECC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    SECURITIES AND EXCHANGE
3   COMMISSION,

4                    Plaintiff,

5          v.                          06 Civ. 3150 (GBD)

6   NELSON J. OBUS, et al.,

7                    Defendants.
    ------------------------------x
8                                     May 8, 2014
                                      11:35 a.m.
9
    Before:
10
                    HON. GEORGE B. DANIELS
11
                                      District Judge
12

13                    APPEARANCES

14  PAUL W. KISSLINGER
    JONATHAN W. HARAY
15  KYLE M. DE YOUNG
         Attorneys for Plaintiff
16
    GIBSON, DUNN & CRUTCHER, LLP
17       Attorneys for Obus and Wynnefield defendants
    BY:  JOEL M. COHEN
18       MARY KAY DUNNING
         DARCY C. HARRIS
19
    COHEN & DRESSER LLP
20       Attorneys for Defendant Black
    BY:  MARK S. COHEN
21       JONATHAN S. ABERNETHY

22  SERCARZ & RIOPELLE LLP
         Attorneys for Defendant Strickland
23  BY:  ROLAND G. RIOPELLE

24

25
```

1        (Case called)

2        THE COURT:  I don't need everyone's appearance since

3    the court reporter has it.

4        Let's pick up where we left off.  I know we have at

5    least the issues of the e-mails, the other tipping and trading

6    activity, and some experts, and then some other minor issues,

7    and then a proposed instruction.

8        Let me first go to the e-mails.  Let me first set the

9    ground work because it is unclear to me what e-mails are

10   relevant.  I assume that, obviously, if there are discussions

11   about trading in the stock, I would think that that is

12   relevant.  I don't know what else the government, other

13   relevant e-mails they want to offer, or what the nature of the

14   prejudicial material is that the defense wants to keep out.  Is

15   it clear to both sides what e-mails the government wants to use

16   and what the material is in those e-mails that you want out?

17       MR. ABERNETHY:  For the defense, for Mr. Black and

18   co-counsel for Mr. Strickland, these e-mails have nothing to do

19   with the case, absolutely zero.  There is nothing about trading

20   in the stock.  There is nothing that even mentions the company

21   SunSource.

22       THE COURT:  So you want no e-mails.

23       MR. ABERNETHY:  That's correct.  And the prejudicial

24   nature, just so the Court is aware, is actually admitted by the

25   SEC in its own papers.  These e-mails are nothing but off-color

1    jokes.  There are some offensive language.

2              THE COURT:  I assume it's not being offered for that

3    purpose.

4              MR. ABERNETHY:  We don't know what it's being offered

5    for.

6              THE COURT:  Then let me confront them directly with

7    it.  What relevant e-mail conversations do you want to offer?

8              MR. KISSLINGER:  The core of the defendants' defense

9    is that Mr. Strickland called Mr. Black for the purpose of

10   doing a due diligence call.  That's a professional type of

11   call.  We believe that the jury should be able to examine the

12   nature of their relationship, and the best way to do that, your

13   Honor, are these e-mails which give a contemporaneous picture

14   of the relationship.

15             THE COURT:  What does it demonstrate about the

16   relationship that you need to prove?

17             MR. KISSLINGER:  It demonstrates they had a casual,

18   nonprofessional relationship.  They talked all the time.  They

19   talked to help each other.  They had a very close relationship,

20   which we have to prove.  We have to prove that Strickland

21   wanted to gain a benefit by way of the tip, and the Second

22   Circuit makes clear that that is shown by a close relationship.

23             THE COURT:  I am not sure what you mean by the e-mails

24   show a close relationship.  Are you talking about the number

25   and frequency of the e-mails or are you talking about something

1    of substance in the e-mail?

2              MR. KISSLINGER:  The nature of the e-mails, the number

3    and frequency, tone, formality or lack thereof.

4              THE COURT:  I am not sure what that proves.

5              MR. KISSLINGER:  Your Honor, it calls into question

6    whether they have the type of professional relationship that

7    would lend itself to a due diligence call on $20 million.

8              THE COURT:  What is it that your witness is going to

9    say was the purpose of this call?

10             MR. KISSLINGER:  I believe Mr. Strickland will say the

11   purpose of his call was to do due diligence on behalf of this

12   client that he was working on, a financing agreement.

13             THE COURT:  Do you have evidence that's inconsistent

14   with that?

15             MR. KISSLINGER:  We do not have e-mails that deal

16   directly with that call.

17             THE COURT:  What are you asking the jury to infer was

18   the specific purpose for the call?  That he made a decision

19   that he was going to give him information so he could trade on

20   inside information specifically, was that your position?

21             MR. KISSLINGER:  Correct, your Honor.  It was a call

22   to a friend, to benefit a friend, for the nature of helping his

23   friend.  It had nothing to do with a due diligence professional

24   relationship.

25             THE COURT:  When you say nothing to do with due

1   diligence, my reaction to that is, well, it depends on what

2   they claim the nature of the conversation was.  You claim the

3   conversation was limited to what or included what?

4           MR. KISSLINGER:  We claim that it was limited to the

5   fact that it was a tip of his friend.  It wasn't done for the

6   purpose of any professional due diligence.

7           THE COURT:  You want to use the e-mails because the

8   e-mails infer that?

9           MR. KISSLINGER:  They had a very nonprofessional

10  relationship.  They had a casual relationship.  They wanted to

11  help each other out.  They socialized together.  They were

12  close friends.  That goes to one of the elements that we have

13  to prove.

14          THE COURT:  How many e-mails do you have?

15          MR. KISSLINGER:  We submitted a large block of e-mails

16  that was produced in the ordinary course from their servers.

17  We are perfectly willing to limit those to a handful.  We don't

18  need the whole block, your Honor.

19          THE COURT:  How many e-mails are there?

20          MR. KISSLINGER:  There is probably, maybe, 100 pages

21  of e-mails.

22          THE COURT:  What number is illustrative of the point

23  that you want to make?

24          MR. KISSLINGER:  I guess what we would like to do is

25  have the jury be able to flip through them and just get the

```
 1   nature of the relationship, the nature of what they talked
 2   about during that time period.
 3            THE COURT:  When you say the nature of what they talk
 4   about, you have to articulate it to me more specifically of
 5   what you could argue from the particular e-mails that you want
 6   them to look at, and why there is a reasonable basis to argue
 7   something from that.
 8            I am not sure what you say is the evidence of their
 9   relationship of what you want to characterize as a more than
10   professional relationship.  Is it just the tone or is it
11   something that they are going off on vacation together?  What
12   is the substance?
13            MR. KISSLINGER:  There is nothing professional at all
14   in their relationship, which is the point.
15            THE COURT:  Why do you need the e-mails to make that
16   point?
17            MR. KISSLINGER:  It's documentary evidence.  It's a
18   snapshot into the relationship at the time.
19            THE COURT:  Is that even going to be an issue?  That's
20   what I am trying to understand.
21            MR. RIOPELLE:  It is not an issue in this case.  We
22   have admitted it in the answer.
23            MR. KISSLINGER:  Just stipulating to something that we
24   have a right to prove takes away some of our --
25            THE COURT:  I understand that.  I am not trying to
```

1    restrict you in your proof.  I am just trying to understand

2    what this proves that is an issue for the jury to determine.

3            MR. KISSLINGER:  Your Honor, Strickland and Black are

4    going to take the stand and they are going to bolster each

5    other's story.  They are the only ones who were there when they

6    talked to each other.  The only way we have to rebut that story

7    is by circumstantial evidence of what the nature of the

8    relationship was.

9            THE COURT:  How do you want to do that?  You want to

10   do that by some witness that you call other than them, or do

11   you want to do that on cross-examination of those witnesses?

12           MR. KISSLINGER:  Cross-examination.

13           THE COURT:  Procedurally, your intent at this point is

14   to utilize a certain number of e-mails on cross-examination.

15           MR. KISSLINGER:  Purely on cross, your Honor.  We

16   would be willing to redact any offensive off-color references.

17   But some of the nicknames they use, I believe that's fairly

18   representative of the closeness of the relationship.

19           THE COURT:  I don't know how offensive or prejudicial

20   the nicknames are.

21           MR. KISSLINGER:  We can give you the block of the

22   e-mails in camera so you can take a look at them.  I think we

23   can work out a deal with the defendants of what we would take

24   out.

25           THE COURT:  My real question is I am trying to

1    understand what you're trying to get the defendants to admit

2    under oath.

3        MR. KISSLINGER:  I would like them to admit that they

4    talked all the time about everything under the sun.  They had

5    no filters in their relationship.  They took risks in their

6    communications, things that you probably shouldn't send over

7    your employer's computer.  And the nature of their relationship

8    was such that Strickland wanted to help his buddy Black in

9    return for getting help in return.

10       THE COURT:  I think that that's perfectly appropriate

11   cross-examination, let's first start with that, in terms of

12   questioning.  I am just trying to figure out, one, if he says

13   everything you want him to say, then what the purpose of the

14   e-mails would be.  And even if he doesn't say everything that

15   you want him to say under oath before this jury, which e-mails

16   are going to make the point that he is somehow trying to give

17   the jury a different impression about the relationship.

18       MR. KISSLINGER:  Perhaps this has to wait until the

19   time cross-examination happens, and we can understand what his

20   answers are so we wouldn't need to impeach him with some of

21   these documents.

22       THE COURT:  I am trying to understand whether this is

23   simply for the purpose of impeaching the witness on

24   cross-examination or whether there is some other independent

25   proof that has a purpose on your direct case.  I am

1    understanding now that that's not necessarily the case.

2            MR. KISSLINGER:  Again sir, the fact that he is going

3    to say, oh, we were good friends, that's a lot different from

4    actually getting to look at an e-mail where they called each

5    other nicknames.

6            THE COURT:  It depends on what the subject is.  I

7    don't disagree with you, and to the extent that you want to

8    confront the witness with examples of that, I have no reason to

9    prohibit you from doing so, except to the extent that they can

10   demonstrate that the potential prejudice outweighs its slight

11   probative value.

12           MR. RIOPELLE:  Judge, these are 25-year-old men.  We

13   have admitted in our answer, in response to the allegations in

14   paragraph 30, Strickland states that he has been friends with

15   Black since the two attended college.  He resided with Black's

16   family in New York City for approximately two nights.  In the

17   summer of 2002, Strickland visited Black's vacation home in the

18   Hamptons.  And they shared a hotel room.

19           That's all admitted.  They are going to say, we were

20   close friends, we met socially all the time, sure we talked

21   about girls, yes we had nicknames for each other, we were close

22   friends.  There is no need to get some off-color e-mail before

23   the jury because it's all admitted.  They were very close

24   friends.  They met socially all the time.  As Strickland

25   recollects it, the conversation he had with Black was in a bar

1    waiting to sit down at a restaurant table.  There is no

2    question they had a close social relationship.  They are going

3    to say that and admit it on the witness stand.  And there is no

4    need to put before the jury off-color e-mails talking about

5    girls as 25-year-old men tend to do to each other.

6         THE COURT:  What I need is I need for you to

7    specifically identify and limit, not for all purposes because

8    things may develop that some other e-mail may become relevant,

9    but at least identify the e-mails that you want to question the

10   witness about substantively, and at least identify for me, as

11   early or as late as possible, the lines in the e-mail that you

12   say you want to ask him about.  And then I can make some

13   judgment about whether or not that should be done in a

14   question, that should be done by putting in the e-mail in

15   evidence, that should be done by redacting the e-mail.  Because

16   what I am going to need from them is I am going to need from

17   them what specific lines they think are inappropriate to put

18   before the jury.

19         If an e-mail says, you know, let's go bowling next

20   week, obviously you can ask him, didn't they go bowling

21   together?  And whether or not the e-mail is necessary I guess

22   depends on the answer.  But it's hard for me to judge that any

23   of this has any strong probative value, or to judge that it has

24   any strong undue prejudice, unless I can see a line.  And if

25   the line is X and you can tell me how you want to use it, then

