E5JZOBU1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION,
4
                    Plaintiff,
5
                v.                          06 CV 3150 (GBD)
6
    NELSON J. OBUS, et al.,
7
                    Defendants.
8
    ------------------------------x
9
                                            May 19, 2014
10                                          9:35 a.m.

11  Before:

12                      HON. GEORGE B. DANIELS,

13                                          District Judge

14                          APPEARANCES

15  U.S. SECURITIES AND EXCHANGE COMMISSION
         Attorneys for Plaintiff
16  BY:  PAUL W. KISSLINGER
         KYLE DeYOUNG
17       JONATHAN HARAY

18

    GIBSON, DUNN & CRUTCHER LLP
19       Attorneys for Defendant Obus and Wynnefield Fund Relief
    BY:  JOEL M. COHEN
20       MARY KAY DUNNING
         DARCY C. HARRIS
21
    COHEN & GRESSER LLP
22       Attorneys for Defendant Black
    BY:  MARK S. COHEN
23       JONATHAN S. ABERNETHY

24  SERCARZ & RIOPELLE, LLP
    Attorneys for Defendant Strickland
25  BY:  ROLAND G. RIOPELLE

E5JZOBU1

1              THE DEPUTY CLERK:  All rise.

2              THE COURT:  You can be seated.

3              (Case called)

4              THE COURT:  Let's do this.  I think we're going to

5     have a jury panel I would say within the hour, maybe even

6     within 45 minutes.  Let me go and address some of the issues

7     that the parties believe are still outstanding.

8              Let me first address the issue of the opening

9     statement, then what might come up today, and then we'll see if

10    we have time to address further issues that might come up

11    beyond today.

12             But let me just first ask the SEC, what did you intend

13    to do with the investigative testimony in your opening

14    statement?

15             MR. KISSLINGER:  Your Honor, we are not quoting the

16    investigative testimony by page or line.  We are referring or

17    saying that admissions and statements by the defendants will

18    come out in the case either by their admissions or on

19    impeachment, not in those words.  So we're not reading from

20    investigative testimony.  We're previewing the evidence that we

21    anticipate will come in.

22             THE COURT:  And are you going to describe the nature

23    of the testimony?

24             MR. KISSLINGER:  We will describe the substance of the

25    testimony without saying that it came from testimony; in other

E5JZOBU1

1   words Mr -- you will hear admissions from Mr. Black of so and

2   so.

3           THE COURT:  Okay, all right.

4           And, yes, what's the objection?

5           MR. ABERNETHY:  It's not accurate to say they're not

6   quoting.  Because in their slides they quote -- there's two

7   places at least where they quote and, they're quoting from our

8   client Mr. Black's testimony from 2002; where, as the Court

9   knows, Mr. Black was the only person in that testimony.  No

10  other defendant in this case was present in this testimony.

11  Because it was not a typical civil deposition.  It was

12  investigative testimony.

13          THE COURT:  Well, are you going to call him or not

14  going to call him?

15          MR. KISSLINGER:  We are going to say you are going to

16  hear these -- you will hear him say the following.  You will

17  hear him admit the following, without saying -- it's either

18  going to come in on his direct statement or it's going to come

19  in on impeachment.

20          THE COURT:  What are you quoting?

21          MR. KISSLINGER:  Would you like to see the language?

22          THE COURT:  Yes.  How extensive is it?

23          MR. KISSLINGER:  It's --

24          THE COURT:  Well, if it's more extensive for you to

25  read it than read it to me, then I'm not going to allow it.

E5JZOBU1

1          MR. KISSLINGER:  Very summary; you're going to get my

2     friend fired, we'll get him a job on Wall Street, to that

3     effect.  Very very summary nature.

4          MR. ABERNETHY:  Judge, it's innacurate.  They have

5     other places where they quote directly at least two sentences

6     in full with quotations.

7          THE COURT:  You can -- well, there is two different

8     issues.  You can allude to what you believe he said at any

9     point, and what you anticipate he's going to say at trial.  I

10     don't know if you anticipate he's going to say the same thing

11     or something different.  But I don't see any reason why you

12     should quote the language in a blowup until the transcript is

13     in evidence, all right.

14          So, I mean, I don't see it's a big deal, but I can put

15     that issue aside.  If you want to say that you'll hear

16     testimony that he said, you know, basically X, admitted

17     basically X, you can do that without putting up the slide, the

18     exact quote of the transcript because the transcript's not on

19     not in evidence.

20          MR. KISSLINGER:  And we're not doing that, your Honor.

21     We're not putting up the transcript.

22          THE COURT:  Well, you're putting up a quotation from

23     the transcript.  That's what you anticipated doing or no?

24          MR. KISSLINGER:  Yes, but --

25          THE COURT:  Well, that's what I'm saying.  Don't do

E5JZOBU1

 1    that.

 2               MR. KISSLINGER:  Okay.

 3               MR. ABERNETHY:  So, Judge, just so we're all clear, I

 4    think there are three slides where the SEC quotes, and our

 5    position is those slides need to come out, respectfully.

 6               THE COURT:  If they're direct quotes from the

 7    transcript and the transcript is not yet in evidence, then

 8    don't use the slides.  Say you anticipate the testimony is

 9    going to be.

10               MR. KISSLINGER:  Okay, your Honor.

11               MR. ABERNETHY:  Thank you, your Honor.

12               MR. RIOPELLE:  Judge, I apologize.  While we're

13    talking about the SEC slides, there is one other slide that we

14    objected to yesterday with the SEC.  We haven't heard back from

15    them.  I believe its slide 22, Judge, I can -- we can show it

16    to your Honor.  It's a computer rendering of the Wynnefield

17    Capital Office space, which, frankly, is just wholly

18    inaccurate.  It's not a blowup of any exhibit in the trial.

19    It's certainly not a photograph, and it's just a rendering

20    which completely would mislead the jury as to the physical

21    space in which Mr. Black and Mr. Obus worked.

22               MR. KISSLINGER:  Your Honor, I can I show you the

23    picture?

24               THE COURT:  Yes, sure.

25               MR. KISSLINGER:  We don't represent that it's a

E5JZOBU1

| 1 | to-scale --

| 2 |             THE COURT:  Just hand it to me.

| 3 |             MR. KISSLINGER:  Sorry, your Honor.  The point of the

| 4 | slide is to show where the two gentlemen sat in the room and we

| 5 | could tell the jury that it's not a scale model.

| 6 |             THE COURT:  Well, how are you going to lay the

| 7 | foundation for this admissibility?  Do you intend to admit it

| 8 | this into evidence?

| 9 |             MR. KISSLINGER:  No, your Honor.

| 10 |             THE COURT:  All right.

| 11 |             MR. KISSLINGER:  It's just a demonstrative to say

| 12 | where the gentlemen sat.

| 13 |             THE COURT:  Well, I mean, I'm not going to allow you

| 14 | to use it in opening if you're going to have a witness who is

| 15 | going to say they saw it.

| 16 |             MR. KISSLINGER:  Mr. Black will say that -- we did a

| 17 | hand drawing at the deposition which is an exhibit.

| 18 |             THE COURT:  Right.

| 19 |             MR. KISSLINGER:  And I -- we just had somebody turn

| 20 | that into a computer drawing.

| 21 |             THE COURT:  But I'm not sure what -- I'm not sure what

| 22 | a witness is going to say this represents.  What are you going

| 23 | to say that this represents?

| 24 |             MR. KISSLINGER:  We're going to say that Wynnefield

| 25 | Capital is layed out this way.  It had a long table, and there

E5JZOBU1

1    was a divider in the middle and Black sat on one side and Obus

2    sat on the other.

3           THE COURT:  Is somebody going to say that?

4           MR. KISSLINGER:  Mr. Black will be.

5           MR. ABERNETHY:  But, Judge, he's certainly not going

6    to say it looked like this.  In fact, it looked very much not

7    like this.  So if they want to introduce, Judge, Mr. Black in

8    deposition made a handwritten diagram in the --

9           THE COURT:  It's not this diagram.

10           MR. ABERNETHY:  This is not this.  This is --

11           THE COURT:  I would just skip it in opening.  Let's

12    see if he acknowledges this is the way it looks, then you can

13    offer it.  If he denies it and you have somebody else can say

14    this is the way it looks, then that's fine.  Otherwise use the

15    drawing that he did at the deposition.  Okay.

16           MR. KISSLINGER:  Fair enough.

17           THE COURT:  All right.  What it is the -- I don't

18    understand Corvino, what do you intend to do with Corvino?

19    Yes?

20           MR. HARAY:  Your Honor, it's our intent to introduce,

21    and preferably to introduce it through the depositions as we've

22    put defense on notice of, a very limited amount of what was the

23    deposition testimony of Mr. Covino.  And I think that what we

24    seek is, you know, in the pretrial motions the Court may recall

25    that the defense raised an issue about whether he could testify

E5JZOBU1

1    to a prior consistent statement that he received from

2    Mr. Andrien, and essentially we see his testimony as being

3    limited to that very piece of --

4              THE COURT:  What is he going to say?  What are you

5    going to quote?  You're not -- you don't intend to elicit any

6    other testimony from him.  Why?

7              MR. HARAY:  I mean, other than introducing himself and

8    maybe a brief bit of background, we think his testimony would

9    be essentially about 15 minutes worth of deposition.

10             THE COURT:  On the deposition.

11             MR. HARAY:  Yes, sir.

12             THE COURT:  What's the substance of his relevant

13   testimony on the deposition?

14             MR. HARAY:  The substance would be that there was a

15   contemporaneous statement, I mean contemporaneous with the call

16   between Mr. Andrien and Mr. Obus where Mr. Andrien reported to

17   Mr. Covino that he had just gotten these two telephone calls

18   and that are consistent with the call that Mr. Andrien will

19   testify about at trial.

20             THE COURT:  Well, when you say consistent, what does

21   he say?

22             MR. HARAY:  He says in the deposition that Mr. Andrien

23   came to him, indicated he had gotten calls from a Mr. Weber,

24   and from Mr. Obus, and that they were inquiring in slightly

25   different ways about whether the company was going to be bought

E5JZOBU1

1   out by a financial buyer.  The words are different for each

2   one.  The distinction doesn't matter for our purposes here

3   perhaps, but.

4              THE COURT:  When do you intend to offer this

5   testimony?

6              MR. HARAY:  We would offer it after Mr. Andrien

7   testifies if it becomes ripe, because he's been impeached, you

8   know, if we can introduce --

9              THE COURT:  If they try to demonstrate that there is

10   some sort of recent fabrication.

11              MR. HARAY:  Yes, sir.  And so we feel that this is the

12   most efficient way to introduce it.  He's beyond a hundred

13   miles from the court, and so under Rule 32 permits the Court to

14   take the testimony by deposition and that's what we intend to

15   do.

16              THE COURT:  Okay.  Why is that objectionable?

17              MR. ABERNETHY:  Judge, here's the problem.  What Mr.

18   Haray fails to the tell the Court is that on Friday we got an

19   e-mail from Mr. Corvino's lawyer basically saying to both the

20   SEC and the defense, when do you want me to show up in court.

21   And so he's available.

22              THE COURT:  If you want him, then you should tell him

23   to come.

24              MR. ABERNETHY:  So we did that.  And so, you know,

25   assuming the SEC is going to put in his testimony in the case,

E5JZOBU1

1    it's the defense position that since we subpoenaed him and then

2    subpoenaed him live, he should come live.  There is no issue of

3    a hundred miles.  He's already consented to the jurisdiction.

4         THE COURT:  If he's already going to be here, then

5    what's your issue?

6         MR. ABERNETHY:  The problem is they are saying, they

7    seem to be saying they don't want him to come live, they just

8    want --

9         THE COURT:  No, they say they don't want to examine

10   him on direct examination live.  That's what they say.  I mean,

11   they can't prevent him from coming.  If you want to

12   cross-examine him live and he's willing to show up or he's

13   within the subpoena power, then you tell him to be here.

14        MR. ABERNETHY:  The reason I raise it, Judge, is I

15   believe in a prior conference your Honor said -- maybe it was,

16   I think it was February, that if the person is going to be here

17   live, there shouldn't be video deposition testimony played

18   also.

19        THE COURT:  Well, do I know if the person is going to

20   be here live?

21        MR. ABERNETHY:  Well, he certainly is going to be here

22   live under either our subpoena or theirs.

23        THE COURT:  Well, you tell me, is he going to be here?

24        MR. ABERNETHY:  His lawyer said he's going to be here.

25   We said --

E5JZOBU1

1           THE COURT:  I didn't read that -- that's not what I

2     read, that his lawyer said he was going to be here.  You asked

3     him to be here and he said yes, he would be here.

4           MR. ABERNETHY:  He said, when do you want me to come.

5           THE COURT:  I understand that.

6           MR. ABERNETHY:  And so we wrote him back and said,

7     Mr. Lawyer, it's our understanding that the SEC may call you,

8     we don't know, and if that's the case, we respectfully suggest

9     you should be here by Wednesday, which is when he suggested.

10          THE COURT:  Did he agree to that?

11          MR. ABERNETHY:  I don't know we've got a response, but

12    I --

13          THE COURT:  Then he hasn't agreed.

14          MR. ABERNETHY:  But he certainly has indicated his

15    willingness to come.

16          THE COURT:  If you want him here, then bring him here

17    then, I mean what's --

18          MR. ABERNETHY:  So just to be clear then, the Court

19    would allow the video deposition played in the SEC case and

20    then we would call him in our case?

21          THE COURT:  Well, it depends.  You know, if he's

22    sitting here in the front row when the government says that

23    they want to play the deposition testimony, I may make him

24    testify live rather than through the deposition.  But I'm not

25    going to force them, unless he's, you know, within the subpoena

E5JZOBU1

1    power of the Court, I'm not going to force them to bring him in

2    here.  If he's sitting in the front row and -- I mean, look,

3    it's up to you, whether or not you want to force them to call

4    him live or you want to argue to the jury that didn't make any

5    sense for them to read his deposition because he's sitting

6    right in the front row.  I mean, I'm not -- you know, that's a

7    judgment call for you to make.  But if he's here live, you

8    know, it's very likely that I'm going to say that, you know, he

9    should get up on the stand and he should testify.  There is no

10   reason to put in out-of-court statements.

11            MR. HARAY:  Your Honor, I think from our perspective

12   if, you know, under our reading of the rule that we can put on

13   his testimony because he's beyond 100 miles of the court --

14            THE COURT:  If he's not in the courtroom.

15            MR. HARAY:  Right.  But I'm saying --

16            THE COURT:  He's not beyond 100 miles of the court if

17   he's sitting the courtroom.

18            MR. HARAY:  We issued a subpoena to him as a

19   precaution because the defense signaled that they may -- had a

20   different view of the law, we didn't know what Court's view

21   would be.  We probably wouldn't require him to be here --

22            THE COURT:  My view --

23            MR. HARAY:  -- if they're putting in the testimony.

24            THE COURT:  My view is that I'm not going to force you

25   to bring him here.  But if they want him here, and he agrees to

E5JZOBU1

1   come here -- because I'm not even sure we have the ability to

2   force him to come here.  So if he's agreed to the defense that

3   he's going to be here, then he should testify live and he

4   should be told when to show up.  If he's not here and he's

5   Philly or some place else and you don't want to call him live

6   because he's -- and he's beyond 100 miles from the courthouse,

7   then you can read his deposition testimony.

8           MR. HARAY:  And --

9           THE COURT:  And then if they want to bring him in here

10  sometime after that, if he's willing to do so, or they can

11  force him to do so, then that's up to them.

12          MR. HARAY:  And I imagine if we decide that we're not

13  calling him and they call him in their case, and they represent

14  that they are, they can call him in their case.  And so that's

15  when he would be here likely.  I imagine he'd be here during

16  their case, not during our case.

17          THE COURT:  Well, I think you should make a very early

18  determination and tell them whether or not you intend to offer

19  this testimony and when.  And when you make a decision as to

20  whether or not -- if you make a timely decision as to whether

21  or not you're going to offer his testimony, either live or by

22  deposition, then they can tell you whether or not he's going to

23  be here for that purpose or he's going to be here some other

24  time.

25          MR. HARAY:  And, your Honor, we have told them that

E5JZOBU1

1    we -- I believe our witness list informs them that we -- that

2    he was a may call at via video deposition.

3            THE COURT:  And when approximately would that happen?

4            MR. KISSLINGER:  Well, what I told one of the counsel

5    today was it depended a little bit on the Court's ruling today,

6    so.  I'm not trying to hedge.  We didn't just didn't know what

7    the Court would say, but --

8            THE COURT:  That's my ruling.  You can do it any time

9    you want to do it.

10           MR. KISSLINGER:  Yes, sir.

11           THE COURT:  But you should let them know what your

12   intent.

13           MR. KISSLINGER:  We will.

14           THE COURT:  If they told him to come, then you should

15   know that and know when they told him to come so that you can

16   make a decision as to whether or not you're going to just have

17   the live testimony.

18           MR. HARAY:  We will.

19           THE COURT:  You should tell them at the same time when

20   you intend to offer the, approximately when you intend to offer

21   the deposition testimony so they can make a decision whether or

22   not they want him here before you offer it, after you offer it,

23   or some later time on their case.

24           MR. HARAY:  Yes, sir.

25           THE COURT:  So I think that that is the way -- that's

E5JZOBU1

1    the guidance I can give you in terms of how you should proceed

2    there.  All right?

3            MR. HARAY:  Yes, Judge.  Thank you.

4            THE COURT:  Tell me exactly -- you still want to call

5    a T. Rowe Price witness and what is that witness going to say?

6            MR. KISSLINGER:  Your Honor, we would like to reserve

7    our judgment on that, depending on whether or not or not the

8    defendants have opened the door on certain issues that we

9    discussed about at some of the pretrial conferences.

10           THE COURT:  And --

11           MR. KISSLINGER:  One of the --

12           THE COURT:  Just tell me the substance of the witness'

13   testimony.

14           MR. KISSLINGER:  Your Honor, there is about a five

15   minute video we'd like to play from Mr. McCrickard.  This says

16   the information he thought was not known at the time, that it

17   was non-public at the time, which is an element we have to

18   prove.

19           THE COURT:  Okay.  And do you intend to prove that

20   additionally by some other --

21           MR. KISSLINGER:  This large investor didn't know the

22   fact.  I believe --

23           THE COURT:  I assume everybody but the people at

24   SunSource are going say they didn't know it.

25           MR. KISSLINGER:  I would anticipate that, your Honor.

E5JZOBU1

1           MR. RIOPELLE:  It's not a contested fact.

2           THE COURT:  Do we need this witness to come in and say

3    that?

4           MR. KISSLINGER:  Perhaps not, your Honor, but we still

5    haven't seen any stipulation or concession that they're not

6    going to say that the information was out.  There are rumors.

7           MR. J. COHEN:  Stipulated and admitted, your Honor.

8    We said this before in court.  We're not going to argue, we're

9    not going to argue this was common knowledge or public.  We

10   said that before in court.

11          MR. KISSLINGER:  And the one --

12          THE COURT:  Does anybody -- I mean, other than your --

13   well, I guess other than -- let's see.  I anticipate the only

14   people who would say that they knew were the people at

15   SunSource and Mr. Strickland and people related to GE Capital.

16          MR. KISSLINGER:  We believe that's right, your Honor?

17          THE COURT:  And I assume everybody GE Capital will say

18   that it was non-public information.

19          MR. KISSLINGER:  Which we believe that's right, your

20   Honor.

21          THE COURT:  It seems to me that's the more relevant

22   testimony since the theory is here that it is a breach of

23   Mr. Strickland's fiduciary duty to GE Capital.  So GE Capital

24   is in the best position to say whether or not he had

25   information and shouldn't disclose and it wasn't public at the

E5JZOBU1

1    time.

2                MR. KISSLINGER:  Your Honor, we believe we left open

3    one other window.  And if, for example, there's still evidence

4    on the defendant's list from this Alan Weber, these third

5    parties who may testify about how great the stock was, how

6    under valued it was.  If that comes in, your Honor, we believe

7    we should be allowed to put on our witness to say it wasn't

8    under valued.

9                THE COURT:  Well, I'm not sure where we were -- are

10   you saying -- you way it's only Mr. Weber that's still out --

11   I'm not sure where we are with --

12               MR. KISSLINGER:  When I last understood, your Honor

13   said that Mr. Obus can talk about why he bought the stock, but

14   nobody else's view of why anybody else bought the stock is

15   relevant, and --

16               THE COURT:  Not unless they had some express view at

17   the time.

18               MR. KISSLINGER:  And that's fine, your Honor.  But if

19   somehow that evidence does come in about, well, some other

20   investor purchased, we'd like to be able to put in our side.

21               THE COURT:  Do you anticipate something like that?

22               MR. J. COHEN:  Your Honor, the only thing we -- no.

23   We anticipate with Mr. Weber it's embedded in a very important

24   part of the facts, which is been different -- we're not putting

25   him on to talk about his purchases.

E5JZOBU1

1        THE COURT:  What's the relevant testimony from

2   Mr. Weber?

3        MR. J. COHEN:  Mr -- the SEC's proof, we understand,

4   will be that on May 24th Mr. Andrien CEO had a conversation

5   with Mr. Weber.  According to the SEC, Mr. Weber said something

6   like, would you be -- are you selling, would you be -- are you

7   considering selling to a financial buyer; hung up the phone,

8   and then Mr. Andrien immediately thereafter had a call with my

9   client, Mr. Obus, which he later described as being very

10  similar.  Mr. Weber has and will deny that he ever had such a

11  call.  So he's obviously directly pertinent because he directly

12  undercuts the credibility or the veracity or whatever of Mr.

13  Andrien.

14        THE COURT:  Are you just calling him in general to

15  impeach the credibility of Mr. Andrien or to impeach him on

16  some pertinent issue?