```
 1   I can assess its probative value.  And then if they see another

 2   line in the same e-mail or that line they say is more

 3   prejudicial.  But I don't even know if you two have an

 4   understanding if there is a particular line in an e-mail that

 5   you want to use that you know that the defense objects to that

 6   line coming in.  What I hear you saying is you're talking past

 7   each other.  You're saying you want to use some information in

 8   some e-mails to put before the jury, but they want to keep out

 9   other information that's also in the e-mail.  I don't know

10   whether or not you're even fighting about the same thing.

11             MR. ABERNETHY:  If I can speak to the prejudice point.

12             We had this conversation with the SEC at least six

13   weeks ago.  These e-mails, which if your Honor wants to see

14   them --

15             THE COURT:  Not particularly.  I want you to focus me

16   on a line.

17             MR. ABERNETHY:  Let me tell you what they have.

18             THE COURT:  Pick an e-mail and tell me why that e-mail

19   is inadmissible.  Give me one e-mail.

20             MR. ABERNETHY:  There are at least a number of

21   e-mails.

22             THE COURT:  Pick one and tell me why that e-mail is

23   inadmissible.  What information they want out of that e-mail

24   and what information you want to keep out.

25             MR. ABERNETHY:  Judge, there are a number of e-mails
```

1    where they are exchanging links to pornographic sites.

2            THE COURT:  So you have an e-mail in your hand that

3    does that?

4            MR. ABERNETHY:  I need to find one.

5            THE COURT:  You want a general rule that the

6    pornographic references in all e-mails should come out?

7            MR. ABERNETHY:  Let me continue the list though.  It's

8    not just that.

9            THE COURT:  The list doesn't help me because I can't

10   just give you carte blanche, everything you want to

11   characterize as a list then I keep that out.  You have got to

12   tell me, this is the e-mail.  They say they want this line read

13   to the jury.  That's really the only issue.  If they want this

14   line read to the jury, you have to tell me you want this line

15   kept away from the jury.

16           MR. ABERNETHY:  Every single e-mail.

17           THE COURT:  I am not going to grant you that relief.

18   I am not going to say they can't use any e-mail because you say

19   every e-mail has a line in it that you find objectionable.

20   That's not the way it works.

21           MR. MARK COHEN:  Judge, what we don't want is to be

22   sandbagged.  And we have been asking for six weeks to tell us

23   what they want to use and why, and the first time we got an

24   explanation was from your Honor's questions to the SEC.  We

25   don't want to do this at side bar.

1          THE COURT:  I will give you the basic rule that I

2     follow.  If you give me 30 seconds to make the decision, you're

3     going to get 30 seconds worth of thought.  That's all I can say

4     to you.  If you give me two weeks to think about this, I am not

5     going to say you're going to get two weeks worth of thought,

6     but you are going to get a whole lot more consideration than if

7     the government stands in front of the jury and hands me a

8     document for the first time, and they try to argue it should

9     come in and you're trying to argue to me it should stay out.

10          MR. MARK COHEN:  Today we began with we want the jury

11     to flip through all 100 pages.  We want to know what they want

12     to offer and why so we can respond to it before trial and your

13     Honor have a chance not to read all 100.

14          THE COURT:  This is what I think you should do.  I am

15     not going to force you to do it, but it would be helpful to me.

16     I suggest that at this point, and you won't be limited to those

17     pages, but at this point I think you should exchange at the

18     same time the e-mails that the government -- we can do it this

19     way.  The first thing the government should do is the

20     government should identify to you the e-mails that they want to

21     admit into evidence, because that's the real issue.  And then,

22     when they do that, you should both be prepared to hand each

23     other the relevant line, as easy as highlighting the relevant

24     line in that e-mail that you think is probative, and you should

25     highlight the relevant line in that e-mail that you say is

1    objectionable.  And you should exchange that at the same time.

2    All right.

3         Now, if you can come to some understanding of where

4    the two shall not meet, then that's fine.  You have two

5    arguments to make.  The SEC can say to me, I want this entire

6    e-mail unredacted in evidence before this jury so they can read

7    the entire thing.  You can argue that you don't want any of it

8    in and tell me why the jury shouldn't read any of it.  But what

9    is going to be more compelling is to tell me what it is that's

10   in the e-mail, the comment that is relevant to the jury to

11   read, and you can tell me what in the e-mail is prejudicial for

12   the jury to read, and then I can assess that.  But until I see

13   that, I can't give you any further guidance in terms of whether

14   or not a particular e-mail, if the foundation is laid for its

15   admissibility and is otherwise relevant, that it won't come in

16   as evidence for the jury to review, and if it does come in,

17   whether it will come in unredacted or redacted.  You have got

18   to give me a better feel for what we are talking about.

19        MR. RIOPELLE:  While your Honor was speaking, I went

20   ahead and pulled out three examples for the Court.

21        I have in my hand an e-mail, a back and forth exchange

22   between Mr. Black and Mr. Strickland.  The first from Mr. Black

23   asking Mr. Strickland, "How was the weekend, jackass?"  That's

24   the kind of stupid 25-year-old guy talk.  Strickland responds,

25   "Awesome.  Did she call you after receiving the beautiful

1    bouquet?"  No doubt referring to some woman, some girlfriend.

2    And then his next line is, "Weather was good.  Weather could

3    have been better.  How about you?  Any nice tail at the house?"

4    I assume that's a reference to women and were there

5    good-looking women at your house in the Hamptons over the

6    weekend in May.  I don't see why that's relevant.  I think they

7    are both going to admit they talked about all kinds of personal

8    things, including girlfriends and the like.  I don't see why we

9    have to hear about somebody calling somebody else a jackass or

10   was there any nice tail at your house.

11            I have in my hand another e-mail in which someone

12   broadcasts to Strickland, and then Strickland broadcasts all

13   kinds of other people an attached file that says "conjugal

14   visit."  I assume that's a bit of pornography.  But Black is

15   one of 30 people to whom Strickland forwards this e-mail.  I

16   don't know why that is relevant to show that Black and

17   Strickland had a particularly close relationship.  There is a

18   lot of pornography that is circulated on Wall Street and here

19   is 30 people getting it.  I am going to guess, and I think I am

20   correct, that the other 29 are not accused by the SEC of being

21   involved in any sort of insider trading, certainly not in

22   SunSource.  So I can't see how this e-mail advances the ball on

23   that issue whatsoever.  Those are examples.

24            THE COURT:  That's a good example.  As I say, my

25   initial reaction is, depending on what they want to do with it,

1   I think that using the word "jackass" isn't so significantly

2   prejudicial on this case as opposed to the substance of using

3   the phrase "tail."  It depends on what purpose they are trying

4   to demonstrate.

5       MR. KISSLINGER:  It's probative of the fact that one

6   jackass isn't calling another jackass to do due diligence.  The

7   jury can consider that.

8       THE COURT:  The first place that you should go to

9   establish this relationship is the direct examination of a

10  witness.  Now, if you want to say, didn't you refer to each

11  other as XYZ or you talked about certain topics, it depends on

12  how you want to ask the question.  But the issue is that,

13  depending on how that direct and cross-examination go, and if

14  there is any disputed issue about the nature of the

15  relationship, then that will help define for me whether or not

16  the e-mails are illustrative of anything that's useful to the

17  jury or it's just simply cumulative of facts that you have

18  already demonstrated.  And if it is, if there is prejudicial

19  material in it, then I would be more likely to keep the

20  prejudicial information out.

21      I think you should identify what is the information

22  that's important to you and identify the objectionable nature

23  of the material if you want me to give serious consideration,

24  thoughtful consideration to your purpose for admitting it or to

25  your objection for keeping it out.

1      MR. ABERNETHY:  We are more than happy to do so.  As I

2  said, we actually called the SEC on this at least six weeks ago

3  with that in mind.  We didn't get a call back.  My only

4  suggestion, obviously, as the Court has said, you can't force

5  us to do something, but I think we are prepared to do it.  But

6  in order for trial management to be effective, and not have to

7  do this on the fly at the side bar, we would ask that the Court

8  set a deadline for both parties.

9      THE COURT:  I always use the example, I heard a lawyer

10  say to a judge once, Judge, you can't make me do that.  And the

11  judge politely responded, You're right, counsel, I can't make

12  you do that, but I can make you wish you had.

13      When do you want to identify the e-mails themselves

14  that you believe there is a likelihood that you will want to

15  admit them into evidence?

16      MR. KISSLINGER:  We can do that by Monday, your Honor.

17      THE COURT:  Then the two of you should agree on a

18  date, and that date should be probably no later than, if you

19  can, Thursday to identify -- you can exchange at the same time

20  what you claim is the relevant portion of that e-mail and what

21  you claim is the objectionable portion of that e-mail.

22      MR. ABERNETHY:  Submit it to the Court?

23      THE COURT:  No.  Submit it to each other at that point

24  in time.  And then to the extent you cannot agree on either

25  keeping it out or letting it stay in, or redacting it, then I