17        MR. J. COHEN:  Well, the pertinent issue is to impeach

18  his recollection.  He said --

19        THE COURT:  Of what?

20        MR. J. COHEN:  Mr. Andrien is saying I received two

21  calls that he, one from Weber, one from Obus.  They were both

22  similar in many ways and they -- and that's the way he

23  remembered them as tandem.  Mr. Obus is going to deny that the

24  call happened the way Mr. Andrien says it.  So is Mr. Weber,

25  which obviously corroborates Mr. Obus.  It demonstrates --

E5JZOBU1

1          THE COURT:  What way is Weber going to say that it

2    didn't happen the way -- the conversation didn't happen the way

3    Andrien said it?

4          MR. J. COHEN:  He's going to deny that he ever said

5    anything about financial buyer in the conversations, I never

6    said that to Mr. Andrien.  He's going to flatly deny it.  So

7    that's the one piece.

8          The other piece is that after the deal is announced --

9          THE COURT:  Right.

10         MR. J. COHEN:  -- Mr. Obus and Wynnefield Capital were

11   unhappy with the price and they were taking steps to find

12   another buyer that would offer a higher price.  They were doing

13   that in coordination with Mr. Weber, who was another major

14   shareholder.  There is going to be evidence of this.

15         So, again, we don't want to get into whether we're

16   right or someone else is right about whether the company was

17   worth more or not.  We're not intending to offer it for that

18   purpose at all.  It just corroborates Mr. Obus's defense that

19   in fact he was -- he was out in the open after the deal was

20   announced in documents and elsewhere, his fund working with

21   others to try to find someone else to basically either undo

22   this deal or get a better price, which undercuts the idea that

23   he did insider trading.  Because that's not something you would

24   do if you would inside trade that confidential information.

25         THE COURT:  I mean, I'm not disallowing that defense,

E5JZOBU1

but I'm not quite sure I follow you it.  I mean, what

difference does it make once the announcement is made?  He's

already made a profit.

      MR. J. COHEN:  That's an argument the SEC certainly

can make.

      THE COURT:  I'm just trying to understand your theory.

I didn't understand what you just said why it makes it less

likely that he traded on inside information.

      MR. J. COHEN:  It makes it less likely -- it's not to

be -- argument will be it's not the behavior of someone who is

seeking to do something in a hidden way, that he's not only

before the trade is he openly, according to the SEC, calling

the CEO, tell them according to the SEC that he's been tipped,

but then he trades and then afterwards, according to the SEC,

he openly calls he, Mr. Russell, the owner and says I was

tipped.

      THE COURT:  I see.  I understand.  You know, what I

don't have in context is I guess June 8th was the --

      MR. J. COHEN:  The purchase.

      THE COURT:  The purchase date.  At what point did

anyone indicate that they thought that there was insider

trading?

      MR. J. COHEN:  Any one meaning the?

      THE COURT:  Anyone meaning anyone, when was the

first --

E5JZOBU1

1            MR. J. COHEN:  I'm not sure how to answer that.

2            I'm not trying to be -- that's a difficult question to

3       answer.  I suppose the SEC might take the position they can

4       answer this, that some of their witnesses would say they

5       thought it might have been insider trading, you know, shortly

6       after the trade.  I don't know what they're going to argue.

7            THE COURT:  I'm just asking you from the evidence that

8       you have, I mean what's the first acknowledgement by somebody

9       that they thought insider trading was happening?

10           MR. J. COHEN:  You know, the first -- as far as I

11      can -- maybe someone will correct me -- I think the first time

12      anybody that I know of in this matter asserted that there might

13      have been insider trading was when the SEC alleged it or maybe

14      the NASD, several months after the deal had been announced.

15           THE COURT:  When you say several months?

16           MR. J. COHEN:  In -- well, there was an NASD

17      investigation, a standard investigation that follows a lot of

18      these deals.  They didn't make any accusations.  The letters

19      that they sent out make that clear, but they were doing the

20      standard investment.  So that's why I'm being -- it's hard to

21      answer because I don't know what's NASD was thinking.

22      Obviously you just know what their letters say and what

23      SunSource's responsive letter to them says, and SunSource --

24           THE COURT:  Was the letter inquiry of -- does it say

25      it's inside trading?

E5JZOBU1

1          MR. J. COHEN:  No, but they're asking about insider

2     trading.  It's very clear.

3          THE COURT:  That's when?

4          MR. J. COHEN:  That is in August of 2000.  And

5     Mr. Corvino, the CFO forwards that letter to people and he

6     actually uses the words potential insider trading.

7          THE COURT:  And the conversations you're talking about

8     with Mr. Weber are what period of time?

9          MR. J. COHEN:  Before that.

10          THE COURT:  That's what I'm trying --

11          MR. J. COHEN:  Yes, before that.

12          THE COURT:  Okay.  I mean, is there -- from the SEC's

13     point of view, what do you anticipate the evidence is going to

14     show that the first -- the evidence is going to indicate to the

15     jury the first time someone started talking insider trading?

16          MR. KISSLINGER:  Well, your Honor, the little birdie

17     call, we allege, occurred on May 24th.

18          THE COURT:  Right.

19          MR. KISSLINGER:  On the day of the tip.

20          THE COURT:  So when is -- so when did someone

21     suspect --

22          MR. KISSLINGER:  I guess the NASD letter would be the

23     first evidence which was --

24          THE COURT:  About when?

25          MR. KISSLINGER:  August maybe.

E5JZOBU1

1            THE COURT:  Okay.  So I'm going too keep in context

2     obviously the activity before the phone call, the activity

3     after the phone call, the activity before the purchase, after

4     the purchase, the activity between after the purchase till

5     someone indicated there might be insider trading, and then

6     activity, particularly defendant's activity after there is at

7     least suspicion indicated insider trading, because obviously

8     they're out in response to that or less reliable in terms of an

9     indication of innocent reasons, ignorant of having to defend

10    themselves against insider trading.

11            Did you have something?

12            MR. DeYOUNG:  I was just going to go back to where I

13    thought the Judge's inquiry began, which was kind of what is

14    Mr. Weber going to testify about.  And I think we're not taking

15    a position Mr. Weber can't talk about whether or not he had a

16    call with Mr. Andrien.  But in their exhibit list they include

17    dozens of documents that are handwritten notes from Mr. Weber's

18    apparent research file which we think have nothing to do with

19    this case.  And even after the purchase when they talk about

20    the potential impeachment of Andrien where Mr. Obus is

21    questioning whether or not they're going getting enough money

22    for the stock, they're also including exhibits.  And I'm not

23    sure what testimony they're going to get from Mr. Weber, and I

24    don't think it's relevant or we don't think it is relevant what

25    Mr. Weber thought about the stock price or what Mr. Weber did

E5JZOBU1

1    to challenge or make the transaction delayed, isn't really

2    relevant to what Mr -- whether Mr. Obus had inside information

3    when he made that purchase on June 8th, so.

4              THE COURT:  I think to the extent that there are

5    conversations between Obus and Weber, that seems to be at first

6    blush relevant testimony.  To the extent that he had some other

7    personal opinions about it, I'm not sure that that's particular

8    compelling.

9              MR. J. COHEN:  To be clear, your Honor, and this --

10   we've had prior discussions and argument with your Honor.  And

11   it's clear to us and we're not going to argue that some other

12   third party thought the company was worth more.  Because we

13   understand that's not the issue at stake here.  The only thing

14   we want to be able to explain very briefly is that Mr -- have

15   Mr. Weber explain it is he in his own mind thought it was under

16   valued so that's why he took steps he took.  Whether he's right

17   or wrong is completely irrelevant.  We're not going to have a

18   parade of witnesses or even the exhibits that the SEC refers

19   to.  We don't intend to introduce those exhibits.

20             THE COURT:  I assume that -- I'm not sure I have a

21   concern about that, because I assume that the nature of his

22   testimony is going to be that he had conversations with Mr.

23   Obus, in which they both expressed their concern with the stock

24   was under valued.  I don't know.

25             MR. J. COHEN:  Yes.  And also with Mr. Andrien.

E5JZOBU1

THE COURT:  Well, I'm not sure of the relevance of the conversations between Mr. Andrien post.

MR. J. COHEN:  It's not relevant -- we're not offering anything to prove that Obus and/or Weber were right about it being under valued.  We're only offering anything for the limited purpose of explaining that in their own minds, at least in Obus's mind, he believed it was under valued.

THE COURT:  Well, that's the important part.

MR. J. COHEN:  Right.

THE COURT:  Obus's mind.  I can care less what Weber thought.  But if Weber and Obus had conversations about that, then Obus can say that was -- I mean Weber can say and Obus can say that that was my concern, I expressed that concern with the other individual, he expressed the same concern, and these are the steps that we took, and that's the nature of the testimony. but beyond that, I'm not sure, I mean as they say it's not particularly relevant what Mr. Weber thought independently about this deal.

MR. J. COHEN:  We agree.  And I think the misunderstanding is that we had marked exhibits earlier and then heard your Honor's arguments and we -- obviously we don't share revised lists, but we don't intend to have a parade with Mr. Weber in which he explains why independently the price was under valued at or over --

THE COURT:  You should clearly identify for them

E5JZOBU1

```
 1   exactly what documents you intend to offer through Weber --
 2               MR. J. COHEN:  Sure.
 3               THE COURT:  -- so we can address those before Weber
 4   gets in here if there is an issue.
 5               MR. J. COHEN:  That seems like a good idea, your
 6   Honor.  We'll do that.
 7               THE COURT:  All right.
 8          I'm not sure, you have to tell me, remind me what else
 9   you can address now.
10               MR. ABERNETHY:  Your Honor, I apologize before we go
11   on.  Did the Court rule on the T. Rowe issue?  I think we're
12   still a little bit up in the air on that, if I'm hearing it
13   correctly.  Our position is it's completely irrelevant.  As the
14   Court knows, we've gone over it twice before.
15               THE COURT:  Yeah, I think we have gone over it twice
16   before.  What is --
17               MR. KISSLINGER:  I still have a glimmer of hope, your
18   Honor, that if a window is open that would make this testimony
19   relevant, I believe your Honor still recognized it could come
20   in.
21               THE COURT:  Well, let's puts it this way.  I have not
22   yet heard an argument that convinces me at this point that
23   there is a reason that it's coming in.  So unless something
24   develops that convinces me so, it's not coming in.  You can
25   revisit that.
```

E5JZOBU1

1          Yes.

2          MR. KISSLINGER:  Your Honor, I'd like to discuss

3    briefly the exhibit of the e-mail exchange between.

4          THE COURT:  Yeah, how did you address that?

5          MR. KISSLINGER:  We've done some negotiating and we've

6    prepared a redacted set of about 17 e-mails.  I don't think we

7    have agreement with the defendant on all of them, but we've

8    tried.

9          THE COURT:  What how many do you disagree about?

10         MR. ABERNETHY:  Judge, I think we can say, and I'll

11   allow my colleague to join if I get this wrong, but I think we

12   can agree on three, which relate to setting up a meeting in

13   Bryant Park, which I believe will come out in the trial that

14   our two clients --

15         THE COURT:  When you say you agree on three?

16         MR. ABERNETHY:  We agree on -- I apologize.

17         THE COURT:  My assumption would be that there is

18   information in the other e-mails that you identified for them

19   that you believe is prejudicial to your client, and you don't

20   believe that that e-mail should come in in an unredacted form.

21   If that's not your objection, then I don't think you're going

22   to have much --

23         MR. ABERNETHY:  Our objection actually is more

24   fundamental.

25         THE COURT:  That's what I'm saying.  If you just have

E5JZOBU1

1    a fundamental carte blanche objection, that's not the way we

2    discussed it and I'm not particularly interested.

3           MR. ABERNETHY:  I wanted to just be clear to the

4    Court, we looked at this carefully at the Court's instruction.

5    I talked with Mr. Kisslinger about it.  It is an objection to

6    the following.  Most of the e-mails in question post date the

7    May 24th call.

8           THE COURT:  Okay.

9           MR. ABERNETHY:  And so if the SEC's position is these

10   e-mails are instructive as to how our two clients interacted

11   prior to May 24th, which is what they said they were going to

12   be arguing from the e-mails, the vast majority --

13          THE COURT:  Well, who are the e-mails between?

14          MR. ABERNETHY:  They're between Mr. Strickland and

15   Mr. Black and in many cases, Judge, 30 or so other people who

16   are copied on the e-mail.

17          THE COURT:  Okay.  So what -- I don't understand what

18   the issue is.

19          MR. ABERNETHY:  Well, there is two issues.  One is

20   it's not probative of anything.

21          THE COURT:  All right, but that's not the issue we

22   discussed the last time, and I don't accept that argument.

23          MR. ABERNETHY:  Then there is the issue of prejudice.

24          THE COURT:  Yeah, right.

25          MR. ABERNETHY:  And they have in them sexist remarks.

E5JZOBU1

1              THE COURT:  And you propose redactions.

2              MR. ABERNETHY:  We propose -- yes.

3              THE COURT:  And they rejected those redactions?

4              MR. ABERNETHY:  They rejected some of them, Judge.

5              THE COURT:  Okay so which ones have they rejected,

6     which e-mails -- how many e-mails do you say still have the

7     problem that you have prejudicial comments that they refuse

8     refused to redact?

9              MR. ABERNETHY:  There is a nickname our two clients

10    used.

11             THE COURT:  How many -- first of all, just tell me how

12    many e-mails are at issue?

13             MR. ABERNETHY:  I would say --

14             THE COURT:  On that issue?

15             MR. ABERNETHY:  With redaction?  Differences, Judge

16    it's probably four or five.

17             THE COURT:  All right.  That's why I want to

18    concentrate, because I'm not persuaded by your other arguments.

19             MR. ABERNETHY:  Okay.  What I would suggest Judge, if

20    the Court is allowing us to do this, maybe we can talk again

21    and we can come back to your Honor.

22             I do want to say, since the issue is still open, we

23    would hope that the SEC wouldn't open on the e-mails, because

24    the issue is still a live issue.  We're going to try to see if

25    we can get some agreement to --

E5JZOBU1

1          THE COURT:  Well, at this point, some e-mails are

2     coming in, right?

3          MR. KISSLINGER:  Your Honor, we don't plan to stress

4     e-mails in the opening, at all.

5          THE COURT:  All right.  Well stress and mention are

6     two different things.

7          MR. M. COHEN:  What does that mean?

8          THE COURT:  Do you intend to mention the e-mails?

9          MR. KISSLINGER:  I think I'd say they had frequent

10    contact by phone and e-mail, and that's it and move on.  I

11    don't describe the e-mails.

12         THE COURT:  That's fine, as long as you're not, you

13    know, addressing the substance of e-mails in the opening.

14         As I say, my position is still the same.  I mean,

15    quite frankly, I don't know why you picked May as the operative

16    date because during this whole period of relevant activity, it

17    seems to me it's probative what kinds of -- what the

18    relationship was and what kind of every comments are made by

19    the relationship.

20         MR. ABERNETHY:  Judge, we will look with the SEC in a

21    break at these e-mails.  They just handed us their proposed

22    redacted sets which we had discussed.  If we cannot get an

23    agreement, we will be back to your Honor.  We'll see what we

24    can do.

25         THE COURT:  All right, okay.  And beside the e-mails,

E5JZOBU1

1     is there anything else we can --

2              MR. ABERNETHY:  There is an issue, Judge, again that I

3     think is relevant to opening, and I think the Court has

4     reserved on this issue of a proposed limiting instruction, with

5     respect to the alleged statements Mr. Obus made to Mr. Andrien

6     and Mr. Russell.

7              If the SEC -- which I know they will -- plan to open

8     on those statements, it's actually the thrust of there case --

9     we would ask the Court to consider that limiting instruction

10    issue certainly prior to openings, whether part of jury, I

11    don't know given the hour, but certainly prior to openings.

12    And our position is that these statements are not admissible

13    against our two clients, Mr. Strickland and Mr. Black.

14             THE COURT:  Well, the reality is that I'm not in any

15    position to tell that that's that stuff, that's the case.  And

16    I'm not sure what is the prejudice that you claim is going to

17    exist.  I assume that -- is it correct assumption that each of

18    the three defendants is anticipated to testify at this trial?

19             MR. ABERNETHY:  Yes, Judge.

20             THE COURT:  All right.  And I assume that you're not

21    saying that those statements aren't appropriate

22    cross-examination of those witnesses.

23             MR. ABERNETHY:  Well, our clients weren't party to

24    those statements.

25             THE COURT:  Well, I'm not talking about your clients.

E5JZOBU1

1     I'm just talking about -- you have no basis to say that if the

2     witness, who is a party to the conversation is on the witness

3     stand, that that witness can't be asked about that

4     conversation.

5               MR. ABERNETHY:  Theoretically, Judge, I don't know

6     what the relevance is to ask Mr. Black about a conversation he

7     wasn't on.

8               THE COURT:  Well, no, it's relevant as to the person

9     who had the conversation.

10              MR. RIOPELLE:  That's not our client.

11              THE COURT:  That's fine.  It's not your client, but

12    your client is not suffering prejudice by out of court

13    statements offered for the truth, because I assume there is an

14    in court statement that's the same statement, or if it's not

15    the same statement, then it only qualifies as prior

16    inconsistent statement to impeach that witness.  So I don't --

17    it's clear to me that in this trial that the witness who is in

18    the conversation cannot preclude cross-examination with regard

19    to those prior statements, and it's clear to me that neither

20    can any other defendant, okay.

21              MR. RIOPELLE:  Of course they can.

22              THE COURT:  Now, the question is what's the

23    appropriate jury instruction if there is an appropriate jury

24    instruction.  Quite frankly, I cannot -- this is not a criminal

25    case, so let's make a distinction between that and this.

E5JZOBU1

1          Your only objection literally would be technically

2     hearsay.  That's really your only objection.  I don't know what

3     other objection that you could possibly put forth in a civil

4     case.

5          MR. ABERNETHY:  Certainly hearsay, and the added

6     objection of prejudicial since the entire case rests on these

7     two statements that our clients were not parties to.

8          THE COURT:  Well --

9          MR. ABERNETHY:  But it is hearsay, Judge.

10          THE COURT:  Why is that prejudicial if the witness is

11     going to make the same statement in the courtroom?

12          MR. ABERNETHY:  Well, it is principally a hearsay

13     objection.

14          THE COURT:  Right, exactly.

15          MR. ABERNETHY:  I agree with the Court on that.  You

16     know, Mr. Black, just speaking for him, was not party to any of

17     these conversations.

18          THE COURT:  Right.

19          MR. ABERNETHY:  The Russell conversation, Judge,

20     happened, it's undisputed, after the trade so there could be

21     no --

22          THE COURT:  What is it about the conversation that is

23     going to be in dispute?  What is -- I mean, yes, what is it

24     about the conversation that's going to be in dispute.

25          MR. ABERNETHY:  There will be a dispute as to whether

E5JZOBU1

 1    the conversation happened the way these two people --

 2              THE COURT:  What part -- what is the witness going

 3    to -- what does the SEC intend to offer about the conversation

 4    that is in dispute?

 5              MR. ABERNETHY:  They intend to say Mr. Obus said, in

 6    words or substance, that he had been tipped, and they are

 7    intending to prove their entire case against all three

 8    defendants based on those two statements.

 9              THE COURT:  So is Mr. Obus going to admit such a

10    statement?

11              MR. ABERNETHY:  I don't believe he is, Judge.

12              THE COURT:  All right.  So they're going to confront

13    him with his prior inconsistent statement.  So it's only --

14    there is no hearsay objection, because it's even only admitted

15    against him for a non-hearsay purpose and.

16              MR. ABERNETHY:  We're only moving on behalf of --

17              MR. RIOPELLE:  That's what we'd like you to tell the

18    jury, Judge.  It's only admitted against him for a non-hearsay

19    purpose, not for the truth of the matter.

20              THE COURT:  I will consider doing that.  But I believe

21    that it is too early for me to make that determination that it

22    is inadmissible against all other parties for any purpose, I

23    don't know that.  I don't know that.  I don't know whether or

24    not it would be substantive evidence beyond the hearsay

25    substance of the conversation against others, depending on what

E5JZOBU1

else is going on at the time, who else was having a

conversation and what it is he says.  I understand that he was

communicating, how much of that he admits or denies and what he

says he communicated to the other defendants.  So I think it's

premature for me to give the jury an instruction in that

regard.  And I'm not convinced yet that the proposed

instruction you gave me is the appropriate instruction to give,

because I don't know if it's inadmissible against all

defendants for all purposes.  It's inadmissible substantive out

of court truthful statements by this witness, but the reality

is I'm not -- this is Black's conversation with whom?

          MR. RIOPELLE:  No, it's Obus' conversation with

Andrien and Russell.  And no one contends that the statement is

inadmissible against Obus as an admission.  The issue is is it

hearsay as to the rest of us and is it admissible substantively

against the rest of us and, if not, what instruction would the

Court give.

          THE COURT:  Part of the problem that I have is the

what is going to be a legitimate reasonable inference for the

jury to draw.  If the jury decides that Obus had the

information, and that Obus did in fact say he had the

information, then the jury has to determine where could he

possibly have gotten that information from.  And that depends

on rest of the case, whether or not there is any evidence that

he could have possibly gotten that information -- if they

E5JZOBU1

conclude he had the information, quite frankly, I'm not sure

what the theory would be; that if he did have that information,

he got it from some other source other than two defendants.  I

don't know.  I mean, I don't know if there is going to be any

legitimate argument based on the evidence before the jury to

argue that.  So I'm not sure that it's not going to be

admissible against the others.  I don't know what the theory is

if you have a theory, that if Obus did know, that he could have

possibly gotten that information from anybody but Black and

Strickland.

MR. RIOPELLE:  Yeah, our theory is he did not know.

THE COURT:  Well, I agree with you.  So that's -- you

know, so but if the jury disagrees with you --

MR. RIOPELLE:  We --

THE COURT:  -- then the question.

MR. RIOPELLE:  We can't know that as they sit in the

box during the trial.

THE COURT:  Right.  And I can't even begin to guess

that right now by giving them some instruction about what

they're supposed to do.

MR. RIOPELLE:  Right.

THE COURT:  So, you know --

MR. RIOPELLE:  We'll revisit the issue.