```
1    will hear from the SEC with regard to their application to have

2    it admitted into evidence, and we can discuss that as early as

3    possible.

4              MR. KISSLINGER:  One more thing.  They have said now

5    twice six weeks ago.  Six weeks ago I offered to them, let's

6    sit down and work out what is going to be in and what is going

7    to be out, and they said they are all out.  They weren't

8    willing to compromise.

9              THE COURT:  But you said they are all in.  So let's

10   both have a better communication on this if you want me to

11   quickly and efficiently resolve it.  But that's my approach to

12   that.  I don't want to bury the jury with a whole lot of

13   unnecessary paper.  As long as there is an articulable reason

14   to have an e-mail and its content before the jury, that

15   provides them with additional evidence, either by direct

16   evidence or inference, then they are entitled to have it,

17   unless its probative value, no matter how slight, is outweighed

18   by its potential undue prejudice, or it's just strictly a

19   cumulative issue that the jury should not concern themselves

20   with because that's a fact not disputed.

21             Obviously, it's for the jury, given the nature of the

22   SEC's position that it is relevant for them to have an

23   understanding, a clear understanding of the nature of their

24   relationship, and the nature of the communication in and around

25   the time that they claim he was provided information.  It
```

obviously makes a difference whether it happened in a bar over

drinks or it happened in his office during business hours in a

meeting or in a business phone call that is recorded as a

business transaction.  So that's my position at this point.

          Let me just move along because I am supposed to meet

with the mayor's counsel by lunch.

          I am not particularly impressed by testimony about how

great a deal it ultimately turns out to be to have bought this

stock.  It seems to me that's totally irrelevant to the issue.

The issue is, what did Mr. Black know at the time he decided to

purchase this stock?  If his position is he made a particular

assessment and was provided certain information that gave him

the benefit of knowing that this was a good buy, then that

historical information can be provided.  And he can provide it,

or if someone else advised him at the time and they want to

say, I went to him and knocked on his door and told him, you

ought to buy this stock, this is the greatest stock in the

world, and he said that's why I bought it, that's fine.  But to

say in hindsight that some expert said they think, in their

analysis from day one until today, that this was a good buy,

whether he had inside information or not, it doesn't seem, one,

particularly relevant, and, two, to advance the determination

of whether or not he had inside information.

          They already had some stock, so obviously they already

made a decision without inside information that the stock was

something that they thought was a good investment.  Now,
whether they thought it was a good investment or not and
whether it made money for them or not is not really the issue.
Because the issue will be for the jury, whether he made money
or not, he made more money than he shouldn't have made if he
additionally bought more of the stock because he knew what
everybody else didn't know, that the stock was going to become
more valuable for an illegitimate reason, not a legitimate
reason.  So those who made the decision to purchase the stock,
they can state on what basis, and particularly Mr. Black can
state on what basis -- my understanding of the facts is that he
was the ultimate decision-maker to purchase the stock?

         MR. JOEL COHEN:  It was actually my client, Mr. Obus,
which is why I am standing up.

         THE COURT:  I'm sorry.  I am not sure what these
so-called experts can tell us.  I think it's beyond a Daubert
issue for me.  So it was a great stock.  I know Microsoft is a
great stock.  It doesn't do much for me to tell you how great a
stock it is and how great a buy it is for you to try to figure
out whether or not when I bought it I bought it because I knew
they were getting ready to buy out Google.  Beyond whether this
is appropriate for expert testimony, it doesn't seem to be
particularly relevant to just simply call people, who had
nothing to do with anyone's decision to buy the stock, to have
them in hindsight talk about what a great buy the stock was.

1          MR. JOEL COHEN:  There are two facets to what your

2     Honor is mentioning.  I think the issue of the expert is the

3     most important and Mr. Abernethy can address that.  But the

4     reason why I stood up is because there is a more essential

5     issue that I think your Honor has clearly touched on.

6          There is a research file that Wynnefield Capital kept.

7     They keep it for all of their investments.  I have a copy of it

8     here.  It's in a binder.  It contains all of the research that

9     they maintained when they followed the SunSource stock for many

10    years, the 10-Qs, 10Ks, notes of investor meetings, notes of

11    meetings with the senior management of SunSource, including

12    some of the SEC's key witnesses, the types of materials they

13    would put into a file so they can look to it when they are

14    making investment decisions.

15         THE COURT:  If you tell me somebody did look to it who

16    made the relevant decision in this case, I think it advances

17    your argument.  To the extent it just sat in a file cabinet and

18    Mr. Obus wasn't aware of any of it, I am not quite sure what

19    your point would be.

20         MR. JOEL COHEN:  Mr. Obus was very aware of it and

21    will testify that he looked to it regularly.  The point that I

22    am raising is because the SEC has taken the position that the

23    research file -- we have asked them to stipulate that it's a

24    business record, or to at least agree to that.  They have taken

25    the position that they don't think it is.  We have asked them

1   why.  The most we have been able to hear over the past two

2   months is that I am not sure about the veracity of some of the

3   documents inside, whether they are genuine.

4          THE COURT:  Again, it sort of depends on the purpose

5   for which you're offering it.  Are you offering it for the

6   truth of what is in the document?  I am not sure what document

7   in the file you say is relevant other than just being able to

8   show they had a real big file and had a whole bunch of

9   research.

10          MR. JOEL COHEN:  What it will show, with testimony

11   supporting it, is that the decision to buy the stock on June 8,

12   which is the issue we are trying here, was based upon a

13   long-standing understanding by Mr. Obus and his colleagues

14   about the value of the stock.  So it's directly pertinent.  It

15   is their defense.  It is our defense.  So it's directly

16   pertinent.

17          THE COURT:  Two things are pertinent.  One, the fact

18   that you have a file and did research is pertinent.  And if you

19   want to show them that it's a 10 inch stack of paper, that may

20   be pertinent.  But the content is only relevant to the extent

21   that Mr. Obus says he was aware of that information and he used

22   that information to decide to buy the stock, to the extent he

23   wants to say that, and to the extent that there is a document

24   in that file that he says, yeah, I read this cover to cover,

25   and I don't know whether it's true or not, but it sure made me

want to buy the stock.  And you can explain to the jury what is

in that 10-K, or he can explain to the jury what is in that

10-K that he said made him decide to buy the stock, to the

extent that he personally relied on anything in making that

decision.  In the abstract, I don't see the objection.

Again, it's not a blanket, just because he wants to

say we got a big file and I checked out that file, so now I

want to put everything in the file and I want to argue from

that, on page 6 of some 10-K they said X, even though of course

I didn't read that, it somehow advances the jury's

determination.  It doesn't.  To the extent that they can

cross-examine him about what information he had that made him

make that decision at that time, that's the relevant

information.  We know that they have already made the decision

to buy the stock.  The question is, why did they buy more of

the stock?  And your position is they bought more of the stock

because that was consistent with their decision that this was a

good investment and a continuing good investment.  Their

position is he bought more of the stock because he was given

inside information and he knew that he had an advantage over

everyone else.

If you want me to be more specific, then you should

pull something out of that file that you want to put in

evidence before the jury.  But neither you nor I want the jury

to sit in the jury room spending hours going through that file

1    and trying to figure out what all the 10-Ks say.  It really

2    doesn't advance the determination of the issue.

3         MR. JOEL COHEN:  You're right.  Everything you have

4    said is correct and we agree with it.  It was more of a trial

5    management issue, similar to the e-mails, because the SEC has

6    taken the position that they won't agree that it is a business

7    record.

8         Now, we understand the SEC doesn't decide whether

9    something is a business record, your Honor does.  But we saw a

10   trial management issue because we don't want to have a

11   situation where I am approaching Mr. Obus with a document from

12   the research file and every time I approach we are going side

13   bar.

14        THE COURT:  As I said to them, it depends on how much

15   of the file we are going to have to spend time going through,

16   how much Mr. Obus is going to recognize and identify.  Quite

17   frankly, it seems to me that there should be an independent

18   basis to admit it into evidence other than a business record,

19   because the foundation is, is it relevant?  If Mr. Obus says,

20   yeah, I have seen this before, and this is exactly the

21   information I knew was in there and I relied upon it, then it

22   seems to me it's admissible whether it's a business record or

23   not.  If he says, I have never seen this before, I don't know

24   what is in it and didn't take this into consideration at all

25   when I made my decision to buy the stock, then I couldn't care

 1    less whether it's a business record, it's not coming in.

 2          So if you want to identify more specifically to them

 3    what particular documents you're going to have your witness

 4    identify, and its foundation in terms of its admissibility

 5    and/or its relevance, and I assume that that would be Mr. Obus,

 6    then I would identify that to them.  As I said, if you want to

 7    bring in this stack of research for that limited purpose to

 8    show the jury how big the stack of research is, that's one

 9    point, and that's a different admissibility.  But if you want

10    the content of all of those documents put before this jury,

11    then you are going to have to explain to me why the content of

12    those documents advances their issue.  And it seems to me it

13    doesn't advance their issue if Mr. Obus is not aware of it.

14          MR. JOEL COHEN:  He is aware, as is Mr. Black and as

15    is another witness from Wynnefield Capital.  So for both

16    purposes your Honor has identified, we will be able to

17    establish clearly the answer is yes.  Part of it is that the

18    jury understands, contrary to the SEC's insinuation, this was a

19    company that they carefully followed and they had a legitimate

20    reason to buy it, and part of it is to show specific documents.

21          THE COURT:  As you have made the argument against

22    their e-mails, I am sure you will have a number of witnesses

23    who can testify to that, and they will say, yes, we do a lot of

24    research, these are the kinds of things we do, these are the

25    kinds of things we consider when we make decisions, and each of