THE COURT:  -- we're going to have to see how this

develops and see whether it really is a substantive issue, and

E5JZOBU1

 1  you know, what the SEC -- I mean, before the SEC offers it,

 2  then they should tell me when they intend to over it, and how

 3  they intend to offer it.  If it just simply turns out to be

 4  that Mr. Obus is on the witness stand and they're

 5  cross-examining Mr. Obus and at some point during his

 6  cross-examination after he says he didn't have the information

 7  they want to say to him, didn't you say to somebody you did

 8  have the information, well, quite frankly, that's not a

 9  statement about your client.

10          MR. RIOPELLE:  Right.  And that's not offered for the

11  truth of the matter.  It's offered for the --

12          THE COURT:  Right.

13          MR. RIOPELLE:  -- fact it was said.

14          THE COURT:  Right.

15          MR. RIOPELLE:  And the jury should hear some kind of

16  instruction about that at that time.

17          THE COURT:  Maybe.

18          MR. RIOPELLE:  Because otherwise there is a serious

19  risk of damage to us, with evidence that is not admissible

20  against us.

21          THE COURT:  Well, maybe.  Because it's not admissible

22  against your client or significantly prejudicial against your

23  client unless Mr. Obus says I knew and Black and Strickland

24  knew too.

25          MR. RIOPELLE:  Yeah.  That's a different trial.

E5JZOBU1

1          THE COURT:  Right.  That's not what I'm facing here,

2     so that's not the issue.

3          So the reality is, I'm not sure you're entitled to an

4     instruction rather than an argument, that just because Mr. Obus

5     says he knew, that doesn't mean my client knew, Mr. Obus never

6     said anything that implicated my client.

7          MR. RIOPELLE:  Right.

8          THE COURT:  That's your argument.  I'm not sure that

9     requires a legal instruction.

10         MR. RIOPELLE:  Impeachment of a prior statement is not

11     substantive evidence.

12         THE COURT:  Even as to Obus.

13         MR. RIOPELLE:  Even as to Obus.

14         THE COURT:  Right.  So that's not a separate

15     instruction as to your client, that's, if an instruction is

16     even necessary.

17         MR. RIOPELLE:  It's not admitted for the truth of the

18     matter.

19         THE COURT:  My standard instructions have in it that,

20     you know, you may have heard testimony that a witness on a

21     prior occasion gave testimony -- made statements that the SEC

22     contends are inconsistent with the statements that the witness

23     made in court.  It's not offered for the truth of the

24     statement.  It's offered for your right assessment of that

25     witness' credibility.  That's the basic standard and

E5JZOBU1

substance -- that's the standard instruction.  That's given if

you think more because of the way the evidence is coming in or

because of the way the testimony comes in, you think that it

requires either at the time the testimony is given or at in

final instructions an instruction, I will reconsider it at that

time.  But I think it would not be appropriate for me to give

an instruction to the jury implying that this is going to be an

issue, and this is the way they should deal with it at this

point.

          MR. RIOPELLE:  All we're asking the Court to do is

consider a mid trial instruction on this issue because it is a

hot button issue for the jury and for us.

          THE COURT:  Before we get to that testimony, right

before that testimony is elicited from the witness, we will

discuss it.

          MR. RIOPELLE:  Thank you, your Honor.

          MR. HARAY:  Your Honor, we have arguments going the

other way.  I'm not sure if the Court wants to hear them now

since it's going to hear them later, but we do think the

evidence is substantively admissible against all defendants.

It's also -- I mean, it's admissible against all defendants for

the reason the Court stated, which was to prove Mr. Obus's

knowledge.  And his knowledge is a relevant fact that's usable

against the other defendants.  That's a non-hearsay purpose.

          But we also have issues and arguments that we put

E5JZOBU1

         1    before the Court and I think when we arguing this before the

         2    Court before, the Court acknowledged that there were

         3    substantive hearsay exceptions that applied here that would

         4    make the evidence, even if it were hearsay, would make it

         5    admissible against the defendants.  There is a variety of --

         6    I'm not sure if the Court wants to take the time to go through

         7    them since it's not giving the instruction yet or not

         8    considering it yet, but when the time comes I just wanted to

         9    make the Court aware we have a different position entirely.

        10         THE COURT:  No I understand that.  I'm not sure I

        11    agree with all of your exceptions.

        12         MR. HARAY:  Well, there are different for different

        13    people, there is a few different ones that apply.  There is an

        14    global one we think applies, which is the residual hearsay.

        15    And I think a core part of this evidence that the Court hit on,

        16    which is a key, is that there is no unavailable declarants in

        17    this case.  And I think that puts these statements in a very

        18    different light than what the Court probably sees in lots of

        19    criminal cases, for example, where there is defendants who

        20    aren't testifying or co-defendants who are not testifying, or

        21    lots of cases where there's out-of-court declarants who are

        22    gone who never come into the courtroom and testify.  That's not

        23    the case here.  Everyone's going to have the opportunity to

        24    cross-examine the witnesses on all these statements.  We think

        25    that is an important consideration.

E5JZOBU1

1          THE COURT:  Well, I can only assume that Mr. Obus is

2     going to testify that he never made such a statement, that he

3     never had such information, and he did not receive any

4     information from Black, and had no knowledge that Strickland

5     had given any information to Black.  So that's what the

6     testimony is going to be.  If it turns out to be something

7     different, if that's the testimony, then they have a right to

8     impeach him if they believe that he said something different.

9     But, you know, there are a lot of issues that at this point I

10     would say that, particularly in light of, for that limited

11     purpose that's admissible again would be admissible against

12     Obus, and given the fact that Obus is going to testify, my

13     position is still the same; that it seems to be appropriate to

14     come in this case, at least to impeach that witness, and maybe,

15     it may turn out to be substantive evidence for the jury to

16     consider as to whether or not it is more likely than not that

17     Obus -- if they do conclude that he had such a conversation and

18     had such information -- that he could have only gotten it from

19     Black, who could have only gotten it from Strickland.  Now,

20     maybe there are other theories about how Mr. Obus could not be

21     guilty of insider trading if he didn't -- if he had the

22     information and didn't get it from Black, but, I mean I haven't

23     heard it yet.  I'm not sure that's going to be an issue for the

24     jury.

25          MR. ABERNETHY:  Judge, we just ask the chance to raise

E5JZOBU1

1      it with Mr. Riopelle.

2                  THE COURT:  Sure.

3                  MR. ABERNETHY:  There are two other issues that I

4      think the defense we would like to address briefly before the

5      jury.

6                  THE COURT:  Sure.

7                  MR. ABERNETHY:  One is, Judge, the SEC has proposed to

8      introduce at the trial a video, which is a GE video and was

9      narrated by Ann Curry, the journalist.  The video mostly

10     relates to other issues, not much on insider trading

11     whatsoever.  There is a part of the video which talks about

12     insider trading and in a, respectfully, inaccurate way.

13                 But more fundamentally, Judge, this video is

14     cumulative of other evidence.  The SEC is going to introduce

15     copies of the GE policy.  They're going to spend, I expect, a

16     fair amount of time on the GE policy and to introduce with this

17     journalist is cumulative, it could prejudice against the

18     defense, we think it should be excluded.

19                 MR. DeYOUNG:  We can cut this short.  We don't plan to

20     introduce the video.

21                 THE COURT:  Okay.

22                 MR. ABERNETHY:  Excellent.  That was easy.

23                 THE COURT:  Most problems resolve themselves.

24                 MR. RIOPELLE:  Let's go home right now.

25                 MR. DeYOUNG:  I tried to get in there, but.

E5JZOBU1

1          THE COURT:  You want to object and say -- you object

2    to the fact that they accuse your client of insider trading,

3    maybe they'll say, oh, Judge, I changed my mind.

4          MR. M. COHEN:  Judge, will they be calling Ann Curry

5    life?

6          THE COURT:  Not at this trial.

7          MR. ABERNETHY:  Last issue, Judge.  We had sent to the

8    Court some time ago a some proposed questions for jury.  I know

9    the Court has its own method here.  We're not trying to change

10   the court's.  But there are select number of questions that we

11   respectfully ask the Court to ask all the jurors.

12         THE COURT:  Let me just, I mean --most of them in

13   substance -- I think I have them right here -- most of them in

14   substance I do intend to cover.  What is the ones you're

15   particularly concerned about?

16         MR. ABERNETHY:  There are -- I have the document if

17   the Court needs it, but it's at least four questions.  We put

18   in bold, Judge, all the questions that we would like the Court

19   to consider in this document.

20         THE COURT:  Okay.  But tell me the substance.

21         MR. ABERNETHY:  One of them, Judge -- I'll read it to

22   the Court -- do you assume that if the government or government

23   agency like the SEC has brought a case, that the defendants

24   must have done something wrong?  We think that's a fundamental.

25   Maybe the Court would ask that anyway, but we ask the Court to

E5JZOBU1

 1 | ask that question or variation of it.

 2 |         THE COURT:  What's the SEC's position?

 3 |         MR. HARAY:  Your Honor, presumably, that's covered by

 4 | something that the Court does as a standard instruction,

 5 | because I think it's a principle that is embodied in the basic

 6 | voir dire that I've seen in other courtrooms.  So I don't think

 7 | it is something that's necessary to stress to underscore any

 8 | more than the Court is already going to do, which is covered by

 9 | the preponderance, it's covered by being fair and impartial.

10 | I'm not privy to the other questions the Court's intending to

11 | ask, but I imagine you've got that base covered.

12 |         (Continued on other page)

E5JPOBU2

1              THE COURT:  I will, in substance, say to the jury -- I

2      don't think I'm going to phrase it the way you proposed it.

3      I'm going to give them instructions that the SEC, even though

4      the case is brought by the SEC, is as a plaintiff in this case.

5      They should consider the SEC as they would consider any other

6      plaintiff in a civil case, and they're not given any greater or

7      lesser consideration as a party in litigation, and ask if they

8      can follow that instruction.  If someone says they can't follow

9      that instruction, then we can --

10             MR. J. COHEN:  Your Honor, I think the last part -- I

11     was beginning to rise because I think the last part is just

12     instructing them without inducing that they follow it.  The

13     important thing is making sure they follow and agree with that

14     fundamental principle.

15             THE COURT:  And what was the other substance, to make

16     sure.

17             MR. ABERNETHY:  The question we propose, it's question

18     35 in our proposed voir dire, where we ask the Court to ask:

19     Have you, or has anyone you know well, supported Wall Street

20     reform or stricter government regulation of the financial

21     industry?

22             THE COURT:  I'm sorry, ask that again.

23             MR. ABERNETHY:  Have you, or has anyone you know well,

24     supported Wall Street reform or stricter government regulation

25     of the financial industry?

E5JPOBU2

1          THE COURT:  And what do you think that that's going to

2     disclose?

3          MR. ABERNETHY:  It will, we believe, root out

4     incipient biases of the jury.

5          THE COURT:  Because they want reform in the industry?

6          MR. ABERNETHY:  For example, to use the most radical

7     example, forgive me for the term, but if somebody on this jury

8     pool had been out in Zuccotti Park three or four years ago, we

9     would want to know about that, and the questions the Court --

10         THE COURT:  Well, if the answer to that question is

11    yes, then what am I supposed to ask them after that?

12         MR. ABERNETHY:  That would be all we wanted the Court

13    to know.

14         THE COURT:  How is that -- I mean, because somebody

15    thinks there should be reform in the securities industry?

16         MR. ABERNETHY:  Well, Judge, there is a risk in a case

17    like this regarding a hedge fund and allegations of insider

18    trading, in this environment, that jurors could have biases

19    coming in.  The Court knows that.

20         THE COURT:  I know, because somebody wants to reform

21    the industry, why is that a bias against your client?

22         MR. ABERNETHY:  We would just want to know the answer;

23    so we could -- the Court is right.  We don't know whether it's

24    a bias, but we'd like to know the answer.  And it's not

25    something that the Court's normal instructions would --

E5JPOBU2

1          THE COURT:  I know, but even if they answered yes, it

2      still doesn't disclose that there's a bias.  So I'm not sure

3      why I should put them in that situation to imply that I think

4      that that's an issue.

5          MR. J. COHEN:  Your Honor, it depends, obviously, on

6      how they answer yes.  Some people might answer yes and put

7      their fist in the air, some people -- I mean that quite

8      seriously.

9          THE COURT:  If they walk in with their fist in the

10     air, I'll give you a challenge for cause.

11         MR. J. COHEN:  I thought you would.  In all

12     seriousness, it might prompt questions.  It might be something

13     that we think should be --

14         THE COURT:  No, okay.

15         MR. J. COHEN:  -- should be changed --

16         THE COURT:  I always say to the lawyers be careful

17     what you ask for, you may get it.  I don't want to emphasize

18     something to the jury that may turn out to be to your

19     disadvantage.  To ask them whether or not -- to make them think

20     that I'm concerned about whether they think the industry should

21     be reformed, I'm not sure who they would hold that.  I don't

22     know whether they think there's too much regulation.  I don't

23     know whether that too many people out there got an advantage,

24     or that I imply that I think that they should be concerned

25     about that one way or the other.  I'm not sure that --

E5JPOBU2

1              MR. J. COHEN:  And all we're trying to see, your

2      Honor, is whether they have any inherent distrust of the

3      securities industry, which I think we all can acknowledge is

4      something, given what's gone on in this courthouse in the last

5      few years, might have affected a lot of the jury pool.  People

6      are entitled to have views and opinions, and we understand

7      that.

8              THE COURT:  Okay.

9              MR. J. COHEN:  We just want to make sure that they can

10     be fair and that their biases are not inherent to the point

11     where they cannot fairly judge our clients because they happen

12     to be an investment fund or a hedge fund.

13             THE COURT:  I'm just not sure what you think -- where

14     you want me to go if they say "yes" to that question, what you

15     think that indicates one way or the other about a bias for or

16     against either side.

17             MR. J. COHEN:  I guess the next question could be,

18     without -- you know, we wouldn't want to infect the rest of the

19     panel by asking what that bias was or their experience was, but

20     would they be able to be fair and impartial, judging both sides

21     of this case, even though they hold that view.

22             THE COURT:  What's the SEC's position?

23             MR. HARAY:  We agree with -- Well, I don't think this

24     question ferrets out any potential bias; so I agree with the

25     sentiments that the Court has expressed, and that is, I don't

E5JPOBU2

think that asking the question ferrets out whether someone was

in Zuccotti Park.  Even if that's a relevant thing to consider,

I don't anticipate it's going to ferret out anyone lifting

their fist in the air in protest.

And I think you're right.  I think it sends, even

unintentionally, to all other jurors who have to hear that and

think about it, that the Court is emphasizing an issue that is

not an issue.  The Court is informing the jury already about

the nature of the case, the nature of the parties, and I

imagine the Court is going to ask about if there's anything

about the type of case it is that would make them unable to be

fair.

And so an honest juror, if they hear this is a case

about Wall Street and they have very strong views about that,

is going to answer that question already.  This is just an

unnecessary emphasis, and I think because it's so vague, the

concern I have is that we just don't know what direction it

goes to, or we don't know what direction it pushes jurors.  And

we don't know that it pulls any relevant information that would

help us.

MR. J. COHEN:  There may be a way around this, to

simply pose the question in a neutral way, whether there are

any jurors that hold the view that either thinks that there

should be more regulation or considerably less regulation, or

however you want to word it.

E5JPOBU2

1          THE COURT:  Well, how I would want to word it is to

2     weed out any particular bias, it's not to be concerned about

3     whether they think there reform is needed in the industry or

4     whether they trust or distrust the industry.  Quite frankly, I

5     think everybody has an unhealthy distrust of the industry.

6     That's why there's so much regulation.

7          So it's -- you know, people will be motivated by their

8     own greed if not -- you know, if there aren't significant

9     regulations that all people have to follow.  So I don't know

10     whether that's -- I'm willing to ask them specifically.

11     Obviously, I'll ask them whether they have any views that

12     would -- I'll ask them whether they have any feelings or views

13     about securities industry that would make it difficult for them

14     to be fair and impartial juror.

15          MR. J. COHEN:  I think the goal here is just to make

16     sure that they can treat both sides exactly equally.  That's

17     all we're asking for.

18          THE COURT:  No, I understand that.  I can emphasize

19     that.

20          MR. HARAY:  We agree with it, the way the Court

21     phrased it.

22          MR. ABERNETHY:  I have one more, I think, and then my

23     co-counsel may have another, but I think we have one more,

24     Judge:  If you feelings were different than the law, is there

25     any reason you might find this difficult to set aside your

E5JPOBU2

1   feelings and only follow the legal instructions?  That question

2   would be two, on Page 9, your Honor.

3          THE COURT:  Let me tell you what I do ask.  I don't

4   have -- I'll give you the substance of the question I'll ask,

5   but I will ask such a question.  Basically, I'll fashion the

6   same question that I fashion in a criminal cases, that they

7   must follow the law as I give it to them, whether they agree

8   with it or not, and apply it to the facts as they find them.

9   If there's anybody that cannot accept that principle.

10          And did you have another point?  I think our jurors

11   are here

12          MR. RIOPELLE:  Judge, earlier this morning I think

13   your deputy handed out what your Honor intends to tell the jury

14   about the case.

15          THE COURT:  Yes.

16          MR. RIOPELLE:  At one point, you describe the

17   information as being about a merger.  I think it's probably

18   better to use the words "buyout" than "merger" there.  I think

19   the witness is referring to it as a "buyout."  I don't think

20   it's a merger.

21          THE COURT:  Well, I took the language -- I think I

22   took it out of the complaint.  It's described as merger,

23   buyout, takeover.  I'm not quite sure exactly.  You tell me.

24          MR. HARAY:  I think the least-technical explanation

25   that's accurate is an acquisition.

E5JPOBU2

1          THE COURT:  Acquisition?

2          MR. J. COHEN:  That's fine, your Honor.

3          THE COURT:  All right.  Is that all right?

4          MR. RIOPELLE:  Yes, same idea.

5          MR. J. COHEN:  While we're on that point, the last

6  paragraph refers to the firm as Wynnefield Partners.  It's

7  Wynnefield Capital.

8          THE COURT:  Yes, that was a mistake, Wynnefield?

9          MR. J. COHEN:  Wynnefield Capital.

10          THE COURT:  Do you want to say Wynnefield Capital or

11  Wynnefield Capital Products?

12          MR. J. COHEN:  I think it's just called Wynnefield

13  Capital.  That's how it's referred to.

14          THE COURT:  Yes, sir.

15          MR. J. COHEN:  Your Honor, one other quick point.  In

16  the SEC slides that they shared with us for their opening, I

17  think this is a mistake, they inadvertently -- and they removed

18  it, but they referred to as Wynnefield Capital being a

19  defendant in the case.  They removed it, but I just want to

20  make sure that we're on the same page, that they're not going

21  to be arguing that Wynnefield Capital is a defendant.

22          THE COURT:  None of the Wynnefield entities are a

23  defendant in this case.

24          MR. J. COHEN:  They're a relief defendant, yes, which

25  means there's no liability alleged here.

E5JPOBU2

```
 1              THE COURT:  That won't be an issue for the jury.
 2    Okay.  Let's do this.  Take a short five-minute break.  I think
 3    our jurors are outside; so just don't talk about the case, and
 4    literally be back in the courtroom so we can start a quarter
 5    of, if you're going to leave at all.
 6              (Recess)
 7              THE COURT:  There's one thing that I want to -- and
 8    I'll take guidance from you.  What I didn't do -- most cases I
 9    give a little bit more balanced, I think, description of the
10    case by saying at the end -- and you can tell me whether you
11    want me to reference it at all -- "In response, each defendant
12    denies that he was involved in insider trading."  Do you want
13    that?
14              MR. ABERNETHY:  That's perfectly fine.
15              MR. J. COHEN:  Yes, Judge.
16              MR. M. COHEN:  Yes, Judge.
17              THE COURT:  I should have put that in.  All right.  So
18    I think we're about ready.  I think we, hopefully, have enough
19    jurors so that we can do this before lunch.  I think so.  If
20    everybody is here, I will introduce the lawyers, and then you
21    can introduce whoever else is at the table with you, and I'll
22    introduce the defendants.  All right.  Then let's get the jury
23    in and let's begin.
24              (Jury of 10 was impaneled and sworn)
25
```

E5JPOBU3

1          THE COURT:  Okay.  Let's bring in the jury.

2          (Jury enters)

3          THE COURT:  You can make yourself comfortable wherever

4     you want.  I'm not going to give you assigned seats.  All

5     right.  You can be seated.  Thanks.  Can we swear in the

6     jurors, please.

7          (Jury sworn)

8          THE COURT:  You can be seated, ladies and gentlemen.

9     Now, members of the jury, at this point, I'm required by law to

10    instruct you generally concerning your basic functions, duties

11    and certain rules which apply to every jury, so that you'll

12    better be able to assess and weigh the evidence as it's

13    presented and reach a proper verdict.

14          Now, the trial has commenced with the selection of the

15    jury.  The next step in the trial will be an opening statement

16    by the parties, if they wish to make an opening statement, to

17    outline for you what they intend to prove by way of evidence to

18    be presented in the case.  Now, after the SEC's attorney makes

19    his opening statement, the defendants' attorneys, if they

20    desire, may also, but is not required, to make an opening

21    statement.

22          Now, what counsel for either side says in opening is

23    not evidence.  You may consider the opening statement as a

24    preview of what each side intends to prove by way of evidence

25    in the case.  Now, after the opening statement or statements,

E5JPOBU3

the SEC's attorney will present one or more witnesses who will

be questioned by them.  This is called direct examination, and

after the SEC's attorneys complete their questioning,

defendants' attorneys will be given an opportunity to question

the witness.  This is called cross-examination.  And after the

SEC has concluded the calling of its witnesses and the

introduction of any exhibits which are admissible into

evidence, each defendant may, but is not required to, offer

evidence in his own defense.

        Now, after both sides rest, the defendants' attorneys,

may make a closing argument, followed by the closing argument

of the SEC attorneys.  Then I will charge you on the law, and

you will retire to deliberate for the purpose of reaching a

verdict.  Now, that is a general outline of the trial

procedure.