1     the defendants who was involved in making that decision or

2     recommendation to purchase the original stock or to purchase

3     more of the stock at the time it was purchased can testify to

4     that, and to the extent that it is more illustrative to have

5     particular documents, the content of which is relevant to make

6     that point, then it seems to me that's appropriate.  That's the

7     guidance that I would give now.

8             Does the SEC have some particular issue individually

9     with regard to their research?  I just don't want experts

10    coming in here in hindsight and giving us their view that they

11    thought, yeah, it looks like it was a good idea to me now at

12    the time when they made it.

13            MR. JOEL COHEN:  As I think Mr. Abernethy will

14    address, that's not the purpose of the expert testimony.  But

15    we understand that, your Honor.  We wouldn't offer it for that

16    purpose.

17            THE COURT:  What is the SEC's position?

18            MR. DE YOUNG:  Starting with the Wynnefield research

19    file, it's not our position that Mr. Obus can't talk about

20    research he looked at when he decided to make the stock.  It

21    touches on two different issues.  One is the expert issues that

22    we will cover in a second.  The fact that Mr. Obus is going to

23    testify about Wynnefield's research and Mr. Black may talk

24    about Wynnefield's research and Mr. Brasser may talk about

25    Wynnefield's research just underscores the reason why they

1    don't need experts to talk about the exact same thing.

2            THE COURT:  Is there a particular issue that I should

3    be focusing on with regard to the research that was in their

4    file at the time they made these decisions?

5            MR. DE YOUNG:  I don't think so, your Honor.  We have

6    gone back and forth about business records, and we did not want

7    to stipulate to that entire stack of business records without

8    having any testimony from Mr. Obus that is admissible for

9    whatever reason.  So I think your approach is the one we would

10   want to take.

11           It also touches on a similar issue, which has come up

12   in their requests for us to stipulate to business records, and

13   that is there is at least 30 documents which are similar files

14   from an investor named Mr. Weber, which appear to be Mr.

15   Weber's handwritten notes, and perhaps research, on SunSource,

16   dating back to 1999, which are on their exhibit list, and they

17   have requested that we stipulate to it as a business record,

18   and we don't think it makes sense as a trial management issue

19   for us to be dealing with that as a business record when it has

20   no relevance in the case.

21           THE COURT:  Let me give you this guidance.  My

22   position is this.  If you have an objection to the

23   admissibility of a document, then make that objection.  If you

24   say that it's not relevant, then make that objection.  What I

25   am saying is that if the only issue is whether or not you have

1    to bring in a witness to establish it as a business record, if

2    that is the only issue that you're fighting about, that is not

3    worth fighting about.  If you have an objection, which would be

4    it doesn't matter to us whether it's a business record or not,

5    we don't think it's admissible for this reason, that's the

6    discussion that I should be having.

7         I don't want the jury to react to this case and hold

8    it against either side if we have to spend days just parading

9    people in who are custodians of records simply to establish

10   that they have these documents.  If there is some other purpose

11   to objecting to the document, there is a legitimate purpose for

12   keeping it out, and if it is clear that they would not be able

13   to establish the other foundational issues, then on one of

14   those bases we can talk about it.  Either you're going to want

15   the document in or you're going to want it out.  And if the

16   document is going to come in anyway if you have a business

17   records witness, then I am not going to be particularly

18   impressed by objecting to it as a business record itself if the

19   only solution to that is to bring in the witness and have the

20   witness testify it's a business record.

21        MR. DE YOUNG:  We agree with that approach.

22        THE COURT:  If you have some other specific objection

23   to the documents, then identify those objections, and it's more

24   likely that I am going to determine that the document is

25   inadmissible on that basis rather than simply make a ruling

1   that it's admissible, that they have to go get a witness to

2   come in here to establish that, even though there is no

3   legitimate legal reason to keep the document out.

4           MR. DE YOUNG:  We agree with that.  It wasn't our

5   intent to make people jump through hoops when we didn't have

6   another objection.  I am just pointing out that they asked us

7   to stipulate to large blocks of documents of which we think are

8   objectionable for a number of reasons.

9           THE COURT:  I assume the objection is not that we know

10  that this is a business record, but you're required to bring in

11  a witness to testify it's a business record.  That's not the

12  objection.

13          MR. DE YOUNG:  Correct.

14          THE COURT:  If they want to identify it to you as

15  early as possible, specifically what document that they want

16  the jury to be able to review its content and have it in

17  evidence, then they should identify that for you as early as

18  possible, and you can state that specific objection to it, and

19  then we can address that.  But those are separate issues than

20  whether it's a business record issue.  So why don't you take

21  that as guidance.

22          MR. JOEL COHEN:  This is a helpful colloquy and it's

23  helpful to hear the SEC say that today, because this is what we

24  are trying to resolve.  We understand they might have

25  objections, as might we, to relevance, but to get off the table

1     the unnecessary, frankly, silly business records parade of

2     witnesses is what we have been trying to do.

3            So I would suggest that we have a conversation with

4     them, in light of what they said today, and they can continue

5     to assert their relevance objections, we will come up with a

6     list, but if we don't have to parade in witnesses from

7     SunSource and from Allied Capital and from the NASD and from

8     places that are businesses that regularly keep and maintain

9     documents in the course of their business, that would help

10    everybody.

11           MR. DE YOUNG:  We have been participating in that

12    process.  We don't share the same exact view, that just because

13    it's produced by a party it's automatically a business record.

14    There might be a narrow set of documents which we don't agree

15    with their characterization on.  But the fact that we won't

16    stipulate to all 357 exhibits before trial --

17           THE COURT:  I assume you would have such an objection

18    because you believe that either the preparation of the

19    document, its purpose for being prepared, manner of being

20    prepared or its use at this trial is inconsistent with its

21    reliability.  To that extent, I want to hear the argument.  If

22    that's not the argument, then I don't want to hear the

23    argument.  Of course I will hear any objection you have with

24    respect to any document, but I just can't throw the laundry

25    list or the grocery list into the business record and claim

1   that I get to use it.

2          If they want to use a self-serving document, that they

3   want the jury to believe it must be true because the defendants

4   made sure they stuck it in there, no, they can't use it for

5   that purpose.  It's got to be some other legitimate purpose and

6   if there is something that challenges its reliability or the

7   genuine definition of the particular document as being a

8   business record.

9          Files aren't business records.  Documents are business

10   records.  You would have to convince me that somebody would be

11   able to say, even if you don't bring him in here, that, yes,

12   this is the kind of document that we regularly keep here, and,

13   no, it wasn't just stuck in this file, just as an example, so I

14   can cover myself later.  We never put this kind of stuff in

15   here.  The only time we ever stuck this in here was the day

16   after we got accused of insider trading.

17          MR. JOEL COHEN:  We have made great progress recently.

18   92 percent of the exhibits we marked eight weeks ago the SEC

19   objected to.  Now we are getting closer.  Let me just give you

20   one example, because I think we can use your guidance, and then

21   we can confer and hopefully resolve these issues, and if we

22   disagree we will come back to you.

23          There were documents that we already have a

24   certification for a business records stipulation from the NASD.

25   There was a FINRA request sent to SunSource a couple of months

1    after the deal was announced, and it asked, in substance, as

2    they often do, can you, SunSource, and your employees and

3    senior management provide information about any concerns about

4    insider trading?  I am paraphrasing.  So we have that letter

5    from FINRA.  We have SunSource's response several weeks later

6    back to FINRA.  The response back to FINRA is plainly relevant.

7            THE COURT:  Whose response is it?

8            MR. JOEL COHEN:  Mr. Corvino, the CFO of the company.

9            THE COURT:  I assume he is going to testify.

10           MR. JOEL COHEN:  Yes.

11           THE COURT:  I assume you can put that document in

12   front of him, whether it's a business record or not, and say,

13   Do you recognize this?  You gave that to FINRA when they asked

14   you about insider trading.  And he says, Yes, that's the

15   document.  Isn't it admissible independent of it being a

16   business record?

17           MR. JOEL COHEN:  We think so.

18           THE COURT:  If it has relevance and he can lay a

19   foundation.

20           MR. JOEL COHEN:  So they get the letter, SunSource.

21   Internally the CFO, as he is supposed to, distributes it to a

22   wide variety of people, including Mr. Andrien, a key witness,

23   and to others at Allied.  They give responses.  Those responses

24   are culled and put into a letter.

25           THE COURT:  I assume somebody can testify to that.

1          MR. JOEL COHEN:  Yes.  The SEC and SunSource, up until

2     ten minutes ago, was taking the position that those aren't

3     business records.

4          THE COURT:  You are fighting about the wrong thing.

5     Who cares whether they are business records?  The question

6     still remains, is the purpose for which you're offering it a

7     legitimate purpose?  Is the inference that you want the jury to

8     draw from this a legitimate inference, or is it a relevant

9     document?  If you have such a document in a business record,

10    and it's got nobody's name on it, and nobody has ever seen it

11    before, then I am not sure I would let it in even if it was a

12    business record.

13         So it doesn't sound to me like the specific records

14    that you are interested in you don't have a person who could

15    independently establish at least a foundation for its

16    admissibility, and you can argue whether or not it has

17    relevance or it doesn't have probative value or whether it is

18    what it purports to be.  If they dispute that it is what it

19    purports to be, or they dispute that the inference that you

20    want the jury to draw from that is not a proper inference

21    simply because it's stuck in somebody's file, then they can

22    make that argument, and we can see whether it legitimately has

23    reliability because it's kept in the regular course of business

24    and prepared in the regular course of business.  As I say, I

25    think you're arguing about something other than whether or not