        I'm going to ask you not to take any notes, listen

carefully.  If you need any testimony read back at any point in

time, we'll have the court reporter read anything that you may

want to review.  Now, the evidence may consist of testimony of

witnesses under oath and exhibits which are entered into

evidence, plus stipulations which are agreed upon by the

attorneys.

        Now, remember, questions in and of themselves are not

evidence.  Therefore, you cannot infer anything from the fact

of the mere asking of the question.  It is the answer, coupled

E5JPOBU3

with the question that constitutes evidence.  For example, if a
witness was asked the question:  Don't you own an automobile,
and the witness answers no, you may not infer from the mere
asking of the question that the witness does own an automobile.

Now, during the course of the trial, either attorney,
the SEC attorneys or defendants' attorneys, may object to a
question or an answer on the ground that somehow it's illegally
improper or inadmissible.  If I sustain the objection, this
means that I believe that the question or the answer was in
some way improper, and if an answer has already been given, I
will instruct you to disregard it and, therefore, the answer is
no longer evidence in the case.  If I overrule the objection,
then it means that the question is proper, and I will permit it
to be answered or, if already answered, I will allow and permit
the answer to remain as evidence in the case.

Now, please do not resent the fact that either
attorney makes objections.  This is their duty.  And do not
hold it against either side if I rule against them.  As I'll
explain to you in detail in my instructions at the close of the
case, as jurors in this case, you are the sole judges of the
facts, and I am the sole judge of the law, and you must accept
the law as I give it to you, without hesitation or reservation,
even if you privately disagree with me.

You must keep an open mind throughout the trial.  You
must not converse among yourselves or with anyone else upon any

E5JPOBU3

subject connected with the trial.  You must neither offer nor

express an opinion or reach any conclusions about what the

verdict should be until I finally give the case to you.  You

must not read or listen to any accounts or discussions of the

case, in the event it's reported by newspapers or other news

media.  You must not visit or view any premises or places

described here in the trial or any other place or premises

involved in the case.  You must not do any research or

investigation on your own.

You must decide this case solely on the evidence

presented at this trial, and you must speak to no one about the

case until the trial has completely ended.  And you must

promptly report to the Court any incident within your knowledge

involving an attempt by any person to speak with any member of

the jury about the case.

Now, during the trial, again, you should not speak to

any of the parties in this case nor any individuals associated

with them.  They are instructed not to speak with you; so don't

consider it rude if they see you outside of the courtroom and

they don't acknowledge your presence.  Obviously, if someone

were to see you speaking to one of the parties involved in the

case, they might draw an improper inference even though it

might be a perfectly innocent conversation unrelated to the

case.

Now, with those preliminary instructions, we'll next

E5JPOBU3

1    proceed with the next step in the trial, which would be the

2    opening statement by the SEC.

3         MR. KISSLINGER:  Thank you, your Honor.  May it please

4    the Court.  Good afternoon, members of the jury.  This is a

5    case about the misuse and abuse of information, secret,

6    valuable information about a company called SunSource,

7    information that these defendants had but the rest of the

8    public did not.

9         The defendants, Bradley Strickland, Peter Black, and

10   Nelson Obus, all financial professionals, misused this

11   information to earn a $1.3 million jackpot for a private

12   investment company, called a hedge fund, located right here in

13   New York.  The evidence in this case will show that these

14   defendants insider traded, they broke the law, and as financial

15   professionals, they knew what they did was wrong.

16        In this case we will prove to you that Bradley

17   Strickland gave his good friend, Peter Black, secret

18   information about SunSource that he was prohibited from giving

19   to anyone.  Peter Black worked as an investment manager, also

20   called an analyst, for a hedge fund.  Strickland gave Black a

21   tip.  Peter Black knew exactly what to do with this

22   information.  He immediately gave it to his boss, Nelson Obus,

23   who ran Wynnefield Capital.  Black gave Obus a tip.  Obus then

24   placed a corrupt and illegal trade in SunSource stock and made

25   more than $1.3 for his hedge fund in two weeks.

E5JPOBU3                          Opening - Mr. Kisslinger

1           So as you consider the evidence in this case, members

2     of the jury, please remember four things:  Tip, tip, trade,

3     jackpot.  Brad Strickland, who was supposed to guard this

4     secret information, instead, tipped his buddy, Black, whose job

5     was to help the hedge fund buy and sell stocks.  Black tipped

6     his boss, Nelson Obus, who ran the hedge fund, and then Obus

7     made the trade that yielded the hedge fund a $1.3 million

8     jackpot.

9           Now, let's dig down a bit.  In this case, we will

10    prove to you the following.  Brad Strickland worked for GE

11    Capital in Stamford, Connecticut.  His job was to help GE

12    Capital make loans to corporations that needed financing.  He

13    was what is called an underwriter.

14          One day in May 2001, while on the job, Strickland

15    learned very valuable information about a client of GE

16    Capital's, called SunSource.  Brad Strickland learned that

17    SunSource was in the process of being sold to a financial

18    company by the name of Allied Capital.  You'll hear that this

19    news was secret at the time.  It was not known to the public

20    until June of 2001, and it was very valuable information.  In

21    fact, it was just about the most important and valuable

22    information possible for a public company like SunSource.

23    Anyone who had access to this information while it was still

24    public, was sitting on a treasure chest.  It's as if they knew

25    which horse was going to win the Belmont Stakes before the race

E5JPOBU3                       Opening – Mr. Kisslinger

1   began.

2          Bradley Strickland was entrusted with this valuable

3   information about SunSource by his employer, GE Capital, a

4   lender on the deal, and he was under strict company rules to

5   keep that information secret.  But Brad Strickland did not keep

6   that information a secret.  He gave that information to his

7   good friend, Peter Black, who was an analyst for a hedge fund

8   in New York by the name of Wynnefield Capital.

9          Peter Black's job was to research and recommend stock

10  purchases for the fund.  In other words, Bradley Strickland

11  tipped Peter Black.  Peter Black took this information, and he

12  immediately gave it to his boss, Nelson Obus, who ran

13  Wynnefield Capital, and he could act on that information.  In

14  other words, Peter Black tipped Nelson Obus.

15         Nelson Obus took this secret information and, at the

16  very first opportunity, he directed his hedge fund to buy a

17  large block of stock while the information was still secret.

18  Obus bought as much as he could as soon as he could.  He bought

19  five percent of the company in one shot.  After the SunSource

20  deal was announced, the stock shot up in value.  Wynnefield

21  made more than $1.3 million in profit in the trade in a matter

22  of two weeks.

23         Ladies and gentlemen, the evidence will show that this

24  was not just luck.  The evidence will establish that Nelson

25  Obus knew his trade would pay off before he invested.  He knew

E5JPOBU3                          Opening - Mr. Kisslinger

1   which horse would win the race before he placed his bet.

2           Strickland tipped Black.  Black tipped Obus.  Obus

3   traded.  Wynnefield Capital made $1.3 million in profit.  Tip,

4   tip, trade, jackpot.

5           The evidence in this case will establish that these

6   three defendants have no excuses for their conduct.  They all

7   knew what they did was wrong.  All three of them are

8   sophisticated professionals in the financial services industry.

9   They are responsible for investing and lending hundreds of

10  millions of dollars of other people's money.  They all knew the

11  rules of the road about insider trading.

12          Brad Strickland knew he couldn't tip his buddy who

13  works for a hedge fund.  Strickland knew what hedge funds do

14  for a living.  They buy and sell stocks all day long.  And he

15  knew very well that Black and his hedge fund, what they would

16  do when they got that valuable information, they'd trade on it.

17  That's what hedge funds do.

18          Peter Black knew when he got the tip, that he couldn't

19  turn around and tip his boss, Nelson Obus.  Obus made all of

20  the trading decisions for Wynnefield Capital, and Peter Black

21  knew very well there was only one thing that Nelson Obus was

22  going to do with that information.  He was going to use it to

23  trade, to turn a quick profit for himself and his hedge fund.

24          Nelson Obus knew that he couldn't trade with that

25  information about the SunSource deal in his head and he knew

E5JPOBU3                    Opening – Mr. Kisslinger

that Strickland, working for a financial institution like GE
Capital couldn't tip that kind of critical information that he
learned on the job.  Obus had 30-plus years of experience on
Wall Street.  He knew the rules of the road.  He chose not to
follow them.

So what kinds of evidence are you going to see in this
case?  This is not the kind of case where you'll see grainy
video or hear the defendants on wiretaps, but in this case you
will see other types of firsthand evidence that is just as
powerful.  The evidence in this case is compelling.  Our case
is based upon the defendant's own statements regarding the tip
from Strickland to Black and from Black to Obus.  Witnesses
from GE will testify about the secret information, who had it,
how they got it, and that how it was not supposed to be
disclosed.

Finally, the trading is not in dispute, nor is the
fact that Nelson Obus made $1.3 million on the trade.

First, the tip.  The evidence will establish that
Nelson Obus admitted to two senior executives that he was
tipped about the SunSource deal.  Let me say that again.  Obus
admitted to two senior executives that he was tipped, that he
knew about the SunSource trade at the time -- the deal, at the
time that he bought the big block of stock.

First, Maurice Andrien, the former president and CEO
of SunSource, he'll take the stand and he'll testify, ladies

E5JPOBU3                          Opening – Mr. Kisslinger

and gentlemen, that in a phone call occurring while the news
about the SunSource deal was still secret, Obus told him:  A
little birdie in Connecticut told me that you're going to sell
the company to a financial buyer.  And Andrien asked him:  A
little birdie?  And Obus responded:  GE.

In this one call, which you may hear in this case
referred to as "the little birdie call," Mr. Obus not only
admitted that he was tipped, but he admitted where the tip came
from, GE, which is located in Connecticut.  The evidence will
establish that Strickland, working for GE in Connecticut, was
the little birdie that Nelson Obus was talking about.

Second, you'll hear about a call that Nelson Obus made
to Daniel Russell, an executive of Allied Capital, the company
that bought SunSource.  In that call, Nelson Obus, once again,
admitted that he was tipped.  Those are the words he used:  I
was tipped off to the deal.

In addition to these admissions out of the mouth of
Nelson Obus, you'll also hear admissions from Peter Black.  For
example, you'll hear him describe a heated conversation that he
had with Nelson Obus right after he overheard Obus calling
Maurice Andrien.  That was in "the little birdie call" I
mentioned just a moment ago.  Black will likely admit that he
basically yelled at Nelson Obus and said:  What are you doing?
You're going to get my friend fired.  And Obus responded, he
was pale and upset:  If that happens, he can work here, or we

E5JPOBU3                    Opening – Mr. Kisslinger

1    can get him a job on Wall Street.  These admissions proved that

2    Strickland knew the rules when he tipped Black, but that still

3    did not stop Mr. Obus from trading.

4          One other thing that bears noting.  As you hear the

5    evidence in this case, obviously, this case is not brand new.

6    For reasons that are not important here, the evidence giving

7    rise to this case is 13 years old.  In fact, the 13th

8    anniversary of the call is going to occur this week.  As you'd

9    expect, some memories may have faded, some witnesses may recall

10   events and conversations, but not everyone can remember every

11   call and every event.  But, fortunately, many witnesses gave

12   sworn testimony in 2002 and again in 2008, when events were

13   fresher in their minds, and you may hear portions of that

14   testimony in this case.  That evidence was fresh when given,

15   and it will be valuable evidence for you to consider.

16         All of this evidence, taken together, will show you

17   that Strickland tipped Black.  Black tipped Obus.  Obus traded,

18   and Wynnefield Capital made $1.3 million profit in a couple of

19   weeks.  They knew what they were doing.  They knew it was

20   wrong, and they did it anyway.  Tip, tip, trade, jackpot.

21         Members of the jury, before we go any further into

22   some more details of the case, let me introduce myself and our

23   team.  My name is Paul Kisslinger, and with me are SEC trial

24   attorneys Kyle DeYoung and Jonathan Haray, paralegals Melody

25   Allen and Jerry Burdge and our technical assistance, Tim

E5JPOBU3                     Opening - Mr. Kisslinger

Brickell.

The SEC is the federal agency charged with enforcing the nation's securities laws.  As you've heard, this case involves the securities laws that prohibit insider trading. The insider trading laws are aimed at stopping people from tipping and trading on important information that others don't have.

These laws are designed to keep the stock market an honest and even playing field for everyone, so that everyone has the same access to the same information.  These laws are intended to stop people who have special access to information, whether they work for corporations, or banks or hedge funds, from trading information amongst themselves like baseball cards to engage in illegal trades, which is exactly what this case is about.

Insider trading cannot happen unless people like the defendants, with access to valuable corporate information, are willing to breach their duty to their employers and share that information.  Insider trading cannot happen unless people who receive that information, whether they work for hedge funds, banks, law firms or anywhere else, make illegal trades with the tipped information in their heads.

I'd like to turn now to the company that is at the core of this case, SunSource Incorporated and Wynnefield Capital's trading in SunSource.  In 2001, SunSource was an

1   industrial company based in Philadelphia.  It traded on the New

2   York Stock Exchange.  It's what's called a public company.  It

3   had a few different divisions that did different things.  One

4   division sold nuts and bolts in home improvement stores like

5   Lowe's and Home Depot, and others distributed key cutting

6   machines.

7        Some divisions did better than others.  Some were

8   earning money, some was losing money, but all in all the

9   company was not doing very well.  It was losing money in 2000

10  and 2001.  SunSource was run, at the time, by CEO Maurice

11  Andrien.  He was working to turn the company around, but he

12  hadn't been able to do so yet.  You will likely hear him say

13  that it was still very much up in the air whether the company

14  was going to make it through tough times.

15       This is a chart showing how SunSource's stock

16  performed in 2001.  On June 8th, 2001, about right there,

17  Nelson Obus directed his hedge fund, Wynnefield Capital, to buy

18  287,200 shares of SunSource stock.  Eleven days later, on

19  June 19th, the stock shot up like a rocket.  It was on that day

20  that SunSource announced that it was going to be acquired by

21  Allied Capital.  The stock went from trading about $5 a share,

22  all the way up to $9.50.  By the end of the day on June 19th,

23  Nelson Obus' fund, Wynnefield Capital, had earned more than

24  $1.3 million on that trade they made 11 days earlier.

25       The main question for you in this case, then, ladies

E5JPOBU3                    Opening – Mr. Kisslinger

and gentlemen, is how did Nelson Obus' fund get so lucky?  Why
did Nelson Obus buy that big block of stock on that day, of all
days?  What did he know about SunSource that other investors
did not?  This was the biggest block of stock that Wynnefield
Capital had ever purchased in SunSource.  Wynnefield nearly
doubled its ownership on this day, going from about a 6 percent
ownership in the company to over 10 percent.

        The last time Nelson Obus bought any stock in the
company was in February, mid-February, and that was 100 shares.
Wynnefield Capital didn't buy any stock in the company in
March, April, May or early June, when it was trading lower.
See, it was trading higher on June 8th.  It was trading a
considerable amount lower during those months.  Nelson Obus
actually sold 19,000 shares in January and did not buy in this
period.

        So, again, the question for you, members of the jury,
is what was different on June 19th, on June 8th?  The evidence
will establish that Nelson Obus did not just get lucky on
June 8th.  He was not just acting on a hunch or good research
or hard work, the evidence will establish that Nelson Obus had
help, illegal help.  He got a tip that SunSource was going to
be sold.  He found out which horse was going to win the race
before the race started.

        So the question is, how did Nelson Obus get that
information?  That question brings us back to the other

E5JPOBU3                         Opening – Mr. Kisslinger

1   defendants, Brad Strickland and Peter Black.  Peter Black is an

2   experienced financial professional.  He's an experienced

3   securities analyst who started working for Nelson Obus in the

4   Wynnefield funds in 1999.  Black's job as an analyst was to

5   research and analyze small companies like SunSource for

6   Wynnefield's investment portfolio.

7          In 2001, Peter Black and Brad Strickland were close

8   friends.  They had been friends starting in college, but their

9   friendship really blossomed in the early 2000s, when they were

10  living in New York.  They socialized together.  They worked out

11  together.  They spent weekends together.  They even vacationed

12  together.  Peter Black was in Brad Strickland's wedding.

13         Strickland and Black talked almost every day by phone

14  and e-mail and in person.  They talked about all sorts of

15  things, as friends will.  They even talked about business

16  sometimes.  Brad Strickland knew Black's job was to research

17  and recommend companies in which his hedge fund should invest,

18  and Black knew that Strickland worked for one of the biggest

19  companies in the world and that his job was to gather sensitive

20  financial information from his corporate clients.

21         Brad Strickland, like Peter Black, is also an

22  experienced financial professional.  After college, he worked

23  for a large investment bank.  He got an MBA, and then he went

24  right to work for GE Capital, which is the financial services

25  wing of General Electric.  We all know what GE is.  They make

E5JPOBU3                          Opening - Mr. Kisslinger

1    light bulbs and jet engines and power plants, but GE Capital is

2    the part of GE that deals with investing and lending money.

3         In 2001, Brad Strickland worked as an underwriter in

4    GE Capital's Stamford, Connecticut office.  Basically, his job

5    was to help GE make large loans to companies that needed

6    funding for various reasons, such as to buy or start a new

7    business.  As part of his underwriting job, Strickland met with

8    GE's clients to gather information so that GE could write up

9    their loans.  A lot of the information that GE and Strickland

10   obtained from its underwriting process was sensitive and

11   confidential, going to the heart of its clients' businesses.

12        GE had all kinds of confidential information that

13   could not be leaked out into the market.  For this reason, GE

14   was adamant that confidential information that it got from its

15   clients remained confidential and not be abused.  GE's

16   reputation depended on it.

17        You'll hear from a few GE witnesses and from Brad

18   Strickland, himself, that GE has a code of conduct that it

19   calls The Spirit and The Letter, and GE takes this code of

20   conduct very seriously.  They give regular training to all of

21   their employees, and their employees have to regularly certify

22   that they read and know the policies.  One of the chapters in

23   The Spirit and Letter is called, Protecting GE Assets.  It

24   states in the introduction that GE must safeguard company

25   property, whether it is a piece of equipment, an electronic

E5JPOBU3                          Opening – Mr. Kisslinger

1    file, a GE trademark or confidential information about an

2    upcoming deal.

3              So you'll see the information that a GE employee

4    learns while working on a secret deal is company property that

5    its employees must protect in the same way as if it was

6    protecting a GE jet engine or a computer.

7              There's a second important rule that will come up in

8    this case and that's the insider trading policy.  Under this

9    rule, GE Capital employees may not disclose inside information

10   to anyone outside of GE, unless, A, the disclosure is needed

11   for the employee to enable GE to carry on its business; and, B,

12   appropriate steps have been taken by GE to prevent the misuse

13   of the information.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

E5jzobu4                    Opening - Mr. Kisslinger

1         MR. KISSLINGER:  In this trial you'll learn that Brad

2    Strickland did not follow any of these rules, which he knew

3    very well.  There was no need for Strickland to call to

4    disclose any information about the SunSource deal to his buddy

5    Peter Black, who worked for a hedge fund, and he didn't take

6    any precautions.  He didn't check with counsel.  He didn't get

7    authorization from his management.

8         And Strickland had plenty of reasons to think that the

9    information would be misused by Wynnefield Capital, which buys

10   and sells stock all day long.  And, indeed, the evidence will

11   show that this information was abused, which brings us back to

12   the time line of our case.

13        On May 14th, 2001 Strickland's boss, Michael

14   Lustbader, e-mailed him what's called a deal book.  The deal

15   book was issued by Allied Capital and it described how Allied

16   Capital intended to buyout SunSource.  Basically, Allied agreed

17   to pay all current shareholders of SunSource $10.38 per share.

18   Well, the new company formed by Allied would borrow $95 million

19   dollars from GE and other lenders to pay off the existing

20   shareholders, and Strickland worked for GE and helped

21   underwrite that loan.

22        Because Allied was going to pay more than $10 per

23   share for SunSource stock, any shareholder fortunate enough to

24   have bought stock before the announcement was selling it at $5

25   a share, would essentially double their money when the deal was

E5jzobu4                    Opening – Mr. Kisslinger

1   closed at over $10 a share.  That's why the information about

2   the SunSource merger, SunSource acquisition was so valuable.

3          So Strickland was an underwriter for GE on the loan.

4   He was the point person in charge of gathering all the

5   paperwork from SunSource and Allied and others.  Strickland

6   went over the deal book on May 14th, and then he started his

7   underwriting job.  He read the deal book.  It said "extremely

8   confidential" all over it.  He'll likely admit in this case

9   that from this point forward he knew that information he

10  learned from GE was confidential and that GE's rules would

11  trigger.

12         One day, Mr. Strickland doesn't remember exactly when,

13  he learned that Wynnefield Capital was a large owner of

14  SunSource.  He decided to give his buddy Peter Black a call,

15  who he knew worked for Wynnefield Capital.  As Strickland

16  himself will likely admit, this was a very bad decision, very

17  dangerous and risky decision.  The evidence will establish that

18  this, at the very least, was a reckless decision.

19         That brings us to May 24th.  Ladies and gentlemen,

20  May 24th is the big day of this case.  If nobody talked to

21  anybody on May 24th, nobody, none of us would be here.  But

22  they did.  At 9:52 in the morning, Brad Strickland called Peter

23  Black.  They both were at work.  They talked for about five

24  minutes, and they talked about SunSource.  None of those facts

25  are in dispute.

1            The evidence will establish that this is the call

2    where Strickland tipped Peter Black.  The evidence of what

3    happened after this call drives this fact home.  Right after

4    talking with -- right after hanging up with Strickland, a

5    little before 10:00 a.m., Black got out of his chair, went over

6    to talk to his boss, Nelson Obus.  He went over to talk to him

7    about that call that just had come in from his friend.

8            As Peter Black will likely admit, this call from

9    Strickland had to be very important to Black to justify such a

10   reaction, going over and talking to his boss interrupting him

11   in the early part of the day.

12           So Black and Obus talked for a few minutes, and they

13   talked about the call that had just come in from Strickland.