```
 1    it technically qualifies as a business record.

 2              MR. JOEL COHEN:  We just wanted to avoid the trial

 3    management issues.  I think your Honor's guidance has helped a

 4    lot with that.

 5              MR. ABERNETHY:  May I briefly address Mr. Porten, who

 6    is one of the two experts, Charlie Porten.  There are two

 7    Daubert motions before your Honor.  I am just going to talk

 8    about Mr. Porten.  He is an investment professional over 30

 9    years.  He has testified for the SEC.

10              THE COURT:  A real smart guy.  No question about it.

11    Except, as they say, he knows you, he doesn't know your client.

12    What can he tell us that advances one's determination of

13    whether your client had inside information?

14              MR. ABERNETHY:  We are not asking him to tell us that.

15              THE COURT:  That's the only real issue here.

16              MR. ABERNETHY:  There are background issues that are

17    important background issues for a jury that is not going to be

18    experienced in them.

19              THE COURT:  What are the important background issues?

20              MR. ABERNETHY:  Issues of what due diligence entails

21    when it comes to an analyst at a hedge fund or other financial

22    institution.  What does an analyst typically do?  What is

23    permissible to do?

24              THE COURT:  Suppose they did do due diligence.  How

25    are they more or less likely to be involved in insider trading?
```

 1          Suppose they didn't do due diligence.  How are they

 2     more or less likely to be involved in insider trading?

 3          MR. ABERNETHY:  I think the concern from the defense

 4     is the SEC may make argument that that somehow was improper to

 5     call management, to have asked questions of management, which

 6     in this case is highly relevant because in this case

 7     co-defendant Mr. Strickland calls our client, Mr. Black, and

 8     asked about management.  It's a central issue in the case.

 9          THE COURT:  I don't understand it to be a central

10     disputed issue in the case.

11          MR. ABERNETHY:  It is disputed since they said he

12     didn't do that.

13          THE COURT:  Saying he didn't do it is not an issue of

14     whether or not it would have been proper to do it.  Nobody

15     disagrees that more information is better than less

16     information.  The jury doesn't need an expert to be able to

17     tell them that.  What does he know that the jury can't

18     understand about this case?

19          MR. ABERNETHY:  Let me pick up on your Honor's last

20     comment.  The fact that your Honor gets it is terrific.  The

21     fact that your Honor gets that this proper is terrific, but the

22     jury may not get it.

23          THE COURT:  May not get what?

24          MR. ABERNETHY:  The fact that it's proper to call and

25     ask for information, perfectly legitimate public information

1    from management, from other investors, shareholders and the

2    like, which is what this case is all about.

3          THE COURT:  It's perfectly legitimate to do that if

4    that information is available to everybody else.

5          MR. ABERNETHY:  Certainly Mr. Porten will talk about

6    what is done regularly in the financial industry.

7          THE COURT:  So will everybody else.

8          MR. ABERNETHY:  Mr. Porten provides extra

9    understanding for the jury from the perspective of an expert

10   witness.

11         THE COURT:  You want Mr. Porten to imply to the jury

12   that they are less likely to be involved in insider trading

13   because they did what he will technically tell them is due

14   diligence as an expert, that's your theory by Mr. Porten?

15   Because I don't see anything that he needs to tell this jury

16   that the jury can't understand.

17         MR. MARK COHEN:  If I might, what we are concerned

18   about is we actually want to try the case that's charged.  So

19   Mr. Black or Mr. Obus or other Wynnefield people will argue we

20   did due diligence.  What did that mean?  We read the public

21   filings.  We called management.  We went to see management.  We

22   spoke to other shareholders.  We went and talked to customers.

23   And there are memos about that in this case.  We are concerned

24   that a jury, who may know nothing about this industry, will

25   say, we don't like the fact that Nelson Obus can get the CEO on

1    the phone at any minute, maybe they were telling him stuff

2    then.  This case is about May 24.

3           THE COURT:  I don't want to distract the jury to make

4    them think that they need ten witnesses to debate this issue.

5           MR. MARK COHEN:  If our clients say, we did that

6    because that's our job and that's permitted, it's the word of

7    the defendant.

8           THE COURT:  I assume that every single human being who

9    comes into this courtroom, who is going to have anything to do

10   with this industry, is going to say the same thing.

11          MR. MARK COHEN:  If that is not in dispute and we can

12   get a charge from the Court to that effect, then I agree with

13   you, we don't need an expert to explain it.

14          THE COURT:  I will put it to you this way.  I will

15   reconsider this issue if they tell me sometime before you get

16   to present your case that they intend to make that argument, or

17   if they make that argument.  If they make that argument at a

18   time that disadvantages you, then I will give the jury an

19   instruction, I will give them a clear instruction.  There is

20   nothing improper about doing due diligence and finding out as

21   much as you can about the company.  That is not what this case

22   is about.  But what is illegal is having the information that

23   wouldn't be available to someone else who might want to do that

24   same research.

25          MR. MARK COHEN:  That would work, your Honor.

1           THE COURT:  I would be surprised if they make that

2      argument that you say is the purpose for which you want to call

3      this witness to rebut that argument.  As I say, if they decide

4      they want to make that argument, then I will consider whether

5      or not this is the appropriate witness for that argument.  But

6      this witness was presented to me on a much broader basis than

7      just simply I want to tell them what due diligence is.

8           MR. MARK COHEN:  We are just focusing on Roman I of

9      his report.  We understand your Honor's points about the later

10     parts of his report.  All we are saying is, if it becomes an

11     issue about the fact what analysts do, having a non-defendant

12     witness explain it would be relevant.  If the Court is going to

13     take care of it with a charge, that's fine.

14          THE COURT:  I will first allow you to ask every single

15     witness that you want to that question to see if anybody gives

16     a different answer.  If somebody from the SEC argues it that

17     way or the SEC witnesses say that, you know, no, it's not

18     appropriate at all to call up a company or go out and visit or

19     check it out thoroughly, talk to people, and if you do that

20     you're breaking the law, then we have got a different

21     situation.  But I don't anticipate that that's really going to

22     be a big dispute for the jury, or that the nature of what we

23     are discussing is beyond the jury's comprehension without an

24     expert.  You don't have to be that sophisticated a jury to

25     understand that you're not going to buy a stock just because

1    you threw a dart to the board and that's the one you hit.

2    You're going to buy it because you're an informed investor, and

3    hopefully everybody is an informed investor.

4          Let me move on because I have to leave in about ten

5    minutes, and we will see if we can finish it.