14   Not disputed.  The evidence will establish that this is the

15   call where Peter Black tipped Nelson Obus.  Nelson Obus

16   admitted -- again, the events that happened after this call

17   drive the point home.

18           At 10:10 a.m., right after speaking with Peter Black,

19   Obus picked up the phone and called the president and CEO of

20   SunSource, Maurice Andrien.  Nelson Obus admitted that he

21   called Andrien just to talk about Strickland's call to Black.

22   Once again, that call from Strickland had to be pretty

23   important to justify such a reaction, a sudden and immediate

24   reaction from Nelson Obus, picking up the phone and calling the

25   CEO of a company out of the blue.

E5jzobu4                     Opening - Mr. Kisslinger

1           Nelson Obus did not reach Maurice Andrien on that

2   first call.  He just left him a voice mail.

3           In the meantime, before Maurice Andrien had a chance

4   to return Mr. Obus' call, a gentleman by the name of Alan Weber

5   called Maurice Andrien at 10:26 a.m.  This call from Alan Weber

6   is important in the timeline of the case.  Alan Weber worked

7   for an investment company like Wynnefield and was another large

8   investor in SunSource.  Alan Weber and Nelson Obus were close

9   professional colleagues and they talked all the time about

10  SunSource.

11          Maurice Andrien will testify that on this call Alan

12  Weber asked Andrien whether SunSource was going to be sold to a

13  financial buyer.  He used those particular words, "a financial

14  buyer," and those words are important.  Maurice Andrien did not

15  think too much of the call at the time.  He'll say something

16  that was Alan Weber being Alan Weber who called all the time.

17  But that was until he got another similar call from Nelson Obus

18  right after that, using similar words.  At 10:55 a.m., Maurice

19  Andrien returned Obus' call.  They spoke for about six minutes,

20  and they spoke about Strickland's call to Black that morning.

21  These facts are not disputed.

22          Maurice Andrien will take the stand and he'll look you

23  in the eye, and he'll testify that on this call Nelson Obus

24  admitted that he was tipped.  This was the little birdie call.

25          Maurice Andrien will testify that that conversation

E5jzobu4                    Opening – Mr. Kisslinger

1    went something like this -- there are three parts to it.  Obus

2    first said, I never thought you'd sell the whole company.  The

3    little birdie told me that you're going to sell the company to

4    a financial buyer.  And Andrien asked him a little birdie?  And

5    Obus said, a little birdie in Connecticut.  And Andrien asked

6    little birdie in Connecticut?  And Obus said, GE.  Again, he

7    admitted the tip and he admitted the source of the tip, GE.

8    Although this call happened a long time ago, Maurice Andrien

9    will likely testify that he still remembers it very well.  The

10   call was burned into his memory.  The fact that the call's from

11   Alan Weber and Nelson Obus were so similar so close in time,

12   and they both calls used similar words, "financial buyer" made

13   Andrien think there was a leak of information about the

14   SunSource deal and that the leak came from GE in Connecticut,

15   which was where Strickland worked.

16        So while Nelson Obus was in the process of calling

17   Maurice Andrien, it's important evidence to note what Peter

18   Black was doing at the same time.  And this story will come

19   right out of the mouth of Peter Black.

20        Peter Black was in the same room as Nelson Obus when

21   Obus was calling Andrien.  This a hand drawing we made when

22   Peter Black gave testimony earlier.  And you can see that Peter

23   Black sat right across a long conference table from Nelson

24   Obus.  It was divided by a little divider.  So when Peter Black

25   was working, when they were sitting down, they couldn't see

1     each other, but when you stood up, you could.

2          Peter Black overheard very choice nuggets of Obus'

3     conversation with Maurice Andrien, just enough to cause him

4     great concern.  When Black overheard what Obus was doing,

5     calling the CEO of SunSource to discuss the call that his

6     friend had just made, you'll hear that Peter Black jumped out

7     of his chair and he waived his arms around to get Nelson Obus'

8     attention.  Black could not believe his ears.  Obus was outing

9     his friend, he was compromising his friend.  Obus will likely

10    admit that he was upset.  He was worried that Maurice Andrien

11    was going to call up GE and say, hey, you've got a guy talking

12    about our deal, talking about sensitive information.  Black

13    will likely admit that he said to Obus Nelson, what are you

14    doing?  You're going to get my friend fired.

15         Black will also likely admit that right after Nelson

16    Obus hung the phone, Peter Black went over and confronted

17    Nelson Obus, basically yelled at him, and he said what was the

18    purpose of that phone call?  You're going get my friend fired.

19    He repeated that.  And Peter Black will admit that Nelson Obus

20    turned pale, he got upset.  And he, Obus, said something like,

21    if that happens, we'll get him a job on Wall Street and he can

22    work here.  This testimony from Peter Black clearly establishes

23    that Black and Obus both knew that what Strickland did was

24    wrong, and that Strickland could get in big trouble if word got

25    back to GE that he was leaking their secret information.

1            But this did not stop Nelson Obus from buying a big

2       block of stock when he had the chance, and this chance came two

3       weeks later.  On June 8th, 2001, Nelson Obus directed

4       Wynnefield Capital to buy 287,000 shares of SunSource stock at

5       a price of $4.75 per share.  That was his first opportunity to

6       purchase after the call from Strickland came in.

7            Wynnefield got call from a broker who had a large

8       block of shares of available to sell.  You'll hear that the

9       broker offered Wynnefield 50,000 shares to start, and Nelson

10      Obus ended up buying every share that he could get his hands

11      on, all 287,000 shares.  Obus cleaned him out.  You may hear

12      Mr. Obus say that he bargained down the broker, he got the

13      broker to go down from $5 to $4.75.  But remember Nelson Obus

14      could have bought the stock for a lot less a month earlier when

15      it was changing from 3.50 to $4 range.

16           A month or two later, after the Allied announcement,

17      Nelson Obus made another important call regarding SunSource.

18      This was the second admission from Obus I mentioned earlier.

19      The evidence will show that Nelson Obus called Dan Russell, a

20      former executive of Allied Capital, to try to push back the

21      closing date of the deal so that Wynnefield could get favorable

22      tax treatment.  The evidence will show that Obus, once again,

23      admitted he was tipped.  He admitted to Dan Russell on that

24      call, I was tipped off to the deal.

25           Fast forward to 2002, to July 2002, and that's when

E5jzobu4                    Opening - Mr. Kisslinger

the SEC issued subpoenas to GE Wynnefield Capital as part of

its investigation.  Subpoenas are formal requests for documents

and information.  These subpoenas kicked off a flurry of

activity by the defendants that you'll hear about.  But I'd

like to highlight just a couple of points.

          First, it's interesting to note that Peter Black

claims that after the SEC issued subpoenas in 2002, this was

the first time he learned that Nelson Obus had bought that big

block of stock a year earlier, the first time he learned that.

Black says he didn't know that information before.

          Members of the jury, when you hear this testimony and

if you believe it, you may wonder why Obus did not mention to

Black such an important fact earlier.  Surely this fact that

Wynnefield made $1.3 million in two weeks was important news

around the office.  And surely Peter Black would have wanted to

know this fact, especially since it was his friend who called

to talk about SunSource a couple of weeks earlier.  You'll hear

that Black got big bonuses for doing good work at SunSource.

          The second point, about the 2002 time when the

subpoenas came in, has to do with what Brad Strickland told GE

Capital as parts of its internal investigation.

          After the SEC sent subpoenas to GE, GE started an

internal investigation.  They called Strickland in for an

interview.  And in the interview GE asked Strickland questions

about his dealings with Wynnefield Capital.  At that interview,

E5jzobu4                      Opening - Mr. Kisslinger

Strickland denied having any conversation with Black about

SunSource.  It was not until a later meeting between Strickland

and Black, that Strickland suddenly remembered their discussion

about SunSource.

        But you'll hear that Strickland remembered the

discussion taking place at a bar holding a beer.  To this day,

he does not remember it taking place in a telephone call.  He

doesn't deny that the call took place.  He just doesn't

remember it.

        There are two important points about Strickland's

version of events.  First, it calls into question what kind of

serious research Strickland could be doing on a $20 million for

GE, standing in a bar waiting for a table, with people all

around.

        Second, the fact that these two defendants, Black and

Strickland, had different versions of what happened, how that

information -- the call happened, the conversation happened,

just shows that maybe there was more than one opportunity for

the two to discuss SunSource, more than one chance for the tip

to have occurred.

        So those are the highlights of our case.  Strickland

abused the duty of trust and confidence that he owed to his

employer GE Capital by tipping critical information about the

SunSource acquisition to his buddy, Peter Black, who worked for

a hedge fund.  He did it for the sake of their close personal

1   friendship.  Black tipped his boss Nelson Obus.  He did it to

2   impress his boss, which could only help his career and get

3   bigger bonuses.  Nelson Obus traded armed with that critical

4   information about SunSource.  Wynnefield Capital made $1.3

5   million jackpot when the deal was announced two weeks later.

6          So what are the defendants going to argue?  What

7   excuses and justifications are they going to raise to justify

8   Nelson Obus's big trade on June 8th?

9          Lawyers for all three defendants get to come after me,

10  and you will hear three very different stories explaining and

11  justifying their actions in all kinds of ways.  They'll raise

12  all kinds of excuses and justifications.  Many of those

13  arguments will have nothing to do with the calls and

14  conversations that took place on May 24th.  There will likely

15  be a lot of finger pointing at other people and other events.

16         But I'd like to tick through a few of the many excuses

17  they'll likely raise and why the evidence won't support their

18  story.

19         First and foremost, they will -- Peter Black and Brad

20  Strickland will claim there was no tip.  They'll claim that not

21  much was said on that May 24th call.  They'll say that

22  Strickland was doing some kind of high level research on

23  SunSource.  It's called due diligence, checking on management,

24  kicking the tires.  But the evidence in this case will prove

25  that the story does not make sense and is not believable.  It's

E5jzobu4                    Opening - Mr. Kisslinger

1    made up.  The evidence will prove that Strickland called

2    Black -- didn't call Black to do any kind of due diligence.  He

3    called Black to give him a tip.  Strickland knew he had

4    valuable information and he knew his friend could use it to

5    make his hedge funds some easy money.  None of the actions of

6    Black and Obus and Strickland after the call make any sense if

7    Strickland just called and talked about vague generalities.

8    Black wouldn't have jumped out of his chair to talk to Obus,

9    Obus wouldn't have jumped on the phone to talk to Maurice

10   Andrien, Black wouldn't have yelled at Obus that he could get

11   his friend fired.  This story just doesn't add up.

12            The second thing you might hear them argue, that

13   defendants will also likely point to GE's internal

14   investigation, which I talked about.  They'll argue that GE's

15   investigation into Strickland's conduct somehow clears him of

16   wrongdoing.  But this argument also fails under the evidence.

17            It's important to note that GE's internal

18   investigation was very incomplete.  About all GE did in the

19   investigation was speaking with Strickland, and he denied

20   everything.

21            GE did not have access to the same compelling

22   information that you'll see in this case.  They didn't know

23   about the little birdie call to Maurice Andrien, they didn't

24   know about the I was tipped call to Dan Russell.

25            You are not at all bound by GE's incomplete and

E5jzobu4                        Opening - Mr. Kisslinger

1   unreliable investigation.

2           GE also did not clear Strickland.  Even based on the

3   little bit of information they had, they found that Strickland

4   had violated GE's policies, reprimanded him and didn't give him

5   a bonus that year, which was a large part of his salary.

6           What else are they going to argue?  Nelson Obus will

7   simply deny that he made those calls to Maurice Andrien and Dan

8   Russell.  He'll deny he made the I was tipped call and the

9   little birdie call.  His lawyers will likely claim that Andrien

10  Russell were mistaken or misstating the truth or out to get

11  Obus when they testified about these calls.

12          The evidence will show you, however, that between Dan

13  Russell and Maurice Andrien and Nelson Obus, the person who has

14  the most to gain from misstating the facts is Nelson Obus.

15  It's his neck on the line and his money at risk.

16          In 2008 Obus had about $40 million of his own money

17  tied up in Wynnefield funds.  Peter Black had over $4 million.

18  They probably have more money invested in Wynnefield today.

19  They both have plenty of reasons to misstate the truth.

20          Obus will also claim that when he called Andrien he

21  didn't say anything about SunSource being sold to a financial

22  buyer.  He called to complain about something called a pipe

23  transaction.  I'll let them explain what a pipe transaction is,

24  but the evidence will show that story is nothing but a pipe

25  dream.  It doesn't make any sense, and it's not supported by

E5jzobu4                       Opening - Mr. Kisslinger

the evidence.

          Mr. Obus will claim that he bought stock for other
reasons.  He'll probably talk about all the research he did in
the company and how he thought it was under valued and a great
bargain.  None of this matters.  You'll learn that in this case
that if Obus knew about the SunSource deal, he couldn't trade,
period, no matter how under valued he thought the stock was, no
matter how much research he did.

          Two week delay.  The defendants may also try to make
hey over the fact that two weeks passed between the date
Strickland called May 24th and Nelson Obus trade on June 8th.
The response to this is simple.  This was the first opportunity
that presented itself to Mr. Obus.  SunSource was a small
company, and you'll hear there was not a lot of stock to be
bought in.  There wasn't a lot of stock to go around.  The
evidence will show this was the first opportunity that
presented itself to Obus and he took full advantage of it.  And
again if Nelson Obus knew about the SunSource deal before the
news was public, he couldn't buy no matter how long he had to
wait.  If he knew which horse was going to win the race, he
couldn't bet.

          Finally, the defendants may claim that because Obus
sold some stock before the announcement, that means he wasn't
tipped; why would he sell stock if he thought it was going to
rise up.  But the evidence will establish that this small sale

E5jzobu4                         Opening – Mr. Kisslinger

1   was administrative in nature and had nothing to do with Nelson

2   Obus's trading strategies.  Ladies and gentlemen, that evidence

3   is a red herring.

4          Finally, the defendants certainly are going to argue

5   that they did not act with any wrongful intent.  They'll claim

6   they if they did something wrong, it was all innocent mistake.

7   But the evidence will not support their story.  Strickland

8   certainly did not make an innocent mistake.  He was a

9   professional in the financial service industry.  He knew that

10  Black, what Black did for a living.  Strickland knew darn well

11  that he couldn't call a hedge fund and give out secret

12  important information about one of his clients the hedge fund

13  invested in, and he -- that's what hedge funds do.

14         Obus and Black also will say they didn't make an

15  innocent mistake.  They were far from innocent bystanders.

16  Their own admissions show this.  They admitted that they knew

17  that Strickland could get fired or worse for such conduct.  And

18  Obus and Black, like Strickland, were sophisticated financial

19  professionals.  They knew the rules about insider trading.

20  They knew they couldn't trade on secret information about a

21  merger and acquisition.

22         They knew that someone like Strickland working for a

23  financial institution like GE Capital couldn't tip that kind of

24  critical information that he learned on the job.  These are

25  basic fundamental rules that they knew were very well.  But

E5jzobu4                           Opening – Mr. Kisslinger

they ignored those rules and chose to act any way.  The
evidence will show that none of the excuses and justifications
and finger pointing to other people relieve the defendants of
wrongdoing.

       Members of the jury, at the close of the case we will
come before you in what is called the closing argument.  And we
won't ask you to convict the defendants of a crime or send them
to jail.  This is a civil case.  We will sum up all the
evidence and ask you to hold these defendants responsible for
violating securities laws and engaging in insider trading,
because at the end of this trial the evidence will establish
that Strickland tipped Black, Black tipped Obus, Obus traded,
and Wynnefield Capital made more than a million dollars in
profit.  Tip, tip, trade, check.

       Thank you for your time and attention and your good
citizenship.

       THE COURT:  Why don't I give the jury a break before
we continue.

       Ladies and gentlemen, we're going to take a 10 minute
break.  Don't discuss the case, keep an open mind.  You don't
have to stay in the jury room, but make sure you're back in the
jury room within ten minutes so we can start.

       (Continued on next page)

E5jzobu4

1           (In open court; jury not present)

2           THE COURT:  All right, let's take a ten minute break.

3    Let's try to avoid the elevators with the jurors.  Don't talk

4    about the case outside the courtroom.

5           All right, we'll continue in ten minutes.

6           (Recess)

7           THE DEPUTY CLERK:  All rise.

8           THE COURT:  You could be seated.  Do we have everyone?

9           MR. RIOPELLE:  Yes, your Honor.  I have an issue to

10   raise before we see the jury again.

11          During its opening statement, the SEC --

12          THE COURT:  Just a second.  Keep that door closed.

13   Close the door.

14          Yes.

15          MR. RIOPELLE:  During its opening statement, the

16   Securities and Exchange Commission displayed a poster board to

17   the jury.  I have asked for permission to use that poster board

18   during my opening statement to display it to the jury and make

19   my arguments from it, and they have refused to do that.

20          THE COURT:  It's not very neighborly.

21          MR. KISSLINGER:  Your Honor, there is a rhetorical

22   point of using somebody else's exhibit, it's kind of like jab

23   in the eye.

24          THE COURT:  Wait.  Wait.  Just a second.

25          MR. KISSLINGER:  They could use our slides, but using

E5jzobu4

1    our board --

2              THE COURT:  You don't want the jury to see your board

3    twice?  I mean, do you intend to use this board again?

4              MR. KISSLINGER:  Likely, your Honor.

5              THE COURT:  During trial or during summation?

6              MR. KISSLINGER:  During summation.

7              MR. RIOPELLE:  See, any time they use a board, I

8    typically put it up and refer to it, your Honor.  That's pretty

9    standard practice in this courthouse.

10             MR. DeYOUNG:  If he wanted a board, he's known about

11   this for a long time, he could have prepared it.  We exchanged

12   demonstratives 24 hours ahead of time.  I think there is

13   something -- I mean, the reason he wants to use our board

14   rather than another board is because it has a rhetorical point

15   of persuasiveness that's different.

16             THE COURT:  But you can't change the facts.  So why

17   don't you let him use the board, see if he makes promises he

18   can't keep.

19             MR. M. COHEN:  Your Honor, while we're on that point,

20   I would like to use some of the SEC's slides.  I think they

21   were very helpful to the defense.

22             THE COURT:  Are you prepared to move forward with it?

23             MR. M. COHEN:  Yes.

24             THE COURT:  Okay, all right.  Let's move forward.  I

25   don't think this is a significant issue that should delay this

E5jzobu4

1     jury.

2               All right, let's bring them in.

3               (Continued on next page)

E5jzobu4                    Opening – Mr. J. Cohen

1              THE DEPUTY CLERK:  Jury entering.

2              (Jury present)

3              THE COURT:  You could be seated.

4              Opening statement for the defense, Mr. Cohen?

5              MR. J. COHEN:  It's me, your Honor, yes.  May I

6     proceed?

7              THE COURT:  Yes.

8              MR. J. COHEN:  Thank you, your Honor.

9              May it please the Court, counsel, ladies and gentlemen

10    of the jury, my name is Joel Cohen.  I am honored today to

11    represent Nelson Obus, one of the defendants in this case.

12             Before we begin, I'd like to introduce you to a couple

13    of my colleagues who you will see during the trial.  Mary Kay

14    Dunning, Darcy Harris, and I'd also like to introduce you to

15    Mr. Obus, Nelson Obus.

16             The jury serves a very important duty, and it

17    certainly is very important to Mr. Obus, very very important.

18    We thank you for your duty for serving today.  I'm sure when

19    you came here a few hours ago, you probably didn't expect to be

20    sitting here, and here you are.  Could imagine that experience

21    is like, but we very much appreciate it.  I think everyone in

22    is this room, all sides and the Court appreciate you being

23    here, because it's a very important duty and very serious duty

24    that you're being asked to undertake.

25             Now you're going to see two boards behind me –– you

E5jzobu4                        Opening - Mr. J. Cohen

 1    will soon enough as we put them up –– and one of them is going

 2    to be a chronology that I ask you to refer to if it helps you

 3    as I'm speaking if it helps to you place certain events in

 4    time.  And I may refer to it or I may not, but it's there for

 5    your help.  Actually, it's over here Darcy is going to put it

 6    up.  The other board that I want to put up just has some

 7    photographs of some of the key people that you're going to hear

 8    about and meet when they testify for you in this trial.

 9            So as you just heard Mr. Kisslinger explain in his

10    opening statement, the SEC has alleged that these three

11    gentlemen, three of the gentlemen at this table where I'll be

12    sitting during the trial, have engaged in something called

13    insider trading.  But, ladies and gentlemen, allegations are

14    not enough.  The SEC has the burden of proving that to be true.

15            Now, what is insider trading?  Well, the Judge is

16    going to instruct you as to what the law is.  I don't do that,

17    none of the lawyers in this room can do that, none of the

18    witnesses that testify here can do that.  Only Judge Daniels

19    will do that.

20            Very basically, what you're going to understand from

21    the evidence is that insider trading is when someone learns

22    confidential information about a company, and then takes that

23    information and buys or sells stock in that company when they

24    know that they're not supposed to do it.  So, fundamentally,

25    what insider trading is about is concealment.  It's about

E5jzobu4                        Opening - Mr. J. Cohen

1   hiding.  It's about concealing that you have confidential

2   information and you're doing something you're not supposed to

3   be doing with it.

4           Now, you all understand that, that's common sense.

5   You walked in here this morning with your common sense.

6           In addition, on this point we do agree with the SEC --

7   we don't agree with them in much of this case, but we will

8   agree on this -- being accused of insider trading is very

9   serious.  It challenges one's honesty, it challenges one's

10  integrity.  Mr. Obus' honesty and integrity have already been

11  challenged in the opening statement by the SEC.  And for Nelson

12  Obus being accused of insider trading is the single most

13  serious thing that has ever happened to him in his life.

14          These allegations that you're going to hear about, the

15  evidence you're going to hear about, the witnesses who are

16  going to testify before you are going to tell you about events

17  that happened more than 12 years ago.  This trial is the first

18  chance for Nelson Obus to allow his story to be told.

19          And what you're going to learn from the evidence is

20  that Nelson Obus did not engage in insider trading.  The

21  evidence will show you that.