6          I don't see any direct evidence that anybody else was

7    tipped in this case.  You want to try to prove a separate case

8    that somebody else was tipped?

9          MR. MARK COHEN:  No, your Honor.

10          THE COURT:  You want to accuse someone else of being

11    tipped.

12          MR. MARK COHEN:  No.

13          THE COURT:  Then I don't understand what the purpose

14    is.

15          MR. MARK COHEN:  Let me try to explain what the

16    purpose is, which is a limited one.  Here are the facts.  The

17    SEC's main witness is Mr. Andrien, who is the CEO of SunSource.

18    They may or may not call him.  They may call Mr. Corvino, who

19    is the CFO of SunSource.

20          The evidence at issue relates to three individuals:

21    Mr. Abrams, who is a personal friend of Mr. Andrien, who traded

22    on the stock two weeks before making the announcement,

23    Mr. Haggerty and Mr. Muldowney, who traded days before the

24    announcement.  We do not want to have a trial about whether

25    Mr. Haggerty, Mr. Muldowney, or Mr. Abrams committed insider

1    trading.

2           THE COURT:  You have no evidence whatsoever that they

3    had inside information.

4           You have temporal proximity, but you have no evidence

5    that they traded on inside information.

6           MR. MARK COHEN:  I don't want to get outside this

7    case.

8           THE COURT:  You have no admissible evidence that they

9    traded on inside information, as far as I can see, and I think

10   that issue should be out of the case.

11          MR. MARK COHEN:  And we do not want to call

12   Mr. Haggerty to the stand and accuse him of insider trading.

13   Nor do we want to use this to accuse the SEC of making a bad

14   prosecutorial decision.

15          THE COURT:  So what smoke do you want to blow?  You

16   can imagine I see absolutely no way that advances the jury's

17   determination of whether your guys had inside information.

18   Even if what you say is true, it doesn't advance their

19   determination of whether or not your guys had inside

20   information.  Even if they were found guilty in a criminal

21   case, it wouldn't have anything to do with whether your guys

22   had inside information.

23          MR. MARK COHEN:  Let me try to link it up because it

24   actually does link up for cross-examination of Mr. Andrien and

25   Mr. Corvino.

1              THE COURT:  You want to say that he made a mistake in

2       his recollection; he thought he told your client, but he really

3       told these other guys.

4              MR. MARK COHEN:  No.

5              THE COURT:  Well, that's the way I sort of read it in

6       your papers.

7              MR. MARK COHEN:  Then maybe our papers were not good.

8       Here is what we want to say.

9              THE COURT:  That's the best argument I could come up

10      with.

11             MR. MARK COHEN:  We have a better one.

12             Let me start with Mr. Corvino.  Mr. Corvino, as we

13      just discussed, is the point person responding to the NASD

14      inquiry, which is now FINRA.  The sequence is this, your Honor.

15      The deal is announced on June 19.  It is to close in September.

16      In between that, before it closes, NASD sends an inquiry to

17      SunSource, please give us information about a bunch of

18      individuals relating to trading in SunSource.

19             THE COURT:  He is trying to deflect it from him by

20      accusing your client.

21             MR. MARK COHEN:  No.

22             THE COURT:  I still don't get it.

23             MR. MARK COHEN:  The list has ten individuals on it.

24      Two of them are his friends.  He has an incentive to be as

25      accurate as he possibly can with the NASD.  It's calling into

1    question trading in a company he works for.  It's calling into

2    question two people he has a personal relationship with.  And

3    the defense's position is that the response to the NASD is

4    incomplete.  It is incomplete in a meaningful way.  It does not

5    mention the "little birdie" conversation that we talked about

6    so much last time from Mr. Andrien, and it doesn't mention any

7    conversation Mr. Corvino has with Mr. Andrien about the "little

8    birdie" conversation or anything else.

9         THE COURT:  He is not going to say he had a "little

10   birdie" conversation with those two individuals.

11        MR. MARK COHEN:  If they call him, he is going to say

12   he had this conversation.

13        THE COURT:  With your client.

14        MR. JOEL COHEN:  With my client.

15        THE COURT:  One of the defendants here, not the other

16   guys.

17        MR. MARK COHEN:  Corvino is the corroborating witness

18   of Andrien.

19        So we are talking about three or four

20   cross-examination questions to establish that Mr. Corvino, the

21   organizer and author of this response, has every incentive in

22   the world, from a business point of view and a personal point

23   of view, to be as accurate as possible with the NASD.

24        THE COURT:  What does that have to do with whether or

25   not you're implying that somebody else had inside information?

1          MR. MARK COHEN:  We are not implying.

2          MR. RIOPELLE:  It impeaches the prior consistent

3    statement because he doesn't repeat it to the NASD with a

4    business duty to do so.  That's fair.

5          THE COURT:  That is fair.  That wasn't the discussion

6    that I was reading that you guys were fighting about.  They

7    were concerned that you wanted to say two things.  You can't

8    trust these guys because they are really covering for their

9    pals.  And the conversation that they had with my client is

10   really a conversation that we want you to believe that they had

11   with their buddies.  And that's why you should believe that our

12   guys didn't do it.

13         MR. MARK COHEN:  Understood.

14         THE COURT:  It's the thinnest of weeds factually to

15   make that argument.  I just don't see anywhere that anybody,

16   other than you, have accused those guys of possibly being

17   involved in insider trading.  I don't know what trades you're

18   particularly talking about.  I don't know specifically the

19   information, except to try to make the jury believe that, even

20   if a conversation about a little birdie happened, you should

21   think it probably happened with their friends, who nobody ever

22   accused of insider trading, rather than it happened with my

23   client.

24         MR. MARK COHEN:  We are not saying that, Judge.

25         THE COURT:  I don't understand what you're fighting

```
 1   about then.  You want to ask him what?  You want the witness to

 2   say what?

 3              MR. MARK COHEN:  I want the witness to say that when

 4   that request came in, it sought information about his company

 5   and two friends of his, both of whom were personal friends of

 6   him, and no one else at SunSource except him.  Therefore, he

 7   had every incentive to be as full and accurate as he could in

 8   his response, period.

 9              THE COURT:  So he didn't do what?

10              MR. MARK COHEN:  The defense's position is his

11   response was not as accurate as it could be.

12              THE COURT:  I want to know what the evidence is going

13   to show.  In what way was his response not forthcoming?  What

14   should he have said that he did not say?

15              MR. MARK COHEN:  He did not mention at all the

16   conversation he now claims he had with Mr. Andrien about the

17   "little birdie" call.

18              THE COURT:  I don't hear that being a dispute about

19   whether or not you can cross-examine him about that issue.

20              MR. KISSLINGER:  Mr. Haggerty, Mr. Abrams, Mr.

21   Muldowney, tons of records, they are all in their exhibit and

22   witness list.  That's what we are arguing about.