22          Let me tell you a little bit about Mr. Obus.  He's

23  married.  He has two grown children.  He is a well respected

24  professional in the investment industry.  He built a business

25  from scratch through hard work and the trust that others have

E5jzobu4                    Opening – Mr. J. Cohen

1    placed in him based upon his proven and unblemished track

2    record.  He runs an investment firm called Wynnefield Capital,

3    which was named after the West Philadelphia neighborhood where

4    Nelson grew up.

5        Wynnefield has been in business for 22 years, and it's

6    still in business today here in New York.  Wynnefield invests

7    its money or invests money on behalf of others; people,

8    foundations, schools, charities that trust him with money to

9    invest for them.  Mr. Obus is trustworthy, you'll get this from

10   the evidence.  He's smart, you'll get this from his testimony.

11   He's hard working.  He's the kind of person someone would trust

12   to invest their money.

13       Now, the amount of money that Wynnefield manages has

14   doubled since 2001, which is when the events most likely at

15   issue in this case occurred.  You will trust Mr. Obus, despite

16   what the SEC says about him.

17       And you're going to hear many things about the

18   financial industry during this trial.  And if you'll briefly

19   allow me just to explain some of them.  You might know some of

20   these terms already, but please bear with me because I think

21   it's important.  You're going to hear this in the evidence.

22   There's something called a public company.  Public company

23   simply company that issues stock, also called shares or

24   securities, which is what you can buy or sell on something

25   called the stock market.  Stock just simply ownership interest

1    in a company.  So if you own stock, what it means is you own a

2    small piece of that company, maybe even just one share, you are

3    an owner of that company.  A block of stock is simply way of

4    describing a large amount of, relatively large amount of or

5    number of shares of stock that are sold and bought at once.

6    That's called a block of stock.

7           A hedge fund is simply an investment firm, an

8    investment firm like Wynnefield Capital that invests other

9    people's money on their behalf with their permission by buying

10   and selling stock.

11          You're going to hear something called portfolio.

12   Portfolio is simply a group of many stocks, the stocks of many

13   different companies that are invested as a group.

14          And you're going to hear about something called a

15   portfolio manager.  Mr. Obus is a portfolio manager.  And

16   that's simply a person who decides whether to buy or to sell or

17   to hold onto stocks that are being invested in a portfolio of

18   stocks in lots of different companies at the same time.  That's

19   what investment firms do.

20          Now, I want to layout the SEC's allegations in a

21   moment, but let me be clear about one thing first before I get

22   a chance to do that.  The SEC's entire case against Mr. Obus

23   comes down to two telephone conversations that happened 13

24   years ago.  The only evidence of those conversations is going

25   to be people's ancient memories, what they think they remember

E5jzobu4                    Opening - Mr. J. Cohen

1     about them.  There are no e-mails.  There are no recordings of

2     those calls.  There are no notes.  There are no text messages

3     about them, none of that.  The SEC has accused Mr. Obus of

4     buying SunSource stock, as you heard from Mr. Kisslinger, for

5     Wynnefield Capital 13 years ago, June 8th, 2001, based upon a

6     tip of inside information that SunSource was going to be

7     acquired by another company, another company called Allied

8     Capital.  The SEC says that Mr. Obus got this tip about the

9     SunSource acquisition from his employee Peter Black, who is

10    also here as a defendant, and that Mr. Black had, in turn,

11    gotten it from his friend Mr. Strickland, who is also here as a

12    defendant, who worked for GE Capital.  And the SEC's evidence

13    against Mr. Obus for that tip is based on two highly disputed

14    telephone calls that happened in 2001.  I think it's very

15    important to keep that in mind.

16          The SEC claims that Mr. Obus called the Chief

17    Executive Officer of SunSource, Maurice Andrien, and told him

18    that he'd been tipped that SunSource was about to be bought by

19    Allied, and that Mr. Obus called someone at another company

20    months later, this fellow named Daniel Russell, a man who

21    you're going to learn from the evidence, Mr. Obus had never met

22    before, never spoken to before, had no interaction with ever

23    before that call, and told that man I've been tipped.

24          So if you believe the SEC, Mr. Obus confessed to two

25    people in two different telephone calls in 2001 that he'd been

E5jzobu4                    Opening – Mr. J. Cohen

1     tipped.  The problem is that confessing is the opposite of

2     concealing.  If you're insider trading, you don't broadcast it

3     over the telephone, and you certainly don't broadcast it over

4     the telephone to someone you've never met before.

5              Now, the evidence will show that Mr. Obus was never

6     tipped, and yet he did not insider trade.

7              Let me talk to you a little bit about SunSource.  Mr.

8     Obus knew SunSource very well, and knew it for a long time

9     before June 2001.  In 2001, he had personally, personally owned

10    stock in SunSource for more than 15 years already.  He'd been

11    an owner of SunSource for more than 15 years.  And Wynnefield,

12    his fund, had owned stock in it for more than four years

13    already by then.  He had researched the company, Mr. Obus had

14    done his homework and he had confidence in the company's

15    management and that's why he owned stock in the company for all

16    those years.  Just before the trade at issue in this case,

17    Wynnefield Capital owned about 400,000 shares of SunSource's

18    stock, which amounted to about 6 percent of the company's

19    stock.  Now, while Wynnefield owned 6 percent of SunSource's

20    stock, you must understand, and the evidence will show you

21    this, that Wynnefield's -- this was only a very small part of

22    Wynnefield' overall portfolio.  The overall portfolio was much

23    bigger.  Wynnefield's investment in SunSource was only about

24    1 percent of the total amount that Wynnefield had invested in

25    companies, all the stocks it owned.  What that means that is

E5jzobu4                    Opening - Mr. J. Cohen

1    for every hundred dollars that Wynnefield Capital was investing

2    on behalf of its investors, $1 was invested in SunSource out of

3    the hundred.

4         Now on June 8th, 2001 Wynnefield received what --

5    you're going to hear about this from witnesses and from

6    documents -- what's called an unsolicited opportunity or

7    unsolicited offer to buy a block of SunSource stock.  Mr. Obus

8    because the stock on June 8th because he believed SunSource was

9    a solid company, he had done his research, his team had done

10   its research and he believed that the company would eventually

11   make money for his shareholders, for his investors, and because

12   he got a good price for the stock.  And that's what you're

13   going to see from the evidence in this case.  Mr. Obus did not

14   buy that stock on June 8th because of a tip.  He bought it

15   because the chance to buy the stock came to him, came to him

16   from someone.  He didn't ask for it, and he bought it for a

17   discount.

18        Now, as I mentioned earlier the SEC's evidence in this

19   case boils down to those two telephone conversations 13 years

20   ago, the one between Mr. Obus and this chief executive officer

21   of SunSource, Maurice Andrien, and the one between Mr. Obus and

22   that stranger that I mentioned before, whose name is Dan

23   Russell.  See Mr. Russell here.

24        Mr. Russell worked at Allied Capital, the company that

25   ultimately bought SunSource.  Mr. Kisslinger told you about

1    those two calls when he addressed you earlier.  And to be sure,

2    let's be clear about this, there were two calls.  There are

3    many more than two calls with Mr. Andrien and Mr. Obus, but

4    there definitely was a call on May 24th between Mr. Obus and

5    Mr. Andrien, and there definitely was a call between Mr. Obus

6    and Mr. Russell sometime in August 2001.  No question about

7    that.

8            But did Mr. Obus in either of those two calls admit to

9    insider trading, say that he was tipped?  Well, that you're

10   going to learn didn't happen.

11           So the SEC argues that Mr. Obus told Mr. Andrien and

12   Mr. Russell that he'd been tipped.  But you'll see that didn't

13   happen, and you'll see that it makes no sense that it could

14   have happened.  It just makes no sense.  Why would someone who

15   wants to secretly trade on a tip call up the CEO of the company

16   and tell him I've been tipped?  You wouldn't.

17           Why would someone who is just engaged in insider

18   trading months later call up a complete stranger, someone

19   you've never talked to or met before, and say I've been tipped?

20   You wouldn't.  These calls, as I told you before, you'll see

21   are not recorded.  There is no notes.  There is no memos about

22   them.  What you have are the memories of long ago from 13 years

23   ago of people.  And after 13 years, this is the best the SEC's

24   going to offer you, two witnesses uncorroborated.

25           You're going to hear all these people testify.  Mr.

E5jzobu4                    Opening - Mr. J. Cohen

Andrien is going to testify, Mr. Russell is going to testify,
Mr. Obus is going to testify and others as well.  And you will
have to decide what makes sense.

          You'll have to decide whether Mr. Obus risked his
reputation and the business that he had built to make one trade
in one stock, one company that made up 1 percent of his entire,
of the entire Wynnefield fund.

          And the SEC has the burden in this case.  They have
the burden now, and they'll have the burden at the end.  It
doesn't shift.  It remains with them throughout this entire
case until the case goes to you to decide the result, the
verdict.

          You came into this courtroom with your common sense,
and I suggest that's all you're going to need to understand
this case.  Some of the terms might seem complicated to some of
you, but you know what, all you're going to need is your common
sense.  It makes no sense that Mr. Obus would buy SunSource
stock based on inside information and then immediately call
SunSource's CEO and tell him he bought the stock.  It makes no
sense that he would call a complete stranger and confess out of
the blue that he'd been tipped.  As I said, insider trading is
about hiding, it's about concealing.  It's not about telling
everyone what you're about to do or what you just did.  That's
why the SEC's theory makes no sense.  And that's why they won't
be able to prove it because the evidence won't support it.

E5jzobu4                          Opening – Mr. J. Cohen

1           Now, the SEC, respectfully, is counting on you to put

2      aside your common sense.  Their case would require you to draw

3      the worst possible conclusions from the evidence and to ignore

4      all the other explanations, the reasonable explanations, the

5      common sense explanations, the explanations that will be

6      supported by years of documents and history and testimony.

7      They will expect you, or hope that you will ignore all of that.

8      Their case requires that the defendants have lied under oath,

9      have lied about what happened here.  Their case depends on your

10     believing that the defendants lied several times over the

11     course of many many years about this.

12          But the defendants, you will see from the evidence,

13     have told the truth again and again and again for the last 13

14     years when they've been asked about this.  And beginning today,

15     they finally get their chance to be heard and they look forward

16     to that.  Mr. Obus certainly does, because they did not engage

17     in insider trading.

18          So that's what the case is today, but let me give you

19     a little background what you're going to see in the evidence

20     over the next week or so, maybe longer than a week, about how

21     all this began.  Let's go through some of the history that will

22     be important to this case from the facts that are going to be

23     presented to you.

24          As I mentioned earlier, Mr. Obus manages something

25     called Wynnefield Capital.  Now earlier in Mr. Obus' career, he

 1   had spent more than a decade working in environmental education

 2   in Massachusetts, working in state parks in Massachusetts, the

 3   Audubon Society and something called the Appalachian Mountain

 4   Club.  And then he went and joined an investment firm here in

 5   New York called Lazard, and that's where he met his partner,

 6   the partner that he founded Wynnefield Capital with, a man

 7   named Josh Landes, who in 1992, Mr. Obus and Mr. Landes decided

 8   to found Wynnefield Capital.  And as they grew their business,

 9   they attracted various kinds of investors, people who trusted

10   them with the investor's money.  And by 2001, Wynnefield

11   investors included individuals, families, schools, charities,

12   foundations, lots of different groups, and people that gave

13   them their money to invest, or trusted them with it.  And when

14   those companies that Wynnefield Capital invests in make money,

15   Wynnefield investment value goes up, which means that the

16   people that give them money make money.

17           So 2001, the total amount of money that Wynnefield was

18   managing had grown to about $150 million, and today Wynnefield

19   manages about $300 million.

20           So what is Wynnefield Capital's investment strategy?

21   How do they decide what to invest in?  Well, its investment

22   strategy from the very beginning, from when Mr. Obus and his

23   partner founded it, has been to invest in what's called small

24   cap value companies, small cap value.  Small cap is just short

25   for small capitalization, and I'll explain in just a minute

E5jzobu4                         Opening - Mr. J. Cohen

1    what that means.

2          Value means that the company's a good value; that it's

3    a bargain.  And I told you earlier that public companies issue

4    shares, remember they issue shares in the company, and those

5    could be bought at a stock market.  So market capitalization,

6    which is also called market cap, simply means the number of

7    shares that the company has issued that could be bought by the

8    public, multiplied by the price of the share at the particular

9    day.  That's the market cap.

10         Why am I telling you that?  Why is this going to be

11   important in the evidence you're going to hear?  Because back

12   in 2001, a small cap company generally meant that the company

13   had a market cap of less than $300 million.  That means that

14   the number of shares trading, multiplied by the price per

15   share, equaled less than that $300 million.  Just so you have

16   some perspective to understand what that means, the market cap

17   of Starbucks is about $33 billion; the market cap of Netflix is

18   about $21 billion, much much larger.  And the companies that

19   Wynnefield Capital was interested in were much much smaller.

20   Still are.

21         (Continued on next page)

22

23

24

25

1          MR. J. COHEN:  Their strategy is to invest in

2    companies with market caps of between 25 million to 300

3    million, and Mr. Obus likes investing in small cap companies.

4    Why?  Because many of them are what he considers to be diamonds

5    in the rough, opportunities.

6          Wynnefield does not try to make a quick buck in

7    companies by buying stock and selling stock quickly.  That's

8    not their business model.  That's not how they do it.  Rather,

9    what Wynnefield does is they buy stock and hold it for a long

10   period of time, waiting for the company to become worth more,

11   hoping -- more than hoping, investigating and researching to

12   try to find companies that, over a long period of time, will

13   increase in value.

14         In fact, in 2001, you will hear that Wynnefield

15   Capital's average period of time that they held a stock after

16   they bought it, was three years.  They're not buying and

17   selling quickly.  That's not their business model.  Now, of

18   course, it takes a lot of time and a lot of energy and a lot of

19   hard work and a lot of research to identify these companies and

20   to follow them.  Following means to research and to sort of

21   keep up on them.

22         So these were small companies that very few people

23   have ever heard of.  We're not talking about Starbucks and

24   Netflix.  We're talking about companies that are not well

25   known, that are not large.  There isn't a lot of research

1    available on the Internet or elsewhere about them, and so if

2    you want to do research on them, you really have to do a lot of

3    work to learn about them, and that's what Wynnefield does and

4    that's what it did in 2001.  You have to take time to dig into

5    these companies.

6          So what did Mr. Obus do?  Well, he would find small

7    companies that he liked and he would research them.  And then,

8    back in 1999, Wynnefield Capital hired two research analysts to

9    help with this.  One of them is Peter Black, who's here today,

10   and another is a man named Max Batzer, who you're going to hear

11   from in this case.  Mr. Obus, Mr. Black and Mr. Batzer,

12   together, along with others in the small group at Wynnefield,

13   began to research companies, began to find good deals and buy

14   stocks in those companies for their investors.

15         Part of doing that research is to read all of the

16   public sources all of the public documents that are available

17   about these companies; so they have to read the news articles

18   about the companies and reports that are published about the

19   companies, if there are any, documents that the company files

20   with the Securities and Exchange Commission, that they're

21   required to file every year and every quarter -- and any

22   investor, anybody in the world can get those on the Internet or

23   in hard copy and read them -- financial statements of the

24   company.

25         But research of the kind that Wynnefield does requires

1    more than just reading.  It's much more than just sitting at a

2    desk.  It requires talking with the people who are in charge of

3    the companies, the management of those companies, hearing what

4    they have to say about their company and taking notes.  And all

5    these documents get put into something called a research file,

6    which is just a file that they keep so that they can share

7    information that each member of the team gathers about a

8    particular company, and they can look to the file and come back

9    to the office and find updates of things in the file.

10            Research also involves visiting, actually visiting the

11   companies.  Visiting, sometimes literally walking the factory

12   floor where they make -- the companies make things, talking to

13   the employees to get a sense of what it's like to work at the

14   company.  Research of the kind that Wynnefield does also

15   involves visiting stores.  If the company makes a product

16   that's sold in stores, Wynnefield Capital, you're going to hear

17   in the evidence, literally goes to visit the stores around the

18   country to see how are the products being displayed.  Are they

19   being displayed in a way that customers are going to find them

20   attractive?  Are they being displayed in a way that is better

21   than their competitors or worse than their competitors?

22   Because that matters when you're trying to find a diamond in

23   the rough.  And this is what Mr. Obus and his team did back in

24   2001, and this is the same thing they to today, and they do it

25   well.  They serve their investors well by doing their homework

and making good investment decisions.

Are they lucky?  That was a word I heard earlier today.  Are they lucky?  Does Wynnefield make money out of luck?  I think you're going to find from the evidence that they don't make money out of luck.  They don't always make money.  They make money more often than they don't make money.  They certainly don't make money out of luck.  They make money out of hard work.

Now, one of the companies that Wynnefield researched and investigated was SunSource, and you're going to hear a lot about SunSource.  Mr. Andrien with SunSource was the CEO, the chief executive officer of SunSource, in 1999 through 2001. He's going to testify here.  SunSource was a company, as Mr. Kisslinger said, that made hardware, made products for hardware stores like keys, nails, screws and signs and things like that.

And Mr. Obus had known about SunSource and had researched it since the 1980s.  I think I mentioned to you earlier he owned stock in SunSource or owned a part of it for more than 15 years before this case.  And part of it is SunSource is from Philadelphia, which is where Mr. Obus is originally from, and he's always had a great interest in Philadelphia companies.

In 1997, SunSource became a public company.  You could sell shares over stock market filings.  As a  public company,

E5JPOBU5                    Opening - Mr. J. Cohen

1   that meant that Wynnefield Capital could finally buy shares in

2   SunSource.  So what happened?  They started to buy shares in

3   SunSource in 1997, four years before the trade at issue in this

4   case, the so-called tipped issue in this case.

5          It fit perfectly within Wynnefield Capital's

6   investment strategy to buy SunSource stock.  SunSource was a

7   perfect potential opportunity for Wynnefield Capital.  It fit

8   right into that sweet spot of the kind of companies and the

9   kinds of opportunities that they were looking for, because in

10  1999, Wynnefield Capital's market cap was $75 million and it

11  had dropped to 30 million by 2000.

12         What that meant is its stock price was dropping, and

13  it was an opportunity, an opportunity for people who could see

14  that there was value there that others weren't seeing, that the

15  stock market wasn't observing, but hard working investors, like

16  Wynnefield Capital, could see it and then buy the stock and

17  hope to make money on it over time.

18         Now, Mr. Obus and his team did that kind of research

19  on SunSource.  They will tell you about the research they did

20  to learn about and understand SunSource.  They will tell you

21  about how they read press releases and news articles, how they

22  analyzed the financial numbers of the company.  They will tell

23  you how they read every single filing that was given, that was

24  filed by law with the SEC, that was required to be filed by

25  SunSource.  They read all of them.

E5JPOBU5                    Opening - Mr. J. Cohen

1          They will tell you that they met with management of

2     SunSource in order to understand what direction the company was

3     taking, how it was trying to improve, how it was trying to

4     improve parts of the company that weren't doing so well.  And

5     you're going to hear that those conversations with management

6     happened frequently, by telephone, in person, over a course of

7     many years, including directly with Mr. Andrien.

8          And over the years, while Mr. Obus and his team were

9     continuing to research and follow SunSource, they continued to

10    buy SunSource stock.  You're going to hear, and you're going to

11    learn, that they bought SunSource stock when it was trading at

12    $25 a share, and you're going to see that they bought SunSource

13    stock when it was trading as low as $2.91 a share and all these

14    prices between those two.  They bought and they sold it for

15    years before June 8th, 2001.

16         In the spring of 1999, SunSource decided to hire

17    Maurice Andrien.  They made him their new chief executive

18    officer.  Mr. Obus thought Mr. Andrien had a good vision for

19    the company.  He met with him soon after Mr. Andrien was hired.

20    He thought that Mr. Andrien had a good idea for how to improve

21    the profitability of the company, how to deal with parts of the

22    company called divisions that were not doing so well, and how

23    to improve parts that had greater opportunity.

24         And as part of Mr. Obus' research, he called, he met

25    with Mr. Andrien many times.  You're going to see evidence of

this, lots of it.  Mr. Obus would call Mr. Andrien sometimes

over the course of their relationship because he liked things

that were happening at SunSource.  And you're going to hear

that Mr. Obus was not shy.  He would not hesitate to call

Mr. Andrien sometimes when he didn't like things that were

happening at SunSource.  Why?  Because that's his obligation to

his investors, to make sure that SunSource is doing the best it

can to make money, since Mr. Obus is making a decision to

invest his investors' money in SunSource.

          And then you're going to hear about October of 2000.

In October 2000, Wynnefield Capital bought more shares in

SunSource.  You can see that up here on the chronology.  You're

going to see October 25th is in one of these -- something

called an earnings call.  You'll learn about that, which is

just an event where the company announces how it's doing.

          And on October 25th, they bought 285,100 shares of

SunSource.  That was about five percent of the shares in the

company, and Nelson was pleased with how the company was doing

at this point.  He felt that, under Maurice Andrien's

leadership, they were making some good moves, they were making

this company a better investment long term, and he was

confident in Mr. Andrien's leadership.

          In Mr. Obus' opinion, SunSource was moving in a good

direction, but Mr. Obus also realized that one challenge that

SunSource faced -- and you're going to hear this from lots of

witnesses in this case -- was that they were short for cash

because they were doing lots of things to improve their

business, but it was costing them a lot of money to do it, and

that was a real challenge for this company.  In fact, for lots

of small companies, good idea, good direction, good vision, but

they need money to get there.  Are they going to get there with

enough money, is always the big question.

So you're going to learn, in particular, that about a

year before, October 2000, one of the bold moves, one of the

good moves that SunSource had made under Mr. Andrien's

leadership was to buy another company called Access

Technologies, which had a technology to cut keys and to also

engrave the pet tags, the kind of pet tags you find at PetSmart

or maybe in hardware stores.  And you're going to hear that

Mr. Obus thought that was a good idea, but it cost a lot of

money to buy that company, and it created a cash shortage for

SunSource; so they had to have more money in order to keep

operating.