23              THE COURT:  Say that again.

24              MR. KISSLINGER:  Haggerty, Abrams, those guys, they

25   are all on their witness list, they are all on their exhibit
```

1  list, all their trading records.  That's what we are trying to

2  keep out.

3          THE COURT:  To the extent that you want to impeach him

4  that he had a prior inconsistent statement, or he had a prior

5  material omission, you can impeach him on that.  But the rule

6  is fairly simple in that regard.  Beyond that, it is collateral

7  impeachment and you can't parade in a bunch of witnesses to try

8  to prove that that's the case, but you must have a good faith

9  basis to ask the question.

10          Now, if you demonstrate that you have a good faith

11  basis to look at what it says he said and something is

12  different, or something that one would have expected him to say

13  and he did not say it, you can ask him about that, and you can

14  impeach him with the fact that the jury should find him less

15  credible because he is now saying something different than he

16  said on a prior occasion.  But beyond that, I don't know any

17  witness who can accuse anybody, other than the lawyers, of

18  insider trading.  I don't hear anybody else coming in here and

19  saying that I have some information that one can reasonably

20  conclude that these were the guys who were doing it, not us.

21          Unless you tell me that you have some proof like that,

22  no, I am not going to let the jury speculate that, oh, that's a

23  good reason to think about why they might not be telling the

24  truth, if there is no basis for anybody.  I don't want them to

25  have to parade in about ten witnesses to say that they never

1    suspected these guys of doing it.

2              MR. JOEL COHEN:  I want to be clear about something

3    else.  Obviously, when we filed these motions, both sides, we

4    had anticipating things that we see the other side says.  We

5    have revised our view of this.  We are not going to make those

6    arguments.

7              THE COURT:  I want to make sure where you're going, so

8    if this comes up in a related context, I know in what relevant

9    context.

10             MR. HARAY:  We take the Court's point, and we don't

11   really disagree that if they had a position that Mr. Corvino or

12   Mr. Andrien made a prior inconsistent statement with something

13   they say at trial, that's fair game.  And whether the "little

14   birdie" reference they say is not in the letter or it's in the

15   letter, that's a factual dispute we will have in the courtroom.

16             It is not logically connected to say that because the

17   NASD letter included the names of two of Mr. Corvino's friends,

18   that that somehow was a motive for him to tell the truth in a

19   different way.  Those two points are disconnected.  They can

20   say, the NASD asked you to describe conversations with Mr.

21   Andrien and you described them differently than you said in

22   court.  It doesn't require them to say, the NASD sent you a

23   letter that asked you about your two high school friends or

24   whoever they are.  That extraneous fact is really just

25   injecting the idea that he had some motive to lie.  I don't

1    think they are making that argument now, but they shouldn't be

2    able to include any reference to these other people.

3        THE COURT:  I will consider that if they start going

4    far afield in that direction.  And you can consider whether or

5    not it's more useful for you to keep it out or to stand up

6    there and tell the jury how absurd an argument that is, that's

7    the length they have gone in order to find their clients not

8    liable.  So you can decide whether you want to keep it out or

9    whether you want to address it.

10       I am not quite sure what they have been arguing that

11   the cover-up was.  That's the part that I am having difficulty

12   with.  I don't see any basis, any evidence of a cover-up to

13   cover up some other illegal activity with other individuals,

14   these individuals or others.

15       Now, one can speculate that if they are not telling

16   the truth, that could be one of the reasons they are not

17   telling the truth.  But that's not appropriate for this jury to

18   speculate that, just because we want to give them ten different

19   scenarios of how this really could have occurred, that it

20   really might have been one of them buying it for themselves,

21   unless there is evidence that supports that.  Their

22   relationship with these individuals in and of itself, without

23   more, is not a basis on which anyone can argue that they are

24   giving untruthful testimony simply because they have friends.

25       MR. HARAY:  We agree.  That's why we think the only

1    inference, which would be an unsupported and improper one for

2    the jury to draw from hearing that Mr. Corvino's friends are on

3    the inquiry letter, is for them to speculate that there must

4    have been something there involving his friends.  It would be

5    wrong to just lay that cloud over Mr. Corvino's testimony, or

6    anyone's testimony, and it doesn't sound like they intend to

7    make those arguments.  That's why it sounds like, based on what

8    we are hearing today, all the references to these other

9    individuals should be out of the case.

10            MR. JOEL COHEN:  Your Honor, can I just explain?  And

11   I hesitate to do this because my good friend and colleague, the

12   other Mr. Cohen, I think he misstated the argument in one way,

13   and I want to be clear.

14            We don't intend to put in the evidence of the NASD to

15   prove that it was inaccurate, that Mr. Corvino was lying.  It's

16   the opposite.  When asked by a regulator to gather information

17   and put it together in a letter, he didn't include the same

18   explanation that he is now giving.  It's that that is actually

19   the truth.  At some point he is confused, but we are not

20   putting it in for that purpose.  I want to be clear with the

21   SEC and with your Honor about that.

22            THE COURT:  I understand what their position is.  What

23   does it have to do with these other guys?  That's their

24   position.  Why are we even talking to the jury about these

25   other individuals?  Because unless you can demonstrate by the

1    evidence very directly that somehow that provides them a motive

2    to do that, they are right, it doesn't matter whether or not

3    they ask him about Santa Claus or the Easter Bunny.  The

4    question is, if it's not about your guys, then what does the

5    jury care?  They only care if you say that the jury is not

6    given complete and accurate testimony here and they should

7    doubt the veracity of their statement.  Who cares whether, as

8    they say, you were lying then or you're lying now?  You're a

9    liar.  And that's the purpose of a prior inconsistent

10   statement, to show that the testimony in court is less reliable

11   because you gave a different statement at a different point in

12   time, and we don't have to sit here and try to figure out which

13   one is supposed to be true.  The evidence before this jury is

14   the testimony in court under oath, and that's what the jury has

15   to judge.

16              I am not going to say at this point that you can't

17   mention these other guys by name for some purpose, but I will

18   say that trying to structure an argument that because they are

19   friends with other people, that somehow that's relevant to

20   either the determination of the facts by the jury or relevant

21   to the assessment of their credibility, you haven't made that

22   compelling argument by these papers.  Clearly, the only purpose

23   that comes across is that you want to imply that it's not my

24   guys, it's these other guys, and that's why these guys are

25   putting it on our guys to try to cover up.  That's the only

1    rational explanation I got from the papers.  Not a legitimate

2    explanation, but a rational explanation that comes through in

3    the papers as to why you would want to do it, and I am not

4    going to let you do it for that purpose.

5          MR. JOEL COHEN:  We are not doing that.  We want to be

6    as clear as we can about that.

7          The other gentleman, Mr. Abrams, we do not intend to

8    make an argument in this court that Mr. Abrams was tipped, and

9    that also reverts back to the SEC witnesses.  The same

10   potential argument, we are not going to do it.  I know our

11   papers addressed it, but it's not part of this case.

12         Mr. Abrams does have an independent small bit of

13   relevance, his information of the case, and here is what it is.

14   The SEC has alleged that my co-counsel's clients, Mr.

15   Strickland and Mr. Black, met a year later and had a discussion

16   about an SEC subpoena, that that somehow is nefarious or a

17   cover-up, and they tipped each other off the fact that they had

18   been subpoenaed.  Mr. Abrams was told by Mr. Andrien, the CEO,

19   Hey, good friend, you might be getting a subpoena.  All we want

20   to do is deduce the fact that there is nothing inherently

21   nefarious or wrong with one friend telling another they had

22   gotten a subpoena from the SEC, which everyone in this

23   courtroom, every lawyer knows happens all the time.  If the SEC

24   wants to make a different argument, they are entitled to the

25   argument.  We are entitled to put in evidence from their own

main witness that show that he didn't think it was nefarious or
improper.

THE COURT:  In the abstract, I don't have a serious
problem with that.  If that's the thrust of their testimony,
and that's what they want to argue, that this cannot have a
legitimate motive, you can then demonstrate that other people
who have legitimate motives do the same thing, other
individuals in this case had legitimate motives.  As I say, you
can't have it both ways.  You can't say they had illegitimate
motives, and then say this is somehow evidence that they
weren't trying to cover up.

The answer to that question is it depends.  That's the
answer to most of these questions.  It depends on the facts.
It depends on in what context they do it, what they say, and
what the consequences are.

Are there significant more issues that we need to
address today because I had to leave five minutes ago?

MR. KISSLINGER:  You left open at our last meeting
what you were going to allow from the T. Rowe Price witnesses.
Our position is that if Mr. Obus has a right to explain why he
sold the stock, we should be allowed, for fairness, to explain
why the company on the other side is allowed.

THE COURT:  To the extent that they have similar
testimony, I think it's just as irrelevant.  They don't need to
give us a whole bunch of technical definitions, and they don't

1    need to tell us how great the stock is.

2            My attitude is very basic.  I think if you have

3    witnesses who have an historical position in these events, then

4    they can testify, if they sold the stock to these people, or if

5    they traded for them, or they did something, or advised them,

6    all those kinds of things.  But it seems to me, from both

7    sides, it is pretty irrelevant in the abstract how experts want

8    to look at this case and the implications that they draw from

9    looking at this in hindsight.  That is not an expertise.

10   That's a legitimate basis for the jury to make those

11   determinations depending on the facts.

12           It seems to me that this is the kind of case, with the

13   kind of sophisticated witnesses, that it is unlikely that some

14   witness, who has nothing to do with this case, except for both

15   of your arguments that we don't want them to be an interested

16   witness, there is very little reason why some expert has to

17   come in and explain to the jury in the abstract what the SEC

18   says was going wrong here.  The jury will understand the issues

19   in this case and how to apply those issues.  My concern is that