So what happened?  In December 2000, SunSource

announced that it had borrowed $30 million.  You see there,

December 28, SunSource announces loan, on the time line there.

Mr. Obus remembers reading about this because SunSource did a

press release in which it announced that it had taken a

$30 million loan with a lender, a group that loans money to

companies.

1        Now, let me move you forward briefly four months

2   ahead.  It's now not December 2000, it's now April 2001.

3   SunSource has now filed what's called a 10-K, which is an

4   annual report that the SEC requires all public companies to

5   file.  Anybody can get it; anybody can read it.  Mr. Obus was

6   reading all of the 10-Ks for all of the companies that

7   Wynnefield Capital invested in.  There were over 30 that he had

8   to read, and many of them he had to read in the month of April

9   because that's when they all came out.

10        And he got to the one for SunSource, and he was

11   reading it, and it gave a summary of the company's financial

12   performance for the year.  And he was reading it because he was

13   getting ready for the company's annual meeting, which he

14   attends every year.  An annual meeting is just an opportunity

15   for the company to invite in its shareholders and investors and

16   possible investors -- in fact, anybody can go, anybody in the

17   public -- and their management talks about the company and how

18   it's doing and they answer questions.

19        So Mr. Obus was preparing for that meeting, reading

20   the 10-K in April, and he noticed something in it.  He noticed

21   a new fact about that loan in December that SunSource had not

22   disclosed, had not disclosed in its press release or other

23   information in December, and this upset Mr. Obus.  He was upset

24   by what he read.  He learned that SunSource had given away to

25   that lender, in December, 285,000 shares of SunSource stock

1   pretty much for free.

2          What they had done is they'd gotten the chance to buy

3   285,000 shares of SunSource stock for one penny per share.

4   That was part of the loan agreement, but it was part of the

5   loan agreement that wasn't disclosed until April, and Mr. Obus

6   was not happy to be learning this four months later.  Why was

7   he unhappy?  Because it's something that's called dilution.

8          Now, let me give you an example of what dilution is.

9   Let's say I own five shares out of a total of a hundred shares

10  in a public company.  That means I own five out of a hundred,

11  five percent of the company.  Let's say the company decides to

12  issue a hundred more shares.  Now, I own five out of 200

13  shares; so my ownership has gone down from five percent to

14  two-and-a-half percent.  That's called dilution.  That's not a

15  good thing for me, and that's not a good thing for Mr. Obus'

16  investors, his limited partners, because he was buying -- he

17  owns stock in SunSource, and now all of a sudden they had been

18  diluted because 285,000 shares had been given away to this

19  lender basically for free.

20          So what did Mr. Obus do when he was frustrated about

21  this?  He picked up the phone and he called Maurice Andrien in

22  April, and he complained.  He complained about what he just

23  read, raised the concern with Maurice Andrien, just as he had

24  done before, and just as he would do later when other things

25  came up that disturbed him because that's the way he acts on

E5JPOBU5                        Opening - Mr. J. Cohen

behalf of his investors.

He told Mr. Andrien what he was upset about.  He said that SunSource hadn't explained in December that they had given away these free shares, and they hadn't explained they had diluted the shareholders.  And he said to Mr. Andrien that if SunSource was thinking about -- if they needed more money, that they should consider other options, other options that are fairer, that are more fair to current shareholders than just diluting them like this, and that was the conversation he had with Mr. Andrien in April.

Mr. Andrien listened to Mr. Obus and listened to his concerns, and that was the end of the discussion.  And then Mr. Obus, a couple of weeks later, went to that annual meeting, along with other shareholders, and continued to follow SunSource.

Now, about three weeks after that, May 24th, 2001, one of Mr. Obus' analysts, Peter Black, got a telephone call from his friend Brad Strickland -- and you'll hear more about this call from Mr. Black and Mr. Strickland's lawyers after I finish, which will be fairly soon, I promise -- and Mr. Strickland worked for GE Capital at the time.  And GE Capital, you're going to learn in this case, is in the business of making loans to companies.

Mr. Strickland, you're going to learn, was doing research for GE Capital, for his employer, and he saw in a

1    public document that Wynnefield Capital owned a lot of

2    SunSource stock.  Wynnefield Capital was the place where his

3    good friend Peter Black worked.  So what did he do?  He picked

4    up the phone and he called Peter at his work, and he asked him

5    what he thought about SunSource's management.  It was a short

6    call, a short conversation.

7            Mr. Black told Mr. Strickland that he thought the

8    management of SunSource was solid, thought they were good guys,

9    and that was the extent of the call.  That was the extent of

10   the call.  That was the extent of their conversation.  It was

11   short, and you're going to hear about it from both of them.

12           Mr. Black then told his boss, Mr. Obus, at the

13   Wynnefield offices in New York, about the call.  Now, knowing

14   that GE Capital is in the business of making loans, Mr. Obus

15   immediately jumped to the conclusion that SunSource was

16   thinking about doing another one of those loans that he hadn't

17   liked, the one where the free shares were given away, the one

18   that happened in December, the one that the company hadn't

19   disclosed very important facts that told shareholders about

20   those free shares until four months later.

21           So what he did, he called Mr. Andrien again on

22   May 24th, and he raised this complaint.  And he said to

23   Mr. Andrien something like:  Maurice, I don't know if you're

24   going -- if you're doing another loan that will hurt the

25   long-term investors, but if you're doing another loan like you

1   did in December, and if you're giving away shares, don't do it.

2   It's not fair to current shareholders.  Think of other options.

3   And that was basically the tenor of their conversation.  That's

4   the May 24th call.  That's what happened.

5         Now, a few weeks later, Wynnefield Capital's trader,

6   someone who works at Wynnefield, gets a call.  It's now

7   June 8th, 2001, the day when Wynnefield Capital does buy some

8   more stock.  Let me explain to you what you're going to learn

9   from the evidence about that purchase.  June 8th, Wynnefield

10  Capital gets a call from a trader in California.  The broker --

11  he's a broker.  I'm sorry, he's not a trader.  He's a broker.

12  His name is Baron Bruno.  You're going to hear from him.  He's

13  going to testify.  And you're going to hear that Baron Bruno,

14  at that time, worked for a firm in California that bought and

15  sold companies on behalf of clients.

16        So a client wants to sell shares or buy shares, and

17  they go to a broker to try to find someone else who will buy it

18  from them.  And in this instance, Mr. Bruno had learned in his

19  firm that they had a customer that wanted to sell some

20  SunSource shares.  So Mr. Bruno, you will learn, researched the

21  public filings of SunSource to see who were the bigger

22  investors in the company.  And what did he see?  He saw that

23  Wynnefield Capital was one of the bigger investors in the

24  company.

25        Why would he be interested in that?  Because if you're

trying to sell shares -- he'll tell you this; Mr. Bruno will

tell you this -- if you're trying to sell shares, the first

place you might want to look is people that are already owning

the shares, people that are interested in the company.

So what does he do?  He calls Wynnefield Capital to

see whether they might be interested in buying those shares.

Mr. Bruno called Wynnefield Capital and said that he had a

block of stock, a large amount of stock for sale and asked

whether Wynnefield wanted to buy it.  This is what's called an

unsolicited offer, an unsolicited offer of stock that

Wynnefield Capital was not looking for, did not look for.

Mr. Bruno and the documents from his firm will confirm

this to you.  You will see it.  Mr. Bruno didn't know anything,

didn't know whether Wynnefield might be interested in buying

stock when he called Wynnefield.  He had no idea.  He was just

making a call to see if he could find someone to sell it to,

and he called Wynnefield and he asked whether they wanted to

buy the stock, and Mr. Bruno sought out Wynnefield.

Wynnefield did not seek out Mr. Bruno in any way at

all.  This is very important.  Wynnefield did not go out into

the market and look for stock to buy on June 8th or, at any

time between May 24th and June 8th.  They didn't.  They got

this call unsolicited and they reacted to it and that's what

the evidence will show you.  Wynnefield, in fact, bought the

stock for a five percent discount.  They got it at a lower

1   price than it was originally offered to them.

2          Mr. Obus, agreed to buy the stock at the lower price

3   because he thought it was a good investment.  He thought the

4   price was good, and he thought it was an opportunity to get

5   more of the stock in a company that he liked.  That's why he

6   bought it, and he's going to explain that to you.

7          And what did Mr. Obus do after he bought the stock

8   that day, June 8th?  You're going to learn that he called

9   Mr. Andrien, and he told him, Maurice, I bought more stock in

10  your company because it's a courtesy call that he sometimes

11  makes.  He called Mr. Andrien to let him know he bought more

12  stock because he wanted Mr. Andrien to know he still had

13  confidence in his company.

14         So now you heard from Mr. Kisslinger that Wynnefield

15  bought stock, quote, at the very first opportunity, the very

16  first opportunity.  I'll let you decide when you see the

17  evidence whether that makes any sense.

18         Now, on June 19th, SunSource announced something.  You

19  see this -- we're getting -- you can tell I'm getting close to

20  the end because it's getting to the right side of the margin,

21  June 19th in yellow.  SunSource announced that it was going to

22  be bought by Allied Capital.  Mr. Obus read the press release

23  that was issued by the company that he got that day with that

24  news.  And before reading the press release let me be very,

25  very clear about this, if it isn't clear already, before

1    reading that press release, Mr. Obus had absolutely no idea

2    that SunSource was being bought by Allied Capital.  He had no

3    idea.

4         When he learned about it, he wasn't happy.  He wasn't

5    happy because he thought the price, $10.38 a share, was too

6    low.  Mr. Obus had been patiently following this company,

7    investing in it, working on it, having his team work on it, go

8    do these visits to factories and to company divisions, meet

9    with Maurice Andrien, call Maurice Andrien with complaints when

10   he wasn't happy, call Maurice Andrien with support when he was

11   happy.

12        He'd been involved in this company, financially and

13   otherwise, seeing how its fortunes developed for years, and he

14   felt that it hadn't yet reached its full value.  He felt that

15   it was worth a lot more than $10.38 a share, and you're going

16   to learn this not only from him, but you're going to see this

17   in documents before the time of the trade which support the

18   research that he had done that will prove that.

19        So what did Mr. Obus do, yet again?  He now knows,

20   he's now heard about this, that Allied Capital is buying the

21   company.  He's not happy about it.  So he calls Mr. Andrien

22   again, and he calls to complain and he said to Mr. Andrien:  I

23   can't believe you sold the whole company.  I can't believe you

24   sold the whole company.  He told Mr. Andrien that he thought

25   that the price was too low, and he asked Mr. Andrien how

1    Wynnefield could go about finding another possible buyer who

2    could put in a bid for the company, for SunSource, for a higher

3    price, for what it might really be worth.

4          And then you're going to learn that throughout the

5    summer of 2001, Mr. Obus and his firm, on their own and working

6    with another investor, tried to find another buyer to bid more

7    money for this company, tried to get a higher price because

8    they actually believed that $10.38 a share was too low.

9          Now, although Mr. Obus wasn't happy about this, and he

10   clearly expressed it to Mr. Andrien and to others, who will

11   testify here and tell you about it, Mr. Obus eventually

12   accepted the fact that Allied Capital was simply going to be

13   buying SunSource.  There was nothing that Mr. Obus could do to

14   stop it.  So as part of the acquisition, there was a question

15   about how much tax Wynnefield Capital would have to pay on

16   those stock -- all the way on the left -- they bought in

17   October of 2000.

18         So Mr. Obus called Mr. Andrien, and he asked him

19   whether there was anything that Mr. Andrien could do to help

20   Wynnefield with this tax question.  Perfectly appropriate

21   question.  And Mr. Andrien thought about it, and he said that

22   he would look into it to see whether he could help Mr. Obus

23   with this.  Mr. Andrien did, in fact, look into it, into the

24   tax question that Mr. Obus had asked him.  And then he later

25   came back to Mr. Obus and he said, you know, I'm not sure if we

1   can help you, but let me give you the name of someone at the

2   new owner, the guys that are buying the company from us, Allied

3   Capital.  You can ask him about the tax question.

4           And so Mr. Andrien told Mr. Obus to call Dan Russell,

5   this fellow, at Allied.  You've heard me say this, and I'm

6   going to tell you again because it's very important, Mr. Obus

7   had never met Mr. Russell, never heard of him, never interacted

8   with him, never spoken to him.  And he called him only because

9   Mr. Andrien recommended that he call him about the tax issue.

10          So he calls this complete stranger in August 2001, and

11  they talk about the tax issue.  Now, I told you that this case

12  largely turns on those two phone calls, Mr. Obus' May 24th

13  phone call to Mr. Andrien, and Mr. Obus' -- it's August, we

14  believe, August phone call to Mr. Russell.  Mr. Obus is going

15  to testify about what he said to Mr. Andrien and what he said

16  to Mr. Russell and what they said to him.

17          Let's talk first about the earlier call, the Andrien

18  call, Mr. Andrien call.  Mr. Obus is going to testify that he

19  called Mr. Andrien on May 24th, as I said, not -- to tell him

20  not to make another loan with free shares, because that's what

21  he thought might be happening, and to consider other options.

22  And what about the call with Mr. Russell in August after the

23  deal has been announced?  Mr. Obus will testify that he called

24  Mr. Russell in August to discuss the tax issue and the tax

25  question only.  That's the only thing they talked about.

1      You'll hear, as you heard from Mr. Kisslinger, the SEC

2    has a different take on those calls.  According to the SEC,

3    Mr. Obus called Mr. Andrien, he called him and he admitted that

4    he'd been tipped.  According to the SEC, Mr. Obus called

5    Mr. Russell and, again, he called a stranger and said, I was

6    tipped.

7      So what's the evidence going to show about those

8    calls?  Well, again, there are no notes, there are no

9    recordings, there are no memos.  Regarding the call with

10   Mr. Andrien, the evidence will show that Mr. Andrien mixed up

11   parts of different calls that he had at different times with

12   Mr. Obus 13 years ago.

13     And regarding the call with Mr. Russell, Mr. Obus will

14   tell you, flat out, he never told Mr. Russell that he was

15   tipped.  Why did he not tell Mr. Russell that he was tipped?

16   Because he wasn't tipped.  That's why he didn't say it, because

17   it didn't happen.  To confess to a complete stranger that you

18   knew that his company was going to acquire another company

19   before it happened, defies common sense.

20     What's more, and this is important, you're going to

21   learn from the evidence that just two weeks after that

22   August 2001 call to Mr. Russell, to this fellow, Mr. Russell

23   was asked to respond to a request from authorities regarding

24   any information about insider trade or possible insider trading

25   in SunSource, and Mr. Russell said nothing about Mr. Obus

1    saying he had been tipped.  Nothing.

2            Now, the SEC's version of events makes Mr. Obus out to

3    be the most unskilled, the lamest insider trader in history.

4    Insider trading -- again, you're going to learn this from the

5    evidence -- is about knowing something you shouldn't know and

6    using it to trade stock in violation of the law.  So it's about

7    concealment.  It's about deceiving other people.  It's about

8    hiding things.

9            But if you believe the SEC and the story they want you

10   to accept, you'll have to believe that Mr. Obus is the worst

11   insider trader ever because, according to what they want you to

12   accept, he didn't hide anything and he didn't deceive anyone.

13   Instead, if you believe them, the SEC, Mr. Obus got tipped and

14   then he immediately picked up the phone and called the CEO,

15   Mr. Andrien, to tell him:  I've been tipped.  Does it make any

16   sense that you get tipped, and then you call the CEO of the

17   company and tell him:  I've been tipped?  You'll have to decide

18   that from the evidence.

19           And if you believe the SEC's evidence, after he gets

20   tipped and then calls the CEO to say, hey, I've been tipped,

21   what's the next thing he does?  Does he run out and look for

22   stocks so he can buy stocks and make some money off of this tip

23   he's gotten?  No, he doesn't.  The evidence will show the exact

24   opposite.  For two-and-a-half weeks they don't look for any

25   stock.  In fact, they never looked for any stock.  The only

E5JPOBU5                    Opening - Mr. J. Cohen

1    reason they buy stock on June 8th is because it was presented

2    to them in that unsolicited offer that you're going hear about

3    and you're going to see documents that support that.  Does that

4    make any sense?

5         You're going to have to seriously consider whether

6    this story makes sense.  Would Mr. Obus risk everything for one

7    trade in one stock, for one percent of Wynnefield's portfolio?

8    It doesn't make sense.  It doesn't make sense for a good

9    reason, because it didn't happen.

10        So when you all came here today, you came with your

11   common sense, and you're going to bring it with you every day

12   you come.  You carry it with you everywhere you go, and

13   hopefully, you'll be able to apply it to the facts.  And every

14   day, when you're hearing witnesses testify and you're seeing

15   evidence, I would just ask that you apply your common sense.

16   You don't need anything more in this case, and you've got that

17   working for you.  And it's a very, very powerful tool for

18   figuring out what happened here.

19        You agreed a few minutes ago to listen to all the

20   evidence and to keep an open mind before making a decision in

21   this case.  And at the close of the evidence, you will be

22   instructed by Judge Daniels about what the law is that applies

23   here.  The burden is on the SEC to prove its case to you.

24   That's true today, that will be true two days from now, that

25   will be true when this case ends.  It will always be their

1    burden.  And the SEC will not be able to prove its case, and

2    there's a simple reason for that, because Nelson Obus did not

3    engage in insider trading.  So I thank you for your attention,

4    and I thank you very much for your service.

5              THE COURT:  Mr. Cohen?

6              MR. M. COHEN:  Thank you, your Honor.

7              Thank you, your Honor.  May I proceed?

8              THE COURT:  Yes, sir.

9              MR. M. COHEN:  Good afternoon, members of the jury.

10   My name is Mark Cohen, and my firm represents Peter Black.

11   Mr. Black?  I'd ask Mr. Black to stand again.

12             With me are my colleagues, John Abernethy -- John, if

13   you could stand -- and Reggie Schafer, and together, we will be

14   presenting his defense.  We represent Mr. Black, and only

15   Mr. Black.

16             Members of the jury, we agree with the SEC on one

17   thing.  This is a serious case.  It is very serious.  The SEC

18   accuses Mr. Black of insider trading.  They claim that he

19   tipped his boss, Nelson Obus, after receiving a tip from his

20   friend Brad Strickland.  They state what the tip was, and you

21   heard that this morning, that on the morning of May 24th, 2001,

22   Strickland told Black about Allied's planned acquisition of

23   SunSource and that Black conveyed this information to Mr. Obus.

24             That is the allegation in their lawsuit.  That is the

25   allegation in their case.  So make no mistake, for Mr. Black,

this is a very serious case.  Nothing could be more serious for

him.  And that's why we're relying on you, ladies and gentlemen

of the jury, to listen carefully to the evidence as it comes in

and to evaluate it in light of your common sense and

experience.

        The evidence will show that Peter Black is a hard

working, dedicated professional who has worked in the financial

industry for his entire business life.  The SEC's allegations

are completely inconsistent with everything he's done in his

life, everything he's worked hard for, everything he believes

in, everything he is.  Simply put, the SEC's allegations make

no sense, given who Peter Black is.  They make no sense because

they're false.

        Now, the SEC has the burden of proof here.  That

burden never shifts to us, and they will not be able to carry

their burden as to Peter Black.  Why?  Because he didn't do it.

He did not commit insider trading.

        Let me tell you a little bit about my client, give you

a bit more of a fuller picture than the SEC just did.  One

thing you'll see again and again over these next two weeks, as

you hear the evidence, and you saw it again in the opening by

the SEC, is they're trying to give you a case built on sound

bites.  Sound bites, nothing more, not even close to evidence

sufficient to carrying their burden of proof.  I was able to

jot down three or four sound bites in their opening.  My

1    handwriting is not even that good.  Corrupt and illegal trade?

2    Treasure chest?  Trading information like baseball cards?

3    Whatever that means.  Sound bites, not evidence.

4         Let me give you some background about Mr. Black.  Let

5    me tell you what he's really like.  You'll learn that he's 42

6    years old.  At the time of the events in this case, 13 years

7    ago, he was in his late 20s.  He grew up in Long Island.  He

8    was and is close with his family and friends.  His father was a

9    respected, ethical businessman.  He looked up to his father,

10   wanted to go into business like his father had.

11        He went to college in Boston College.  He graduated in

12   1994.  He went and got a job.  Then he went to business school

13   at Fordham University and graduated in 1997.  After graduating

14   from business school, he went to work at a big investment bank

15   called UBS.  He went through UBS' training program, where they

16   taught him how to be an analyst, the skills of being an

17   analyst.  They also trained him on compliance policies.  That

18   is, in laymen's terms, learning the rules of the financial

19   world and how to follow them.  He also received training on the

20   insider trading rules and, of course, he learned how important

21   it is not to engage in insider trading.

22        He worked at UBS and another big bank for about two

23   years, and then he decided to move.  He decided that working at

24   a big bank just wasn't for him.  He wanted to work on the

25   investment side, and he wanted to work at someplace small,

1    where he knew everybody.  So he searched for another job, and

2    he wound up getting hired at Wynnefield Capital as an analyst.

3            And as you heard from my colleague, Joel Cohen,

4    Wynnefield was and is an investment firm.  They invested in

5    small companies called small cap investing.  Wynnefield wasn't

6    buying Apple or Coca-Cola.  They were looking for small

7    companies that they found out about through research and hard

8    work.  So they were looking at the places where the big banks

9    didn't look or the big investors didn't look.  If you will,

10   they were like the basketball scout who goes to the small

11   school to look at somebody who other scouts may not have looked

12   at, or the theater producer who goes to a small regional

13   theater to try to find the next star, someone maybe Broadway

14   has overlooked.

15           And how did they do it?  They do it, as Mr. Joel Cohen

16   just described for you, through research, through hard work.

17   And when they thought they had done that work, if they believed

18   the company was a good company and for some reason its stock

19   was at a good price, then they would buy it, and they would

20   hold the stock for the long term, hoping hopefully it would go

21   up.  So, again, this wasn't day trading.  This was doing

22   homework, researching companies, buying and holding for the

23   long term.  This is what Mr. Black wanted to learn how to do,

24   and as I mentioned, Wynnefield was a small place where you knew

25   everybody.