20   the jury gets a picture of this that makes them think that this

21   is a more complicated, technical case than it is, and it's not.

22   It doesn't need a bunch of experts.

23           If you want to explain some basic terms, most of the

24   people who are fact witnesses are in a position to explain

25   those terms and those situations.  But if you want someone to

opine about their view of this past situation, which they had

no relationship with, I don't see that.  But to the extent that

they were involved at the time, and again, you can give me more

specifics about what information you say they have to give to

the jury.

MR. KISSLINGER:  Your Honor, these two portfolio

managers sold their stock at the same time Mr. Obus was buying.

THE COURT:  Then get me the portfolio manager who sold

the stock to these guys.  I am not sure what they are going to

say other than we sold the stock.  I will reconsider this if

you want to get into a debate and a dual of experts about

whether or not it was an appropriate investment, not an

appropriate investment, it implies making legitimate decisions,

not making legitimate decisions.  I don't think that's

appropriate for their witnesses to come in and do that, and I

don't think it's appropriate for your witnesses to come in and

do that, to try to say, well, I want to tell you it smells to

me, it looks bad.  Who cares what you think?  Oh, I sold some

of that stock too.  But you didn't sell it to these guys.

MR. KISSLINGER:  One of our witnesses did sell a block

of stock to those guys.

THE COURT:  Then he can come in and say, historically,

if he wants to testify, I sold a block of stock to these guys.

MR. RIOPELLE:  He didn't speak to him.  He just sold a

block of stock into the market.  It happened to come to

1   Mr. Obus.  So what?

2             MR. JOEL COHEN:  It is an inaccuracy to keep asserting

3   that.

4             THE COURT:  What do I care?  You're right.  It makes

5   it even less relevant if they never had a conversation.  But if

6   you want somebody to say they bought shares, it's probably in

7   that big file that you don't want in.  What does the jury care?

8             As I say, if you want to bring somebody in to say

9   that, to give us that historical fact, and you think it's

10  relevant and convince me that it's relevant, then fine, he can

11  testify to that historical fact.  But beyond that, give me an

12  example of what it is that you want him to testify to.

13            MR. KISSLINGER:  That's it.

14            MR. JOEL COHEN:  Except that it's counter factual

15  because there is no privity at all.  I'm sorry, but I have to

16  be clear about this.  The SEC does not have evidence that

17  anyone at T. Rowe Price ever spoke to or communicated with

18  anyone at my client's firm about the sale of stock in this

19  case.  It's an inaccuracy for the SEC to be saying it.  It's

20  not true.

21            THE COURT:  It doesn't matter.

22            MR. JOEL COHEN:  If it's not true, you can't put it

23  into evidence.

24            THE COURT:  If it's not true, then the other side gets

25  to prove that it's not true.  The bottom line is I don't care,

1    and I don't think the jury is going to care.  Who cares whether

2    he bought it on the street from somebody who was hawking it or

3    whether he bought it from T. Rowe Price?  It doesn't matter.

4    If you want to confuse this jury, fine, put in all of this

5    stuff.  It doesn't matter.  It has absolutely no relevance.

6        MR. KISSLINGER:  Can I clarify my position?  We are

7    concerned that Mr. Obus –– we have no defense to what he is

8    going to say about how undervalued the stock was, how great it

9    was, what a bargain it was.  We have nothing on the other side

10   to go against that.

11       THE COURT:  What are you going to say, it wasn't a

12   great bargain?

13       MR. RIOPELLE:  Somebody sold it.

14       THE COURT:  You don't disagree with any of that.  You

15   don't think it was a good bargain?

16       MR. KISSLINGER:  Once the tip came out, it sure was.

17       MR. JOEL COHEN:  They don't want any evidence that it

18   might have been an innocent reason to buy it.

19       THE COURT:  I assume your T. Rowe Price guy is not

20   going to say, I sold this worthless stock to all of these

21   customers even though I didn't think it was a decent buy.  You

22   can't tell me that that's what the purpose of the T. Rowe Price

23   witness is.  He is not going to say that.  He is going to say,

24   yeah, I sold this stock, people wanted it, I checked it out.

25   It was at this price and at some point we thought it might go

1     up two dollars.  Well, we didn't think it was going to go up

2     five dollars, but we didn't have inside information.  But they

3     are not going to say, this was a worthless stock that nobody

4     should have bought, because they sold it to people and they

5     gave advice.  I assume he is going to say on the stand, if

6     asked, Did you ever recommend this stock to anyone?  And he is

7     going to say, Yes, we recommended it to plenty of people, and

8     then they bought it on my recommendation.

9                 So what difference does it make?  If you can give me

10    some more direct, substantive, relevant testimony from the T.

11    Rowe Price people, that's fine.  But those points aren't

12    articulated to me to be any purpose to cause someone, who had

13    no contact whatsoever with these defendants, or even any of

14    your other witnesses.  They are not in direct contact with

15    anyone in this case.  That's my position on that.

16              MR. RIOPELLE:  I read the transcript in which you

17    describe your jury selection process, and I think I understand

18    it, but I just want to make sure I do so it all goes smoothly.

19    You're going to seat 16.  You're going to voir dire them all.

20    There will be some who can't do it, and they go.  There may be

21    some challenges for cause, and they go.  But you will qualify a

22    box of 16.  As jurors leave the box, will you simply be calling

23    the next juror in line or do you pull them out of a hat?

24              THE COURT:  We will pull them out of the wheel.

25              MR. RIOPELLE:  That was really my question.

1          Once we have got 16 qualified and the challenges for

2     cause are all decided, then we are going to have three strikes

3     each, exercised simultaneously, as I understand it.

4          THE COURT:  Three strikes per side, exercised

5     simultaneously.

6          MR. RIOPELLE:  So it's not going to be one and one.

7     We hand up our three, they hand up their three, and whoever is

8     left in the box is our jury.

9          THE COURT:  No.  The first ten is the jury.  So if all

10    of you use the same strike for 16, 15 and 14, 1 through 10 are

11    going to be your jury.

12         MR. RIOPELLE:  The ten lowest in number will be our

13    jury.  And then we will proceed to verdict with something above

14    six, up to ten.

15         THE COURT:  Yes.

16         MR. RIOPELLE:  I think I have it.  Thank you.

17         THE COURT:  I need to go.  I am ten minutes late.  Do

18    we need to come back?

19         MR. RIOPELLE:  I did want to ask a little bit about

20    voir dire.  We have submitted some voir dire.  I know your

21    Honor does this for a living.  I do want to make sure that

22    there will be some voir dire on the issue of whether the fact

23    that the government and the Securities and Exchange Commission

24    is a party, will that affect your ability to decide this case

25    fairly?

1          THE COURT:  I will give appropriate language as I give

2     in the criminal case.

3          MR. RIOPELLE:  We have submitted questions on that.

4          MR. MARK COHEN:  The other thing is both sides have

5     submitted proposed limiting instructions on two issues.  If

6     your Honor wants to have more time to think about it.

7          THE COURT:  Let me look at it further.  I don't have a

8     real problem with the limiting instruction.  What is unclear to

9     me at this point is whether or not, particularly, for example,

10    the statements are going to be inadmissible against some for

11    all purposes.  Depending on how the facts come out, it may make

12    it more or less likely that somebody else is involved in this,

13    depending on what was said after by others, so without offering

14    it for its truth.

15         MR. JOEL COHEN:  We will need time for a charging

16    conference.  That's especially important with opening

17    statements.  And on the subject of opening statements, would

18    your Honor like to see the demonstratives that any of the

19    parties are going to use?

20         THE COURT:  No, not unless you disagree with them.

21         We can have a charging conference, but my standard

22    instructions are pretty much out of Sand on the general

23    instructions, and you should assume, to the extent that you

24    have a consistent instruction on the substantive law, that's

25    the way we are going to proceed.  And we will finalize the

1    instructions, but it's not my practice to have a full-blown

2    charging conference before the trial begins because I am not

3    yet ready to know exactly how the issues are presented and what

4    is going to be the final charge.

5            MR. JOEL COHEN:  During the trial at some point.

6            THE COURT:  My practice usually is, depending on how

7    long it lasts, hopefully several days before you have to sum up

8    we will have a charging conference, and we will have more than

9    one charging conference, because we will talk about it right up

10   until you see the final draft before you sum up, and we will

11   make minor changes.

12           MR. JOEL COHEN:  Obviously, all parties will stay away

13   from talking about the law in the opening statements.  That's

14   your Honor's province.

15           THE COURT:  Obviously, you can talk in terms of the

16   issues and phrase it how you want to phrase it, but I would ask

17   you to stay away from telling them the law is going to be X.

18   You can tell them what the SEC has to prove and what the issues

19   are and you can paraphrase them or say them exactly as you know

20   the words will come out in the jury instructions.

21           MR. JOEL COHEN:  The final thing I can think of that

22   might require your Honor's attention is we have each submitted

23   objections to designations to the deposition evidence in 2007

24   and 2008 and your Honor might have to resolve some of those.

25   I'm not sure what mechanical way you want us to do that.

1              THE COURT:  I usually find that those objections are

2    so broad and numerous that it doesn't make sense for me to sit

3    down and spend days going through them.  I suggest that you

4    look at it.  To the extent that you really don't want the jury

5    to hear it, you better tell me about it.  I need to know why we

6    are dealing with this and what you're fighting about.

7              MR. JOEL COHEN:  I think we are all professionals.  We

8    can agree to strip out the objections on the record and that

9    sort of stuff.  The reason why I am asking is because it's

10   displayed on a screen in certain instances.

11             THE COURT:  I expect just the Q and A.

12             MR. RIOPELLE:  Finally, with three defendants, will

13   the Court accept or make a ruling that if one defendant

14   objects, you don't need the others to formally join?  It will

15   be an objection on behalf of all of us.

16             THE COURT:  Unless you disagree.

17             MR. RIOPELLE:  That does happen, but I just don't want

18   to be bouncing up and down.

19             THE COURT:  Once an objection is made, that objection

20   is made, and it's made on those grounds.  Now, if you don't

21   want to join in the objection or you think those grounds don't

22   apply to you, you should further articulate another ground.

23             All right.  We will see if we need to meet one more

24   time before trial.

25             (Adjourned)