1          Mr. Black's boss was Nelson Obus.  Mr. Black went to

2     Wynnefield in large part because of Mr. Obus, who had many

3     years of experience in the small cap world and had an

4     excellent, sterling reputation in the industry, and he was

5     passionate about what Wynnefield did.  He'd get excited when

6     Wynnefield's research uncovered a really good company that

7     maybe no one else had bothered to take the time to look at, and

8     because Mr. Obus was so involved, he'd get passionate.  He'd

9     even get upset when he thought management of a company was not

10    being fair to long-term holders like Wynnefield.

11         Wynnefield's offices were on 7th Avenue, right near

12    Penn Station.  Not big, fancy offices.  Everyone sat together

13    in one room.  The room they sat in was probably a third the

14    size of this courtroom.  They all sat around one table.

15    Mr. Obus sat on one side with some of their colleagues, and

16    about four or five feet across sat Mr. Black with other

17    colleagues.  Between them was a black divider and then computer

18    monitors and then papers and books; so that they could not see

19    each other directly.  They could see the top of each other's

20    heads.

21         And during the day, things could get busy, people

22    talking on the phone, people talking to each other, people

23    typing on their computers, what have you, and they could get

24    noisy.  So if Mr. Black wanted to get his boss' attention

25    during one of those periods, he would do what he did every day.

He'd stand up out of his chair and motion to Mr. Obus.  That's
what everybody did when they wanted to get their attention at
Wynnefield.

Now, as I mentioned, he joined Wynnefield, Mr. Black,
in March of 1999, and he was an analyst reporting to Mr. Obus.
Mr. Black wasn't a partner in the firm.  He was paid a salary.
He didn't make trades on behalf of the firm.  He couldn't tell
anyone to make trades.  Only Mr. Obus could do that.  So what
did Mr. Black do?  Well, you'll learn he spent a lot of time
doing the research I mentioned, the homework, and there's a
term for that in the financial world, it's sometimes called due
diligence.  Mr. Obus would assign him five or ten companies to
follow, that's also sometimes called covering the company.  And
Mr. Black would cover or research those five or ten companies
and then report back to Mr. Obus.

How did he do it?  How did he go about it?  Well, he
followed the very traditional approach that analysts had used
for many years that he learned about at UBS and that he
continued to learn about at Wynnefield.  He'd seek out
information from many sources.  There was no one source that
was mandatory.

So, for example, as my colleague mentioned, public
companies are required to file annual reports every year, and
in those annual reports, they disclose information about
themselves.  They're also required to file reports every three

months, or three months are called a quarter; so these are
called quarterly reports.  And they, again, disclose
information about themselves.

          Mr. Black would review that information.  He'd go to
the company's annual meeting.  Every three months after a
quarterly report came out, the company would have a conference
call that any investor could participate in, and he'd listen in
and participate in those calls.  He'd do financial models about
a company.  He might read industry journals about the industry
it was in.  He might talk to suppliers, to customers.

          If analysts at other firms were also looking at the
company or covering it, he'd talk to them.  He talked to other
shareholders who had bought the company stock.  He might see
those other shareholders at an annual meeting, might hear them
on a conference call.  If he wanted to find out who the other
shareholders were, there's no secret about that.  It was
publicly available.  And he'd speak to management.  That was
important too.  Analysts needed to know who's running the
company.  Were they good managers?  Did they run the business
well?  What were their plans for the future?  So Mr. Black
would try to speak to management as well.  He'd visit their
offices.  He'd speak to them on calls.

          In all, this was the standard, accepted way of doing
due diligence.  After he did this, he would report back to his
boss, and Mr. Obus would decide whether to buy more stock if it

E5JPOBU5                      Opening – Mr. M. Cohen

was a company that Wynnefield already owned, or to buy stock at
all if it was a company that Wynnefield did not own.

          And in doing this work on behalf of the people who had
entrusted their money to Wynnefield, Wynnefield was always
concerned about doing things the right way, doing their
homework, doing their research and playing by the rules,
following the securities laws.  So that was the state of
Mr. Black's business life in 1999 to 2001, the period that this
case focuses on.

          Let me touch briefly on his personal life, what was
going on then.  He was in his late 20s.  He was single.  He was
living in Manhattan.  He was very close with his family, and he
had a group of friends from college that he was close with.
Brad Strickland was a close friend of Mr. Black.  There's no
secret about that.  There's nothing sinister about that.
They'd met in college.  They'd become good friends.  After
college, they both worked in New York.  They had similar
outside interests, and most of the time they would talk about
social things.  Some of the time they would talk about their
jobs.

          What did Mr. Black know about Mr. Strickland's job?
He knew that Mr. Strickland worked at GE Capital.  Now, many of
us know GE.  It's one of the largest companies in the world,
and it has many different businesses.  One of those businesses
is a financial business called GE Capital, and that's where

Mr. Strickland worked.  And as Mr. Black understood it,
Strickland worked in the part of GE Capital that made loans to
companies.  They were a lender.  The loans might be backed by
the company's assets or some other collateral.

          And like his friend, Strickland was just starting out
in his career and held a junior position.  So his job, as
Mr. Black understood it, was to do homework on companies GE
Capital was thinking of loaning money to, from the perspective
of whether the company would be able to pay back the loan in
the future.  So that's briefly an overview of Mr. Black's
personal life, and his friendship with Mr. Strickland in the
1999 to 2001 time period.

          Let me talk briefly now about SunSource, the company
who's stock is at issue in this case.  As you heard, SunSource
was a company which had different divisions.  One of the
divisions, called Hillman, was in the hardware business.
Another division, called STS, was in the inventory systems and
hydraulics business, and a third division, called Harding
Glass, sold glass products.

          Now, when Mr. Black joined Wynnefield in 1999,
Wynnefield already owned SunSource.  As you heard from my
colleague, Mr. Obus had been following SunSource for years and
had purchased it for Wynnefield before Mr. Black ever joined.
And, again, there was no secret about that.  Wynnefield's
holding of SunSource stock could be seen by anyone in the

1  financial industry who had a Bloomberg terminal, which is a

2  computer terminal where you can see holdings of stock.

3         So when Mr. Black joined the firm, his boss did not

4  assign him to follow SunSource every day or cover it, as they

5  say in the industry, because there was no need.  Mr. Obus was

6  already covering it himself.  Okay.  So what was Mr. Black's

7  involvement with SunSource?  Well, on a few occasions he helped

8  his boss out.  Remember I said, one of the things that a good

9  analyst will do is they will go to visit management?

10         In 1999, SunSource decided to have a meeting with

11  management for analysts to come visit some of their operations

12  in Chicago and a few other cities in the midwest.  Mr. Obus was

13  supposed to go, but he couldn't go; so he asked Mr. Black to

14  go, listen, take notes and report back, which he did.  He came

15  back from that meeting, Mr. Black did, thinking that

16  SunSource's management was doing a good job, that they had one

17  division, Hillman, that was doing very well and the other

18  divisions weren't doing so well and maybe they would need to

19  sell them or do something about them.  He took notes, came

20  back, went over his notes with Mr. Obus and gave them to him.

21         Other than that, there were a few times in 1999 and

22  2000 when SunSource held conference calls for investors and

23  Mr. Black listened in.  Again, either because Mr. Obus was

24  supposed to and couldn't make it, or because Mr. Obus was

25  listening in already and said, hey, why don't you listen in on

1    this call, too.  Mr. Black didn't follow SunSource day-to-day.

2    There was no need for him to.  Mr. Obus was doing it and, in

3    fact, you'll learn that another analyst, Mr. Batzer, had joined

4    the company in '99 also, and he started to help Mr. Obus with

5    SunSource.

6            So with that background in mind about Mr. Black's

7    business life, his personal life, his involvement with

8    SunSource, why don't we now go to the events of May 24th, 2001,

9    that you heard a lot about from the SEC this morning, about the

10   calls on that day.  And I thought the SEC did a very

11   interesting thing in their opening when they got up to this

12   part of their presentation.  They would talk about the

13   conversation between Mr. Strickland and Mr. Black.  They'd say

14   they're getting to it.  They'd get to it, and then they

15   wouldn't tell you what was discussed.  They'd talk about the

16   conversation between Strickland and Black, we're going to talk

17   to you about it, they'd get to it, and then they wouldn't tell

18   you what was discussed.  They'd go right past it.

19           Why don't we talk about what really happened, what the

20   evidence is going to show you they discussed in that call.  In

21   the morning of May 24th, Mr. Black was at work at Wynnefield,

22   sitting at that long table I described for you.  He was doing

23   his job, and he got a call from Mr. Strickland.  And both

24   Mr. Strickland and Mr. Black will take that stand and testify

25   for you about the conversation.  Now, they're not going to be

able to give you the exact words they used 13 years ago.

They're not going to be able to do that, but they'll be able to

tell you the substance of what they discussed, and their

testimony will be consistent.  The only difference is that

Mr. Black remembers it as being a phone call and Mr. Strickland

remembers it as being a conversation in a restaurant or a bar.

What did they discuss?  They spoke socially for a

time, and then Mr. Strickland said something like:  I see from

Bloomberg, the computer screen, that you guys own SunSource

stock.  He wanted to know what Mr. Black thought about the

company.  What do you think about management?  And

Mr. Strickland indicated that GE Capital was thinking of

potentially doing business with SunSource.

What did my client say?  Well, remember, he didn't

follow SunSource every day.  He'd done some work on them.  He'd

gone on the Chicago trip; so he told Mr. Strickland what he

remembered about the company.  He thought management were good

guys and were doing a good job.  He said that one of the

divisions was doing well and the other divisions weren't, and

management was trying to fix it, and that's it, ladies and

gentlemen.  No insider tips, no discussions of mergers and

acquisitions, no mention of Allied, no deceiving anyone.

Indeed, Mr. Black will tell you this was the sort of

high-level due diligence call that happened all the time in his

industry.  It's like calls others had made to him, that he

E5JPOBU5                        Opening - Mr. M. Cohen

1    himself has made.  Hey, I see on Bloomberg you own a lot of

2    company X, why do you like them?  What do you think of them?

3    This sort of question happens every day in his industry, and

4    there's nothing wrong with it.  Mr. Black had no idea what

5    prompted Mr. Strickland to call and ask about SunSource at the

6    time.  Maybe GE Capital, which makes loans to companies all the

7    time, was thinking of making a loan to SunSource.  Maybe they

8    weren't.

9            Now, in their opening, the SEC spent some time talking

10   about a deal book, they called it, some documents which they

11   say were confidential documents that were in the possession of

12   GE and Mr. Strickland, and they talked about one which they

13   called extremely confidential.  Well, you'll learn that

14   Mr. Black knew nothing of these documents.  Mr. Strickland

15   never sent them to him.  No one did.  It is undisputed that he

16   never had them.

17           And all this leads to a critical point, ladies and

18   gentlemen.  When we ask you to keep in mind throughout this

19   trial, as you hear the evidence come in, Strickland and Black

20   will both testify for you -- and the testimony about the

21   conversation is consistent -- Mr. Strickland was trying to do

22   some due diligence.  He asked high-level questions about

23   SunSource and its management.  Think about that.  The SEC is

24   bringing an insider trading case based on this conversation

25   between Strickland and Black when both sides to the

1    conversation will testify under oath that there was no tip.

2    Really?  How can that be?  What does that mean?

3              It means that if you credit or believe the testimony

4    of Strickland and Black, which we submit that you will after

5    you have a chance to observe them, this case is over.  No tip,

6    no insider trading, period.

7              In its opening, the SEC spent a lot of time on a

8    conversation between Mr. Obus and Maurice Andrien, the CEO of

9    SunSource, that happened after the Strickland and Black call.

10   For now, it's important to keep in mind that if you believe

11   Strickland and Black's testimony about their conversation, all

12   that doesn't matter.  There was no tip and there can be no

13   violation.  Put simply, if Strickland and Black did not discuss

14   an acquisition of SunSource, as the SEC claims they did, then

15   whatever happened after their conversation is irrelevant.

16             So what does the SEC say about all this?  They say

17   they're going to prove their case, in essence, by asking you to

18   disregard the testimony of Strickland and Black.  And let's not

19   be fancy about this.  They're saying that my client is a liar,

20   that he's lying about the May 24th call.  I guess they're

21   saying Mr. Strickland's a liar too.

22             What do they base that on?  Well, as I mentioned,

23   Mr. Strickland and Mr. Black were the only two people on the

24   call, and they're going to provide consistent testimony that

25   there was no tip.  Will the SEC call for you as a witness

anyone else who was on the call?  No.  There was no one else on

the call.  Will they call for you anyone who was sitting next

to Strickland or sitting next to Black?  No.  Will they play

for you a tape recording of the call that contradicts what my

client will tell you?  No.  Will they offer a single e-mail, a

single text that contradicts the content of the call?  No.

Nothing like that.  No other witnesses, no tapes, no e-mails,

no texts.

        And to top it off, ladies and gentlemen, not a single

witness in this trial, other than Mr. Strickland and my

client's colleagues at Wynnefield, ever met or spoke to Peter

Black.  No one from SunSource, GE or Allied is going to take

that stand and say they ever met Peter Black, ever spoke to

Peter Black.

        Moreover, you'll learn that Strickland and Black

received no benefit from any of this.  They were close friends

before, during and after the May 24th call.  There will be no

evidence presented that Strickland ever sought any kind of

payment or other benefit from Black in connection with the call

or that Black ever offered to pay or provide such a benefit.

Because it didn't happen.  No tip, no benefit, no motive, no

case.

        So what does the SEC do?  They'll ask you to conclude

that my client engaged in insider trading based on certain

events that happened after his call with Strickland.  Let me

turn briefly to those events.  After my client spoke with
Mr. Strickland, what did he do?  He told his boss, Mr. Obus,
about the call.  Why?  This is what he was supposed to do as an
employee.

Mr. Black will tell you that he told Mr. Obus about
any business-related call he got.  He didn't filter calls from
Mr. Obus, especially when they were about a company he wasn't
following and Mr. Obus was.  He said something like, my friend
called, he works at GE, he asked a few questions about
SunSource and said they're thinking of working with SunSource.
In short, it was just like the calls I got all the time.  You
own company X, we're thinking of working with them, why do you
like them?  That's it.

Mr. Black didn't turn and say, oh, boy, Nelson, we've
got a hot tip here, let's go out and buy some SunSource.  He
didn't direct the trader at Wynnefield to buy SunSource.  Of
course, he couldn't direct anyone to buy anything at Wynnefield
because he had no authority to do so.  All he did was report
the call to his boss, as he was supposed to do, as he did all
the time.

As I mentioned earlier, Mr. Black had received
training in the insider rules, insider trading rules.  He knew
what material, nonpublic information was, and he knew he
couldn't trade on it.  Indeed, you'll learn of instances
involving other companies where he received such information,

1   and he and Mr. Obus agreed that Wynnefield could not trade.

2   But this wasn't that kind of situation.  He'd received a

3   high-level inquiry, and he passed it onto his boss.

4           Well, what happened after Mr. Black told Mr. Obus

5   about the call?  You heard this from my colleague, Joel Cohen.

6   In December of 2000, SunSource had taken out a large loan that

7   was structured in such a way that hurt long-term shareholders

8   like Wynnefield, and Mr. Obus had been concerned about that.

9   So now Mr. Obus called Maurice Andrien, the CEO of SunSource,

10  to complain and to confirm his position.  Look, if you're doing

11  another loan like you did in December, please don't do it.

12  It's not fair to long-term shareholders, and you heard that

13  from my colleague.

14          For our purposes, it's very important to focus on what

15  Mr. Black actually heard of the conversation.  Remember I

16  talked about the physical layout of Wynnefield for you?

17  Mr. Black sat across from Mr. Obus.  There was the divider, and

18  the computer monitors between them, stacks of books and papers.

19          First of all, you'll learn that Mr. Black had no idea

20  beforehand that Mr. Obus was going to make the call.  He didn't

21  hear the beginning of the call.  He didn't even know who

22  Mr. Obus was talking about.  He didn't remember Mr. Andrien's

23  name at the time.  Also, Mr. Black didn't hear a single thing

24  Mr. Andrien said because he wasn't on the line.  Then he heard

25  Mr. Obus say something like, one of my guys received a call

1    from someone who worked at a big conglomerate in Fairfield who

2    mentioned that you guys are working on something.

3           And when he heard this, Mr. Black realized for the

4    first time that Mr. Obus was talking about SunSource, and he

5    was making Mr. Strickland's call to him sound more specific

6    than it really was.  So what did he do?  He did what he did

7    every day at Wynnefield when he wanted to get his boss'

8    attention.  He stood out of his chair and waived to him, and he

9    said something like, hey, Nelson, that's my friend you're

10   talking about.  In other words, don't make this sound like more

11   than it is.  Don't get my friend in trouble for something he

12   didn't say or do.

13          As I covered already, there was no tip.  So the last

14   thing Mr. Black wanted was for Mr. Andrien or someone else at

15   SunSource to call over to GE and say, hey, why are you guys

16   talking about something when, in fact, they weren't.  There was

17   no tip.  Don't make it sound like there was one.

18          Well, what happened after the call?  Mr. Black went

19   back to work.  He didn't make any effort to follow up with Brad

20   Strickland or to call him again.  He went back to work.  He

21   wasn't responsible for following SunSource every day, and he

22   spent his time on the other companies that he'd been assigned

23   to follow.

24          And then you'll learn that more than two weeks later,

25   on June 8th, a broker, who my colleague mentioned, named Baron

1    Bruno, made an unsolicited call to the trader at Wynnefield.

2    An unsolicited call is where a broker, on his own, decides to

3    call an investment firm to see if they're interested in buying

4    a stock.  The broker seeks out the firm, not the other way

5    around.  And this broker asked if Wynnefield was interested in

6    buying a block of SunSource stock.  Think about that.  Two

7    weeks after this so-called hot tip, a broker calls on his own

8    to ask if Wynnefield is interested, not the other way around.

9         In any event, as you heard from my colleague, Mr. Obus

10   decided to buy the block, and Mr. Black, Mr. Black didn't even

11   know this happened.  As I mentioned, he had no authority to

12   trade, no authority to buy or sell stocks for Wynnefield.  He

13   had no idea Wynnefield had made the purchase on June 8th.

14        (Continued on next page)

1      MR. M. COHEN:  He didn't know about the purchase until

2   more than a year later.  In spite of having what the SEC says

3   was a hot tip, he didn't know about the trade at the time at

4   all.  This is the heart of the stuff of insider trading.

5      Let me turn to one last event the SEC mentioned.  They

6   talked about a conversation that my client had with Mr.

7   Strickland a year after the events in May 2001 after both of

8   their companies had received subpoenas from the SEC.  And we

9   can be brief about this conversation.  Again, they went up to

10  the conversation, they told you they were going to tell about

11  the conversation, then they tell you what was discussed.

12  Here's hears what you'll learn.  They had a conversation and

13  Mr. Strickland said, you know, we don't really talk about

14  business, Pete; I don't think we talked about SunSource.  And

15  Mr. Black said, no, no, no, Brad, we did; we had that one

16  conversation in May about SunSource.  Remember that?  Mr.

17  Strickland said something like, oh, yeah, I remember.

18  Mr. Black said, okay.  Well, we got to tell the truth,

19  everything will be fine.  And that's that conversation.

20  Nothing mysterious, nothing sinister, no cover up, my client

21  reminding Mr. Strickland about the May 20001 call, and telling

22  him to tell the truth.

23      Ladies and gentlemen, we submit that as this trial

24  unfolds, you'll see that there's just a fundamental lack of

25  evidence to carry the SEC's burden as to Peter Black.  The

1    evidence will show, rather, that Mr. Black got a call at work

2    from Mr. Strickland about SunSource and its management; that he

3    told his boss, Mr. Obus, about the call; that he had no idea

4    Wynnefield had bought SunSource stock until a year later, and

5    that when GE Capital and Wynnefield were both subpoenaed, he

6    told his friend to tell the truth.  And at the end of the day

7    they will not be able to carry their burden of proof as to

8    Mr. Black.

9         What's more, the explanations they offer for their

10   evidence don't make sense and they're not consistent with your

11   common sense and experience.

12        So, ladies and gentlemen, we ask you to keep an open

13   mind and listen carefully to the evidence as it comes in.

14   Consider it in light of your experience and common sense.

15   Listen carefully to Judge Daniels' instruction also.  We submit

16   that when you do this, you'll agree that the SEC has not met

17   its burden of proof as to Mr. Black.

18        At the close of the evidence, we'll have another

19   opportunity to address you in summation and we will ask you to

20   find that Mr. Black is not liable because he did not commit

21   insider trading.  Thank you.

22        THE COURT:  All right, ladies and gentlemen, we're

23   going to adjourn for the day.  We'll continue tomorrow morning

24   with Mr. Riopelle's argument on behalf of -- his opening

25   statement on behalf of Mr. Strickland, then we'll begin with

E5JZOBU6

 1   the first witness.

 2           I'm going to ask you to be inside the jury room before

 3   9:45 so we can start promptly at that time so we can get a good

 4   start tomorrow and start hearing witnesses.  Don't discuss the

 5   case, keep an open mind, I'll see you tomorrow morning at 9:45.

 6           (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E5JZOBU6

1              (In open court; jury not present)

2              THE COURT:  Is there anything we need to address for

3      tomorrow morning?  Yes?

4              MR. RIOPELLE:  Not for tomorrow morning, your Honor.

5      I just want to know if we can leave our materials here in the

6      courtroom overnight.

7              THE COURT:  We will lock the courtroom, but don't

8      leave anything that you'd be too unhappy if it's not here.

9              MR. RIOPELLE:  I understand.

10             THE COURT:  Don't leave anything of value here, but

11     you can leave everything undisturbed, and we'll lock the

12     courtroom.

13             All right, so I'll see everyone at 9:45 tomorrow.

14     We'll continue.  Thank you

15             (Adjourned to May 20, 2014 at 9:45 a.m.)

16

17

18

19

20

21

22

23

24

25